**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| RAJAT SHARMA, Individually and on Behalf of All Others Similarly Situated, | Case No. 22-cv-06935 |
| Plaintiff, | Judge Orelia E. Merchant |
| v. | **CLASS ACTION** |
| RENT THE RUNWAY, INC., JENNIFER Y. HYMAN, SCARLETT O'SULLIVAN, TIM BIXBY, JENNIFER FLEISS, SCOTT FRIEND, MELANIE HARRIS, BETH KAPLAN, DAN NOVA, GWYNETH PALTROW, CARLEY RONEY, DAN ROSENSWEIG, MIKE ROTH, GOLDMAN SACHS & CO. LLC, MORGAN STANLEY & CO. LLC, BARCLAYS CAPITAL INC., CREDIT SUISSE SECURITIES (USA) LLC, PIPER SANDLER & CO., WELLS FARGO SECURITIES, LLC, JMP SECURITIES LLC, KEYBANC CAPITAL MARKETS INC., and TELSEY ADVISORY GROUP LLC, | DEMAND FOR JURY TRIAL |
| Defendants, | |

**CORRECTED AMENDED CLASS ACTION COMPLAINT**
**FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**

## <u>TABLE OF CONTENTS</u>

**Page**

I.    NATURE OF THE ACTION ........................................................................ 1

II.   JURISDICTION AND VENUE ................................................................... 5

III.  PARTIES ..................................................................................................... 6

    A.    Lead Plaintiffs ................................................................................... 6

    B.    Defendant Rent the Runway .............................................................. 7

    C.    The Individual Defendants ................................................................. 7

    D.    The Underwriter Defendants ............................................................ 12

IV.   SUBSTANTIVE ALLEGATIONS .......................................................... 16

    A.    Background ....................................................................................... 16

    B.    As a Result of the COVID-19 Pandemic, Rent the Runway Lost a Substantial Number of Subscribers in 2020 .......................................... 18

    C.    The Company was Unable to Regain Subscriber Momentum in 2021 ................. 19

    D.    Rising Costs and Unsustainable Business Strategies Impair the Company's Ability to Reach Profitability .............................................. 22

        1.    *Increasing Transportation Costs* ........................................ 22

        2.    *Increasing Material Theft of Merchandise* ............................. 23

    E.    Rent the Runway's IPO ................................................................... 25

    F.    The Offering Documents Contained Materially False and Misleading Statements of Fact and Omitted Material Information ......................................... 26

        1.    *The Offering Documents Contained Misstatements and Omissions About Customer Demand for Subscriptions, Failed to Disclose a Material Adverse Trend in that Demand's Purported Momentum, and Falsely Describes Certain Risks as Potential when Such Risks had Already Manifested or Would Foreseeably Occur Shortly After the IPO* ...................................... 27

        2.    *The Offering Documents Contained Misstatements and Omissions About The Company's Shipping Costs and Falsely Described*

*Certain Risks as Potential when Such Risks had Already Manifested or Would Foreseeably Occur Shortly After the IPO* ............. 34

3.  *The Offering Documents Contained Misstatements and Omissions About Thefts and Falsely Described Certain Risks as Potential when Such Risks had Already Manifested or Would Foreseeably Occur Shortly After the IPO* ...................................................... 36

G.  Post-IPO Events ............................................................................. 40

V.   CLASS ALLEGATIONS ............................................................................. 44

VI.  CAUSES OF ACTION ............................................................................. 46

COUNT  I FOR VIOLATION OF SECTION 11 OF THE SECURITIES ACT ........... 46

COUNT  II FOR VIOLATION OF SECTION 12(a)(2) OF THE SECURITIES ACT ............................................................................................. 49

COUNT  III FOR VIOLATION OF SECTION 15 OF THE SECURITIES ACT ........ 51

VII.  PRAYER FOR RELIEF ............................................................................. 52

VIII. JURY DEMAND ............................................................................. 53

Lead Plaintiffs, Delaware Public Employees Retirement System and Denver Employees Retirement Plan ("Lead Plaintiffs"), individually and on behalf of a class of similarly situated persons and entities, allege the following upon information and belief, except as to those allegations concerning Lead Plaintiffs, which are alleged upon personal knowledge. Lead Plaintiffs' information and belief is based upon, among other things, the investigation undertaken by Court-appointed Lead Counsel, Labaton Sucharow LLP, which included a review and analysis of: (i) regulatory filings made by Rent the Runway, Inc. ("Rent the Runway," "RTR," or the "Company") with the U.S. Securities and Exchange Commission (the "SEC"); (ii) Company press releases, transcripts of earnings calls, and other public statements issued and disseminated by the Company; (iii) Company website and marketing materials; (iv) price and volume data for Rent the Runway's Class A common stock; (v) research reports from securities and financial analysts; (vi) news and media reports concerning the Company and other facts related to this action; (vii) interviews with former Rent the Runway employees; and (viii) other publicly available materials and data. Lead Counsel's investigation into the factual matters alleged herein continues and many of the relevant facts are known only by the Defendants (as defined herein) or are exclusively within their custody or control. Lead Plaintiffs believe that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## I.    NATURE OF THE ACTION

1.    This action asserts strict liability and negligence claims for violations of Sections 11, 12(a)(2), and 15 of the Securities Act of 1933 (the "Securities Act") relating to Rent the Runway's initial public offering of 19,550,000 shares of Class A common stock at the offering price of $21.00 per share, including the Underwriter Defendants (as defined herein) overallotment of 2,550,000 shares, commenced on or about October 27, 2021 (the "IPO"). This federal securities

class action is brought on behalf of a Class (as defined herein) consisting of all persons and entities who purchased or otherwise acquired Rent the Runway's publicly traded Class A common stock pursuant and/or traceable to the Offering Documents (as defined herein) for Rent the Runway's IPO, and who were damaged thereby.

2.      Congress passed the Securities Act in the hopes of restoring investor confidence after corporate scandals and the stock market crash of 1929. The Securities Act requires that those who sell securities to the investing public do so on the basis of accurate and fulsome disclosure. The Securities Act creates strict liability for false, misleading, and incomplete statements made in connection with public securities offerings — even if innocently done — in order to protect investors and maintain confidence in our public markets.

3.      Rent the Runway pioneered the concept of internet-based clothing rentals, which the Company refers to as its "Closet in the Cloud." Through their online platform, Rent the Runway's customers can rent clothing for everyday wear or a variety of events using either a subscription or on a one-off basis. At the time of the IPO, customers using a subscription plan accounted for over 80% of the Company's revenues.

4.      Because Rent the Runway's business is based significantly on its customers renting clothing for social and business events, the COVID-19 pandemic essentially wiped-out demand for its service in 2020 when those in-person events were banned throughout much of the country as states issued lockdown orders. During the COVID-19 pandemic, Rent the Runway lost almost two-thirds of its subscribers, decimating its revenue stream.

5.      As a result, the Company was required to take out a loan secured on substantially all of its assets. As the pandemic continued in 2020, the Company depleted its loan. In order to

repay the loan, the Company and the Individual Defendants decided to conduct the IPO and use a substantial amount of the proceeds to pay it off.

6.    To do so, the Company admitted to investors that 2020 was a challenging year for the Company. But the IPO occurred in October 2021 and for that fiscal year, the Offering Documents painted a starkly different picture.[1] In a cover letter contained in the Offering Documents, Defendant Jennifer Y. Hyman — Rent the Runway's co-founder, Chief Executive Officer ("CEO"), and chair of the Company's Board of Directors (the "Board") — told investors that the Company had entered 2020 with momentum behind us, poised for continued growth" and that since then Rent the Runway had "emerged" from the pandemic "stronger as a result of our agility and resilience." The Offering Documents further stated in greater detail that Rent the Runway "*continue[d] to experience strong momentum* in the third quarter of fiscal year 2021" and that the "spread of COVID-19 Delta variant and the trend of continued work from home … *had minimal impact* on our business or financial performance as of the date of [the Offering Documents]."

7.    Unfortunately for investors, the true state of affairs at the Company was materially different than the one portrayed in the Offering Documents.

8.    At the time of IPO, the Company was encountering material difficulties in retaining customers, acquiring new customers, and reacquiring customers that it had lost during the pandemic. Contrary to what was described in the Offering Documents, leading into the IPO, customer subscriptions were trending down with over 100 customers cancelling subscriptions

---

[1] The Company's fiscal year begins on February 1 and ends on January 31 of the following year. All references to (i) fiscal year 2019 relate to the year ended January 31, 2020, (ii) fiscal year 2020 relate to the year ended January 31, 2021, and (iii) fiscal year 2021 relate to the year ending January 31, 2022.

every day. As a result, the Company was not meeting internal subscriber enrollment projections. These trends were discussed at meetings attended by Rent the Runways' leadership, including Defendant Hyman and Defendant Scarlett O'Sullivan.

9.      At the time of the IPO, the Company was also facing runaway shipping costs which rendered its fulfillment business strategy unsustainable. Shipping rented clothing to customers and having that clothing shipped back to the Company is not only one of the Company's largest expenses, its timely and efficiently execution is critical to the Company's ability to succeed.

10.      During the relevant time period, Rent the Runway began by primarily using UPS as its shipping vendor. However, UPS was very expensive, and a decision was made to switch to FedEx in 2019 because it was cheaper. FedEx proved to not be as reliable as UPS and many customers provided the Company with negative feedback or cancelled their subscriptions when they did not receive their items on time. Receiving items on time is critically important for a company that is shipping clothing that is often rented to be worn at a particular event on a particular day. Moreover, after one year of contracting with FedEx, FedEx significantly increased its prices and Rent the Runway was forced to switch back to the already expensive UPS for shipping immediately prior to the IPO.

11.      Finally, at the time of the IPO, the Company was faced with materially increasing theft of its rented products. While theft of merchandise had always been a "huge issue" at Rent the Runway, in 2021 customer theft became an even "larger issue," which led to the loss of millions of dollars in revenue. The trend of increasing thefts was due in part to the Company's introduction of return drop boxes intended to decrease shipping expenses.

12.    Although the Company maintained a fraud processing program, manual intervention required to prevent customer thefts was not utilized and policies and procedures were never put in place to prevent these thefts. At the same time, the Company was only able to obtain successful insurance claims on approximately 35 percent of lost packages and insurance claims were capped at $100 despite most shipments containing items worth more than $100.

13.    As a result of these undisclosed adverse events, trends, uncertainties, and materialized risks, the money raised during the IPO was only able to sustain the Company for so long before it too was depleted, leaving the Company in a dire situation. In September 2022, just one year after the IPO, Rent the Runway announced a major restructuring plan, which included firing approximately 24% of the Company's corporate employees in an effort to save approximately $25 to $27 million in 2023.

