**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

RAJAT SHARMA, Individually and on Behalf of All Others Similarly Situated,

                        Plaintiff,

     -v.-

RENT THE RUNWAY, INC., JENNIFER Y. HYMAN, SCARLETT O'SULLIVAN, TIM BIXBY, JENNIFER FLEISS, SCOTT FRIEND, MELANIE HARRIS, BETH KAPLAN, DAN NOVA, GWYNETH PALTROW, CARLEY RONEY, DAN ROSENSWEIG, MIKE ROTH, GOLDMAN SACHS & CO. LLC, MORGAN STANLEY & CO. LLC, BARCLAYS CAPITAL INC., CREDIT SUISSE SECURITIES (USA) LLC, PIPER SANDLER & CO., WELLS FARGO SECURITIES, LLC, JMP SECURITIES LLC, KEYBANC CAPITAL MARKETS INC., and TELSEY ADVISORY GROUP LLC,

                        Defendants.

Case No. 1:22-cv-6935-OEM-VMS

---

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS THE CORRECTED AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**

WILLKIE FARR & GALLAGHER LLP
Todd G. Cosenza
Charles D. Cording
787 Seventh Avenue
New York, NY 10019-6099
Telephone: (212) 728-8000

*Counsel for Defendants Goldman Sachs & Co. LLC, Morgan Stanley & Co. LLC, Barclays Capital Inc., Credit Suisse Securities (USA) LLC, Piper Sandler & Co., Wells Fargo Securities, LLC, JMP Securities LLC, KeyBanc Capital Markets Inc., and Telsey Advisory Group LLC*

FRESHFIELDS BRUCKHAUS DERINGER US LLP
Mary Eaton
Meredith Kotler
Marques Tracy
601 Lexington Avenue, 31st Floor
New York, New York 10022
Telephone: (212) 277-4000

*Counsel for Defendants Rent the Runway, Inc., Jennifer Y. Hyman, Scarlett O'Sullivan, Tim Bixby, Jennifer Fleiss, Scott Friend, Melanie Harris, Beth Kaplan, Dan Nova, Gwyneth Paltrow, Carley Roney, Dan Rosensweig, and Mike Roth*

**TABLE OF CONTENTS**

**Page**

TABLE OF AUTHORITIES ............................................................................................. *iii*

TABLE OF ABBREVIATIONS ....................................................................................... *xiii*

PRELIMINARY STATEMENT ...........................................................................................1

BACKGROUND ...................................................................................................................3

     A.     Rent the Runway's Business..................................................................................3

     B.     The Impact of COVID-19 on Rent the Runway's Business ..................................6

     C.     Rent the Runway Launches its IPO ......................................................................6

     D.     Post-IPO Developments........................................................................................8

     E.     This Litigation......................................................................................................12

ARGUMENT ......................................................................................................................13

I.     THE CAC FAILS TO ADEQUATELY PLEAD A SECTION 11 CLAIM ....................13

     A.     The CAC Fails to Adequately Plead an Actionable Misstatement .......................15

     B.     The CAC Fails to Adequately Plead an Actionable Omission .............................20

           1.     The customer demand risk factor disclosures were not false or misleading.................................................................................................20

           2.     The shipping costs risk factor disclosures were not false or misleading.................................................................................................22

           3.     The theft/fraud prevention risk factors were not false or misleading ........24

     C.     The CAC Fails to Adequately Plead an Item 303 Violation.................................27

           1.     Customer Demand .................................................................................28

           2.     Customer Theft .....................................................................................30

     D.     The CAC Fails to Adequately Plead an Item 105 Violation.................................31

II.     THE CAC FAILS TO ADEQUATELY PLEAD A SECTION 12(A)(2) CLAIM ...........32

III.    NEGATIVE CAUSATION BARS PLAINTIFFS' CLAIMS ...........................................34

CONCLUSION..................................................................................................................................35

## TABLE OF AUTHORITIES

**Page**

**Cases**

*Abuhamdan v. Blyth, Inc.*,
9 F.Supp.3d 175 (D. Conn. 2014) ........................................................................................31

*Altayyar v. Etsy*,
242 F.Supp.3d 161 (E.D.N.Y. 2017) ....................................................................................31

*Amorosa v. AOL Time Warner*,
409 F.App'x 412 (2d Cir. 2011) ...........................................................................................34

*Arfa v. Mecox Lane Ltd.*,
504 F.App'x 14 (2d Cir. 2012) .............................................................................................35

*Asay v. Pinduoduo*,
2020 WL 1530745 (S.D.N.Y. Mar. 30, 2020),
*aff'd*, 2021 WL 3871269 (2d Cir. 2021) ..............................................................................31

*ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*,
493 F.3d 87 (2d Cir. 2007) .....................................................................................................3

*Axar Master Fund v. Bedford*,
308 F.Supp.3d 743 (S.D.N.Y. 2018) ....................................................................................27

*Banerjee v. Zhangmen Educ.*,
2023 WL 2711279 (S.D.N.Y. Mar. 23, 2023) ......................................................................29

*Basic v. Levinson*,
485 U.S. 224 (2010) ..............................................................................................................27

*Blackmoss Invs. v. ACA Cap. Holdings*,
2010 WL 148617 (S.D.N.Y. Jan. 14, 2010) ........................................................28, 29, 31, 34

*Bldg. Trades Pension Fund of W. Pa. v. Insperity, Inc.*,
2022 WL 784017 (S.D.N.Y. Mar. 15, 2022) ........................................................................16

*Boluka Garment Co. v. Canaan Inc.*,
547 F.Supp.3d 439 (S.D.N.Y. 2021) ....................................................................................35

*Brody v. Homestore*,
2003 WL 22127108 (C.D. Cal. Aug. 8, 2003) ................................................................33, 34

*Caiafa v. Sea Containers Ltd.*,
525 F.Supp.2d 398 (S.D.N.Y. 2007) ....................................................................................19

*City of Roseville Employees' Ret. Sys. v. Sterling Fin. Corp.*,
    963 F.Supp.2d 1092 (E.D. Wash. 2013),
    *aff'd*, 691 F.App'x 393 (9th Cir. 2017) ...................................................................................27

*City of Warren Police & Fire Ret. Sys. v. Foot Locker*,
    412 F.Supp.3d 206 (E.D.N.Y. 2019) ........................................................................................32

*Constr. Laborers Pension Tr. for S. Cal. v. CBS Corp.*,
    433 F.Supp.3d 515 (S.D.N.Y. 2020) ..................................................................................13, 23

*Coronel v. Quanta Cap. Holdings Ltd.*,
    2009 WL 174656 (S.D.N.Y. Jan. 26, 2009) ............................................................................15

*Dalberth v. Xerox Corp*,
    766 F.3d 172, 186-87 (2d Cir. 2014) .......................................................................................26

*Dresner v. Utility.com*,
    371 F.Supp.2d 476 (S.D.N.Y. 2005) ........................................................................................21

*ECA, Local 134 IBEW Joint Pension Tr. of Chicago v. JP Morgan Chase Co.*,
    553 F.3d 187 (2d Cir. 2009) ..............................................................................................17, 25

*Elite Aviation LLC v. Credit Suisse AG*,
    588 F.App'x 37 (2d Cir. 2014) .................................................................................................14

*Emerson v. Mut. Fund Series Tr.*,
    393 F.Supp.3d 220 (E.D.N.Y. 2019) .......................................................................................33

*Endo v. Albertine*,
    1995 WL 170030 (N.D. Ill. Apr. 7, 1995) ...............................................................................33

*Finger v. Pearson PLC*,
    2019 WL 10632904 (S.D.N.Y. Sept. 16, 2019) ....................................................................... 18

*Fogel v. Wal-Mart de Mexico SAB de CV*,
    2017 WL 751155 (S.D.N.Y. Feb. 27, 2017),
    *aff'd*, 759 F.App'x 18 (2d Cir. 2018) ........................................................................................7

*Ford v. Voxx Int'l*,
    2016 WL 3982466 (E.D.N.Y. July 22, 2016) .....................................................................19, 24

*Geiger v. Solomon-Page Grp.*,
    933 F.Supp. 1180 (S.D.N.Y. 1996) ..........................................................................................23

*Golesorkhi v. Green Mtn. Coffee Roasters*,
    973 F.Supp.2d 541 (D. Vt. 2013) .............................................................................................19

*Gordon v. Tencent Music Entm't Grp.*,
   2021 WL 9183821 (E.D.N.Y. Mar. 31, 2021) ................................................................31, 32

*Greco v. Qudian Inc.*,
   2022 WL 4226022 (S.D.N.Y. Sept. 13, 2022) .........................................................................17

*Gross v. AT&T*,
   2021 WL 9803956 (S.D.N.Y. Sept. 27, 2021) ...................................................................18, 19

*Gutman v. Lizhi Inc.*,
   633 F.Supp.3d 681 (E.D.N.Y. 2022) .......................................................17, 27, 29, 35

*Holbrook v. Trivago*,
   2019 WL 948809 (S.D.N.Y. Feb. 26, 2019),
   *aff'd*, 796 F.App'x 31 (2d Cir. 2019) ................................................................16, 30

*Holsworth v. BProtocol Found.*,
   2021 WL 706549 (S.D.N.Y. Feb. 22, 2021) ......................................................33, 34

*Hutchison v. Deutsche Bank Secs.*,
   647 F.3d 479 (2d Cir. 2011) ...........................................................................25

*Ind. Pub. Ret. Sys. v. SAIC*,
   818 F.3d 85 (2d Cir. 2016) ............................................................................27

*In re AOL Time Warner Sec. & "ERISA" Litig.*,
   381 F.Supp.2d 192 (S.D.N.Y. 2004) ................................................................14

*In re AppHarvest Sec. Litig.*,
   2023 WL 4866233 (S.D.N.Y. July 31, 2023) ..................................................28, 31

*In re AT&T/DirectTV Now Sec. Litig.*,
   480 F.Supp.3d 507 (S.D.N.Y. 2020) ................................................................27

*In re Authentidate Holding Sec. Litig.*,
   2009 WL 755360 (S.D.N.Y. Mar. 23, 2009),
   *aff'd in relevant part*, 369 F.App'x 260 (2d Cir. 2010) .......................................28

*In re Barclays Bank PLC Sec. Litig.*,
   756 F.App'x 41 (2d Cir. 2018) .......................................................................35

*In re Blockbuster Sec. Litig.*,
   2004 WL 884308 (N.D. Tex. Apr. 26, 2004) ....................................................26

*In re Britannia Bulk Holdings Sec. Litig.*,
   665 F.Supp.2d 404 (S.D.N.Y. 2009) ................................................................35

*In re Chembio Diagnostics, Inc. Sec. Litig.*,
  616 F.Supp.3d 192 (E.D.N.Y. 2022) ..............................................................14, 15

*In re CIT Grp. Sec. Litig.*,
  349 F.Supp.2d 685 (S.D.N.Y. 2004)......................................................................15

*In re Coty Inc. Sec. Litig.*,
  2016 WL 1271065 (S.D.N.Y. Mar. 29, 2016) ................................................ *passim*

*In re Danimer Sci. Sec. Litig.*,
  2023 WL 6385642 (E.D.N.Y. Sept. 30, 2023) ........................................................3

*In re Donna Karan Int'l Sec. Litig.*,
  1998 WL 637547 (E.D.N.Y. Aug. 14, 1998)....................................................17, 21

*In re Doral Fin. Sec. Litig.*,
  563 F.Supp.2d 461 (S.D.N.Y. 2008),
  *aff'd*, 344 F.App'x 717 (2d Cir. 2009)...................................................................18

*In re DSP Grp., Inc. Sec. Litig.*,
  1997 WL 678151 (N.D. Cal. Mar. 5, 1997)...........................................................23

*In re Duane Reade Sec. Litig.*,
  2003 WL 22801416 (S.D.N.Y. Nov. 25, 2003),
  *aff'd*, 107 F.App'x 250 (2d Cir. 2004).................................................................16

*In re Express Scripts Holding Co. Sec. Litig.*,
  2017 WL 3278930 (S.D.N.Y. Aug. 1, 2017),
  *aff'd*, 773 F.App'x 9 (2d Cir. 2019).......................................................................3

*In re Francesca's Holdings Sec. Litig.*,
  2015 WL 1600464 (S.D.N.Y. Mar. 31, 2015) ..................................................29, 30

*In re HEXO Corp. Sec. Litig.*,
  524 F.Supp.3d 283 (S.D.N.Y. 2021).......................................................................17

*In re IAC/InteractiveCorp Sec. Litig.*,
  695 F.Supp.2d 109 (S.D.N.Y. 2010).......................................................................19

*In re Infonet Servs. Corp. Sec. Litig.*,
  310 F.Supp.2d 1080 (C.D. Cal. 2003) ....................................................................33

*In re JP Morgan Chase Sec. Litig.*,
  363 F.Supp.2d 595 (S.D.N.Y. 2005)..................................................................14, 15

*In re Lone Pine Res., Inc.*,
  2014 WL 1259653 (S.D.N.Y. Mar. 27, 2014) .........................................................32

*In re Lululemon Sec. Litig.*,
14 F.Supp.3d 553 (S.D.N.Y. 2014),
*aff'd*, 604 F.App'x 62 (2d Cir. 2015)...................................................................................13, 19

*In re Micro Focus Int'l Sec. Litig.*,
2020 WL 5817275 (S.D.N.Y. Sept. 29, 2020)......................................................................19, 21

*In re Morgan Stanley Info. Fund Sec. Litig.*,
592 F.3d 347 (2d Cir. 2010)..........................................................................................13, 14, 32

*In re N. Telecom Ltd. Sec. Litig.*,
116 F.Supp.2d 446 (S.D.N.Y. 2000)..............................................................................................17

*In re N.Y. Community Bancorp. Sec. Litig.*,
448 F.Supp.2d 466 (E.D.N.Y. 2006) ............................................................................................17

*In re Nokia Oyj Sec. Litig.*,
423 F.Supp.2d 364 (S.D.N.Y. 2006)...............................................................................................17

*In re Overstock Sec. Litig.*,
2020 WL 5775845 (D. Utah Sept. 28, 2020)................................................................................26

*In re Pretium Res. Inc. Sec. Litig.*,
2020 WL 953609 (S.D.N.Y. Feb. 27, 2020)...................................................................................14

*In re ProShares Tr. II Sec. Litig.*,
2020 WL 71007 (S.D.N.Y. Jan. 3, 2020),
*aff'd*, 839 F.App'x 649 (2d Cir. 2021)..........................................................................................32

*In re ProShares Tr. Sec. Litig.*,
728 F.3d 96 (2d Cir. 2013).............................................................................................13, 14, 22, 25

*In re Qudian Inc. Sec. Litig.*,
2019 WL 4735376 (S.D.N.Y. Sept. 27, 2019)................................................................................19

*In re Qutoutiao, Inc. Sec. Litig.*,
2023 WL 4977499 (S.D.N.Y. Aug. 3, 2023)..................................................................................32

*In re Rockwell Med. Sec. Litig.*,
2018 WL 1725553 (S.D.N.Y. Mar. 30, 2018) ...............................................................................14

*In re Sanofi Sec. Litig.*,
155 F.Supp.3d 386 (S.D.N.Y. 2016)...............................................................................................16