14.    It was not until this restructuring was announced that Company finally admitted that its business strategy no longer worked in a post-pandemic world.

15.    As a result of these undisclosed, adverse facts, Rent the Runway's stock plummeted, falling from its offering price of $21.00 per share to close at $1.58 on November 14, 2022, the day this action was filed.

## II.    JURISDICTION AND VENUE

16.    The claims asserted herein arise under and pursuant to Section 11, 12(a)(2) and 15 of the Securities Act, 15 U.S.C. §§ 77k and 77o.

17.    This Court has jurisdiction over this action pursuant to Section 22 of the Securities Act, 15 U.S.C. § 77v, and 28 U.S.C. § 1331.

18.    Venue is properly laid in this District pursuant to Section 22 of the Securities Act and 28 U.S.C. § 1391(b), (c), and (d). Many of the acts and transactions that constitute violations

of law complained of herein, including the dissemination to the public of untrue statements of material facts, occurred in this District.

19.     In connection with the acts alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the United States mails, interstate telephone communications, and the facilities of national securities exchanges.

### III.     PARTIES

#### A.     Lead Plaintiffs

20.     As set forth in the Certification previously filed with the Court (ECF No. 29-3), Lead Plaintiff Delaware Public Employees Retirement System ("DPERS") purchased a significant amount of Rent the Runway's Class A common stock pursuant to and traceable to the Offering Documents, including 27,615 shares purchased in the IPO from an Underwriter Defendant. DPERS purchased Rent the Runway's Class A common stock at a time when only shares offered in the IPO were in the market. DPERS suffered damages as a result of the violation of federal securities laws alleged herein. On June 8, 2023, the Court appointed DPERS as a Lead Plaintiff in this Action (ECF No. 38).

21.     As set forth in the Certification previously filed with the Court (ECF No. 29-3), Lead Plaintiff Denver Employees Retirement Plan ("DERP") purchased a significant amount of Rent the Runway's Class A common stock pursuant to and traceable to the Offering Documents, including 9,700 shares purchased in the IPO from an Underwriter Defendant. DERP purchased Rent the Runway's Class A common stock at a time when only shares offered in the IPO were in the market. DERP suffered damages as a result of the violation of federal securities laws alleged herein. On June 8, 2023, the Court appointed DERP as a Lead Plaintiff in this Action (ECF No. 38).

B.    **Defendant Rent the Runway**

22.    Defendant Rent the Runway is incorporated under the laws of Delaware with its principal executive offices located at 10 Jay Street, Brooklyn, New York. The Company also operates two fulfillment centers, one is Secaucus, New Jersey and one in Arlington, Texas. Rent the Runway's Class A common stock trades on the Nasdaq under the symbol "RENT."

C.    **The Individual Defendants**

23.    At the time of the IPO, Defendant Jennifer Y. Hyman ("Hyman") was the Company's CEO and the Chair of the Board. Defendant Hyman was the Company's co-founder and served as CEO and Chair since March 2009. Leading up to the IPO, Defendant Hyman, together with Defendant Fleiss, were controlling stockholders of the Company through their controlling ownership of Rent the Runway's Class B common stock. Defendant Hyman beneficially owned 3,127,989 shares, or 63.8%, of the Company's Class B common stock at the time of the IPO. Each share of Class B common stock is entitled to 20 votes per share and is convertible into one share of Class A common stock at any time.

24.    At the time of the IPO, Defendant Scarlett O'Sullivan ("O'Sullivan") was Rent the Runway's Chief Financial Officer ("CFO") since September 2015. Defendant O'Sullivan beneficially owned 581,096 shares of the Company's Class A common stock at the time of the IPO.

25.    At the time of the IPO, Defendant Tim Bixby ("Bixby") was a director on the Board since February 2021 and chair of the Board's audit committee. According to the Offering Documents, the Board had determined that Defendant Bixby was an "audit committee financial expert" within the meaning of SEC regulations.

26.    At the time of the IPO Defendant Jennifer Fleiss ("Fleiss") was a director on the Board since March 2009 and member of the Board's nominating and ESG committee. Defendant

Fleiss was the Company's co-founder and served as Rent the Runway's Head of Logistics and Business Development from November 2008 through March 2017. Leading up to the IPO, Defendant Fleiss, together with Defendant Hyman, were controlling stockholders of the Company through their controlling ownership of Rent the Runway's Class B common stock.

27.    At the time of the IPO, Defendant Scott Friend ("Friend") was a director on the Board since July 2009 and was a member of the Board's compensation committee. Defendant Friend was also, at the time of the IPO, a partner at Bain Capital Ventures. At the time of the IPO, Bain Capital Ventures beneficially owned 8,176,418 shares of the Company's Class A common stock. Entities affiliated with Bain Capital Ventures also owned 550,469 shares of the Company's Series E redeemable preferred stock (purchase price of $21.7560 per share), 558,074 shares of the Company's Series F redeemable preferred stock (purchase price of $22.3537 per share), and 135,406 shares of the Company's Series G redeemable preferred stock (purchase price of $14.74096). Defendant Friend served as the Board's lead independent director at the time of the IPO.

28.    At the time of the IPO, Defendant Melanie Harris ("Harris") was director on the Board since July 2021 and was a member of the Board's audit committee.

29.    At the time of the IPO, Defendant Beth Kaplan ("Kaplan") was a director on the Board since February 2014 and was the chair of the Board's compensation committee and a member of the Board's audit committee. Defendant Kaplan served as Rent the Runway's President and Chief Operating Officer ("COO") from September 2012 through September 2015. Defendant Kaplan beneficially owned 885,910 shares of the Company's Class A common stock at the time of the IPO.

30.     At the time of the IPO, Defendant Dan Nova ("Nova") was a director on the Board since February 2010 and was a member of the Board's audit committee and the Board's compensation committee. Defendant Nova was also, at the time of the IPO, a General Partner at Highland Capital Partners. Defendant Nova and Highland Capital Partners beneficially owned 5,104,393 shares of the Company's Class A common stock at the time of the IPO. Entities affiliated with Highland Capital Partners also owned 174,430 shares of the Company's Series E redeemable preferred stock (purchase price of $21.7560 per share), 89,471 shares of the Company's Series F redeemable preferred stock (purchase price of $22.3537 per share), and 915,816 shares of the Company's Series G redeemable preferred stock (purchase price of $14.74096).

31.     At the time of the IPO, Defendant Gwyneth Paltrow ("Paltrow") was a director on the Board since May 2021 and was a member of the Board's nominating and ESG committee.

32.     At the time of the IPO, Defendant Carley Roney ("Roney") was a director on the Board since May 2011 and was member of the Boards nominating and ESG committee. Defendant Roney beneficially owned 37,812 shares of the Company's Class A common stock at the time of the IPO.

33.     At the time of the IPO, Defendant Dan Rosensweig ("Rosensweig") was a director on the Board since November 2012 and was the chair of the Board's nominating and ESG committee and was a member of the Board's compensation committee. Defendant Rosensweig beneficially owned 51,911 shares of the Company's Class A common stock at the time of the IPO

34.     At the time of the IPO, Defendant Mike Roth ("Roth") was a director on the Board since November 2020 and was a member of the Board's compensation committee. Defendant

Roth beneficially owned 67,838 shares of the Company's Class A common stock at the time of the IPO

35.    Defendants Hyman, O'Sullivan, Bixby, Fleiss, Friend, Harris, Kaplan, Nova, Paltrow, Roney, Rosensweig, and Roth are collectively referred to herein as the "Individual Defendants."

36.    Each of the Individual Defendants signed the Registration Statement (as defined herein).

37.    Each of the Individual Defendants participated in the preparation of the Offering Documents and in the making of the materially inaccurate, misleading, and incomplete statements alleged herein.  In particular, the Individual Defendants each reviewed, edited, and approved the Offering Documents, participated in the IPO and solicited the purchase of Rent the Runway's Class A common stock in the IPO to serve their financial interest and those of Rent the Runway.

38.    The Individual Defendants conducted a roadshow for the IPO along with the Underwriter Defendants to solicit the purchase of Rent the Runway's Class A common stock in the IPO.  The Individual Defendants each also reviewed, approved, and delivered to investors the IPO's roadshow presentation, talking points, and script.

39.    In connection with the IPO, the Board adopted a non-employee director compensation program which gave each non-employee director (each Individual Defendant except Defendants Hyman and O'Sullivan): (i) an annual retainer of $40,000, (ii) an additional $15,000 retainer to the lead independent director, (iii) an additional $20,000 retainer to the chair of the audit committee and $10,000 to each other member of the audit committee, (iv) an additional $13,000 retainer to the chair of the compensation committee and $6,500 to each other members of the compensation committee, and (v) an additional $8,000 retainer to the chair of the

nominating and ESG committee and $4,000 to each of the other members of the nominating and ESG committee.  Pursuant to the program, the non-employee directors were entitled to elect to receive restricted stock units (RSUs) in lieu of all or a portion of their annual cash retainers.

40.    Under the non-employee compensation program, expressly adopted in connection with the IPO, Defendant Bixby received $60,000, Defendant Fleiss received $44,000, Defendant Friend received $61,500, Defendant Harris received $50,000, Defendant Kaplan received $63,000, Defendant Nova received $56,500, Defendant Paltrow received $44,000, Defendant Roney received $44,000, Defendant Rosensweig received $54,500, and Defendant Roth received $46,500.

41.    Moreover, the non-employee director compensation program adopted in connection with the IPO, provided that for each of the Individual Defendants (excluding Defendants Hymen and O'Sullivan) that continues to serve on the Board following an annual meeting would receive an annual equity award of RSUs with a grant date value of $165,000.

42.    Also, in connection with the IPO, the Company granted Defendant Hyman and Defendant O'Sullivan each an "IPO RSU Award" equal to 67,842 RSUs on the date of the IPO. RSUs are contractual promises to deliver Class A common stock in the future. Twenty-five percent of the IPO RSU Awards vested on the grant date with the remainder vesting quarterly over the next four years.

43.    Rent the Runway's Amended Charter provides that the Company has agreed to indemnify the Individual Defendants to the fullest extent permitted by law. The Individual Defendants also made certain that prior to the IPO, the Company had purchased millions of dollars of directors' and officers' liability insurance.

### D.    The Underwriter Defendants

44.    Defendant Goldman Sachs & Co. LLC ("GS&Co.") was an underwriter for the IPO, serving as a financial advisor for and assisting in the preparation and dissemination of the materially inaccurate, misleading, and incomplete Offering Documents. Defendant GS&Co. acted as a representative of all of the Underwriter Defendants. Defendant GS&Co. was allocated 5,254,304 shares, before the exercise of the overallotment, in the IPO to sell to the investing public.