*In re Sec. Cap. Assur. Ltd. Sec. Litig.*,
729 F.Supp.2d 569 (S.D.N.Y. 2010)..............................................................................................35

*In re Sibanye Gold Sec. Litig.*,
2020 WL 6582326 (E.D.N.Y. Nov. 10, 2020)..........................................................................16

*In re Sierra Wireless Sec. Litig.*,
482 F.Supp.2d 365 (S.D.N.Y. 2007)........................................................................................18

*In re State Street Bank & Tr. Co. Fixed Income Funds Inv. Litig.*,
774 F.Supp.2d 584 (S.D.N.Y. 2011)........................................................................................34

*In re Symbol Techs. Class Action Litig.*,
950 F.Supp. 1237 (E.D.N.Y. 1997) ........................................................................................18

*In re Tempur Sealy Int'l Sec. Litig.*,
2019 WL 1368787 (S.D.N.Y. Mar. 26, 2019) ........................................................................14

*In re Wachovia Equity Sec. Litig.,*
753 F.Supp.2d 326 (S.D.N.Y. 2011)........................................................................................18

*In re Weight Watchers Int'l Sec. Litig.*,
504 F.Supp.3d 224 (S.D.N.Y. 2020)........................................................................................33

*In re XP Inc. Sec. Litig.*,
524 F.Supp.3d 23 (E.D.N.Y. 2021) ...................................................................................26, 28

*In re Yunji Sec. Litig.*,
2021 WL 1439715 (E.D.N.Y. Mar. 31, 2021) ........................................................................31

*Jiang v. BlueCity Holdings Ltd.*,
2023 WL 5412891 (E.D.N.Y. Aug. 22, 2023)........................................................................31

*Karam v. Corinthian Colleges*,
2012 WL 8499135 (C.D. Cal. Aug. 20, 2012)........................................................................27

*Kemp v. Universal Am. Fin. Corp.*,
2007 WL 86942 (S.D.N.Y. Jan. 10, 2007) .............................................................................24

*Kocourek v. Shrader*,
391 F.Supp.3d 308 (S.D.N.Y. 2019)........................................................................................13

*Ladmen Partners v. Globalstar*,
2008 WL 4449280 (S.D.N.Y. Sept. 30, 2008).........................................................................15

*Lau v. Opera Ltd.*,
527 F.Supp.3d 537 (S.D.N.Y. 2021)........................................................................................34

*Lentell v. Merrill Lynch & Co.*
396 F.3d 161 (2d Cir. 2005).....................................................................................................34

*Leykin v. AT&T Corp.*,
   423 F.Supp.2d 229 (S.D.N.Y. 2006)........................................................................................34

*Loc. No. 38 Int'l Bhd. of Elec. Workers Pension Fund v. Am. Express Co.*,
   724 F.Supp.2d 447 (S.D.N.Y. 2010),
   *aff'd*, 430 F.App'x 63 (2d Cir. 2011)......................................................................................18

*Medina v. Tremor Video*,
   2015 WL 1000011 (S.D.N.Y. Mar. 5, 2015),
   *aff'd*, 640 F.App'x 45 (2d Cir. 2016)........................................................................16, 29, 30

*Novak v. Kasaks*,
   216 F.3d 300 (2d Cir. 2000)....................................................................................................18

*Nurlybayev v. ZTO Express (Cayman)*,
   2019 WL 3219451 (S.D.N.Y. July 17, 2019) ....................................................................22, 32

*Olkey v. Hyperion 1999 Term Trust*,
   98 F.3d 2 (2d Cir. 1996)....................................................................................................14, 17

*Pearlstein v. BlackBerry Ltd.*,
   93 F.Supp.3d 233 (S.D.N.Y. 2015),
   *aff'd*, 660 F.App'x 23 (2d Cir. 2016)......................................................................................28

*Pehlivanian v. China Gerui Advanced Materials Grp.*,
   153 F.Supp.3d 628 (S.D.N.Y. 2015)........................................................................................26

*Pehlivanian v. China Gerui Advanced Materials Grp.*,
   2016 WL 2859622 (S.D.N.Y. May 16, 2016) ..........................................................................23

*Pinter v. Dahl*,
   486 U.S. 622 (1988)................................................................................................................33

*Plumber & Steamfitters Loc. 773 Pension Fund v. Danske Bank*,
   11 F.4th 90 (2d Cir. 2021) ......................................................................................................16

*Risley v. Universal Navigation*,
   2023 WL 5609200 (S.D.N.Y. Aug. 29, 2023) ..........................................................................33

*Rombach v. Chang*,
   355 F.3d 164 (2d Cir. 2004)..............................................................................................13, 14

*San Leandro Emerg. Med. Grp. Profit Sharing Plan v. Philip Morris Cos.*,
   75 F.3d 801 (2d Cir. 1996)................................................................................................19, 26

*Sandoz v. Waterdrop Inc.*,
   2023 WL 1767526 (S.D.N.Y. Feb. 3, 2023)............................................................................22

*Schaffer v. Horizon Pharma PLC*,
2018 WL 481883 (S.D.N.Y. Jan. 18, 2018) ...............................................................16, 28, 29

*Schiro v. Cemex, S.A.B. de C.V.*,
396 F.Supp.3d 283 (S.D.N.Y. 2019)........................................................................................18

*Schoenhaut v. Am. Sensors*,
986 F.Supp. 785 (S.D.N.Y. 1997) ...........................................................................................18

*Scott v. Gen. Motors*,
46 F.Supp.3d 387 (S.D.N.Y. 2014),
*aff'd*, 605 F.App'x 52 (2d Cir. 2015).......................................................................................13

*Sheppard v. TCW/DW Term Tr. 2000*,
938 F.Supp. 171 (S.D.N.Y. 1996) ...........................................................................................17

*Singh v. Schikan*,
106 F.Supp.3d 439 (S.D.N.Y. 2015)........................................................................................26

*Solow v. Citigroup*,
2012 WL 1813277 (S.D.N.Y. May 18, 2012),
*aff'd*, 507 F.App'x 81 (2d Cir. 2013).......................................................................................26

*Stadnick v. Vivint Solar*,
861 F.3d 31 (2d Cir. 2017)........................................................................................................28

*Stratte-McClure v. Morgan Stanley*,
598 F.App'x 25 (2d Cir. 2015) .................................................................................................16

*Wandel v. Gao*,
590 F.Supp.3d 630 (S.D.N.Y. 2022)........................................................................................14

*Willard v. UP Fintech Holding*,
527 F.Supp.3d 609 (S.D.N.Y. 2021)...................................................................................30, 32

*Woolgar v. Kingstone Cos.*,
477 F.Supp.3d 193 (S.D.N.Y. 2020)...................................................................................18, 26

*Yaroni v. Pintec Tech. Holdings*,
600 F.Supp.3d 385 (S.D.N.Y. 2022)........................................................................................21

*Zirkin v. Quanta Cap. Holdings*,
2009 WL 185940 (S.D.N.Y. Jan. 23, 2009) ............................................................................29

**Statutes, Rules and Regulations**

15 U.S.C. § 77k(a) ............................................................................................................................13

15 U.S.C. § 77k(e) ...............................................................................................34

17 C.F.R. § 229.105 ............................................................................................31

17 C.F.R. § 229.303 ........................................................................................27, 30

**Other Sources**

Joseph Ax & Lisa Shumaker, "U.S. schools delay openings as Omicron rages; New York City hits 33% positivity rate," *Reuters* (Jan. 3, 2022)............................................10

Todd Benge, "Parcel Rates And Cost Impact in Q4 And 2021," *Talking Logistics* (Oct. 15, 2020) ..........................................................................5

"Broadway Shows Canceled Again as Omicron Outbreak Threatens New York City & London," *Billboard* (Dec. 16, 2021)..............................................10

Centers for Disease Control and Prevention, "CDC Museum COVID-19 Timeline," https://www.cdc.gov/museum/timeline/covid19.html.........................16

Centers for Disease Control and Prevention, "First Confirmed Case of Omicron Variant Detected in the United States," https://www.cdc.gov/media/releases/ 2021/s1201-omicron-variant.html (Dec. 1, 2021) ....................................................9

Stephen Culp, "Wall St tumbles to biggest loss in two years following CPI data," *Reuters* (Sept. 13, 2022).............................................................12

"Governor Cuomo Announces COVID-19 Restrictions Lifted as 70% of Adult New Yorkers Have Received First Dose of COVID-19 Vaccine," https://www.governor.ny.gov/news/governor-cuomo-announces-covid-19-restrictions-lifted-70-adult-new-yorkers-have-received-first (June 15, 2021) .......................16

Lauren Hirsch & Emma Goldberg, "As Omicron uncertainty mounts, return-to-office plans are being revised again," *NY Times* (Jan. 3, 2022)...........................10

Nicole Hong, *et al.*, "New York's Recovery Took 2 Steps Forward. Omicron Sent it One Step Back," *NY Times* (Jan. 28, 2022)............................................10

Kaia Hubbard, "CDC: Omicron Overtook Delta as Dominant Variant," *U.S. News & World Report* (Dec. 28, 2021). ..............................................................9

Steve Inskeep & Michaeleen Doucleff, "Scientists estimate record U.S. COVID cases attributed to the omicron variant," *NPR* (Dec. 27, 2021)...........................10

Eric Kulisch, "FedEx adds war surcharge as Ukraine crisis ratches up shipping costs," *FreightWaves* (Mar. 4, 2022) .........................................................35

Mara Leighton, "Rent the Runway now has drop-off locations at WeWork offices in 6 major cities – here's how it works," *Insider* (Oct. 18, 2018) ...........................................31

Alex Lennane, "More pain for shippers as FedEx hikes parcel surcharges yet again," *The Loadstar* (May 28, 2021)....................................................................................5

Ivo C. Nenin, "Tech Stocks Lead the Market Decline in Early 2022," *Commonfund* (Feb. 7, 2022) ........................................................................................34

"Rent the Runway jumps in trading debut," *Yahoo! Finance* (Oct. 27, 2021) ..............................23

Jade Scipioni, "Omicron might be the worst Covid gets when it comes to transmissibility, experts predict," *CNBC* (Jan. 20, 2022).........................................10

Mark Solomon, "Early-termination agreements a burr in parcel shippers' saddle," *FreightWaves* (June 9, 2022) ......................................................................................5

Alexander Tin, "Omicron now 95% of new COVID-19 infections in U.S., CDC estimates," *CBS News* (Jan. 4, 2022) ...................................................................10

Robyn Turk, "Rent the Runway closes all brick-and-mortar business," *Fashion United* (Aug. 17, 2020) .........................................................................................23

Caroline Valetkevitch, "Wall Steet suffers biggest weekly loss since January after hot CPI data," *Reuters* (June 10, 2022)....................................................................12

Paul Ziobro, "FedEx, UPS Rate Rises Are Making Online Shopping More Expensive," *Wall St. Journal* (Sept. 20, 2021). ..................................................................5

**TABLE OF ABBREVIATIONS**

| ¶ | Paragraphs of the CAC |
|---|---|
| 1Q21 | First quarter ended April 30, 2021 |
| 1Q22 | First quarter ended April 30, 2022 |
| 2Q21 | Second quarter ended July 31, 2021 |
| 2Q22 | Second quarter ended July 31, 2022 |
| 3Q19 | Third quarter ended October 31, 2019 |
| 3Q20 | Third quarter ended October 31, 2020 |
| 3Q21 | Third quarter ended October 31, 2021 |
| 4Q20 | Fourth quarter ended January 31, 2021 |
| 4Q21 | Fourth quarter ended January 31, 2022 |
| Annex A | Annex A to this Memorandum of Law |
| Annex B | Annex B to this Memorandum of Law |
| Annex C | Annex C to this Memorandum of Law |
| CAC | Corrected Amended Class Action Complaint for Violations of the Federal Securities Laws, dated September 5, 2023 (ECF 61) |
| CDC | Centers for Disease Control and Prevention |
| CEO | Chief Executive Officer |
| CFO | Chief Financial Officer |
| Company | Rent the Runway, Inc. |
| Competitors | Defined solely for purposes of this Motion as StitchFix, Inc., Allbirds, Inc., and ThredUp Inc. |
| COVID-19 | Coronavirus disease 2019, an infectious disease cased by the SARS-CoV-2 virus |
| CW | Confidential witness |
| Defendants | Rent the Runway Defendants and Underwriters |

| | |
|---|---|
| Delta | A variant of COVID-19, classified as a new variant by the World Health Organization on May 11, 2021 |
| Ex. | Exhibit to the Tracy Decl. |
| Exchange Act | Securities Exchange Act of 1934, 15 U.S.C. § 78a *et seq.* |
| FE | Former Employee |
| FedEx | FedEx Corporation |
| Individual Defendants | Jennifer Y. Hyman, Scarlett O'Sullivan, Tim Bixby, Jennifer Fleiss, Scott Friend, Melanie Harris, Beth Kaplan, Dan Nova, Gwyneth Paltrow, Carley Roney, Dan Rosensweig and Mike Roth |
| IPO | Initial Public Offering |
| Item 105 | Item 105 of Regulation S-K, 17 C.F.R. § 229.105 |
| Item 303 | Item 303 of Regulation S-K, 17 C.F.R. § 229.303 |
| Item 601 | Item 601 of Regulation S-K, 17 C.F.R. § 229.601 |
| Motion | Defendants' Motion to Dismiss the CAC, dated October 20, 2023 |
| Ms. Hyman | Jennifer Y. Hyman, CEO of Rent the Runway |
| Ms. O'Sullivan | Scarlett O'Sullivan, former CFO of Rent the Runway |
| Offering Documents | Prospectus and Registration Statement |
| Omicron | A variant of COVID-19, classified as a new variant by the World Health Organization on December 1, 2021 |
| Plaintiffs | Lead Plaintiffs Delaware Public Employees' Retirement System and Denver Employees Retirement Plan |
| Prospectus | Rent the Runway's Final Prospectus, filed with the SEC on Form 424B4 on October 27, 2021 |
| Registration Statement | Rent the Runway's Registration Statement, filed with the SEC on Form S-1 on October 4, 2021, and amended on Forms S-1/A on October 18, 2021 and October 22, 2021 |
| Rent the Runway | Rent the Runway, Inc. |

| Rent the Runway Defendants | Rent the Runway, Jennifer Y. Hyman, Scarlett O'Sullivan, Tim Bixby, Jennifer Fleiss, Scott Friend, Melanie Harris, Beth Kaplan, Dan Nova, Gwyneth Paltrow, Carley Roney, Dan Rosensweig, and Mike Roth |
|---|---|
| RFID | Radio-frequency identification |
| RS | Registration Statement |
| RTR | Rent the Runway, Inc. |
| Rule 9(b) | Federal Rule of Civil Procedure 9(b) |
| SEC | Securities and Exchange Commission |
| Section 10(b) | Section 10(b) of the Exchange Act |
| Section 11 | Section 11 of the Securities Act |
| Section 12(a)(2) | Section 12(a)(2) of the Securities Act |
| Section 15 | Section 15 of the Securities Act |
| Securities Act | Securities Act of 1933, 15 U.S.C. § 77e *et seq.* |
| Tracy Decl. | Declaration of Marques Tracy in Support of Defendants' Motion to Dismiss the CAC, dated October 20, 2023, filed contemporaneously with this Motion |
| Underwriter Defendants | Defendants Goldman Sachs & Co. LLC, Morgan Stanley & Co. LLC, Barclays Capital Inc., Credit Suisse Securities (USA) LLC, Piper Sandler & Co., Wells Fargo Securities, LLC, JMP Securities LLC, KeyBanc Capital Markets Inc., and Telsey Advisory Group LLC |
| UPS | United Parcel Service |

**PRELIMINARY STATEMENT**

Rent the Runway is an emerging growth e-commerce company that pioneered the concept of apparel rentals through subscription plans and a-la-carte rentals for special events, work, and other occasions. As it did for many e-commerce companies, the emergence of COVID-19 in March 2020 posed tremendous challenges for RTR's business, as shelter-in-place orders restricted human interaction outside the home. RTR responded decisively and creatively to these unprecedented conditions, cutting costs, renegotiating contractual arrangements with its suppliers and revamping its inventory and consumer offerings. As 2021 progressed, and vaccines were developed and shelter-in-place orders were lifted, RTR's business improved significantly, with revenues and subscriber levels approaching pre-pandemic levels. RTR was poised for growth and so, after more than 10 years as a private company, the Company went public on October 27, 2021, issuing 17 million shares at $21 per share and using a portion of the proceeds to reduce its debt.