45.    Defendant Morgan Stanley & Co. LLC ("Morgan Stanley") was an underwriter for the IPO, serving as a financial advisor for and assisting in the preparation and dissemination of the materially inaccurate, misleading, and incomplete Offering Documents. Defendant Morgan Stanley acted as a representative of all of the Underwriter Defendants. Defendant Morgan Stanley was allocated 4,904,017 shares, before the exercise of the overallotment, in the IPO to sell to the investing public.

46.    Defendant Barclays Capital Inc. ("Barclays") was an underwriter for the IPO, serving as a financial advisor for and assisting in the preparation and dissemination of the materially inaccurate, misleading, and incomplete Offering Documents. Defendant Barclays acted as a representative of all of the Underwriter Defendants.  Defendant Barclays was allocated 2,276,865 shares in the IPO to sell to the investing public before the exercise of the overallotment.

47.    Defendant Credit Suisse Securities (USA) LLC ("Credit Suisse") was an underwriter for the IPO, serving as a financial advisor for and assisting in the preparation and dissemination of the materially inaccurate, misleading, and incomplete Offering Documents. Defendant Credit Suisse was allocated 1,259,259 shares, before the exercise of the overallotment, in the IPO to sell to the investing public.

48.     Defendant Piper Sandler & Co. ("Piper Sandler") was an underwriter for the IPO, serving as a financial advisor for and assisting in the preparation and dissemination of the materially inaccurate, misleading, and incomplete Offering Documents.  Defendant Piper Sandler was allocated 787,037 shares, before the exercise of the overallotment, in the IPO to sell to the investing public.

49.     Wells Fargo Securities, LLC ("Wells Fargo") was an underwriter for the IPO, serving as a financial advisor for and assisting in the preparation and dissemination of the materially inaccurate, misleading, and incomplete Offering Documents. Defendant Wells Fargo was allocated 787,037 shares, before the exercise of the overallotment, in the IPO to sell to the investing public.

50.     JMP Securities LLC ("JMP") was an underwriter for the IPO, serving as a financial advisor for and assisting in the preparation and dissemination of the materially inaccurate, misleading, and incomplete Offering Documents. JMP was allocated 708,333 shares, before the exercise of the overallotment, in the IPO to sell to the investing public.

51.     KeyBanc Capital Markets Inc. ("KeyBanc") was an underwriter for the IPO, serving as a financial advisor for and assisting in the preparation and dissemination of the materially inaccurate, misleading, and incomplete Offering Documents. Defendant KeyBanc was allocated 708,333 shares, before the exercise of the overallotment, in the IPO to sell to the investing public.

52.     Defendant Telsey Advisory Group LLC ("Telsey") was an underwriter for the IPO, serving as a financial advisor for and assisting in the preparation and dissemination of the materially inaccurate, misleading, and incomplete Offering Documents. Defendant Telsey was

allocated 314,815 shares, before the exercise of the overallotment, in the IPO to sell to the investing public.

53.      Defendants GS&Co., Morgan Stanley, Barclays, Credit Suisse, Piper Sandler, Wells Fargo, JMP, KeyBanc, and Telsey may herein be referred to at times as the "Underwriter Defendants."

54.      Defendant Rent the Runway, the Individual Defendants, and the Underwriter Defendants may herein be referred to at time as the "Defendants."

55.      The Underwriter Defendants are investment banking houses which specialize in, among other things, underwriting public offerings of securities. The Underwriter Defendants' participation in and their solicitation of purchases of Rent the Runway's Class A common stock in the IPO was motivated by their financial interests. Collectively, the Underwriter Defendants received over $27 million in fees and commissions in connection with their sale of Rent the Runway's Class A common stock in the IPO.

56.      The Underwriter Defendants determined that in return for their share of the IPO's proceeds, they were willing to merchandise Rent the Runway's Class A common stock in the IPO. The Underwriter Defendants arranged for a roadshow prior to the IPO during which they and the Individual Defendants met with investors and presented highly favorable information about the Company, its operations, and its financial prospects.

57.      The Underwriter Defendants also demanded and obtained an agreement from Rent the Runway that the Company would indemnify and hold the Underwriter Defendants harmless from any liability under the federal securities laws. They also made certain that the Company purchased millions of dollars of directors' and officers' liability insurance.

58.     The Underwriter Defendants assisted Rent the Runway and the Individual Defendants in planning the IPO, and purportedly conducted an adequate and reasonable investigation into the business and operations of the Company, an undertaking known as a "due diligence" investigation. The due diligence investigation was required of the Underwriter Defendants in order to engaged in the IPO. During the course of their purported "due diligence," the Underwriter Defendants had continual access to confidential corporate information concerning Rent the Runway's operations and financial prospects.

59.     In addition to availing themselves of virtually unbridled access to internal corporate documents, the Underwriter Defendants had access to the Company's lawyers, management, and directors and top executives (including the Individual Defendants) to determine: (i) the strategy to best accomplish the IPO; (ii) the terms of the IPO, including the price at which the Company's Class A common stock would be sold; (iii) the language to be used in the Offering Documents; (iv) what disclosures about the Company would be made in the Offering Documents; and (v) what responses would be made to the SEC in connection with its review of the Offering Documents. As a result of those constant contacts and communications between the Underwriter Defendants and the Company's lawyers, management, directors, and top executives (including the Individual Defendants), at a minimum, the Underwriter Defendants were negligent in not knowing of the materially untrue statements and omissions contained in the Offering Documents as detailed herein.

60.     The Underwriter Defendants caused the Offering Documents to be filed with the SEC and to be declared effective in connection with offers and sales of the Company's Class A common stock pursuant and/or traceable to the IPO and the Offering Documents, including to Lead Plaintiffs and the Class.

## IV.    SUBSTANTIVE ALLEGATIONS

### A.    Background

61.    Founded in 2008, Rent the Runway pioneered the concept of online clothing rentals, which the Company describes as "The Closet in the Cloud." According to Rent the Runway, "the Closet in the Cloud is the world's first and largest shared designer closet that has transformed the way that women get dressed by letting them wear whatever they want without having to own it. Our mission is to empower women to feel their best every day and to encourage millions of customers to buy fewer clothes and use our shared closet instead."

62.    To facilitate consumers' access to its digital closet the Company uses an online portal, which it describes as a "proprietary operating system for the sharing economy of physical goods." Through this platform, consumers are able to choose from over 750 designer clothing brands to suit their particular fashion needs, including over 18,000 clothing styles ranging from formal attire to business casual. Because the Company is able to rent the same piece of clothing to multiple customers, it is able to offer access to its service at a price affordable to most consumers.

63.    A Rent the Runway customer is able to access the Company's digital closet in one of three ways. First, Rent the Runway offers a subscription plan whereby a customer can sign up for a recurring monthly subscription that allows them to order a certain number of items at a fixed price. As of the time of the IPO, Rent the Runway offered four subscription plans allowing customers to rent 4, 8, 12, or 16 items per month.

64.    The Company also allows customers to make one-time rentals through what it describes as its "reserve" offering. The reserve offering consists of a-la-carte rentals, typically used for special occasions, which can be booked up to 4 months in advance. Customers, who include subscribers, have the option to rent items for four or eight days at rental rates per item

16

which typically range from $5 to $525. Reserve customers receive one primary item and can select a complimentary backup size, as well as a backup style at a discounted price.

65.    Rent the Runway also sells its clothing through what the Company describes as its resale offering. Through the resale option subscribers and customers can purchase pre-worn items from the Company's digital closet without having to sign up for a subscription or return the item to Rent the Runway.

66.    While reserve and resale contribute to the Company's bottom line, subscriptions account for the vast majority of the Company's revenue, bringing in approximately 80 percent of the Company's revenue. Indeed, the Company primarily sees its reserve and resale offerings as a way of converting new customers into subscribers. As Rent the Runaway explained in the Offering Documents: "We attract new subscribers directly into our Subscription offering, and through conversions of customers into subscribers from our Reserve and Resale offerings. Reserve has historically been a productive funnel into our Subscription offering, and we believe our Resale offering could provide a similar opportunity to drive acquisition into our Subscription offering."

67.    The value proposition for customers is clear. By renting clothing instead of buying it customers are able to wear many pieces of clothing they may not otherwise be able to afford. According to the Offering Documents, the average subscriber gets to wear clothes worth more than twenty times what she pays for a monthly subscription on an annualized basis, i.e., more than $37,000 in designer retail value annualized for the first six months of fiscal year 2021.

68.    Rent the Runway also portrays itself as a data driven technology company and proudly touts that it captures "a vast amount of unique, actionable data on our customers and products."

69.     Although the Company has never been profitable and has operated at a net loss since its inception, Defendant Hyman told investors though a letter included in the Offering Document that it "entered 2020 with momentum behind [it], poised for continued growth."

**B.     As a Result of the COVID-19 Pandemic, Rent the Runway Lost a Substantial Number of Subscribers in 2020**

70.     In early 2020, the COVID-19 virus entered the United States and began to spread rapidly.  Due to the uncontrolled spread of the virus, nearly every state in the United States issued an unprecedented public safety mandate: lockdown or shelter-in-place orders requiring most people to stay in their homes and requiring non-essential businesses to close in order to mitigate the spread of COVID-19.  Social gatherings were rapidly cancelled as people isolated in an effort to mitigate the spread of the virus.

71.     As a result, people had less of a need for the designer clothing they traditionally rented from Rent the Runway, causing an almost immediate contraction of the Company's customer base. As Defendant Hyman explained on a podcast on July 28, 2022, Rent the Runway lost 50% of its subscribers in a five-day period at the outset of the pandemic.

72.     Immediately before the pandemic, Rent the Runway had 147,866 ending active subscribers[2] as of the end of 2019. One year later, that number plummeted to 95,245 ending active subscribers as of the end of 2020. By July 31, 2021, less than three months before the IPO, Rent the Runway had grown that number by just over 2,000 subscribers to 97,614.

73.     Nevertheless, the Offering Documents told investors Rent the Runway emerged from the pandemic "stronger as a result of [its] agility and resilience during the pandemic."

---

[2] Rent the Runway defines ending active subscribers as ending total subscribers as of period end, excluding paused subscribers.

74.    Undeniably, fiscal year 2020 was challenging for the Company and the Offering Documents disclosed as much.

75.    However, the IPO occurred in October 2021 and for that fiscal year the Offering Documents painted a starkly different picture.  According to the Offering Documents, Rent the Runway "***continue[d] to experience strong momentum*** in the third quarter of fiscal year 2021" and that the "spread of COVID-19 Delta variant and the trend of continued work from home … ***had minimal impact*** on our business or financial performance as of the date of [the Offering Documents."