RTR's Offering Documents included extensive risk factor disclosures, warning investors of the many risks, uncertainties, and challenges it faced, including specific mentions of the Company's history of losses, untested business plan at scale, COVID risks and macroeconomic challenges, among many others. Unhappy with RTR's post-IPO stock price performance, Plaintiffs purport to assert claims under Sections 11 and 12(a)(2) of the Securities Act, alleging that the risk factors in the RS were false and misleading when made because the risks they warned of had supposedly already materialized before the IPO. According to Plaintiffs, RTR failed to disclose that customer demand was falling and that the cost of shipping on which RTR's business depended was rising, and hid the Company's losses from customer theft and its allegedly deficient efforts to combat fraud. None of that states a claim because these issues were either addressed in the RS, publicly available for any investor to see, or immaterial as a matter of law.

-1-

As the RS accurately disclosed, customer demand was *increasing* at the time of the offering (not declining as Plaintiffs inaccurately allege), with subscribers and revenues growing significantly. Indeed, except for subsequent, temporary dips in active subscribers in the wake of post-IPO events—*e.g.*, during Omicron when a new wave of closures caused several customers to "pause" their subscriptions—both total subscribers and revenues grew each quarter immediately after the IPO and for several quarters thereafter. These undisputed facts are dispositive: as caselaw uniformly holds, a securities law claim cannot be premised on a company's disclosure of accurate historical data, even where less favorable results later occurred or might have been predicted.

Plaintiffs' shipping cost claims rest on a similar fiction. As the documents incorporated in their own Complaint show, before the IPO (and after), RTR expressly warned that shipping costs were on the rise, creating "headwinds" for the Company. That could not have come as a surprise to any reasonable investor, as shipping cost increases during the pandemic were a market-wide, broadly reported phenomenon. And, while Plaintiffs fault RTR for changing national carriers before the IPO, that change was likewise publicly reported, part of RTR's ongoing efforts to control costs, and is not alleged to have had a negative impact on the Company's performance.

As to fraud and theft losses, the Company disclosed that it was subject to such losses, that it took steps to mitigate them, and that insurance against such losses was not always available. Nothing more was required. RTR had no obligation to disclose the dollar value of such losses because the amount was immaterial to its financial statements, which were audited by the Company's independent auditors. Nor was RTR obligated to reveal granular details about the steps it took to prevent such losses or to seek recovery from those who stole from it. In any case, pertinent information about the Company's efforts to combat theft and fraud was in the RS, on the Company's website, and in the public domain. No reasonable investor could have been misled.

But the deficiencies with the CAC do not stop there.

- Plaintiffs' reliance on anonymous sources changes nothing because the CAC pleads no facts showing that those sources were in a position to know about these matters and, in any case, their statements are too subjective, vague, and anecdotal to credit.

- Plaintiffs' attempt to repackage their omission claims as Item 303 and 105 violations fails because the CAC does not plead, as it must, that management had actual knowledge of undisclosed material trends that the Company did not disclose.

- There can be no claim under Section 12(a)(2) because the CAC does not plead that any of the RTR Defendants either sold shares to Plaintiffs or solicited them directly.

- The post-IPO declines in RTR's stock price were not caused by the revelation of any previously concealed truth, but rather by market forces outside RTR's control. This included a precipitous decline in the market price of unprofitable technology companies generally shortly after RTR went public and continuing into 2022, as investors gravitated away from "growth" companies in favor of those with more stable earnings, resulting in high, double-digit stock price declines for RTR and its Competitors. It also included the resurgence of COVID, the delay in employees returning to offices, inflation and other forces, all of which put downward pressure on the stock price of RTR and its Competitors.

In short, the Company's robust warnings did not mislead investors but informed them, and the fact that those risks later materialized is no basis to state a claim. The CAC should therefore be dismissed with prejudice.

## BACKGROUND[1]

### A.    Rent the Runway's Business

Rent the Runway was co-founded in 2009 by Jennifer Y. Hyman and Jennifer Fleiss to transform the way women get dressed. (Ex. 20 at 1, 12; ¶ 61.) They did so by creating the world's first and largest shared designer closet—the "Closet in the Cloud"—through which customers have

---

[1] The background set forth herein is drawn from the non-conclusory allegations of the CAC, which are accepted as true solely for the purpose of this Motion. The background is also drawn from documents referenced in the CAC, and documents that may be judicially noticed—including SEC filings, press releases, conference call transcripts, press coverage, and analyst materials. *See, e.g.*, *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007); *In re Danimer Sci. Sec. Litig.*, 2023 WL 6385642, *3 (E.D.N.Y. Sept. 30, 2023); *In re Express Scripts Holding Co. Sec. Litig.*, 2017 WL 3278930, *8-10 (S.D.N.Y. Aug. 1, 2017), *aff'd*, 773 F.App'x 9 (2d Cir. 2019).

access thousands of styles by over 750 designer brands, allowing them to wear what they want, when they want, without having to buy the product.  (Ex. 20 at 1, 118; ¶¶ 61-62.)  This saves customers money and time, while reducing clothing waste.  (Ex. 20 at 1; ¶¶ 62, 67.)

Rent the Runway has two primary ways it generates revenue:  subscription and an a-la-carte event rental "Reserve" offering.  (Ex. 20 at 1; ¶¶ 63-64.)  The biggest revenue driver in the business is the subscription offering, which allows customers to rent a certain number of items a month.  (*See* Ex. 20 at 1; ¶ 63.)  The "Reserve" business allows women to rent designer clothes and accessories, in advance, for special occasions at a fraction of the retail price.  (Ex. 20 at 87, 140; ¶¶ 63-64.)  Subscriptions renew automatically, but subscribers may disable this feature by canceling or pausing prior to the next month's bill date.  (Ex. 20 at 25.)  Throughout the relevant period, the Company reported both total subscribers (current paid subscribers and paused subscribers) and active subscribers (only current paid subscribers).  (Ex. 15 at 1, 3; Ex. 20 at 1, 3; *see also* Ex. 24 at 1; Ex. 41 at 1; Ex. 45 at 1; Ex. 50 at 1.)  Even though many customers have historically renewed their subscriptions, as the Company disclosed, its cancellation and pause options create uncertainty in predicting subscribers in the future.  (Ex. 20 at 25.)  As the Company also disclosed, subscriber figures fluctuate seasonally, with typically higher subscriber acquisition in March through May and September through November, and higher pause and cancel rates in the summer and mid-December through January.  (*See* Ex. 20 at 42; Ex. 25 (Tr.) at 9, 12; Ex. 42 (Tr.) at 9, 15-16; Ex. 46 (Tr.) at 8, 15; Ex. 51 (Tr.) at 8, 14-15.)

As of the time of the IPO, Rent the Runway had shipped over 40 million units, including garments and accessories.  (*See* Ex. 20 at 127, 168.)  A critical component of its business is thus fulfillment expenses—including the costs of inbound and outbound shipping, labor, packaging, cleaning, and other related expenses (*id.* at 98)—which fluctuate significantly based on volume of

orders as well as macroeconomic factors.  (*See, e.g.*, *id.* at 38, 42, 44, 101.)  For example, during the COVID-19 pandemic, e-commerce business in the U.S. increased dramatically, and national carriers like FedEx and UPS increased their pricing market-wide, and increasingly insisted on early termination clauses in their contracts more frequently than had previously been the norm.[2]  As it had done since inception, the Company sought ways to mitigate these increases, including by strategically transitioning carriers, adding a number of other regional carriers, and launching at-home pickup initiatives.  (*E.g.*, Ex. 10 at 105; Ex. 20 at 38; Ex. 25 (Tr.) at 6, 7-8, 11-12.)  Through these and other means, the Company successfully managed its fulfillment expenses, which decreased from 46% as a percentage of total revenue in fiscal year 2019 to 34% in fiscal year 2020 to 28% for the first six months of fiscal year 2021.  (Ex. 20 at 96, 100-01.)[3]

Like other retailers and e-commerce businesses, RTR occasionally experienced theft and other forms of fraud, including by employees, third parties, and customers.  (*Id.* at 62; ¶¶ 97-98, 100, 104, 134.)  RTR sought to mitigate these issues by charging late fees, up to the replacement costs for non-returned items (*see* Ex. 64), and through various fraud prevention measures, including proprietary technology, RFID tags, and other detection tools designed to identify irregular order patterns.  (Ex. 20 at 62-63, 168, F-10; ¶ 132.)  It also cooperated with authorities by pressing criminal charges (where appropriate[4]) and maintained insurance to cover such losses, although full coverage was not always available, or on favorable terms.  (Ex. 20 at 63; ¶ 136.)

---

[2] *See, e.g.*, Todd Benge, "Parcel Rates And Cost Impact in Q4 And 2021," *Talking Logistics* (Oct. 15, 2020) (Ex. 5); Alex Lennane, "More pain for shippers as FedEx hikes parcel surcharges yet again," *The Loadstar* (May 28, 2021) (Ex. 6); Paul Ziobro, "FedEx, UPS Rate Rises Are Making Online Shopping More Expensive," *Wall St. Journal* (Sept. 20, 2021) (Ex. 14); Mark Solomon, "Early-termination agreements a burr in parcel shippers' saddle," *FreightWaves* (June 9, 2022) (Ex. 44).

[3] The Company's fiscal year begins February 1, with first, second, and third quarters ending on April 30, July 31, and October 31, respectively.  (Ex. 20 at 84.)

[4] *See United States v. Barnes, et al.*, 3:19-cr-00257, Dkt. Nos. 188 (Ex. 2 at 8), 190 (Ex. 3 at 7) (N.D. Cal. filed June 4, 2019) (awarding $60,632 in restitution to RTR in criminal proceedings against two customers for inventory theft).

**B.**   **The Impact of COVID-19 on Rent the Runway's Business**

Rent the Runway's business was significantly negatively impacted by the COVID-19 pandemic. (*E.g.*, ¶¶ 70-72.) Due to a steep decline in special events and social gatherings, Rent the Runway's "Reserve" business declined precipitously. (*See* Ex. 20 at 27-28, 87, 94, 96.) Also, the decline in in-office work and social events caused many subscribers to pause or cancel their subscriptions or downgrade to lower-priced plans, especially as shelter-in-place and other restrictions were imposed. (*Id.* at 27-28, 94-96; ¶ 70.) Rent the Runway's results reflected these adverse effects, as revenue decreased from $256.9 million in fiscal year 2019 to $157.5 million in fiscal year 2020 (Ex. 20 at 3; ¶ 123), and total and active subscribers decreased from 147,866 to 95,245 and 133,572 to 54,797, respectively, during the same period (Ex. 20 at 3; ¶ 117).

In the months leading up to the IPO, however, Rent the Runway began to see significant improvements as vaccines became readily available, positivity rates declined, concerns about COVID-19 lessened, lockdown orders were lifted, and customers began to engage more outside the home. (*See* Ex. 20 at 27, 94-96, 107.) Revenue increased 39% from $33.5 million in 1Q21 to $46.7 million in 2Q21 (*id.* at 25, 105; ¶ 123), and, as of July 31, 2021 (the last day of 2Q21), total and active subscribers increased to 126,841 and 97,614, respectively, representing 17% and 80% gains over the same quarter the prior year (*see* Ex. 20 at 3, 8, 86).

**C.**   **Rent the Runway Launches its IPO**

On July 19, 2021, the Company announced its intention to go public (Ex. 9) and, shortly thereafter, conducted two presentations with analysts to review the Company's strategy and financial performance (Ex. 10; Ex. 11). Among other things, the Company noted the "quicker than expected" recovery it was seeing, both in terms of revenue and subscriber growth, since the pandemic began. (Ex. 10 at 140-41.) The Company also described its efforts to diversify its carrier

network beyond FedEx and UPS (*id.* at 105) in an effort to control transportation costs.

Rent the Runway subsequently provided analysts with a presentation, which noted that management "incorporated a negative impact from the delta variant in [their] projections starting in Q3'21" (Ex. 11 at 6), predicting a 6% increase in active subscribers from 98,000 at the end of 2Q21 to 104,000 at the end of 3Q21 (*id.* at 11), and an 11% revenue increase from $47 million in 2Q21 to $52 million in 3Q21 (*id.* at 14), as compared to 32% and 38% increases, respectively, from 1Q21 to 2Q21 (*see id.* at 11, 14).  The Company also addressed fulfillment costs, noting that one of the key "[d]rivers" was "[s]hipping rate headwinds beginning in Q3'21." (*Id.* at 24.)  Nearly two months later, Rent the Runway launched the roadshow for its IPO (Ex. 17), providing updates on its performance and noting (among other things) that, as of September 30 (a month before quarter end), active subscribers totaled 112,000, surpassing its end-of-quarter projection of 104,000 from just a couple months prior (Ex. 18 at 13).

The Registration Statement—first filed on October 4, 2021 (Ex. 15) and twice amended in response to SEC comments (Ex. 16; Ex. 19)—was deemed effective on October 26, and the Company went public on October 27, issuing 17 million shares at $21 per share (¶¶ 1, 106-07).

The Prospectus is replete with cautionary language regarding the risks of investing in Rent the Runway, both in a *46-page* risk factor section (Ex. 20 at 25-71; *see also* Annex B) and throughout its discussion of the Company's business.[5]  The very first risk factors cautioned that Rent the Runway had "grown rapidly in recent years" (Ex. 20 at 25), but had a short "track record[]" (*id.*), a "history of losses" (*id.* at 31), "limited experience at our current scale of operations" (*id.* at 25), and may not be able "to attract new, and retain existing, customers" (*id.* at

---

[5] For the Court's convenience, excerpts of the risk factor disclosures pertinent here are reproduced in Annex B.  *See Fogel v. Wal-Mart de Mexico SAB de CV*, 2017 WL 751155, *18 (S.D.N.Y. Feb. 27, 2017), *aff'd*, 759 F.App'x 18 (2d Cir. 2018) (accepting similar appendices as "organizational tools").

26, 30), and "achieve or sustain profitability" (*id.* at 27, 31-32). Rent the Runway's "recent growth rates and financial performance," it warned, "should not necessarily be considered indicative of our future performance." (*Id.* at 25.)