**C.    The Company was Unable to Regain Subscriber Momentum in 2021**

76.    Unbeknownst to investors, Rent the Runway was in fact, at the time of the IPO, encountering material difficulties in retaining customers, acquiring new customers, and reacquiring customers that it lost at the outset of the pandemic. Indeed, multiple Rent the Runway former employees ("FE") explained that leading into the IPO the Company was struggling at the time of the IPO to sign up subscribers.

77.    FE-1 was employed by Rent the Runway as a Manager in the Customer Experience department from November 2020 to September 2022. In that role, FE-1 was responsible for, among other things, overseeing fifteen Customer Experience team leaders, managing Rent the Runway's contact center, and meeting with the Finance department regarding Customer Experience costs. FE-1 reported to Becky Hyman Leader, RTR's vice president of Customer Experience.[3]

78.    FE-1 recalled that Rent the Runway was not meeting its enrollment subscriber projections at the time of its October 2021 IPO. According to FE-1, subscriptions leading up to

---

[3] Becky Hyman Leader is the sister of Defendant Hyman.

the IPO were "down every day." FE-1 detailed that over 100 Rent the Runway customers were cancelling/churning their subscriptions per day and noted that as a result, a team of seven Rent the Runway agents was created to exclusively work on customer cancellations. FE-1 noted that it was rare when less than 100 customers cancelled their subscriptions in a day.

79.     FE-1 recalled that she attended monthly all-hands meetings during her tenure at Rent the Runway remotely, aside for two or three she attended in person.[4] FE-1 detailed Rent the Runway's leadership, including Defendant Hyman, discussed, and presented on the current state of the Company's business during these meetings. According to FE-1, Defendant O'Sullivan's presentations during these meetings reflected that the Company's subscriber enrollments were "consistently down" and not meeting its projections.

80.     FE-2 joined Rent the Runway in customer service in November 2017. In May 2021, FE-2 was promoted to Training Specialist responsible for training customer experience employees, among other things. FE-2 departed Rent the Runway in November 2021. FE-2 reported to former Rent the Runway Director of Training and Quality Development Ashley Ostrowski.

81.     FE-2 stated that she worked "closely" with Becky Hyman Leader, and regularly attended remote meetings with Hyman Leader, Ostrowski, subscriber teams and other Customer Operations managers, which were held either monthly or bi-weekly leading up to the October 2021 IPO. FE-2 recalled that Rent the Runway's overall performance, and specifically the Company's subscriber enrollment figures, were shared and discussed during these meetings.

---

[4] For ease of comprehension and readability, the Complaint uses the pronoun "she" and possessive "her" in connection with former Rent the Runway employees. This convention, however, is not meant to identify the actual gender of any of the former employees.

82.     FE-3 was an Operations Manager from before the IPO to May 2022. According to FE-3, she was responsible for planning and budgeting and for completing and preparing one of Rent the Runway's fulfillment center's workload.

83.     According to FE-3, Rent the Runway held companywide Zoom meetings every two weeks or monthly. FE-3 recalled that from approximately August 2021 to December 2021, it was mentioned during these meetings that Rent the Runway was not meeting its subscriber enrollment projections. Specifically, FE-3 detailed that "multiple speakers," including Defendant Hyman and Defendant O'Sullivan, said that the Company is "going through rough times because we're not getting as many subscribers as we want."

84.     FE-4 joined Rent the Runway as Senior Operations Manager, Outbound and Inventory Control and Quality Assurance ("ICQA") in September 2019 and transitioned to Senior Manager, Operations Integration and ICQA in August 2021. FE-4 left the company in December 2022.

85.     FE-4 stated that Rent the Runway began holding monthly companywide Zoom meetings "as soon as" COVID hit and noted that these meetings were later held every two to three months after COVID subsided. According to FE-4, Defendant Hyman hosted these meetings and presented to the Company current subscriber statistics and projected future subscriber statistics, among other things. FE-4 recalled that during at least one of these meetings held at the "tail end of COVID," either Defendant Hyman or Defendant O'Sullivan mentioned that Rent the Runway did not meet its subscriber enrollment projections at that time.

86.     Moreover, on the same July 2022 podcast mentioned above, Defendant Hyman essentially admitted that the Company had no plan during the pandemic or before its IPO on how

to reacquire the customers it lost during the pandemic, explaining that "I truly believe that COVID was the first time in my life where I felt that optimism is actually a strategy."

**D.      Rising Costs and Unsustainable Business Strategies Impair the Company's Ability to Reach Profitability**

87.      Compounding the Company's subscriber loss and faltering momentum, Rent the Runway experienced substantial cost increases as a result of unsustainable fulfillment business strategies and increasing theft.

88.      One of the largest costs incurred by the Company preceding the IPO related to transportation and shipping. As an e-commerce platform that depended on quickly and efficiently shipping its clothing to customers, Rent the Runway was highly dependent on shipping, and, as a result, at the mercy of transportation costs.

**1.      *Increasing Transportation Costs***

89.      According to FE-1, a lot of Rent the Runway customers were frustrated with shipping delays during her tenure.

90.      FE-1 stated that most subscribers cancelled due to quality issues with the items and because of carrier (freight) problems.

91.      FE-1 stated that Rent the Runway was "constantly" searching for different carriers to lower costs. FE-1 detailed that Rent the Runway switched carriers from UPS to FedEx to save money and utilized a local carrier in New York, New York referred to as last mile couriers, which was cheaper than FedEx but "less reliable." She described the last mile couriers as 100% less reliable than FedEx and UPS but cheaper.

92.      Due to significant cost increases after the first year of contracting with FedEx, as well as reliability issues, Rent the Runway was forced to switch back to using the prohibitively expensive UPS for shipping.

93.     According to FE-4, FedEx had doubled the Company's shipping rates because it was not shipping enough, which caused "panic" for 30 days until the Company switched to UPS.

94.     It has been reported that this change back to UPS occurred in August 2021 and the Offering Documents themselves disclose that the Company was in the process of transitioning shipping vendors at the time of the IPO.

95.     Also, prior to the IPO, the Company was attempting to lower shipping costs by setting up physical drop boxes for customers to use to return their orders.

### 2.     *Increasing Material Theft of Merchandise*

96.     Finally, at the time of the IPO the Company was facing a material increase in theft of rented merchandise, while the Company turned a blind eye and insurers denied coverage.

97.     FE-1 stated that customer theft was an issue during her tenure at Rent the Runway and detailed that a "notorious" customer stole $100,000 worth of merchandise. According to FE-1, Defendant Hyman and Becky Hyman Leader were aware of the theft issue but did not take any actions to stop them and ignored recommendations from employees, including former Rent the Runway Customer Experience Fraud Analyst Lindsay Gulla, to help prevent thefts. FE-1 detailed that Rent the Runway maintained *Signifyd*, a fraud processing program, but that manual intervention was required to prevent customer thefts but not utilized. FE-1 recalled that when customers stole items from Rent the Runway, no actions were taken against those customers, aside from preventing them from placing new orders.

98.     According to FE-2, customer and employee thefts were a "huge issue" during her tenure at Rent the Runway.  Moreover, FE-2 noted that customer theft became a "larger issue" in 2021. FE-2 estimated that the Company lost at least $500,000 every two months in revenue directly from thefts. FE-2 detailed that some customers scanned their items to return at drop boxes

23

located throughout the country but kept the items instead of returning them. FE-2 recalled that one customer stole between $20,000 and $40,000 worth of merchandise from Rent the Runway.

99.     FE-5 was employed with Rent the Runway from March 2019 to July 2021 as a senior employee in Asset Protection.

100.    According to FE-5, the Company's revenue loss from stolen items during FE-5's tenure was "quite substantial." FE-5 detailed the following ways in which Rent the Runway items were stolen: (1) some customers scanned items to return at Rent the Runway drop boxes located throughout the country but kept the items instead of returning them, (2) some Rent the Runway employees or third-party vendors in charge of shipping returned items from customers at these drop boxes only shipped some of the scanned items back to Rent the Runway and kept the other items, and (3) some Rent the Runway employees or staffing agency employees stole items from Rent the Runway's Secaucus, New Jersey and Arlington, Texas fulfillment centers.

101.    According to FE-5, Rent the Runway did not have any policies or procedures in place to prevent thefts. FE-5 recalled that in 2019 she approached former Rent the Runway Director of Operations Chris Brougham about creating policies and procedures to prevent these thefts from occurring, but that Rent the Runway never addressed this issue during FE-5's tenure.

102.    FE-5 noted that lost revenue from thefts "never got better" during her tenure.

103.    FE-6 joined Rent the Runway as a Customer Experience Operations Manager in June 2019 and departed as Manager, Transportation Execution in July 2021. FE-6 advised that as Manager of Transportation Execution, she was responsible for increasing shipping efficiency, acting as a liaison between customers and the RTR Transportation team and dealing with shipping carrier claims.

104. FE-6 recalled that Rent the Runway lost a significant amount of money on inventory during his tenure. FE-6 detailed that "tons" of customer packages were lost and that Rent the Runway was only able to obtain successful insurance claims on approximately 35 percent of those packages. FE-6 also noted that customers during her tenure were "robbing us blind" and explained that when some customers went to return items worth $6,000 and more at drop boxes at *Nordstrom* and *West Elm*, they scanned their items for return but kept the items and subsequently sold them on *Poshmark* and other platforms. FE-6 noted that most customer thefts occurred at drop boxes at *WeWork* locations.

105. FE-6 noted that insurance claims were capped at $100 per shipment plus shipping costs because RTR did not pay for insurance when it shipped items to customers. FE-6 explained that since most shipments contained items worth more than $100, the revenue loss from these lost packages was "pretty significant."

### E.    Rent the Runway's IPO

106. On or about October 27, 2021, the Defendants conducted Rent the Runway's IPO, in which the Defendants sold 19,550,000 shares of Class A common stock to the public, including an underwriter over-allotment option of 2,550,000 shares. As a result of the shares of Class A common stock offered in the IPO, Rent the Runway received $377.3 million after deducting expenses and underwriting discounts and commissions.

107. The IPO was conducted pursuant to, and the sale of Rent the Runway stock was solicited by, several documents filed by the Defendants with the SEC and disseminated by the Defendants to the investing public, including: (i) a registration statement on Form S-1, which following amendment, was declared effective by the SEC on October 26, 2021 (the "Registration Statement"), and (ii) final prospectus dated October 26, 2021, which forms part of the Registration

25

Statement, on Form 424(b)(4) (the "Prospectus" and, together with the Registration Statement, the "Offering Documents.").