The Prospectus also included extensive discussion about the impact of COVID-19 on the Company's business. (*See id.* at 27-28, 94-96.) Many of the risk factors addressed the uncertainty surrounding COVID-19, including risks associated with the "spread of new variants of the virus" and "[t]he continued scope and duration of the pandemic." (*Id.* at 28.) Accordingly, the Company emphasized that "quarterly operating results and key metrics" could vary dramatically. (*Id.* at 39.)

Likewise, the Company repeatedly warned that it "anticipate[d] shipping cost headwinds due to macro global transportation network inefficiencies over the next several quarters." (Ex. 15 at 86; Ex. 16 at 92; Ex. 19 at 93.) The risk factors drove this point home, stressing that "[s]hipping and logistics are a critical part" of the Company's business, its reliance on "third-party shipping vendors," its past and current efforts to transition vendors and diversify its shipping network, and the risks associated with increased shipping costs. (Ex. 20 at 38; *see also id.* at 98.)

The Prospectus further warned that Rent the Runway had "in the past incurred and may in the future incur losses from various types of fraud," including from "customers who have failed to return rentals," and that those losses could be "significant." (*Id.* at 62.) It also described its various fraud prevention measures but cautioned that they may not be able to "adequately prevent" fraud (*id.* at 63) or "successfully manage these logistics" (*id.* at 38). The Company further noted it had insurance to cover "risks," including "crime," but warned such insurance may not be adequate "to cover losses that occur." (*Id.* at 63.)

**D.      Post-IPO Developments**

*3Q21.*  On December 8, 2021, Rent the Runway announced results for 3Q21 (¶ 139; Ex.

24), reporting that it exceeded its guidance both for revenue ($59 million vs. $52 million) (Ex. 24 at 1; Ex. 25 (Deck) at 7; Ex. 11 at 14) and active subscribers (about 117,000 vs. 104,000) (Ex. 24 at 1; Ex. 25 (Deck) at 6; Ex. 11 at 11), increases of 66% and 78% year-over-year, respectively. Total subscribers also increased to about 150,000, a 45% increase year-over-year.  (Ex. 24 at 1.) RTR also reported GAAP gross profit of $20 million (*id.*), beating the analyst consensus of $14 million.  (*See, e.g.*, Ex. 30 at 2.)  During an investor call that day (¶¶ 141-42), Ms. O'Sullivan explained how fulfillment costs had increased in absolute dollars (from $13.5 million to $19.2 million) but stayed relatively flat *as a percentage of revenue*—from 31% for 3Q20 to 33% for 3Q21—and decreased significantly from 52% in 3Q19 (Ex. 25 (Tr.) at 7).  She added that, as "anticipated" and "like many companies," Rent the Runway "started to see transportation headwinds during Q3 with price increases from national carriers," and that RTR "expect[ed] to see the full impact of these headwinds in Q4 and fiscal '22."  (¶ 142; Ex. 25 (Tr.) at 7.)[6]

Both Ms. Hyman and Ms. O'Sullivan also noted the recent arrival of Omicron (Ex. 25 (Tr.) at 6, 9, 17), which the WHO had classified as a new COVID-19 variant on November 26, and which was first detected in the U.S. on December 1.[7]  Ms. O'Sullivan stressed that the Company was "closely watching COVID and the Omicron variant and potential impact" (Ex. 25 (Tr.) at 9) but, based on trends to date, predicted its impact on the business would not differ significantly from the Delta variant (*id.* at 6, 17), which had previously been dominant.[8]  Looking forward, the Company forecasted a modest increase in active subscribers in 4Q21, noting that, in addition to

---

[6] Analysts had anticipated the same, with Goldman Sachs, for example, stating in November 2022, "Short-term, we expect shipping rate headwinds beginning in 3Q21 to drive de-leverage in fulfillment expense from 29% of revenue in 2Q21 to 36% in 3Q21 and 35% in 4Q21."  (Ex. 22 at 15-16.)

[7] Centers for Disease Control and Prevention, "First Confirmed Case of Omicron Variant Detected in the United States," https://www.cdc.gov/media/releases/2021/s1201-omicron-variant.html (Dec. 1, 2021) (Ex. 23).

[8] Kaia Hubbard, "CDC: Omicron Overtook Delta as Dominant Variant," *U.S. News & World Report* (Dec. 28, 2021) (Ex. 33).

seasonality, subscriber acquisition had typically been higher in Q3 versus Q4 since COVID-19 because of "fewer large-scale holiday and special events." (Ex. 25 (Tr.) at 9, 12.)[9]

Over the ensuing weeks, the Omicron variant spread like wildfire, including in New York, Washington, D.C., and San Francisco,[10] three of RTR's largest markets, and by January 4, 2022, it was responsible for 95% of new cases in the U.S.[11] Studies showed that Omicron was more than four times as transmissible as Delta,[12] leading to postponement of in-person school classes, changes in return-to-office plans, and cancellation of Broadway shows, parties, holiday gatherings, and other large events.[13]

*4Q21.* Unsurprisingly, the steep rise in infections and related closures and cancellations from Omicron had a significant impact on the Company's subscriber count, which it announced for Q4 and fiscal year 2021 on April 13, 2022. (¶¶ 144-46; Ex. 41.) Active subscribers totaled 115,240 (Ex. 41 at 1; Ex. 42 (Deck) at 15), roughly 5,000 (or 4%) less than the Company projected on December 8, 2021 (Ex. 24 at 2). Notwithstanding this decline, the Company reported above-expectations 4Q21 revenue of $64.1 million (Ex. 41 at 1; Ex. 42 (Deck) at 16), a 9% increase over 3Q21 and 91% over 4Q20, which both beat its guidance (Ex. 24 at 2) and the analyst consensus (*see, e.g.*, Ex. 43 at 2). RTR also reported $24 million in GAAP-gross profit (Ex. 24 at 1), beating

---

[9] Analysts also acknowledged that the "COVID hangover is resulting in fewer special holiday events" (Ex. 26 at 2), and noted the "industry-wide," "macro pressures" on shipping costs from carrier rate hikes (Ex. 28 at 1; Ex. 29 at 1, 4), which were "headwinds" for Rent the Runway as well as its "competitors" (Ex. 27 at 2).

[10] Steve Inskeep & Michaeleen Doucleff, "Scientists estimate record U.S. COVID cases attributed to the omicron variant," *NPR* (Dec. 27, 2021) (Ex. 32).

[11] Alexander Tin, "Omicron now 95% of new COVID-19 infections in U.S., CDC estimates," *CBS News* (Jan. 4, 2022) (Ex. 36).

[12] Jade Scipioni, "Omicron might be the worst Covid gets when it comes to transmissibility, experts predict," *CNBC* (Jan. 20, 2022) (Ex. 37).

[13] "Broadway Shows Canceled Again as Omicron Outbreak Threatens New York City & London," *Billboard* (Dec. 16, 2021) (Ex. 31); Joseph Ax & Lisa Shumaker, "U.S. schools delay openings as Omicron rages; New York City hits 33% positivity rate," *Reuters* (Jan. 3, 2022) (Ex. 35); Lauren Hirsch & Emma Goldberg, "As Omicron uncertainty mounts, return-to-office plans are being revised again," *NY Times* (Jan. 3, 2022) (Ex. 34); Nicole Hong, *et al.*, "New York's Recovery Took 2 Steps Forward. Omicron Sent it One Step Back," *NY Times* (Jan. 28, 2022) (Ex. 38).

the $17 million consensus estimate (*see, e.g.*, Ex. 43 at 2). And while fulfillment expenses again increased slightly on a dollar basis (¶ 145), they notably *decreased* as a percentage of revenue from 33% in 3Q21 to 32% in 4Q21 (*compare* Ex. 41 *with* Ex. 24).[14]

On that day's investor call, Ms. Hyman discussed the impact of COVID's "significant and unanticipated" resurgence, while noting that the Company still exceeded its guidance on total revenue and average revenue per subscriber. (Ex. 42 (Tr.) at 4.) Ms. O'Sullivan also discussed Omicron's impact on revenue and active subscribers but added that *total* subscribers still increased—up 6% quarter-over-quarter and 68% year-over-year (*id.* at 7)—meaning that the active subscriber decrease reflected an increase in the subscriber pause rate due to Omicron. Ms. O'Sullivan also shared that the Company had seen a "bounce back" coming out of Omicron at the mid-point of 1Q22, leading the Company to predict an increase in active subscribers to 130,000 to 132,000 by the end of 1Q22. (*Id.* at 9; *see also* ¶ 146; Ex. 41.)

*1Q22.* On June 9, RTR announced 1Q22 results, exceeding its guidance across all key metrics, growing revenue 100% year-over-year, and achieving a record 134,998 active subscribers. (¶ 148; Ex. 45 at 1; Ex. 46 (Deck) at 7-8.) And for the third straight quarter, the Company beat the analyst consensus for revenue and GAAP gross profit. (*See, e.g.*, Ex. 47 at 2.) While fulfillment expenses increased to $22.9 million (¶ 149; Ex. 45 at 7), they only represented 34% of revenue (*see* Ex. 45 at 7), well within the Company's expectations (*see* Ex. 46 (Tr.) at 7). During the investor call, Ms. O'Sullivan remarked that the increase was "largely due to transportation cost increases," as anticipated and previously warned, but noted that the Company had "been steadily diversifying [its] shipping partners" and thus was "maintain[ing]" its "prior expectation of

---

[14] The CAC mistakenly claims that the Company's reported net loss of $211.8 million was "an approximately $40 million greater loss than the same quarter a year prior." (¶ 144.) The $211.8 million figure was for the fiscal year of 2021. (Ex. 41 at 2.) Net loss for 4Q21 was only $39.3 million (a slight increase from $38.8 million in 4Q20), and net loss as a percentage of revenue decreased significantly, from 116% in 4Q20 to 61% in 4Q21. (*Id.*)

fulfillment costs as a percentage of revenue at approximately 34% for full year '22." (*Id.*)[15]

**2Q22.**   On September 12, Rent the Runway announced 2Q22 results.  (¶ 152; Ex. 50.) While the Company reported record quarterly revenue of $76.5 million (Ex. 50 at 1; Ex. 51 (Deck) at 11)—the fourth straight quarter that the Company beat its topline guidance (Ex. 45 at 2) and analyst consensus[16]—active and total subscribers dropped to 124,131 and 173,321, representing declines of 8% and 2%, respectively, from 1Q22 (*compare* Ex. 50 at 1 *with* Ex. 45 at 2; *see also* Ex. 46 (Deck) at 10)).[17]  During the earnings call, Ms. Hyman noted that, while the quarter began with record subscriber acquisitions, starting in mid-June, the Company "noticed an increase in subscriber pause rates and a decrease in retention along with [a] delay in former subscribers rejoining." (Ex. 51 (Tr.) at 4.)[18]  "It is becoming clear to us," she stated, "that our customers live, work, socialize and travel differently in 2022 than they did prior to the pandemic," and that "it remains difficult to predict how customers will behave." (*Id.* at 4-5, 12.)[19]

## E.      This Litigation

On September 5, 2023, Plaintiffs filed the CAC, challenging twenty-five statements[20] in

---

[15] The CAC alleges that RTR's stock price fell on June 10, 2022. (¶ 151.)  RTR's Competitors' stock prices all fell the same day (*see* Ex. 65), which also coincided with the announcement that day of a steeper-than-expected rise in U.S. consumer prices, leading all three major U.S. stock indices to fall approximately 3%, *see* Caroline Valetkevitch, "Wall Steet suffers biggest weekly loss since January after hot CPI data," *Reuters* (June 10, 2022) (Ex. 48).

[16] *See, e.g.*, Ex. 55 at 2.  And for the fourth straight quarter, RTR beat the consensus for GAAP gross profit. (*Id.*)

[17] The CAC alleges another drop in RTR's stock price on September 13, 2022 (¶ 155), but, again, RTR's Competitors all suffered declines that day (*see* Ex. 65), as they coincided with yet another increase in the consumer price index, resulting in the three major U.S. stock indices suffering the biggest one-day percentage drops since June 2020, *see* Stephen Culp, "Wall St tumbles to biggest loss in two years following CPI data," *Reuters* (Sept. 13, 2022) (Ex. 60.)

[18] RTR also implemented a price increase in April 2022, and the impact was seen in 2Q22.  (Ex. 51 (Tr.) at 7-8, 12.)

[19] The Company also announced a restructuring plan to reduce costs, streamline the organizational structure, and drive operating efficiencies (¶ 152; Ex. 50), with Ms. Hyman and Ms. O'Sullivan explaining that it was intended to help the Company achieve profitability sooner (*see* Ex. 51 (Tr.) at 5-6), not due to revenue and subscriber concerns, about which the Company remained optimistic (*see id.* at 7-8).  The Company reiterated as much on its next earnings call, for 3Q22, noting the three objectives were:  (1) transforming RTR's cash flow profile; (2) accelerating its path to profitability; and (3) allowing for more reinvestment to deliver value to customers.  (*See* Ex. 62 (Tr.) at 4-5.)

[20] A chart setting forth each challenged statement is annexed hereto as Annex A.

-12-

the Offering Documents as allegedly false and misleading—regarding customer demand, shipping costs, and theft/fraud—and asserting Securities Act claims under Sections 11 and 12(a)(2) (all Defendants) and Section 15 (Individual Defendants only).

## ARGUMENT

### I.   THE CAC FAILS TO ADEQUATELY PLEAD A SECTION 11 CLAIM

To state a claim under Section 11 of the Securities Act, a plaintiff must plead a material misstatement or omission of fact in a registration statement.  *See* 15 U.S.C. § 77k(a).   The registration statement must be read "as a whole," and the Court must consider whether the disclosures and representations, "taken together and in context," would have misled a reasonable investor.  *In re ProShares Tr. Sec. Litig.*, 728 F.3d 96, 103 (2d Cir. 2013); *In re Morgan Stanley Info. Fund Sec. Litig.*, 592 F.3d 347, 360 (2d Cir. 2010).

To allege an affirmative misstatement, a plaintiff must "do more" than assert that the challenged statements "were false and misleading." *Rombach v. Chang*, 355 F.3d 164, 174 (2d Cir. 2004).   They "must demonstrate with specificity why and how that is so," *id.*, by pleading facts that "contradict" the statement made or render it misleading, *Kocourek v. Shrader*, 391 F.Supp.3d 308, 324 (S.D.N.Y. 2019).   They must also plead that each challenged statement "was false *at the time it was made*," *In re Lululemon Sec. Litig.*, 14 F.Supp.3d 553, 571 (S.D.N.Y. 2014) (emphasis in original), *aff'd*, 604 F.App'x 62 (2d Cir. 2015), and may not "rely[] solely on hindsight," *Scott v. Gen. Motors*, 46 F.Supp.3d 387, 394 (S.D.N.Y. 2014), *aff'd*, 605 F.App'x 52 (2d Cir. 2015).