108.    The Prospectus stated that it was "an offer to sell" Rent the Runway's Class A common stock.

109.    The Offering Documents stated that "[n]either [Rent the Runway] nor any of the underwriters have authorized anyone to provide any information or to make any representations other than those contained in this [P]rospectus or in any related free writing prospectuses [Rent the Runway] ha[s] prepared."

110.    Lead Plaintiffs and other members of the Class purchased or otherwise acquired Rent the Runway's Class A common stock pursuant and/or traceable to the IPO and the Offering Documents and were damaged thereby.

**F.    The Offering Documents Contained Materially False and Misleading Statements of Fact and Omitted Material Information**

111.    The Offering Documents were negligently prepared, and as a result, contained untrue statements of material fact, omitted material facts necessary to make the statements contained therein not misleading, and failed to make adequate disclosures required under the rules and regulations governing its preparation.

112.    Section 11 creates liability against each of the Defendants for each: (1) misstatement, (2) omission in contravention of an affirmative legal disclosure obligation, and (3) omission of information that is necessary to prevent existing disclosures from being misleading, in the Offering Documents.

113.    Additionally, pursuant to SEC Regulation C, the Offering Documents were required to disclose material information necessary to ensure that representations in the Offering Documents were not misleading. Specifically, Rule 408, 17 C.F.R. § 230.408(a), states that "[i]n

addition to the information expressly required to be included in a registration statement, there shall be added such further material information, if any, as may be necessary to make the required statements, in [] light of the circumstances under which they are made, not misleading."

114.    Further, Defendants were required to comply with Item 303 of Regulation S-K, 17 C.F.R. § 229.303. Specifically, Item 303 and the SEC's related interpretive releases thereto, requires issuers to disclose events and uncertainties, including any known trends that have had or are reasonably likely to cause the issuer's financial information not to be indicative of future operating results.

115.    Moreover, Defendants were also required to comply with Item 105 of Regulation S-K, 17 C.F.R. § 229.105. Specifically, Item 105 requires that the Offering Documents furnish, among other things, a discussion of the most significant factors that make the IPO speculative or risky.

1.    ***The Offering Documents Contained Misstatements and Omissions About Customer Demand for Subscriptions, Failed to Disclose a Material Adverse Trend in that Demand's Purported Momentum, and Falsely Describes Certain Risks as Potential when Such Risks had Already Manifested or Would Foreseeably Occur Shortly After the IPO***

116.    The Offering Documents misrepresented that state of demand for Rent the Runway's subscription service. Indeed, though the Company was consistently failing to meet its subscriber projections leading up to the IPO, it touted to investors a purportedly steep upward trend of new subscriptions and represented to investors that it was continuing. As a result, the Offering Documents contained untrue statements of material facts, omitted to state other facts necessary to make the statements contained therein not misleading, and was not prepared in accordance with the rules and regulations governing its preparation.

117.    There was no hiding from the fact that 2020 had been a disastrous year for the Company. According to the Offering Documents, the Company ended fiscal year 2019 (March 31, 2020 with 147,866 total subscribers and 133,572 active subscribers (which excludes paused subscriptions). On the other hand, the Company ended fiscal year 2020 (March 31, 2021) with 95,245 total subscribers and 54,797 active subscribers.  This represented a loss of over 35% of total subscribers and over 59% of active subscribers.

118.    However, the Offering Documents proudly touted that the Company had nearly made up those subscription losses in 2021. According to the Offering Documents, the Company grew active subscribers to 111,732 as of September 30, 2021, which represented a 104% growth since the beginning of fiscal year 2021 — only six months prior. Moreover, the Offering Documents reported that total subscribers as of September 30, 2021, had grown to 143,464 subscribers which represented 97% of the total subscribers at the end of the fiscal year 2019.

119.    In the very same paragraph of the Offering Documents under the title "Recent Developments," the Defendants told investors that the Company "continue[s] to experience strong momentum in the third quarter of fiscal year 2021" and that "the spread of the COVID-19 Delta variant and the trend of continued work from home has had minimal impact on our business or financial performance as of the date of this prospectus."  The Offering Documents stated more fully, in pertinent part, the following:

> *We continue to experience strong momentum in the third quarter of fiscal year 2021. The spread of the COVID-19 Delta variant and the trend of continued work from home has had minimal impact on our business or financial performance as of the date of this prospectus*, but we continue to monitor the situation. We grew to 111,732 active subscribers as of September 30, 2021, representing 104% growth since the beginning of fiscal year 2021. Active subscribers also grew 14% from the end of our second fiscal quarter on July 31, 2021 to September 30, 2021. Our total subscribers as of September 30, 2021 grew to 143,464 subscribers

including paused and active subscribers representing 97% of the
total subscribers at the end of fiscal year 2019.

120.    Likewise, under the heading "Impact of COVID-19 on Our Business" the
Defendants acknowledged that the "COVID-19 pandemic materially adversely affected [the
Company's] fiscal year 2020 operating and financial results," but the Offering Documents went
on to claim that "[a]s COVID-19 restrictions have been relaxed and virus positivity rates have
declined, [the Company had] seen increased demand for [its] offerings" and thus "[a]s of the date
of this prospectus, our operations and customer demand have not been significantly impacted."
The Offering Documents stated more fully, in pertinent part, the following:

> The COVID-19 pandemic materially adversely affected our fiscal
> year 2020 operating and financial results. Beginning in March
> 2020, positivity rates and shelter-in-place restrictions significantly
> reduced consumer demand for our Subscription and Reserve
> offerings due to a sharp decrease in interactions outside the home,
> social gatherings, special events and in-office work. Unlike the
> retail model where a customer can invest in an article of clothing
> to wear in the future, we primarily operate a "rent now, wear now"
> subscription model where subscribers are picking items for
> immediate use. Throughout 2020, we observed that consumer
> demand decreases were closely tied to COVID-19 positivity rates
> and social distancing/shelter-at-home restrictions. ***As COVID-19
> restrictions have been relaxed and virus positivity rates have
> declined, we have seen increased demand for our offerings.*** The
> first Delta variant case was identified in December 2020, and the
> variant soon became the predominant strain of the virus and by the
> end of July 2021, the Delta variant was the cause of more than 80%
> of new U.S. COVID-19 cases. As a result, new restrictions are
> being contemplated and implemented by workforces and federal,
> state and local government officials. ***As of the date of this
> prospectus, our operations and customer demand have not been
> significantly impacted***, but we continue to monitor the situation.

121.    The statements in ¶¶118-20 were false and misleading statements of material fact
when made because they failed to disclose material adverse facts, material adverse trends,
material uncertainties, or significant risks that existed at the time of the IPO. Rather than
continuing to "experience strong momentum" and seeing "increased demand" that was not being

29

"significantly impacted" by COVID-19, the Company's number of subscribers was materially trending down at the time of the IPO and the Company was materially not meeting internal subscriber enrollment projections.

122. The Offering Documents inaccurately described as **_potential_**, certain future risks associated with acquiring new subscribers, reacquiring subscribers the Company had lost during the pandemic, and retaining subscribers, which "may" or "could" have an adverse effect on its business, financial condition, and results of operations, rather than disclosing the actual events and trends or uncertainties that had already manifested at the time of the IPO.

123. The Offering Documents touted that the Company had "grown rapidly over the last several years" and that "[a]though the COVID-19 pandemic had materially adversely affected [the Company's] fiscal year 2020 operating and financial results," the Company's "revenue increased 39.4% from 33.5 million for the three months ended April 30, 2021 to $46.7 million for the three months ended July 31, 2021." The Offering Documents also claimed that the Company "may experience significant growth in the future" or "[i]f [the Company's] growth rate declines, investor's perception of our business, financial condition and results of operations may be adversely affected" and "[t]o the extent [the Company's] growth rate slows, our business performance will become increasingly dependent on our ability to retain revenue from existing subscribers and increased sales to existing customers." The Offering Documents stated, in pertinent part, as follows:

> **_We have grown rapidly in recent years and have limited experience at our current scale of operations. If we are unable to manage our growth effectively, our brand, company culture, and financial performance may suffer._**
>
> **_We have grown rapidly over the last several years, due in large part to the growth in demand for our subscription offerings_**, and therefore, our recent growth rates and financial performance should not necessarily be considered indicative of our future performance.

*Although the COVID-19 pandemic has materially adversely affected our fiscal year 2020 operating and financial results, resulting in our total revenue decreasing 38.7% from $256.9 million in fiscal year 2019 to $157.5 million, our revenue increased 39.4% from $33.5 million for the three months ended April 30, 2021 to $46.7 million for the three months ended July 31, 2021* and we may experience significant growth in the future.

*    *    *

Our plans and offerings do not have demonstrably long track records of success and may not grow as much or as fast as we expect. *If our growth rate declines, investors' perception of our business, financial condition and results of operations may be adversely affected. To the extent our growth rate slows, our business performance will become increasingly dependent on our ability to retain revenue from existing subscribers and increased sales to existing customers.*

124.    The Offering Documents also stated, in pertinent part, that:

*Our continued growth depends on our ability to attract new, and retain existing, customers, which may require significant investment in paid marketing channels. If we are unable to cost-effectively grow our customer base, our business, financial condition and results of operations would be harmed.*

*    *    *

The growth of our business is dependent upon our ability to continue to grow by cost-effectively adding new customers. Historically, a substantial portion of new customer acquisition has originated from organic word-of-mouth and other non-paid referrals. Although we will continue to encourage customer engagement, loyalty, and word-of-mouth referrals, there is no guarantee that we will be successful and our organic growth may decline…. *Moreover customer preferences may change and customers may not rent through our platform as frequently or spend as much with us. If we are not able to continue to expand our customer base through cost-effective methods, our revenue may grow slower than expected or decline*. Relatedly, an inability to attract and retain customers could harm our ability to attract and retain brand partners, who may decide to partner with alternative platforms.