To allege an actionable omission, a plaintiff must plead "that the defendant had a duty to disclose the omitted fact," *Constr. Laborers Pension Tr. for S. Cal. v. CBS Corp.*, 433 F.Supp.3d 515, 531 (S.D.N.Y. 2020) (citation omitted), either because "a statement would otherwise be inaccurate, incomplete, or misleading" without it, *id.*, or because the defendant had a specific

-13-

statutory or regulatory duty to disclose, *see Morgan Stanley*, 592 F.3d at 365. Otherwise, "the securities laws do not create an affirmative duty to disclose any and all material information," *In re Pretium Res. Inc. Sec. Litig.*, 2020 WL 953609, *5 (S.D.N.Y. Feb. 27, 2020) (citation omitted), nor must a corporation "disclose the entire corpus of [its] knowledge" regarding an existing disclosure, *Morgan Stanley*, 592 F.3d at 366.[21] And, where "a registration statement warns of the exact risk that later materialized, a section 11 claim will not lie as a matter of law." *ProShares*, 728 F.3d at 102; *accord Elite Aviation LLC v. Credit Suisse AG*, 588 F.App'x 37, 38 (2d Cir. 2014); *Olkey v. Hyperion 1999 Term Tr.*, 98 F.3d 2, 5 (2d Cir. 1996).

For Securities Act claims "premised on allegations of fraud," a plaintiff must also satisfy Rule 9(b)'s heightened pleading standard. *Rombach*, 355 F.3d at 170-71. Accordingly, where a plaintiff pleads "no facts" to support a negligence theory, *In re Chembio Diagnostics, Inc. Sec. Litig.*, 616 F.Supp.3d 192, 202-03 (E.D.N.Y. 2022), and instead uses "wording and imputations" that are "classically associated with fraud"—such as allegations that the statements were "inaccurate *and* misleading" or "*untrue* statements of material facts"—Rule 9(b) applies, *Rombach*, 355 F.3d at 172. Here, because the CAC "contain[s] almost all of the same fraud-based buzzwords" that *Rombach* held were "sufficient to trigger" Rule 9(b),[22] to survive dismissal, the CAC must specify each challenged statement and explain with particularity why it was false and misleading when made. *In re AOL Time Warner Sec. & "ERISA" Litig.*, 381 F.Supp.2d 192, 214 (S.D.N.Y. 2004); *In re JP Morgan Chase Sec. Litig.*, 363 F.Supp.2d 595, 635 (S.D.N.Y. 2005).[23]

---

[21] *Accord Wandel v. Gao*, 590 F.Supp.3d 630, 640 (S.D.N.Y. 2022); *In re Tempur Sealy Int'l Sec. Litig.,* 2019 WL 1368787, *12 (S.D.N.Y. Mar. 26, 2019); *In re Rockwell Med. Sec. Litig.*, 2018 WL 1725553, *11 (S.D.N.Y. Mar. 30, 2018).

[22] For example, the CAC alleges RTR "misrepresented" the state of demand for its "subscription service" (¶ 116), omitted facts that were "known" to the Company that would or did have an unfavorable impact on results (¶¶ 127, 138), and issued statements that were "false and misleading" (*e.g.*, ¶¶ 121, 127, 129, 133, 138, 165, 171, 177).

[23] Where a complaint for violations of Sections 11 and/or 12(a)(2) sounds in fraud, Plaintiffs must also plead facts

The CAC falls far short of these standards.

## A.    The CAC Fails to Adequately Plead an Actionable Misstatement

The CAC challenges four affirmative statements in the RS related to customer demand, claiming that the Offering Documents "misrepresented" the "state of demand for Rent the Runway's subscription service."[24] (¶ 116.)  In particular, Plaintiffs challenge the Company's reported historical subscriber and revenue growth figures as well as its statements concerning the Company's "strong momentum" in 3Q21, the "minimal impact" it had experienced as a result of the Delta variant, and the "increased demand" it had seen as COVID-19 restrictions relaxed and virus positivity rates declined.  (¶¶ 119-20.)[25]  According to Plaintiffs, these statements were false and misleading because, based on the allegations of certain FEs (¶¶ 76-86), the "number of subscribers was materially trending down at the time of the IPO and the Company was materially not meeting internal subscriber enrollment projections" (¶ 121).  Even if the Court were to credit the FEs' statements—and it should not (*see infra* at 18-19)—none of that states a claim.

Critically, Plaintiffs do not allege that the historical performance figures reported in the RS were inaccurate, including the Company's disclosures about the significant increases in total and active subscribers (¶¶ 118-19) and revenues (¶ 123) in the period leading up to the IPO (*see* Annex C).  Instead, they claim that the Company's past performance reporting was misleading because it implied that RTR's subscribers and revenues would continue to grow when subscriber numbers were "trending down."  (¶¶ 8, 121, 126-27.)  But a violation of federal securities laws "cannot be

---

sufficient to support the inference that Defendants acted with *scienter*.  *See Chembio*, 616 F.Supp.3d at 203-04; *JP Morgan*, 363 F.Supp.2d at 635; *Coronel v. Quanta Cap. Holdings*, 2009 WL 174656, *15-16 (S.D.N.Y. Jan. 26, 2009); *Ladmen Partners v. Globalstar*, 2008 WL 4449280, *11-12 (S.D.N.Y. Sept. 30, 2008); *In re CIT Grp. Sec. Litig.*, 349 F.Supp.2d 685, 690 & n.4 (S.D.N.Y. 2004).  The CAC does not even attempt to plead scienter.

[24] The CAC does not allege any affirmative misrepresentations concerning transportation costs or theft/fraud losses, instead relying on an omissions theory in support of those claims.  (Point I.B, *infra*.)

[25] *See* Annex A at 1.

premised upon a company's disclosure of accurate historical data," *Plumber & Steamfitters Loc. 773 Pension Fund v. Danske Bank*, 11 F.4th 90, 98-99 (2d Cir. 2021).[26]  To the extent Plaintiffs suggest these historical figures were false due to allegedly negative *existing* trends, that contention fails too because "disclosure of accurate historical data does not become misleading even if less favorable results might be predictable by the company in the future."  *In re Duane Reade Sec. Litig.*, 2003 WL 22801416, *6 (S.D.N.Y. Nov. 25, 2003) (citation omitted), *aff'd*, 107 F.App'x 250 (2d Cir. 2004); *see also In re Sibanye Gold Sec. Litig.*, 2020 WL 6582326, *14-15 (E.D.N.Y. Nov. 10, 2020) (disclosure of accurate historical data about miner safety not misleading despite allegations that improvements were "illusory").[27]

Plaintiffs' challenge to the Company's statements about the "increased demand" it had seen and the "minimal impact" of the Delta variant is equally infirm.  (¶¶ 119-20.)  The truth of those statements is borne out by the Company's accurately reported performance figures—nowhere disputed—which showed increases in subscribers and revenues despite Delta becoming the dominant variant in the U.S. by June 1, 2021.[28]  For example, after declining precipitously from the start of the pandemic through spring 2021 (when the COVID-19 vaccine first became available and shelter-in-place and other restrictions were gradually relaxed),[29] Rent the Runway's revenues steadily increased from $33.5 million for 1Q21, to $46.7 million for 2Q21, and to $59.0 million for 3Q21.  (Ex. 20 at 105; Ex. 24 at 1.)

---

[26] *Accord In re Coty Inc. Sec. Litig.*, 2016 WL 1271065, *6 (S.D.N.Y. Mar. 29, 2016); *Stratte-McClure v. Morgan Stanley*, 598 F.App'x 25, 28 (2d Cir. 2015); *In re Sanofi Sec. Litig.*, 155 F.Supp.3d 386, 404 (S.D.N.Y. 2016); *Medina v. Tremor Video*, 2015 WL 1000011, *4 (S.D.N.Y. Mar. 5, 2015), *aff'd*, 640 F.App'x 45 (2d Cir. 2016); *Schaffer v. Horizon Pharma PLC*, 2018 WL 481883, *9 (S.D.N.Y. Jan. 18, 2018).

[27] *Accord Bldg. Trades Pension Fund of W. Pa. v. Insperity, Inc.*, 2022 WL 784017, *9 (S.D.N.Y. Mar. 15, 2022); *Holbrook v. Trivago*, 2019 WL 948809, *20 n.23 (S.D.N.Y. Feb. 26, 2019), *aff'd*, 796 F.App'x 31 (2d Cir. 2019).

[28] CDC, "CDC Museum COVID-19 Timeline," https://www.cdc.gov/museum/timeline/covid19.html (Ex. 7).

[29] *See, e.g.*, "Governor Cuomo Announces COVID-19 Restrictions Lifted as 70% of Adult New Yorkers Have Received First Dose of COVID-19 Vaccine," https://www.governor.ny.gov/news/governor-cuomo-announces-covid-

That leaves Plaintiffs' challenge to the Company's statement that it was "continu[ing] to experience strong momentum" in 3Q21. (¶ 121.) That faulty contention likewise fails.

*First*, Plaintiffs' assertion that the number of subscribers was trending down by the time of the IPO is belied by the documents upon which Plaintiffs rely (Ex. 20 at 3, 9; Ex. 24), which clearly show that subscribers *increased* during 3Q21. To the extent Plaintiffs mean to show falsity through post-IPO subscriber decreases—*e.g.*, in 4Q21 due to the rise of Omicron—they cannot plead falsity through a "backward-looking assessment" of the Prospectus. *Olkey*, 98 F.3d at 7; *Gutman v. Lizhi Inc.*, 633 F.Supp.3d 681, 690 (E.D.N.Y. 2022) (dismissing Section 11 claims where "it is only with hindsight" that plaintiff could plead falsity).[30]

*Second*, whether the Company was meeting "internal" subscriber projections is irrelevant because such "internal calculations and projections are not material facts that are required to be disclosed." *In re N.Y. Community Bancorp. Sec. Litig.*, 448 F.Supp.2d 466, 480-81 (E.D.N.Y. 2006); *see also In re N. Telecom Ltd. Sec. Litig.*, 116 F.Supp.2d 446, 458-59 (S.D.N.Y. 2000) ("The federal securities laws do not obligate companies to disclose their internal forecasts.").[31]

*Third*, the statement that the Company was experiencing "strong momentum" is classic inactionable puffery—*i.e.*, statements of corporate optimism "too general" to be relied upon. *ECA, Local 134 IBEW Joint Pension Tr. of Chicago v. JP Morgan Chase Co.*, 553 F.3d 187, 206 (2d Cir. 2009). Indeed, courts have rejected Securities Act claims based on virtually identical statements. *See Greco v. Qudian Inc.*, 2022 WL 4226022, *18-20 (S.D.N.Y. Sept. 13, 2022) ("driven by strong momentum"); *In re Nokia Oyj Sec. Litig.*, 423 F.Supp.2d 364, 397-98 (S.D.N.Y.

---

19-restrictions-lifted-70-adult-new-yorkers-have-received-first (June 15, 2021) (Ex. 8).

[30] *Accord In re HEXO Corp. Sec. Litig.*, 524 F.Supp.3d 283, 300-01 (S.D.N.Y. 2021); *In re Donna Karan Int'l Sec. Litig.*, 1998 WL 637547, *15 (E.D.N.Y. Aug. 14, 1998).

[31] *Accord Donna Karan*, 1998 WL 637547, *12; *Sheppard v. TCW/DW Term Tr. 2000*, 938 F.Supp. 171, 177-78 (S.D.N.Y. 1996).

2006) ("continued momentum"); *In re Symbol Techs. Class Action Litig.*, 950 F.Supp. 1237, 1243 (E.D.N.Y. 1997) (results expected "to be strong" and "continue with the momentum"); *Schoenhaut v. Am. Sensors*, 986 F.Supp. 785, 791-92 (S.D.N.Y. 1997) ("continued strong demand").[32]

Plaintiffs' reliance on the alleged statements of FEs 1-4 does not and cannot alter the result.

- The CAC fails to establish how these FEs—who worked in customer service (¶¶ 77, 80), managed a single fulfillment center (¶ 82), or worked in inventory control (¶ 84)—would have had access to granular subscription and revenue information, much less at a Company-wide level. Because Plaintiffs do not allege facts sufficient "to support the probability that a person in the position occupied by the source would possess the information alleged," *Novak v. Kasaks*, 216 F.3d 300, 314 (2d Cir. 2000), these FE statements should be rejected.[33]

- The facts alleged by the FEs did not clearly occur "before the Registration Statement became effective," *Coty*, 2016 WL 1271065, *6, as required. (*See* ¶ 85 (alleging certain remarks were made at meetings sometime at "tail end of COVID"); ¶ 83 (alleging certain remarks were made at meetings that occurred from "approximately August 2021 to December 2021"); ¶ 79 (alleging that certain remarks were made "during her tenure," which was November 2020 to September 2022); ¶ 78 (alleging customers were cancelling subscriptions "at the time" of the IPO, not before).) *See In re Doral Fin. Sec. Litig.*, 563 F.Supp.2d 461, 466 (S.D.N.Y. 2008) (rejecting allegations about meetings attended by CW on timing grounds), *aff'd*, 344 F.App'x 717 (2d Cir. 2009).[34]

- That some FEs allegedly attended certain meetings during which internal subscriber numbers were supposedly discussed (¶¶ 78-79, 83, 85) does not suffice because, even

---

[32] The CAC asserts that Ms. Hyman "essentially admitted that the Company had no plan during the pandemic or before its IPO on how to reacquire the customers it lost during the pandemic," based on remarks she made during an interview with the *Wall Street Journal* in July 2022. (¶ 86.) Plaintiffs take those comments out of context. Ms. Hyman explained how the Company lost more than 50% of its subscribers in a five-day period in March 2020, and how her "optimism" drove the prompt, prescient actions they took—including renegotiating with partners, securing additional funding, and changing their subscription models—all of which made the Company stronger. (Ex. 49.) That hardly constitutes the "admission" Plaintiffs claim. *See Finger v. Pearson PLC*, 2019 WL 10632904, *12 (S.D.N.Y. Sept. 16, 2019) (finding that statements taken "completely out of context" do not demonstrate falsity).

[33] *Accord Gross v. AT&T*, 2021 WL 9803956, *6 n.14 (S.D.N.Y. Sept. 27, 2021) (rejecting CW accounts "with no accompanying facts that would allow the [c]ourt to reasonably infer that the CW would have been in a position to know the facts relayed"); *Schiro v. Cemex, S.A.B. de C.V.*, 396 F.Supp.3d 283, 305 (S.D.N.Y. 2019) (same); *Loc. No. 38 Int'l Bhd. of Elec. Workers Pension Fund v. Am. Express Co.*, 724 F.Supp.2d 447, 460-61 (S.D.N.Y. 2010) (discounting testimony of "rank-and-file" CWs with no access to relevant data), *aff'd*, 430 F.App'x 63 (2d Cir. 2011); *In re Sierra Wireless Sec. Litig.*, 482 F.Supp.2d 365, 376 (S.D.N.Y. 2007) (rejecting account where plaintiffs failed to indicate how, given his role, CW "would be in a position to know" about defendant's strategy).