125.    The Offering Documents also stated, in pertinent part, that:

> *If we fail to retain customers, our business, financial condition, and results of operations would be harmed.*
>
> A high proportion of our revenue comes from highly engaged subscribers. For the six months ended July 31, 2021, 83% of our total revenue was generated by our subscribers. *A decrease in the number of existing customers or a reduction in the amount existing customers spend on our offerings could negatively affect our operating results.*
>
> *Our number of customers and the amounts they spend on our offerings may decline materially or fluctuate as a result of many factors, including, among other things: … changes in efficiency of our historic or current customer acquisition methods….*
>
> \*        \*        \*
>
> If existing customers no longer find our offerings and products appealing or appropriately priced or if we are unable to provide high-quality support to customers to help them resolve issues in a timely and acceptable manner, they may stop using our offerings, negative publicity may be generated and word-of-mouth and other referrals may be hampered. *Even if our existing customers continue to find our offerings and products appealing and our customer service satisfactory, they may decide to downgrade to a less frequent, lower cost subscription and rent fewer items over time as their demand for apparel and accessories declines*. For example, as a result of changes to daily life due to the COVID-19 pandemic, including increased rates of working remotely from home, many customers' demand for a variety of apparel was, and in the future may be, reduced or eliminated. *If customers who rent most frequently and rent a significant amount of items from us were to make fewer or lower priced rentals or stop using our offerings, our financial results could be negatively affected*.

126.    The statements in ¶¶123-25 were each inaccurate statements of material fact when made because while noting only the *potential* negative impacts on the Company's business, financial condition, and results of operations, the Offering Documents failed to disclose the following significant, *then-existing* material events and adverse trends or uncertainties that Rent the Runway *had already been* facing at the time of the IPO:

      (a)     Rent the Runway's growth rate was slowing and declining;

      (b)     The Company was failing to attract new customers and retain existing customers; and

      (c)     The number of subscribers was trending down and the Company was not meeting internal subscriber enrollment projections.

127.    Item 303 of SEC Regulation S-K, 17 C.F.R. §229.303(a)(3)(ii), required the Defendants to "[d]escribe any known trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable or unfavorable impact on the sales or revenues or income from continuing operations." Similarly, Item 105 of SEC Regulation S-K, 17 C.F.R. §229.105, requires, in the "Risk Factors" section of registration statements and prospectuses, "a discussion of the most significant factors that make the offering speculative or risky" and requires each risk factor to "adequately describe[] the risk." The failure of the Offering Documents to disclose the omitted material facts set forth above in ¶¶121 and 126 — *i.e.,* that at the time of the IPO the number of subscribers was trending down at the time of the IPO, the Company was not meeting projected subscriber enrollments, the Company's growth rate was slowing and declining, and the Company was failing to attract new customers and retain existing customers — violated Item 303, because these undisclosed facts were known and would (and did) have an unfavorable impact on the Company's sales, revenues, and income from continuing operations. This also violated Item 105, because these specific risks were not adequately disclosed, or disclosed at all, even though they were some of the most significant factors that made an investment in Rent the Runway's Class A common stock speculative or risky. Indeed, as alleged above in ¶¶123-126, the purported Risk Factors that were provided in the Offering Documents were themselves materially false and misleading when made.

2.  ***The Offering Documents Contained Misstatements and Omissions About The Company's Shipping Costs and Falsely Described Certain Risks as Potential when Such Risks had Already Manifested or Would Foreseeably Occur Shortly After the IPO***

128.  The Offering Documents told investors that "[a] substantial majority of [its] inbound shipments from customers are currently returned through a single vendor" and the Company was "currently in the process of transitioning" shipping vendors but claimed that it could not "predict how this transition may impact [the Company's] costs and [the Company's] customer sentiment and satisfaction."  The Offering Documents stated, in pertinent part, as follows:

> We currently rely on several third-party national and regional shipping vendors for our outbound and inbound logistics. ***A substantial majority of our inbound shipments from customers are currently returned through a single vendor—we have from time to time transitioned, and are currently in the process of transitioning, inbound shipments from this vendor to multiple other vendors, and we cannot predict how this transition may impact our costs and our customer sentiment and satisfaction***.

129.  The statements in ¶128 were false and misleading statements of material fact when made because they failed to disclose material adverse facts, material adverse trends, material uncertainties, or significant risks that existed at the time of the IPO. In particular, the Offering Documents failed to disclose that prior to the IPO, Rent the Runway had switched from UPS to FedEx as its primary shipping vendor because UPS was too expensive to be sustainable, however, just before the IPO, FedEx doubled its shipping rates for the Company and the Company was forced to switch back to the already prohibitively expensive UPS.

130.  Further, the Offering Documents inaccurately described as ***potential***, certain risks associated with the shipping or transportation of its products, which "may" or "could" have an adverse effect on its business, financial condition, and results of operations, rather than disclosing

the actual events and trends or uncertainties that had already manifested. The Offering Documents

stated, in pertinent part, that:

> *Shipping and logistics are a critical part of our business and our supply chain and any changes or interruptions in shipping or logistics operations could adversely affect our operating results*.
>
> \*       \*       \*
>
> *[O]ur business relies on the successful management of reverse logistics needed to ingest*, clean, and restock returned items quickly and efficiently in order to offer them for rental or resale to other customers. *If we are not able to negotiate acceptable pricing and other terms with these vendors or they experience performance problems or other difficulties, our operating results and customers' experience could be negatively impacted*.
>
> Our ability to receive inbound products efficiently and ship products to and from customers may be negatively affected by many events outside of our control including, inclement weather, public health crises such as the COVID-19 pandemic, governmental regulations, labor disputes and other factors. We are also subject to risks of damage or loss during delivery by our shipping vendors. If our customers do not receive their orders in good condition on time, they could become dissatisfied and cease using our services, which would adversely affect our business and operating results. Our shipping vendors have faced and may continue to face increased volumes which, in turn, could cause a decrease in their service levels or result in an increase of their prices. *Increases in shipping costs* or other significant shipping difficulties or disruptions or any failure by our brand partners or third-party carriers to deliver high-quality products to us or to our customers, as applicable, in a timely manner or to otherwise adequately serve our customers *could damage our reputation and brand and may substantially harm our business.*

131.    The statements in ¶130 were each inaccurate statements of material fact when

made because while noting only the ***potential*** negative impacts on the Company's business,

financial condition, and results of operations, the Offering Documents failed to disclose the

significant, ***then-existing*** material events and adverse trends or uncertainties that Rent the

Runway ***had already been*** facing at the time of the IPO.  In particular, the Offering Documents

failed to disclose that prior to the IPO, Rent the Runway had switched from UPS to FedEx as its primary shipping vendor because UPS was too expensive to be sustainable, however, just before the IPO, FedEx doubled its shipping rates for the Company and the Company was forced to switch back to the already prohibitively expensive UPS.

      3.    ***The Offering Documents Contained Misstatements and Omissions About Thefts and Falsely Described Certain Risks as Potential when Such Risks had Already Manifested or Would Foreseeably Occur Shortly After the IPO***

132.    The Offering Documents told investors that the Company had "***implemented fraud prevention measures, such as detection tools to identify irregular or high risk customer order patterns, to reduce the risk of fraud***."

133.    The statements in ¶132 were false and misleading statements of material fact when made because they failed to disclose material adverse facts, material adverse trends, material uncertainties, or significant risks that existed at the time of the IPO. Contrary to having "implemented fraud prevention measures … to reduce the risk of fraud," although Rent the Runway maintained a fraud processing program, the Company did not have policies or procedures in place to prevent theft and no actions were taken against customers who stole rented merchandize aside from preventing those customers from placing new orders. Also, at the time of the IPO, in an attempt to lower the Company's shipping expenses, the Company had expanded the use of drop boxes throughout the country, however, the drop boxes facilitated the theft of rented merchandise. For those reasons, and others discussed herein, customer thefts were materially increasing at the time of the IPO, leading to at least a loss of $6 million in revenue annually.

134.    The Offering Documents inaccurately described as ***potential,*** certain future risks associated with theft of products which "may" or "could" have an adverse effect on its business,

financial condition, and results of operations, rather than disclosing the actual events and trends or uncertainties that had already manifested. The Offering Documents stated, in pertinent part, that:

> ***We may incur significant losses from fraud.***
>
> ***We have in the past incurred and may in the future incur losses from various types of fraud, including claims that a customer did not authorize a purchase, customers who have closed bank accounts or have insufficient funds to satisfy payments, customers who use stolen credit cards to make purchases, customers who fraudulently rented multiple products at once and customers who have failed to return rentals.*** In addition to the direct costs of such losses, if the fraud is related to credit card transactions and becomes excessive, it could result in us paying higher fees or losing the right to accept credit cards for payment. In addition, under current credit card practices, we are typically liable for fraudulent credit card transactions….
>
> However, ***our failure to adequately prevent fraudulent transactions could damage our reputation, result in litigation or regulatory action, and lead to expenses that could substantially impact our operating results***.

135.    The Offering Documents inaccurately described as ***potential,*** certain future risks associated with the use of drop boxes which could have an adverse effect on its business, financial condition, and results of operations, rather than disclosing the actual events and trends or uncertainties that had already manifested. The Offering Documents stated, in pertinent part, that:

> In addition to offering the ability to return products through our third-party shipping vendors, ***we offer multiple physical drop-off points for customers located in certain cities, including, for example, New York City, Boston, Nashville, Houston, and San Francisco to return their orders. In the event that we do not successfully manage these logistics, it will make it more difficult for us to maintain our products, and satisfy our customers which will negatively affect our brand, financial condition and results of operations.***

136.    The Offering Documents inaccurately described as ***potential,*** certain future risks associated with insurance coverage failing to cover incidents of fraud which "may" or "could"

have an adverse effect on its business, financial condition, and results of operations, rather than

disclosing the actual events and trends or uncertainties that had already manifested. The Offering

Documents stated, in pertinent part, that:

> *If our insurance coverage is insufficient for the needs of our business or our insurance providers are unable to meet their obligations, we may not be able to mitigate the risks facing our business.*
>
> *We procure third-party insurance policies to cover various operations-related risks including* employment practices liability, workers' compensation, *property* and business interruptions, cybersecurity and data security incidents, *crime*, directors' and officers' liability, and *general business liabilities*. We cannot guarantee that we will continue to receive adequate insurance coverage on favorable terms. Insurance providers may discontinue their coverage or significantly increase the cost of coverage, and we cannot guarantee that we would be able to secure replacement coverage on reasonable terms or at all. In addition, if our insurance carriers change the terms of our policies in a manner not favorable to us, our insurance costs could increase. *Further, if the insurance coverage we maintain is not adequate to cover losses that occur*, or if we are required to purchase additional insurance for other aspects of our business, *we could be liable for significant additional costs*. Additionally, if any of our insurance providers becomes insolvent, it would be unable to pay any operations-related claims that we make.
>
> Insurance providers have also raised premiums and deductibles for many businesses, including ours, and may do so in the future. As a result, our insurance and claims expense could increase, or we may decide to raise our deductibles or self-insured retentions when our policies are renewed or replaced. *Our business, financial condition, and results of operations could be adversely affected if the cost per claim, premiums, the severity of claims, or the number of claims significantly exceeds our historical experience and coverage limits; we experience a claim in excess of our coverage limits; our insurance providers fail to pay on our insurance claims; we experience a claim for which coverage is not provided; or the number of claims under our deductibles or self-insured retentions differs from historical averages*.