[34] *Accord In re Wachovia Equity Sec. Litig.*, 753 F.Supp.2d 326, 352 (S.D.N.Y 2011) (CW "allegations about an unspecified time period cannot supply specific contradictory facts available to [d]efendants at the time of an alleged misstatement"); *Woolgar v. Kingstone Cos.*, 477 F.Supp.3d 193, 221-22 (S.D.N.Y. 2020) (rejecting CW allegations because CWs were "employed before and after" relevant period, "making it unclear whether the purported issues" existed during the relevant period).

assuming *arguendo* that internal projections were material (and they are not), their allegations lack any details as to what the internal projections were, the extent to which those projections were missed, and for what period. *See Caiafa v. Sea Containers Ltd.*, 525 F.Supp.2d 398, 411 n.10 (S.D.N.Y. 2007) (rejecting CW allegation that products were "overvalued" where failed to "specify the amount" and "at what times").[35]

- FE-1's claim that "over 100 Rent the Runway customers were cancelling/churning their subscriptions per day" (¶ 78) is insufficient too because the CAC does not establish when this occurred, for how long, or that the rate of alleged cancellations/churns was inconsistent with rates the Company experienced. *See Ford*, 2016 WL 3982466, *6 (CW's allegations of sales decline provided "no indication of the time period," the "magnitude of the alleged decline," or its impact on "[c]ompany's reported sales figures"); *see also In re Micro Focus Int'l Sec. Litig.*, 2020 WL 5817275, *7-8 (S.D.N.Y. Sept. 29, 2020) (CW's general allegations about "customer attrition" not sufficient to show it was "wide-spread" at relevant time).[36]

- And, while the FEs purport to attribute statements to Ms. Hyman and/or Ms. O'Sullivan that the Company was "going through rough times because we're not getting as many subscribers as we want" (¶ 83) and "did not meet its subscriber enrollment projections" (¶ 85), their allegations are too conclusory, generalized, and vague to plead falsity. *See Lululemon*, 14 F.Supp.3d at 580 (CW statements that individual defendants "acknowledged" product issue lacked sufficient detail); *Golesorkhi v. Green Mtn. Coffee Roasters*, 973 F.Supp.2d 541, 555-56 (D. Vt. 2013) (CW statements about meetings attended by individual defendants too "generalized" to show falsity).

In short, such vague, general allegations from unknown employees that, at unknown times, Rent the Runway was missing unknown, aspirational, internal enrollment projections by unknown amounts do not "nudge" Plaintiffs' misstatement claims "across the line from conceivable to plausible," *In re IAC/InteractiveCorp Sec. Litig.*, 695 F.Supp.2d 109, 119 (S.D.N.Y. 2010), let alone provide the specificity required under Rule 9(b). *See San Leandro Emergency Med. Grp. Profit Sharing Plan v. Philip Morris Cos.*, 75 F.3d 801, 812 (2d Cir. 1996) (holding as insufficient "unsupported general claim of the existence of confidential company sales reports that revealed [a] larger decline in sales"); *Coty*, 2016 WL 1271065, *6 (holding as insufficient "conclusory,

---

[35] *Accord Ford v. Voxx Int'l*, 2016 WL 3982466, *6 (E.D.N.Y. July 22, 2016) (rejecting CW allegations regarding declining sales as "overly vague because there is no indication of the time period to which the statements refer"). *Gross*, 2021 WL 9803956, *6 n.14 (rejecting CW allegations "not moored to a . . . particular time").

[36] *Accord In re Qudian Inc. Sec. Litig.*, 2019 WL 4735376, *6 (S.D.N.Y. Sept. 27, 2019) (disregarding allegations of CW who provided information about period earlier than IPO "without facts that might corroborate" his statements).

nonspecific statements" from CWs that sales were "struggling," "underperform[ing]," "forecasted to be down," and "smaller than expected").

**B.      The CAC Fails to Adequately Plead an Actionable Omission**

Plaintiffs also allege that a small, cherry-picked handful of Rent the Runway's fulsome risk factor disclosures were false and misleading when made because, while each allegedly purported to describe "***potential*** negative impacts on the Company's business, financial condition, and results of operations," the Company failed to disclose certain "significant, ***then-existing*** material events and adverse trends or uncertainties that Rent the Runway ***had already been*** facing at the time of the IPO." (¶¶ 126-27, 129, 131, 133, 137-38 (emphases in original).)  Plaintiffs' omission theory is equally flawed and likewise fails to state a cognizable claim.

**1.      The customer demand risk factor disclosures were not false or misleading.**

Rent the Runway warned investors of its limited track record of success and history operating at its current scale (Ex. 20 at 25-27), the numerous factors that could adversely affect customer engagement (including the uncertain effects of COVID-19) (*id.* at 30-31, 38-39), and the ease with which subscribers could cancel or pause subscriptions at any time (*id.* at 25).  As a result of these and other uncertainties, the Company made clear "it is difficult to evaluate [its] current business and future prospects," that it "may not grow as much or as fast as we expect," that "there can be no assurance that [it] will be able to retain a significant portion of subscribers beyond the existing monthly subscription periods," and, thus, that "the forecasts of market growth included in this prospectus should not be taken as indicative of our future growth." (*Id*. at 25-26, 49).

Notwithstanding those robust warnings, Plaintiffs challenge those risk factors cautioning investors that Rent the Runway had "limited experience at [its] current scale of operations," that it may not be able to effectively manage and maintain its current growth trajectory or to "attract new,

-20-

and retain existing, customers," and that failure to do so could adversely affect the Company's performance. (¶¶ 123-25.) Per Plaintiffs, those risk factors were false and misleading because the Offering Documents failed to disclose that, at the time of the IPO, (i) the number of subscribers was trending down, (ii) the Company was failing to attract and retain customers, and (iii) the Company's growth rate was already slowing and declining. (¶ 126.)[37]  None of that is correct.

As noted above, the number of total and active subscribers was at all times accurately reported and had been *increasing* in advance of the IPO, not trending down, and nothing in the CAC disputes that fact. (*Supra* at 15-17.)  *See Coty*, 2016 WL 1271065, *11 (risk disclosures not misleading when plaintiffs failed to allege facts establishing that alleged events were occurring at time of IPO).[38]  The conclusory allegation that the Company was failing to attract new customers and retain existing customers at the time of the IPO is thus implausible because it is contradicted by indisputable facts.

As to the *rate* of growth, investors could discern for themselves from the "hard financial data," *In re Donna Karan*, 1998 WL 637547, *11 n.12, in the Prospectus that the Company's growth rate had been inconsistent, with percentage gains in subscribers and revenues fluctuating both before the pandemic and through to the IPO (Ex. 20 at 105-06).[39]  The 3Q21 guidance shared in advance of the IPO also made it clear that the Company expected a slower rate of growth as

---

[37] The CAC also alleges that the customer demand risk factors were misleading because RTR failed to disclose that it was not meeting internal subscriber enrollment projections. (¶¶ 126-27.)  As noted above, however, an issuer has no duty to disclose internal projections and the failure to do so cannot ground a Securities Act claim. (*See supra* at 17.)

[38] *See also Yaroni v. Pintec Tech. Holdings*, 600 F.Supp.3d 385, 396-99 (S.D.N.Y. 2022) (risk disclosures not misleading where plaintiff failed to allege risk had materialized at time of IPO); *accord Micro Focus*, 2020 WL 5817275, *7-9; *Dresner v. Utility.com*, 371 F.Supp.2d 476, 496-500 (S.D.N.Y. 2005).

[39] For example, in 2019, the growth rates for active subscribers went from 5% between Q1 and Q2, to 12% between Q2 and Q3, to 12% between Q3 and Q4, while the growth rates for revenue for the same periods went from 14% to 1% to 15%, respectively. (Ex. 20 at 105-06.)  Similarly, leading up to the IPO, the growth rates for active subscribers went from -16% between 3Q20 and 4Q20, to 35% between 4Q20 and 1Q21, to 32% between 1Q21 and 2Q21, while the revenue growth rates for the same periods went from -6% to 0% to 39%, respectively. (*Id.*)

compared to 2Q21.  (*See* Ex. 11 at 11, 14.)[40]  In any event, the Company was transparent about this expectation, warning that "[f]luctuations in our quarterly operating results and key metrics may be particularly pronounced in the current economic environment due to the uncertainty caused by, and the unprecedented nature of, the COVID-19 pandemic, consumer spending patterns, and the impacts of the gradual reopening of the offline economy and lessening of restrictions on movement." (Ex. 20 at 39.)  No reasonable investor could have been misled, and the fact that these warned-of risks later materialized bars Plaintiffs' claim.  *See ProShares*, 728 F.3d at 102.

     2.     **The shipping costs risk factor disclosures were not false or misleading.**

Plaintiffs concede that Rent the Runway warned that a "substantial majority" of its inbound shipments came via "a single vendor," that the Company had "from time to time transitioned" vendors and was "currently in the process" of doing so, that it could not "predict how this transition may impact [its] costs," and that future increased shipping costs "could damage our reputation and brand and may substantially harm our business." (¶¶ 94, 128, 130.)  Nor do Plaintiffs contest the numerous additional warnings the Company made leading up to the IPO, including that it "anticipate[d] shipping cost headwinds due to macro global transportation network inefficiencies over the next several quarters." (Ex. 15 at 86; Ex. 16 at 92; Ex. 19 at 93; *see also* Ex. 11 at 21-24.)  The Company's advance warnings of the very risks that materialized foreclose any claim. *See ProShares*, 728 F.3d at 102.[41]

Plaintiffs claim the challenged risk disclosures are nonetheless actionable because RTR

---

[40] For example, the Company projected a 6% increase in active subscribers from 2Q21 to 3Q21 (as compared to a 32% increase from 1Q21 to 2Q21), and an 11% increase in revenue from 2Q21 to 3Q21 (as compared to a 38% increase from 1Q21 to 2Q21).  (*Compare* Ex. 11 at 11, 14 *with* Ex. 20 at 105-06.)

[41] *See also Sandoz v. Waterdrop Inc.*, 2023 WL 1767526, *9 (S.D.N.Y. Feb. 3, 2023) (rejecting claim that registration statement failed to warn about increased spending where it warned that such costs "may increase"); *Nurlybayev v. ZTO Express*, 2019 WL 3219451, *6-7 (S.D.N.Y. July 17, 2019) (disclosures regarding increasing transportation costs not misleading where company warned of risks associated with higher transportation costs in future).

failed to disclose that, "prior to the IPO," it had switched from UPS to FedEx as its primary shipping vendor as UPS was "too expensive to be sustainable," that FedEx had "reliability issues," and that, "just before the IPO, FedEx doubled its shipping rates," forcing RTR "to switch back to the already prohibitively expensive UPS." (¶¶ 91-94, 129, 131.)  But the CAC does not link these alleged omissions to the challenged statements, *see, e.g.*, *CBS Corp.*, 433 F.Supp.3d at 531, nor offer any plausible reason why they rendered the Company's disclosures false and misleading.

For example, there was no duty to reveal the *names* of RTR's shipping vendors,[42] or the *terms* of its new arrangement with UPS.[43]  In any event, it was publicly reported that the Company switched from UPS to FedEx in 2020[44] and back to UPS in 2021,[45] and the salient details of its agreement with UPS were public as well.  Indeed, while the SEC originally suggested that the UPS contract be annexed to the Registration Statement as a "material contract" under Item 601(b)(10), it abandoned that position once Rent the Runway explained that it "[did] not believe it [was] substantially dependent on this shipping vendor," that "there are no exclusivity requirements" under its shipping agreement with the vendor, and that the Company had the "flexibility" to change shipping vendors "again as needed." (*Compare* Ex. 12 at 8 *with* Ex. 13.)[46]

If Plaintiffs mean to suggest the Company should have disclosed that UPS was more

---

[42] *See Pehlivanian v. China Gerui Advanced Materials Grp.*, 2016 WL 2859622, *10 (S.D.N.Y. May 16, 2016) (no duty to disclose counterparty to purchase agreement).

[43] *See Pehlivanian*, 2016 WL 2859622, *10 (no duty to disclose "every detail and contour of a [c]ompany transaction simply because it may be relevant or of interest to a reasonable investor" (citations omitted)); *In re DSP Grp., Inc. Sec. Litig.*, 1997 WL 678151, *5 (N.D. Cal. Mar. 5, 1997) (no "duty to disclose the detailed terms of every new license agreement they announced.").

[44] Robyn Turk, "Rent the Runway closes all brick-and-mortar business," *Fashion United* (Aug. 17, 2020) (noting that "[t]he company recently switched its shipping partner from UPS to FedEx") (Ex. 4).

[45] "Rent the Runway jumps in trading debut," *Yahoo! Finance* (Oct. 27, 2021) ("Even earlier this year, you all switched your fulfillment provider from FedEx to UPS, and that's a switch, I believe, you've made several times over the course, over the lifetime in the business.") (Ex. 21).

[46] *Cf. Geiger v. Solomon-Page Grp.*, 933 F.Supp. 1180, 1187-88 (S.D.N.Y. 1996) (noting that "[t]he fact that the SEC does not require disclosure of" certain information supports the conclusion that the information is not material "because it reflects the SEC's expert view").

expensive than FedEx, their own allegations undercut their claim.  They imply, for example, that the switch back to UPS was cost-prohibitive because UPS was more expensive *in the past*.  (¶¶ 92, 129, 131.)  But whether UPS had *historically* been more expensive than FedEx does not show that UPS was the more expensive of the two carriers *at the time of the IPO*.  *See Coty*, 2016 WL 1271065, *6.  What is more, the CAC alleges that the switch to UPS was prompted when FedEx "doubled" its rates (¶¶ 93, 129, 131), but the only logical inference flowing from that allegation is that UPS was more cost-effective than FedEx at the pertinent time, not less so.[47]

None of the FE statements compels a different result.  FE-1 worked in "Customer Experience" (¶ 77) and FE-4 worked in "Inventory Control and Quality Assurance" (¶ 84), but the CAC pleads no facts to suggest that either was in a position to know the specifics of the Company's contractual pricing arrangements with its shipping vendors.  (*See supra* at 18.)  Moreover, the statements that UPS was "too expensive to be sustainable" and "prohibitively expensive" (¶ 92) are too conclusory, subjective, and vague to support the inference Plaintiffs seek.  *See supra* at 19; *Ford*, 2016 WL 3982466, *6 (rejecting CW's "opinion" that "products were too expensive").[48]

### 3. The theft/fraud prevention risk factors were not false or misleading.

Plaintiffs also allege that Rent the Runway's risk factor disclosures concerning its theft and fraud prevention measures were misleading because, per several FEs, the Company failed to disclose that thefts "were materially increasing" to the tune of "$6 million in revenue annually," that such thefts were "facilitated" by the use of return drop boxes, that the Company "did not have policies or procedures in place to prevent fraud" and took virtually no actions "against customers

---

[47] Rent the Runway's relationship with UPS has continued to prove sustainable and favorable, with RTR negotiating a new agreement with UPS "to lock in competitive rates and consolidate" most of their shipping needs.  (Ex. 63.)

[48] *Accord Kemp v. Universal Am. Fin. Corp.*, 2007 WL 86942, *13 (S.D.N.Y. Jan. 10, 2007) ("mere opinions" of CWs not actionable).

who stole rented merchandi[s]e," and that the Company "was only able to obtain successful insurance claims on approximately 35% of 'lost' packages and insurance claims were capped at $100 plus shipping costs." (¶¶ 133, 137.) None of those purported omissions is actionable.