137.    The statements in ¶¶134-36 were each inaccurate statements of material fact when

made because while noting only the *potential* negative impacts on the Company's business,

financial condition, and results of operations, the Offering Documents failed to disclose the following significant, ***then-existing*** material events and adverse trends or uncertainties that Rent the Runway ***had already been*** facing at the time of the IPO:

(a)    Thefts were materially increasing and leading to a loss of at least $6 million in revenue annually;

(b)    In an attempt to lower the Company's shipping expenses, the Company expanded the use of return drop boxes throughout the country, however, the drop boxes facilitated the theft of rented merchandise;

(c)    Although Rent the Runway maintained a fraud processing program, the Company did not have policies or procedures in place to prevent fraud and no actions were taken against customers who stole rented merchandize aside from preventing those customers from placing new orders; and

(d)    Rent the Runway was only able to obtain successful insurance claims on approximately 35% of "lost" packages and insurance claims were capped at $100 plus shipping costs.

138.    Item 303 of SEC Regulation S-K, 17 C.F.R. §229.303(a)(3)(ii), required the Defendants to "[d]escribe any known trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable or unfavorable impact on the sales or revenues or income from continuing operations." Similarly, Item 105 of SEC Regulation S-K, 17 C.F.R. §229.105, requires, in the "Risk Factors" section of registration statements and prospectuses, "a discussion of the most significant factors that make the offering speculative or risky" and requires each risk factor to "adequately describe[] the risk." The failure of the Offering Documents to disclose the omitted material facts set forth above in ¶¶133 and 137 — *i.e.,* that Customer thefts

were materially increasing and leading to a loss of at least $6 million in revenue annually, the Company's expanded use of return drop boxes was facilitating the theft of rented merchandise, and the Company was only able to obtain successful insurance claims on approximately 35% of "lost" packages and insurance claims were capped at $100 plus shipping costs — violated Item 303, because these undisclosed facts were known and would (and did) have an unfavorable impact on the Company's sales, revenues, and income from continuing operations. This also violated Item 105, because these specific risks were not adequately disclosed, or disclosed at all, even though they were some of the most significant factors that made an investment in Rent the Runway's Class A common stock speculative or risky. Indeed, as alleged above in ¶¶134-37 the purported Risk Factors that were provided in the Offering Documents were themselves materially false and misleading when made.

### G.    Post-IPO Events

139.    In its first press release, on December 8, 2021, less than two months after the IPO, Rent the Runway reported the Company's third quarter 2021 financial results. Rent the Runway reported a net loss of $87.8 million, a $43.5 million decrease when compared to the same quarter a year previously (during the height of the COVID-19 pandemic). Further, the Company provided guidance to investors on the number of ending active subscribers that the Company expected to have at the end of the fourth quarter 2021, stating that it would have between 121,000 and 122,000 ending active subscribers, representing a quarter over quarter increase of approximately 4,000 subscribers.

140.    Fulfillment expenses, which include shipping costs, increased to $19.2 million for the third quarter 2021. The Offering Documents reported the following fulfillment expenses for the preceding four quarters: (i) $13.5 million for the second quarter 2021; (ii) 8.8 million for the

first quarter of 2021; (iii) $9.2 million for the forth quarter of 2020; and (iv) $11.0 million for the third quarter of 2020.

141.    On the same day, during the earnings call to discuss the quarterly results, Defendant Hyman explained that the Company was able to raise $357 million in its IPO, "a portion" of which was used to pay off approximately one third of the Company's substantial debt.

142.    On the same call, Defendant O'Sullivan spoke about the impact of the rising transportation costs on the Company's profitability, explaining that it was something that the Company had "anticipated" during the IPO: "As we had anticipated, like many companies, we started to see transportation headwinds during Q3 with price increases from national carriers, and we expect to see the full impact of these headwinds in Q4 and fiscal '22." Defendant O'Sullivan further explained that "[w]e have implemented several strategies to mitigate rising transportation costs. The first is reducing our dependence on national carriers and moving towards regional carriers, local couriers and consolidation play."

143.    On this news, the Company's stock price fell $0.50 per share, or 4.35% to close at $11 on December 9, 2021.

144.    The next quarter, on April 13, 2022, Rent the Runway issued a press release reporting the Company's fourth quarter 2021 and full fiscal year 2021 financial results. In the press release Rent the Runway reported a net loss of $211.8 million, an approximately $40 million greater loss than the same quarter a year prior. Further, the Company reported 115,240 ending active subscribers, which not only represented an approximately 5,000 subscriber miss from the Company's previous quarter guidance, but also represented a loss of over 1,500 subscribers from the previous quarter.

145.    Fulfillment expenses, which include shipping costs, increased to $20.4 million for the fourth quarter 2021.

146.    In the same press release, Rent the Runway, provided guidance to investors on the number of ending active subscribers that the Company expected to have at the end of the first quarter 2022, stating that the Company expected to grow its active subscribers to between 130,000 and 132,000.

147.    On the same day, during the earnings call to discuss the quarterly and annual results, Defendant Hyman attempted to downplay the Company's subscriber miss, stating the Company's path toward profitability was "focused on a lot more than subscriber growth. We believe that these other initiatives will get us to our goals faster and can lead to even more attractive long-term margins." However, Defendant O'Sullivan later pivoted from the sentiment, acknowledging that "[w]e are focused on growing revenue by growing subscribers[.]"

148.    The next quarter, on June 9, 2022, Rent the Runway issued a press release reporting the Company's first quarter 2022 financial results. In the press release Rent the Runway reported a net loss of $42.5 million and reported 134,998 ending active subscribers. Notably, as of this quarter, Rent the Runway stopped providing guidance for its subscriber totals for future quarters.

149.    Fulfillment expenses, which include shipping costs, increased to $22.9 million for the first quarter 2022.

150.    On the same day, during the earnings call to discuss the quarterly results, Defendant Hyman explained the Company's results, stating:

> We finished Q1 with 135,000 ending active subscribers, hitting a new record high for quarterly ending active subscribers. Additionally, our subscribers are increasingly more profitable for 3 key reasons. One, the margins of our new subscription plans, whose

rollout was completed last year in May 2021, are nearly double what they were in 2019. Two, subscribers are more loyal than pre-COVID. And three, they are highly engaged, evidenced by the rate at which they opt to pay for additional items in their subscriptions, meaning they rent many items from us for more use cases.

151.    On this news, the Company's stock price fell $.11 per share, or 3.14% to close at $3.39 on June 10, 2022.

152.    The next quarter, on September 12, 2022, Rent the Runway issued a press release announcing the Company's second quarter 2022 financial results. In the press release, Rent the Runway reported a net loss of $33.9 million. The Company also reported that its ending active subscribers decreased by over 10,000 from the previous quarter to 124,131 active subscribers. Moreover, the Company announced a massive restructuring plan intended to "streamline its organizational structure and drive operational efficiencies." The press release explained that "[t]he plan primarily includes total workforce reductions of approximately 24% of corporate employees (primarily a reduction in force, with some open role closures/reduced backfills), reorganizing certain functions and reallocating resources to continue to focus on customer experience and growth initiatives" and would save the company between $25 and $27 million in fiscal year 2023.

153.    Fulfillment expenses, which include shipping costs, increased to $23.4 million for the second quarter 2022.

154.    On the same day, during the earnings call to discuss the quarterly results, Defendant Hyman explained the reasons for the restructuring plan, stating:

> **Today, we announced a restructuring plan to reduce $25 million to $27 million of annual operating costs and streamlined our org structure. We made the difficult decision to reduce our corporate headcount by about 24%.** The headcount measures will be largely complete in Q3, and we expect to realize savings beginning in Q3 and into fiscal 2023. We took a

43

deep and rigorous look at our business, benchmarking ourselves to other companies and realize that we have the potential to improve efficiency and drive profitability sooner while continuing to grow revenue. **Despite almost 45% incremental flow-through margins on additional revenue, growth in our relatively high fixed cost base prevented more rapid gains in profitability.** We believe that our customers are best served by investments that focus on them and by simple and quicker decision-making.

155.    On this news, the Company's stock price fell $1.90 per share, or 38.77% to close at $3.00 on September 13, 2022.

## V.    CLASS ALLEGATIONS

156.    Lead Plaintiffs bring this action as a class action pursuant to Rules 23(a) and 23(b)(3) of the Federal Rules of Civil Procedure on behalf of a class consisting of all persons and entities who purchased or otherwise acquired Rent the Runway's publicly traded Class A common stock pursuant and/or traceable to the Offering Documents for Rent the Runway's IPO, and who were damaged thereby (the "Class"). Excluded from the Class: the Defendants and the Individual Defendants' immediate family members; the officers, directors, affiliates of Rent the Runway and the Underwriter Defendants, at all relevant times, including Rent the Runway's employee retirement and/or benefit plan(s) and their participants and/or beneficiaries to the extent they purchased or acquired Rent the Runway's Class A common stock through any such plan(s); any entity in which Defendants have or had a controlling interest; and the legal representatives, heirs, successors, or assigns of any such excluded person or entity.

157.    The members of the Class are so numerous that joinder of all members is impracticable. The exact number of Class members is unknown to Lead Plaintiffs at this time and can only be ascertained through appropriate discovery. Lead Plaintiffs believe there are at least thousands of members in the proposed Class as the Defendants offered over 19 million shares of Class A common stock in the IPO. Moreover, in order to meet the Nasdaq's listing requirements,

the Underwriter Defendants were required to sell lots of 100 or more shares of Class A common stock to a minimum of 400 beneficial holders. Record owners and other members of the Class may be identified from records maintained by Rent the Runway or its transfer agent (American Stock Transfer & Trust Company) and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

158.    Lead Plaintiffs' claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of the Securities Act as set forth herein.

159.    Lead Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class and securities litigation.

160.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a)      whether Defendants violated the Securities Act;

(b)      whether the Offering Documents contained inaccurate statements of material fact and/or omitted material information required to be stated therein; and

(c)      to what extent the members of the Class have sustained damages and the proper measure of damages.

161.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the

wrongs done to them. There will be no difficulty in the management of this action as a class action.

## VI.    CAUSES OF ACTION

### COUNT  I
### FOR VIOLATION OF SECTION 11 OF THE SECURITIES ACT
### Against All Defendants

162.    Lead Plaintiffs repeat and reallege each and every allegation above as if fully set forth herein.

163.    This cause of action is brought pursuant to Section 11 of the Securities Act, 15 U.S.C. § 77k, on behalf of the Class, against Defendant Rent the Runway, each of the Individual Defendants, and each of the Underwriter Defendants.