As a threshold matter, the Company clearly disclosed that theft and fraud were more than a mere possibility, stating, "***[w]e have in the past incurred*** and may in the future incur losses from various types of fraud, including . . . customers who fraudulently rented multiple products at once and customers who have failed to return rentals." (Ex. 20 at 62; ¶ 134 (emphasis added).) The Company also disclosed that it had "implemented fraud prevention measures, such as detection tools to identify irregular or high risk customer order patterns, to reduce the risk of fraud." (Ex. 20 at 62; ¶ 132.) And it disclosed that Rent the Runway had "procure[d] third-party insurance policies to cover various operations-related risks including . . . crime" (Ex. 20 at 63; ¶ 136), but warned that it could not "guarantee" that it would "continue to receive adequate insurance coverage on favorable terms," or that it "would be able to secure replacement coverage on reasonable terms or at all" (Ex. 20 at 63; ¶ 136). The notion that Rent the Runway did not caution investors that it was subject to customer theft and fraud (like other retail or e-commerce companies) and that fraud-based losses might not be fully insured is thus entirely meritless. *See ProShares*, 728 F.3d at 102.

Plaintiffs seem to believe that additional, detailed disclosure was required (*see* ¶¶ 133, 137-38), but that is not so. As to the value of stolen merchandise, the dollar value was not material. Even crediting FE-2's allegation that the Company lost $6 million in revenue annually due to theft (¶¶ 98, 133, 137, 138), that comprises less than 3% of the Company's 2021 annual revenue of $203.3 million (Ex. 41), an amount too small to be material as a matter of law. *See, e.g., ECA*, 553 F.3d at 204 (adopting SEC's "five percent numerical threshold" for materiality) (quoting SEC Staff Accounting Bulletin No. 99, 64 Fed. Reg. 45,150, 45,151 (1999)); *Hutchison v. Deutsche*

*Bank Secs.*, 647 F.3d 479, 488-89 (2d Cir. 2011) (misstatement of 4.7% of loan portfolio immaterial); *accord In re XP Inc. Sec. Litig.*, 524 F.Supp.3d 23, 33 (E.D.N.Y. 2021).[49]

Nor can Plaintiffs point to any authority supporting their contention that any of the other purportedly omitted items—alleged inefficiencies regarding the Company's fraud prevention procedures, purported issues with the expansion of drop boxes, and details of the Company's insurance coverage—were material either. *See, e.g.*, *San Leandro Emergency Med. Grp.*, 75 F.3d at 809-12 (no duty to disclose internal company policies); *In re Overstock Sec. Litig.*, 2020 WL 5775845, *7 (D. Utah Sept. 28, 2020) (no duty to disclose limitations on insurance coverage); *Pehlivanian v. China Gerui Advanced Materials Grp., Ltd.*, 153 F.Supp.3d 628, 651-52 (S.D.N.Y. 2015) (no duty to disclose changes to production, expansion, diversification strategies). Moreover, the law is clear that "[c]orporations are not required to phrase disclosures in pejorative terms." *Dalberth v. Xerox Corp*, 766 F.3d 172, 186-87 (2d Cir. 2014).[50]

In any event, the CAC relies entirely on the statements of various FEs to support its falsity allegations, but again, they lack the detail necessary to do so:

- The CAC fails to explain how FE-2—who "estimated that the Company lost at least $500,000 every two months" (¶ 98)—would have had access to granular revenue information, given his role as a customer service Training Specialist (¶ 80). *See Woolgar*, 477 F.Supp.3d at 219 (none of CWs "alleged to have specific experience with or knowledge of" company reserving practices or loss estimates); *accord In re Blockbuster Sec. Litig.*, 2004 WL 884308, *13 (N.D. Tex. Apr. 26, 2004). Regardless, this was an immaterial amount. (*See supra* at 25-26.)

- The FEs' statements about RTR's supposed failure to take action against customers who stole merchandise (¶¶ 97, 101) are conclusory and contradicted by the public record (*see, e.g.*, *supra* at 5 and n.4) and RTR's failure to return policy (*see* Ex. 64).

- The FEs' statements concerning the "significant amount of money" from "tons" of lost

---

[49] Moreover, the Company's financial reporting was reviewed by an independent auditor. (*E.g.*, Ex. 20 at 47, 189, F-2.) If the auditor had identified theft at a material level, that figure would have been disclosed.

[50] *Accord Solow v. Citigroup*, 2012 WL 1813277, *4 (S.D.N.Y. May 18, 2012), *aff'd*, 507 F.App'x 81 (2d Cir. 2013); *Singh v. Schikan*, 106 F.Supp.3d 439, 448 (S.D.N.Y. 2015).

packages (¶ 104) and theft losses being "pretty significant" (¶ 105) are too vague and subjective to support a misstatement claim (*see supra* at 19, 24).[51]

- And the FEs' references to a "notorious" customer who stole merchandise (¶ 97) and misconduct by "some customers" or employees (¶¶ 98, 100, 104) are too "anecdotal" to credit. *See, e.g.*, *In re AT&T/DirectV Now Sec. Litig.*, 480 F.Supp.3d 507, 527 (S.D.N.Y. 2020); *Local No. 38*, 724 F.Supp.2d at 460 (rejecting allegations based on "anecdotes and conclusory statements of belief" from CWs).[52]

## C.   The CAC Fails to Adequately Plead an Item 303 Violation[53]

Item 303 of Regulation S-K requires an issuer of securities to "[d]escribe any known trends or uncertainties that have had or the registrant reasonably expects will have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations." 17 C.F.R. § 229.303(a)(3)(ii). Knowledge of a trend is an essential element. *Coty*, 2016 WL 1271065, *5. It is not "enough that [the issuer] should have known of the existing trend, event, or uncertainty." *Ind. Pub. Ret. Sys. v. SAIC*, 818 F.3d 85, 95 (2d Cir. 2016); *see also Axar Master Fund v. Bedford*, 308 F.Supp.3d 743, 758 n.90 (S.D.N.Y. 2018) (same). Rather, a plaintiff must allege facts sufficient to plead a plausible inference that the trend existed *and* that management had actual knowledge of the trend and its future material impact on the company's financial condition. *Gutman*, 633 F.Supp.3d at 690; *see also SAIC*, 818 F.3d at 95 (issuers need "disclose only those trends, events, or uncertainties that it actually knows of when it files the relevant [SEC] report ").

Here, Plaintiffs claim that the same omitted information that allegedly made its risk factors false and misleading were also required disclosures under Item 303. Those arguments fail for the

---

[51] *Accord Coty*, 2016 WL 1271065, *6 (rejecting CW allegation of "significant increase" in competitor products).

[52] *Accord City of Roseville Employees' Ret. Sys. v. Sterling Fin. Corp.*, 963 F.Supp.2d 1092, 1127 (E.D. Wash. 2013) (rejecting alleged practices identified by CW as "anything other than a local, isolated practice"), *aff'd*, 691 F.App'x 393 (9th Cir. 2017); *Karam v. Corinthian Colleges*, 2012 WL 8499135, *11 (C.D. Cal. Aug. 20, 2012) ("anecdotal accounts of the CWs" insufficient to demonstrate "materially widespread practice").

[53] Item 303 does not apply to private rights of action under the federal securities laws because, among other things, it embodies a lower threshold for materiality than applicable to such claims under *Basic v. Levinson*, 485 U.S. 224, 238 (2010). That issue is presently before the U.S. Supreme Court in *Macquarie Infrastructure Corp. v. Moab Partners*, No. 22-1165, albeit in the context of Section 10(b) claims, expected for decision this term.

same reasons Plaintiffs' omissions claims fail (*see* Point I.B *supra*), and because the CAC does not plausibly allege any of the required elements of an Item 303 violation.[54]

### 1.    Customer Demand

Plaintiffs' allegations fail to demonstrate that the number of subscribers declined at all leading up to the IPO, let alone for several months. (*Supra* at 15-17, 20-21.) There was thus "never a trend" of declining subscriber growth to disclose. *See Schaffer*, 2018 WL 481883, *14 (no disclosable trend where defendant "was enjoying a positive upward swing during this period, as its sales were increasing."); *Coty*, 2016 WL 1271065, *7 (declining sales not required to be disclosed where sales had actually increased leading up to IPO).

Nor does the CAC plausibly allege that a decline in the *rate* of subscriber growth was a disclosable "trend." As evident from the data in the Prospectus, the subscriber growth rate fluctuated from quarter to quarter. (Ex. 20 at 106; *supra* n.39.) Such fluctuations do not comprise Item 303 "trends." *See, e.g.*, *Stadnick v. Vivint Solar*, 861 F.3d 31, 38 (2d Cir. 2017) (no Item 303 violation for failure to disclose data from pre-IPO quarter on shareholder revenue, earnings where company had history of fluctuation in these metrics); *accord In re XP*, 524 F.Supp.3d at 40.[55]

Even assuming the CAC had sufficiently alleged a trend (and it has not), its allegations do not plead actual knowledge. For one, the CAC expressly disclaims "fraud" or "intentional or reckless misconduct" or that any Defendants "acted with scienter or fraudulent intent." (¶ 164.)

---

[54] Plaintiffs do not allege violations of Items 303 or 105 in respect of their transportation costs claims.

[55] Plaintiffs' claim that the Company should have disclosed that it was not meeting internal subscriber enrollment projections is meritless because Item 303 does not require disclosure of non-public, internal targets. *See In re Authentidate Holding Sec. Litig.*, 2009 WL 755360, *3 (S.D.N.Y. Mar. 23, 2009), *aff'd in relevant part*, 369 F.App'x 260, 265–66 (2d Cir. 2010). Regardless, the CAC does not allege that the purported failure to meet such projections lasted sufficiently long to constitute a trend. *See Pearlstein v. BlackBerry Ltd.*, 93 F.Supp.3d 233, 245 (S.D.N.Y. 2015) ("The two- and five-month periods preceding defendants' public filings were insufficient to establish a reportable trend"), *aff'd*, 660 F.App'x 23 (2d Cir. 2016); *accord In re AppHarvest Sec. Litig.*, 2023 WL 4866233, *44 (S.D.N.Y. July 31, 2023); *Blackmoss Invs. v. ACA Cap. Holdings*, 2010 WL 148617, *10 (S.D.N.Y. Jan. 14, 2010).

*See Banerjee v. Zhangmen Educ.*, 2023 WL 2711279, *13 (S.D.N.Y. Mar. 23, 2023) (knowledge

not pled where complaint "is premised on disavowing any allegation of knowledge"); *accord*

*Zirkin v. Quanta Cap. Holdings*, 2009 WL 185940, *12 (S.D.N.Y. Jan. 23, 2009).

For another, while the CAC alleges in conclusory fashion that the "undisclosed facts" about

the Company's declining growth were "known" (¶ 127), it nowhere pleads who knew of those

facts, or when or how they learned them (*see id.*). The lack of such details is dispositive. *See*

*Schaffer*, 2018 WL 481883, *14 (dismissing Item 303 claim where plaintiffs fail to plead "with

any specificity" facts establishing defendants' actual knowledge); *Blackmoss*, 2010 WL 148617,

*9 (noting plaintiff must plead actual knowledge "with some specificity"). To the extent the FE

allegations are meant to fill that void, they fall woefully short:

- FE-1 alleges that "at the time of the IPO," a team of agents was created to work on allegedly rising customer cancellations (¶ 78), but nowhere specifies that Company management was aware of the cancellations, created the team, or knew of its existence, much less know that what the team was reviewing constituted a material trend. *See Medina*, 640 F.App'x at 48-49; *Gutman*, 633 F.Supp.3d at 689.

- FE-1 claims to have attended certain meetings during which Ms. Hyman addressed "the current state of the Company's business." (¶ 79.) That is too vague to plead knowledge of a disclosable trend. *See, e.g.*, *In re Coty*, 2016 WL 1271065, *7 (CW statement that he attended "monthly meetings" where "declining sales trends, customer disinterest, and competitor risks were discussed" too vague to plead knowledge under Item 303).

- FE-1 also claims that Ms. O'Sullivan made presentations at those meetings that "reflected that the Company's subscriber enrollments were 'consistently down.'" (¶ 79.) That does not show knowledge of a disclosable "trend" because it does not specify when enrollments were "down," for how long or by how much. *See In re Francesca's Holdings Sec. Litig.*, 2015 WL 1600464, *18 (S.D.N.Y. Mar. 31, 2015) (no Item 303 claim absent "non-conclusory" allegations on how prices changed).

- FE-3 recalled that at company-wide meetings, Ms. Hyman and Ms. O'Sullivan both allegedly said the Company was "going through rough times because we're not getting as many subscribers as we want." (¶ 83.) This, again, is too general and subjective to be credited (*supra* at 19, 24, 27) and, in any case, a failure to meet internal projections is not a disclosable event under Item 303 (*see supra* at 17). For the same reasons, the allegations regarding remarks by Ms. Hyman or Ms. O'Sullivan that the Company was not meeting subscriber enrollment "projections" (¶¶ 79, 85) do not show knowledge of a disclosable Item 303 trend.

Nor have Plaintiffs adequately pled that that there was a "substantial probability" that these alleged trends would "have a material impact" on the company's financial results, let alone that Defendants knew so. *Holbrook*, 2019 WL 948809, at \*12. To the contrary, the Company beat its guidance in 3Q21, surpassing projections for active subscribers and revenues. (*Supra* at 9.) And, while Rent the Runway's results were impacted by the spread of the Omicron variant, that did not occur until well after the IPO, and there is no allegation (nor could there be) that Company management had any inkling of what was to come. S*ee Medina*, 640 F.App'x at 49 (actual knowledge cannot be attributed to Defendants based on hindsight).

### 2.    Customer Theft

According to Plaintiffs, the alleged increase in customer thefts, that they were supposedly "facilitated" through drop box use, and the limits of the Company's theft insurance to cover such losses were all required Item 303 disclosures that the Company failed to make. (¶ 138.) But the CAC merely alleges that they had an "*unfavorable impact*" on the Company's "sales, revenues, and income" (*id.*)—not a "material" one—which is not sufficient. 17 C.F.R. § 229.303(a)(3)(ii). That is not surprising because theft losses did not rise to a level where they had (or were expected to have) a material impact on the Company's "reported" results. (*Supra* at 25-26.) *See also Willard v. UP Fintech Holding*, 527 F.Supp.3d 609, 619 (S.D.N.Y. 2021).

Nor does the CAC allege that these events were reportable "trends." With respect to the Company's insurance coverage, for instance, the CAC nowhere alleges that the prices or terms Rent the Runway received for insurance coverage "*even changed*" in the period leading up to the IPO and therefore "fails to plausibly allege a change in circumstance" that would give rise to a reporting obligation. *Francesca's Holdings*, 2015 WL 1600464, \*18 (emphasis in original). And while the CAC does allege that customer theft "became a 'larger issue' in 2021" (¶ 98), it lacks

the detail necessary to support a pleading-stage inference that thefts were materially trending upward at the time the RS became effective. *See AppHarvest*, 2023 WL 4866233, \*44 (dismissing Item 303 claim where complaint did not allege "when exactly" trend occurred). Finally, Plaintiffs' allegations about drop boxes "facilitating" theft does not change the outcome because those boxes were implemented in 2018,[56] three years before the IPO.

The CAC's knowledge allegations are similarly thin. Of the six FEs quoted in the CAC, only FE-1 makes any allegation regarding management's knowledge—that a "'notorious' customer stole $100,00 worth of merchandi[s]e" at some unspecified point and that Ms. Hyman was "aware of the theft issue." (¶ 97.)[57] That is hardly enough to plead knowledge of a material trend, which is "essential" to any viable Item 303 claim. *Blackmoss*, 2010 WL 148617, \*9.