164.    This cause of action does not sound in fraud. Lead Plaintiffs do not claim that any of the Defendants committed intentional or reckless misconduct or that any of the Defendants acted with scienter or fraudulent intent. This Count is based solely on strict liability as to Rent the Runway and negligence as to the remaining Defendants. Lead Plaintiffs expressly disclaim any allegations of scienter or fraudulent intent in these non-fraud claims except that any challenged statements of opinion or belief made in connection with the IPO are alleged to have been materially misstated statements of opinion or belief when made.

165.    The Registration Statement, which includes the Prospectus, issued in connection with the IPO was inaccurate and misleading, contained untrue statements of material facts, omitted material facts necessary to make the statements made not misleading, and omitted material facts required to be stated therein.

166.    Rent the Runway is the registrant and issuer of the Class A common stock sold pursuant to the Registration Statement. As such, Rent the Runway is strictly liable for the materially inaccurate statements contained in the Registration Statement and the failure of the

Registration Statement to be complete and accurate. By virtue of the Registration Statement containing material misrepresentations and omissions of material fact necessary to make the statements therein not false and misleading, Rent the Runway is liable under Section 11 of the Securities Act to Lead Plaintiffs and the Class.

167.    None of the Defendants named herein made a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the Registration Statement were true and without omissions of any material facts and were not misleading.

168.    The Individual Defendants each signed the Registration Statement and caused its issuance. As such, they participated in the solicitation, offering, and sale of the securities to the investing public pursuant to the Offering Documents. The Individual Defendants each had a duty to make a reasonable and diligent investigation of the truthfulness and accuracy of the statements contained in the Registration Statement. They each had a duty to ensure that such statements were true and accurate and that there were no omissions of material fact that would make the statements misleading. By virtue of each of the Individual Defendants' failure to exercise reasonable care, the Registration Statement contained misrepresentations of material facts and omissions of material facts necessary to make the statements therein not misleading. As such, each of the Individual Defendants is liable under Section 11 of the Securities Act to Lead Plaintiffs and the Class.

169.    Each of the Underwriter Defendants served as the underwriters for the IPO and qualify as such according to the definition contained in Section 2(a)(11) of the Securities Act, 15 U.S.C. § 77b(a)(11). As such, they participated in the solicitation, offering, and sale of the securities to the investing public pursuant to the Offering Documents. Each of the Underwriter Defendants, as an underwriter of the securities offered in the IPO pursuant to the Registration

47

Statement, had a duty to make a reasonable and diligent investigation of the truthfulness and accuracy of the statements contained in the Registration Statement. They each had a duty to ensure that such statements were true and accurate and that there were no omissions of material fact that would make the statements misleading. By virtue of each of the Underwriter Defendants' failure to exercise reasonable care, the Registration Statement contained misrepresentations of material facts and omissions of material facts necessary to make the statements therein not misleading. As such, each of the Underwriter Defendants is liable under Section 11 of the Securities Act to Lead Plaintiffs and the Class.

170.    None of the untrue statements or omissions of material fact in the Registration Statement alleged herein was a forward-looking statement. Rather, each such statement concerned existing facts. Moreover, the Registration Statement did not properly identify any of the untrue statements as forward-looking statements and did not disclose information that undermined the putative validity of those statements.

171.    Each of the Defendants named in this Count issued, caused to be issued, and participated in the issuance of materially untrue and misleading written statements to the investing public that were contained in the Registration Statement, which misrepresented and failed to disclose, *inter alia*, the facts set forth above. By reasons of the conduct herein alleged, each such Defendant violated Section 11 of the Securities Act.

172.    Lead Plaintiffs and the Class have sustained damages. The value of Rent the Runway's Class A common stock has declined substantially subsequent to and due to violations by Defendants named in this Count.

173.    At the time of their purchases of Rent the Runway's Class A common stock, Lead Plaintiffs and other members of the Class were without knowledge of the facts concerning the

wrongful conduct alleged herein and could not have reasonably discovered those facts prior to the disclosures alleged herein. Less than one year has elapsed from the time that Lead Plaintiffs discovered or reasonably could have discovered the facts upon which this Complaint is based and the time that this action was commenced. Less than three years have elapsed between the time that the securities upon which this cause of action is brought were offered to the public and the time that this action was commenced.

**COUNT II**
**FOR VIOLATION OF SECTION 12(a)(2) OF THE SECURITIES ACT**
**Against All Defendants**

174.    Lead Plaintiffs repeat and reallege each and every allegation above as if fully set forth herein.

175.    This cause of action is brought pursuant to Section 12(a)(2) of the Securities Act, 15 U.S.C. § 77l(a)(2), on behalf of the Class, against Rent the Runway, each of the Individual Defendants, and each of the Underwriter Defendants.

176.    This cause of action does not sound in fraud. Lead Plaintiffs do not claim that any of these Defendants committed intentional or reckless misconduct or that any of these Defendants acted with scienter or fraudulent intent, which are not elements of a Section 12(a)(2) claim. This Count is based solely on strict liability as to Rent the Runway and negligence as to the remaining Defendants. Lead Plaintiffs expressly disclaim any allegations of scienter or fraudulent intent in these non-fraud claims except that any challenged statements of opinion or belief made in connection with the IPO are alleged to have been materially misstated statements of opinion or belief when made.

177.    Each of the Defendants named in this Count were sellers, offerors, and/or solicitors of purchasers of the Company's Class A common stock pursuant to the defective Prospectus. The actions of solicitation by the Defendants named in this Count included participating in the

49

preparation of the false and misleading Prospectus, which are part of the Registration Statement, and marketing of Rent the Runway's Class A common stock to investors, such as Lead Plaintiffs and the other members of the Class.

178.    The Prospectus contained untrue statements of material fact, omitted to state other facts necessary to make statements made therein not misleading, and omitted to state material facts required to be stated therein.

179.    Each of the Defendants named in this Count owed to the purchasers of Rent the Runway's Class A common stock, including Lead Plaintiffs and other members of the Class, the duty to make a reasonable and diligent investigation of the statements contained in the Prospectus to ensure that such statements were true and that there was no omission to state a material fact required to be stated in order to make the statements contained therein not misleading.  By virtue of each of these Defendants' failure to exercise reasonable care, the Prospectus contained misstatements of material facts and omissions of material facts necessary to make the statements therein not misleading.

180.    Lead Plaintiffs and other members of the Class did not know, nor in the exercise of reasonable diligence could have known, of the untruths and omissions contained in the Prospectus at the time Lead Plaintiffs and other members of the Class acquired Rent the Runway shares.

181.    By reason of the conduct alleged herein, the Defendants named in this cause of action violated and/or controlled a person who violated Section 12(a)(2) of the Securities Act.  As a direct and proximate result of such violation, Lead Plaintiffs and the other members of the Class who purchased Rent the Runway's Class A common stock pursuant to the Registration Statement sustained substantial damages in connection with their purchases.  Accordingly, Lead Plaintiffs

and the other members of the Class who hold Rent the Runway's Class A common stock issued pursuant to the Prospectus have the right to rescind and recover the consideration paid for their shares with interest thereon or damages as allowed by law or in equity.  Class members, including Lead Plaintiffs, who have sold their Rent the Runway shares seek damages to the extent permitted by law.

<u>**COUNT  III**</u>
**FOR VIOLATION OF SECTION 15 OF THE SECURITIES ACT**
**Against the Individual Defendants**

182.    Lead Plaintiffs repeat and reallege each and every allegation above as if fully set forth herein.

183.    This cause of action is brought pursuant to Section 15 of the Securities Act, 15 U.S.C. § 77o, on behalf of the Class, against each of the Individual Defendants.

184.    This cause of action does not sound in fraud. Lead Plaintiffs do not allege that any of the Defendants committed intentional or reckless misconduct or that any of the Defendants acted with scienter or fraudulent intent, which are not elements of a Section 15 claim. This Count is based solely on negligence and/or strict liability. Lead Plaintiffs expressly disclaim any allegations of scienter or fraudulent intent in these non-fraud claims except that any challenged statements of opinion or belief made in connection with the IPO are alleged to have been materially misstated statements of opinion or belief when made.

185.    The Individual Defendants each were control persons of Rent the Runway by virtue of their positions as directors and/or senior officers of Rent the Runway. The Individual Defendants each had a series of direct and/or indirect business and/or personal relationships with other directors and/or officers and/or major stockholders of Rent the Runway.

186.    Each of the Individual Defendants participated in the preparation and dissemination of the Offering Documents, and otherwise participated in the process necessary to

conduct the IPO. Because of their positions of control and authority as senior officers and/or directors each of the Individual Defendants were able to, and did, control the contents of the Offering Documents, which contained materially untrue information and/or omitted material information required to be disclosed to prevent the statements made therein from being misleading.

187.    As control persons of Rent the Runway, each of the Individual Defendants is liable jointly and severally with and to the same extent as Rent the Runway for its violation of Sections 11 and 12(a)(2) of the Securities Act.

## VII.    PRAYER FOR RELIEF

WHEREFORE, Lead Plaintiffs on behalf of themselves and the members of the Class, prays for relief and judgment, as follows:

A.    Determining that this action is a proper class action maintainable under Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure, certifying Lead Plaintiffs as class representatives, and appointing Labaton Sucharow LLP as class counsel pursuant to Rule 23(g) of the Federal Rules of Civil Procedure;

B.    Awarding all damages and other remedies set forth in the Securities Act in favor of Lead Plaintiffs and the Class, against all Defendants, jointly and severally, in an amount to be proven at trial, including interest thereon;

C.    Awarding Lead Plaintiffs and the Class their reasonable costs and expenses incurred in this action, including attorneys' fees, accountants' fees, and experts' fees, and other costs and disbursements; and

D.    Awarding Lead Plaintiffs and the Class such other relief as the Court deems just and proper.

## VIII.  JURY DEMAND

Lead Plaintiffs demand a trial by jury.

DATED: September 5, 2023                    Respectfully submitted,

*/s/ Alfred L. Fatale III*
**LABATON SUCHAROW LLP**
Jonathan Gardner
Alfred L. Fatale III
Guillaume Buell
Robert S. Rowley
140 Broadway
New York, New York 10005
Telephone: (212) 907-0700
Facsimile: (212) 818-0477
jgardner@labaton.com
afatale@labaton.com
gbuell@labaton.com
rrowley@labaton.com

*Lead Counsel for Lead Plaintiffs and the Class*