In short, given the Prospectus's "repeated warnings" about the "specific business vulnerabilit[ies]" of which Plaintiffs complain, "there is no basis to conclude that the [C]ompany failed to fulfill its affirmative disclosure obligations under Item 303." *Asay v. Pinduoduo*, 2020 WL 1530745, \*10 (S.D.N.Y. Mar. 30, 2020), *aff'd*, 2021 WL 3871269 (2d Cir. 2021).[58]

## D.  The CAC Fails to Adequately Plead an Item 105 Violation

Item 105 requires a disclosure of the "most significant risk factors" associated with the security, 17 C.F.R. § 229.105, a "considerably high" standard that goes beyond materiality, *Gordon v. Tencent Music Entm't Grp.*, 2021 WL 9183821, \*7 (E.D.N.Y. Mar. 31, 2021). To plead an Item 105 violation, Plaintiffs must plead facts "unique to Item [105]"; it is not sufficient to

---

[56] Mara Leighton, "Rent the Runway now has drop-off locations at WeWork offices in 6 major cities – here's how it works," *Insider* (Oct. 18, 2018) (Ex. 1).

[57] Even if FE-1 meant to suggest Ms. Hyman knew of the "theft issue" more generally (¶ 97), FE-1 does not allege what that "issue" was or when it occurred, let alone how or when Ms. Hyman became aware of it.

[58] *Accord In re Yunji Sec. Litig.*, 2021 WL 1439715, \*7 (E.D.N.Y. Mar. 31, 2021); *Altayyar v. Etsy.*, 242 F.Supp.3d 161, 180 n.3 (E.D.N.Y. 2017); *Abuhamdan v. Blyth, Inc.*, 9 F.Supp.3d 175, 207 (D. Conn. 2014); *Jiang v. BlueCity Holdings*, 2023 WL 5412891, \*6 (E.D.N.Y. Aug. 22, 2023).

-31-

allege that the "[t]he same facts underlying [the] Item 303 violation . . . also support [the alleged] Item [105] violation." *Willard*, 527 F.Supp.3d at 618 n.4.  The latter, however, is all Plaintiffs allege here.  Indeed, the CAC claims that the same allegedly undisclosed trends purportedly supporting its Item 303 claim also violated Item 105 "because these specific risks were not adequately disclosed, or disclosed at all, even though they were some of the most significant factors that made an investment in Rent the Runway's Class A common stock speculative or risky." (¶¶ 127, 138.)   Plaintiffs' Item 105 claim therefore cannot survive dismissal because it "fail[s] to satisfy the higher standard of Item [105]." *Gordon*, 2021 WL 9183821, *7.[59]

## II.    THE CAC FAILS TO ADEQUATELY PLEAD A SECTION 12(A)(2) CLAIM

Because the CAC fails to adequately plead a material misrepresentation or omission under Section 11 (Points I.A and I.B, *supra*), Plaintiffs' Section 12(a)(2) claim, which relies on the same underlying factual allegations, must also be dismissed.  *See Morgan Stanley*, 592 F.3d at 359 (describing Section 11 and 12(a)(2) as "Securities Act siblings with roughly parallel elements"); *In re Qutoutiao, Inc. Sec. Litig.*, 2023 WL 4977499, *15 (S.D.N.Y. Aug. 3, 2023) (dismissing Section 12(a)(2) claims for same reasons set forth regarding Section 11 claims).[60]

Count II of the CAC fails for the independent reason that it does not adequately allege that any Rent the Runway Defendant was a "statutory seller" under Section 12(a)(2), which requires a showing that the named defendant (1) "passed title, or other interest in the security, to the buyer for value," or (2) "successfully solicit[ed] the purchase [of a security], motivated at least in part by a desire to serve his own financial interests or those of the securities['] owner." *Morgan Stanley*,

---

[59] *Accord In re ProShares Tr. II Sec. Litig.*, 2020 WL 71007, *9 (S.D.N.Y. Jan. 3, 2020), *aff'd*, 839 F.App'x 649 (2d Cir. 2021); *Nurlybayev*, 2019 WL 3219451, *8; *City of Warren Police & Fire Ret. Sys. v. Foot Locker*, 412 F.Supp.3d 206, 223 n.10 (E.D.N.Y. 2019).

[60] *Accord In re Lone Pine Res., Inc.*, 2014 WL 1259653, *6 (S.D.N.Y. Mar. 27, 2014) (quotation omitted).

592 F.3d at 359 (citing *Pinter v. Dahl*, 486 U.S. 622, 647 (1988)).

With respect to the Individual Defendants, the CAC offers only conclusory allegations that the Individual Defendants (i) signed the Registration Statement; (ii) and "reviewed, edited, and approved the Offering Documents"; and (iii) "conducted a roadshow" and "reviewed, approved, and delivered to investors the IPO's roadshow presentation, talking points, and script." (¶¶ 36-38). But signing a registration statement does not amount to solicitation. *See In re Weight Watchers Int'l Sec. Litig.*, 504 F.Supp.3d 224, 260-61 (S.D.N.Y. 2020) (collecting cases). And "vague and conclusory allegation[s]" that Defendants "participat[ed] in the preparation of the false and misleading Prospectuses and participat[ed] in marketing" shares to investors are "plainly insufficient" too. *Emerson v. Mut. Fund Series Tr.*, 393 F.Supp.3d 220, 260 (E.D.N.Y. 2019). Even if these or other activities did amount to solicitation, the CAC nowhere alleges that Plaintiffs themselves were solicited by any Individual Defendant. Instead, the CAC relies on impermissible group pleading, alleging that the Individual Defendants *en masse* solicited purchases of Rent the Runway stock. (*See* ¶¶ 36-38, 168.) That is not enough. *See Holsworth v. BProtocol Found.*, 2021 WL 706549, *3 (S.D.N.Y. Feb. 22, 2021) (dismissing Section 12 claim where plaintiff failed to allege "he was directly contacted by [d]efendants").[61]

Plaintiffs' allegations against Rent the Runway fare no better. As the CAC concedes, the IPO was a firm commitment offering, with all shares allocated to the underwriters for sale to investors. (¶¶ 20-21, 44-52.) Section 12, however, only imposes liability on "the buyer's immediate seller"; "a buyer cannot recover against his seller's seller." *Pinter*, 486 U.S. at 644 n.21; *accord Risley v. Universal Navigation*, 2023 WL 5609200, *15 (S.D.N.Y. Aug. 29, 2023).

---

[61] *Accord Emerson,* 393 F.Supp.3d at 259-60; *Brody v. Homestore*, 2003 WL 22127108, *5 (C.D. Cal. Aug. 8, 2003); *Endo v. Albertine*, 1995 WL 170030, *3 (N.D. Ill. Apr. 7, 1995); *In re Infonet Servs. Corp. Sec. Litig.*, 310 F.Supp.2d 1080, 1102 (C.D. Cal. 2003).

And because the CAC offers no allegations that Rent the Runway solicited Plaintiffs, the second prong of Section 12(a)(2) fails as well. *See, e.g.*, *Holsworth*, 2021 WL 706549, \*3 (dismissing where no allegation of solicitation by issuer); *Homestore*, 2003 WL 22127108, \*5 (same).

## III.  NEGATIVE CAUSATION BARS PLAINTIFFS' CLAIMS

The CAC's Section 11 and 12(a)(2) claims are separately barred by the affirmative defense of "negative causation," which allows a defendant to "avoid liability if the depreciation in the value of the security did not result from any nondisclosure or false statement made in the prospectus or registration statement." *Blackmoss*, 2010 WL 148617, \*11 (citations omitted); *see also see* 15 U.S.C. § 77k(e). Negative causation is the "mirror image[]" of loss causation, *Lau v. Opera Ltd.*, 527 F.Supp.3d 537, 561 (S.D.N.Y. 2021), which requires that "the misstatement or omission concealed something from the market that, when disclosed, negatively affected the value of the security," *Lentell v. Merrill Lynch & Co.*, 396 F.3d 161, 173 (2d Cir. 2005).[62] Accordingly, negative causation is grounds for dismissal at the pleading stage "where the absence of loss causation is apparent on the face of the complaint," *Blackmoss*, 2010 WL 148617, \*11, or publicly available information, *Lau*, 527 F.Supp.3d at 561. That is the case here.

For starters, Rent the Runway's stock price history shows that its decline started well before the first "corrective disclosure" and moved in tandem with its Competitors (*see* Ex. 65),[63] negating any inference that the market was reacting to Company-specific news.[64] In addition, the three

---

[62] *Lentell* addresses loss causation in the context of Section 10(b) claims, but courts have applied its reasoning to Section 11 claims. *See, e.g.*, *Amorosa v. AOL Time Warner*, 409 F.App'x 412, 415-17 (2d Cir. 2011); *In re State Street Bank & Tr. Co. Fixed Income Funds Inv. Litig.*, 774 F.Supp.2d 584, 589-96 & n.4 (S.D.N.Y. 2011).

[63] *See also* Ivo C. Nenin, "Tech Stocks Lead the Market Decline in Early 2022," *Commonfund* (Feb. 7, 2022) (noting market preference for earnings stability at expense of growth, index of non-profitable U.S.-listed companies in innovative industries was down 50% in 2021 and 27% in January 2022) (Ex. 39).

[64] *State St. Bank*, 774 F.Supp.2d at 593 ("The loss causation affirmative defense recognizes that other market forces can also contribute to the depreciation in the value of a security"); *Leykin v. AT&T Corp.*, 423 F.Supp.2d 229, 246 (S.D.N.Y. 2006) (no loss causation where losses attributed to "Internet stock collapse" as opposed to alleged concealment of subscriber and growth prospects).

-34-

price declines cited in the CAC[65] were completely unconnected to the challenged statements.

- ***Customer Demand.*** Even assuming there were a "negative trend" in subscriber rates pre-IPO, as alleged, it reversed itself by 3Q21 when the Company accurately reported significant increases in both total and active subscribers. (Ex. 24.) Even where active subscribers declined in 4Q21, RTR's stock price did not decline. (*See* Ex. 66.) Thus, RTR's 3Q21 earnings release did not, and could not, have disclosed some pre-IPO trend that had continued, and thus could not have caused Plaintiffs' loss. *See In re Barclays Bank PLC Sec. Litig.*, 756 F.App'x 41, 51 (2d Cir. 2018) (intervening disclosure to which market did not react "broke any chain of causation" from earlier corrective disclosure); *In re Sec. Cap. Assur. Ltd. Sec. Litig.*, 729 F.Supp.2d 569, 602 (S.D.N.Y. 2010) (rejecting theory of "incremental revelation" of allegedly omitted information where plaintiffs were "cherrypicking dates that suit their argument").[66]

- ***Shipping Costs.*** Well before the 3Q21 earnings release, it was publicly known that shipping costs were on the rise, and the Company itself made clear pre-IPO that it anticipated "headwinds" from those cost increases (*supra* at 7-8).[67] Nothing new was therefore disclosed when Ms. O'Sullivan revisited this topic at the 3Q21 earnings call, affirmed what the Company previously disclosed, and apprised investors that further headwinds were ahead. (*See* Ex. 25.) *See In re Britannia Bulk Holdings Sec. Litig.*, 665 F.Supp.3d 404, 419-20 (S.D.N.Y. 2009) (dismissing on negative causation grounds where alleged corrective disclosure was "entirely consistent" with prior disclosures).[68]

- ***Customer Theft.*** None of the three "corrective disclosures" cited in the CAC mention customer theft, fraud, or insurance coverage. Accordingly, any price declines following those disclosures could not have caused Plaintiffs' losses. *See Boluka Garment Co. v. Canaan Inc.*, 547 F.Supp.3d 439, 447 (S.D.N.Y. 2021) (dismissing on negative causation grounds where alleged corrective disclosure said nothing about alleged omissions).[69]

---

[65] Per the CAC, the price of RTR's stock declined following its earnings releases for 3Q21 (on Dec. 9, 2021), 1Q22 (on June 10, 2022), and 2Q22 (on Sept. 13, 2022). (¶¶ 143, 151, 155.) The CAC does not allege that the Company's stock price declined following the release of the Company's earnings for 4Q21. (*See* ¶¶ 144-47.)

[66] Indeed, subscribers and revenue grew from 4Q20 through mid-June 2022—a period of more than two years. (Ex. 20 at 105-06; Ex. 24; Ex. 41; Ex. 45.) Although there was a decline in subscribers in 2Q22 (Ex. 50), (i) RTR recovered from that decline by 3Q22 (Ex. 61), (ii) the decline was due to "changes in customer behavior" since the pandemic and to price increases RTR had introduced (Ex. 50; Ex. 51 (Tr.) at 7-8), and (iii) "other newly public ecommerce companies" experienced "a slowdown the exact same period" (Ex. 54 at 2). Analysts thought likewise. (Ex. 52 at 1; Ex. 53 at 1; Ex. 55 at 1; Ex. 56 at 1, 2; Ex. 57 at 1; Ex. 58 at 2; Ex. 59 at 1, 2, 4.)

[67] National carriers also began adding fuel surcharges at the onset of the conflict in Ukraine in early 2022. *See, e.g.*, Eric Kulisch, "FedEx adds war surcharge as Ukraine crisis ratches up shipping costs," *FreightWaves* (Mar. 4, 2022) (Ex. 40).

[68] Labor costs, which comprise part of fulfillment costs, were also on the rise. (Ex. 20 at 40, 96, 98.)

[69] Because the CAC fails to plead a primary violation, the Section 15 claim for control person liability fails. *See Arfa v. Mecox Lane Ltd.*, 504 F.App'x 14, 17 (2d Cir. 2012); *Gutman*, 633 F.Supp.3d at 692.

## CONCLUSION

For the foregoing reasons, the CAC should be dismissed.


Dated:   New York, New York
         October 20, 2023

Respectfully submitted,

**FRESHFIELDS BRUCKHAUS DERINGER US LLP**

*/s/ Mary Eaton*

Mary Eaton
Meredith Kotler
Marques Tracy
601 Lexington Avenue, 31st Floor
New York, New York 10022
Telephone: (212) 277-4000
mary.eaton@freshfields.com
meredith.kotler@freshfields.com
marques.tracy@freshfields.com

*Counsel for Defendants Rent the Runway, Inc., Jennifer Y. Hyman, Scarlett O'Sullivan, Tim Bixby, Jennifer Fleiss, Scott Friend, Melanie Harris, Beth Kaplan, Dan Nova, Gwyneth Paltrow, Carley Roney, Dan Rosensweig, and Mike Roth*

**WILLKIE FARR & GALLAGHER LLP**

/s/ *Todd G. Cosenza*

Todd G. Cosenza
Charles D. Cording
787 Seventh Avenue
New York, NY 10019-6099
Telephone: (212) 728-8000
Facsimile: (212) 728-8111
tcosenza@willkie.com
ccording@willkie.com

*Counsel for Defendants Goldman Sachs & Co. LLC, Morgan Stanley & Co. LLC, Barclays Capital Inc., Credit Suisse Securities (USA) LLC, Piper Sandler & Co., Wells Fargo Securities, LLC, JMP Securities LLC, KeyBanc Capital Markets Inc., and Telsey Advisory Group LLC*