**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| RAJAT SHARMA, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>RENT THE RUNWAY, INC., JENNIFER Y. HYMAN, SCARLETT O'SULLIVAN, TIM BIXBY, JENNIFER FLEISS, SCOTT FRIEND, MELANIE HARRIS, BETH KAPLAN, DAN NOVA, GWYNETH PALTROW, CARLEY RONEY, DAN ROSENSWEIG, MIKE ROTH, GOLDMAN SACHS & CO. LLC, MORGAN STANLEY & CO. LLC, BARCLAYS CAPITAL INC., CREDIT SUISSE SECURITIES (USA) LLC, PIPER SANDLER & CO., WELLS FARGO SECURITIES, LLC, JMP SECURITIES LLC, KEYBANC CAPITAL MARKETS INC., and TELSEY ADVISORY GROUP LLC,<br><br>Defendants, | Case No. 22-cv-06935 |

**LEAD PLAINTIFFS' MEMORANDUM OF LAW**
**IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS**

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ...............................................................................................iii

I.      INTRODUCTION ..................................................................................................1

II.     BACKGROUND .....................................................................................................4

    A.      Rent the Runway Flourished in an Environment Where People Attended
    Work and Social Events Regularly ...................................................................4

    B.      At the Time of the IPO, Rent the Runway Faced Increased Losses Due to
    Transportation Costs and Customer Theft .......................................................6

    C.      Rent the Runway's IPO ....................................................................................8

    D.      Post-IPO Events .............................................................................................10

III.    ARGUMENT.........................................................................................................12

    A.      Legal Standard ...............................................................................................12

    B.      Defendants' Attempts to Undermine Allegations Attributed to Former RTR
    Employees Fails .............................................................................................15

    C.      Defendants Fail to Establish That RTR's Statements Concerning Customer
    Demand Were Not False .................................................................................17

        1.      The Allegations Attributed to FEs 1-4 Establish Defendants'
        Statements Were False .................................................................20

        2.      Defendants' Other Arguments Challenging the Actionability of Their
        Statements Fail.............................................................................21

    D.      Defendants Fail to Establish That the Company's Risk Disclosures Were Not
    Misleading......................................................................................................25

        1.      Defendants Fail to Show That Risks Associated With Shipping and
        Transportation Were Adequately Conveyed to Investors........................25

        2.      Defendants Wrongly Suggest That the Offering Documents
        Adequately Informed Investors About Customer Demand .....................27

        3.      Defendants' Arguments Concerning the Company's Risk Factors
        Related to Theft and Fraud Fail to Establish That They Adequately
        Informed Investors .....................................................................28

    E.      Defendants Failed to Comply With the Disclosure Requirements of Items 303
    and 105............................................................................................................29

1. Defendants' Arguments Do Not Negate That Loss of Customer Demand was a Known Trend and Material Risk That RTR was Required to Disclose ................................................................................... 30

2. Losses Due to Theft Were a Known Trend and Material Risk That RTR Was Required to Disclose ................................................................. 31

F. Defendants' Arguments Fail to Negate Plaintiffs' Claim Under Section 12(a)(2) ........................................................................................... 32

G. Defendants' Negative Causation Defense Fails ...................................... 34

IV. CONCLUSION ............................................................................................ 35

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re AOL Time Warner Sec. & "ERISA" Litig.*,
  381 F. Supp. 2d 192 (S.D.N.Y. 2004)................................................................................14

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009).............................................................................................................12

*In re Bear Stearns Mortg. Pass-Through Certificates Litig.*,
  851 F. Supp. 2d 746 (S.D.N.Y. 2012)................................................................................15

*In re Blue Apron Holdings, Inc. Sec. Litig.*,
  2020 WL 1950783 (E.D.N.Y. Apr. 22, 2020) ..............................................................24, 31

*Bos. Ret. Sys. v. Alexion Pharms., Inc.*,
  556 F. Supp. 3d 100 (D. Conn. 2021)................................................................................18

*Briarwood Invs. Inc. v. Care Inv. Tr. Inc.*,
  2009 WL 536517 (S.D.N.Y. Mar. 4, 2009) .........................................................................33

*Chambers v. Time Warner, Inc.*,
  282 F.3d 147 (2d Cir. 2002)..............................................................................................12

*In re Citigroup Bond Litig.*,
  723 F. Supp. 2d 568 (S.D.N.Y. 2010)................................................................................14

*Citiline Holdings, Inc. v. iStar Fin. Inc.*,
  701 F. Supp. 2d 506 (S.D.N.Y. 2010)................................................................................32

*City of Omaha Police & Fire Ret. Sys. v. Evoqua Water Techs. Corp.*,
  450 F. Supp. 3d 379 (S.D.N.Y. 2020)....................................................................15, 17, 34

*City of Roseville Employees' Ret. Sys. v. EnergySolutions, Inc.*,
  814 F. Supp. 2d 395 (S.D.N.Y. 2011)................................................................................30

*City of Warren Police & Fire Ret. Sys. v. World Wrestling Ent. Inc.*,
  477 F. Supp. 3d 123 (S.D.N.Y. 2020)................................................................................21

*Cortec Indus., Inc. v. Sum Holding L.P.*,
  949 F.2d 42 (2d Cir. 1991)................................................................................................35

*In re CPI Card Grp. Inc. Sec. Litig.*,
  2017 WL 4941597 (S.D.N.Y. Oct. 30, 2017) ...............................................................12, 31

*In re Dentsply Sirona, Inc. Sec. Litig.*,
  2023 WL 2682905 (E.D.N.Y. Mar. 29, 2023) ..................................................... 21, 23, 29, 30

*In re Facebook, Inc. IPO Sec. & Derivative Litig.*,
  986 F. Supp. 2d 487 (S.D.N.Y. 2013) ............................................................... 13, 20, 25, 28

*Fed. Housing Fin. Agency v. UBS Ams., Inc.*,
  858 F. Supp. 2d 306 (S.D.N.Y. 2012), *aff'd*, 712 F.3d 136 (2d Cir. 2013) .......................... 32

*Fresno Cnty. Emps. Ret. Ass'n v. comScore, Inc.*,
  268 F. Supp. 3d 526 (S.D.N.Y. 2017) ................................................................................. 14

*In re Fuwei Films Sec. Litig.*,
  634 F. Supp. 2d 419 (S.D.N.Y.2009) .................................................................................. 35

*Ganino v. Citizens Utils. Co.*,
  228 F.3d 154 (2d Cir. 2000) ............................................................................................... 18

*Garnett v. RLX Tech. Inc.*,
  632 F. Supp. 3d 574 (S.D.N.Y. 2022), *aff'd sub nom. Tseng v. De Vries*, 2023
  WL 8073087 (2d Cir. Nov. 21, 2023) .................................................................................. 33

*In re Giant Interactive Grp., Inc. Sec. Litig.*,
  643 F. Supp. 2d 562 (S.D.N.Y. 2009) ............................................................................ 34, 35

*Herman & MacLean v. Huddleston*,
  459 U.S. 375 (1983) ........................................................................................................... 12

*In re JP Morgan Chase Sec. Litig.*,
  363 F. Supp. 2d 595 (S.D.N.Y. 2005) ................................................................................. 14

*Lematta v. Casper Sleep, Inc.*,
  2022 WL 4637795 (E.D.N.Y. Sept. 30, 2022) ..................................................................... 22

*Levine v. AtriCure, Inc.*,
  508 F. Supp. 2d 268 (S.D.N.Y. 2007) ............................................................................ 34, 35

*Litwin v. Blackstone Grp., L.P.*,
  634 F.3d 706 (2d Cir.2011) ............................................................................................ 13, 18

*Mallen v. Alphatec Holdings, Inc.*,
  861 F. Supp. 2d 1111 (S.D. Cal. 2012), *aff'd*, 607 F. App'x 694 (9th Cir.
  2015) .................................................................................................................................... 32

*McKenna v. SMART Techs. Inc.*,
  2012 WL 3589655 (S.D.N.Y. Aug. 21, 2012) ..................................................................... 24

*McMahan & Co. v. Wherehouse Ent., Inc.*,
  900 F.2d 576 (2d Cir.1990)...............................................................................................18

*In re MF Glob. Holdings Ltd. Sec. Litig.*,
  982 F. Supp. 2d 277 (S.D.N.Y. 2013)..........................................................................25, 26

*In re Morgan Stanley Info. Fund Sec. Litig.*,
  592 F.3d 347 (2d Cir. 2010)...................................................................................12, 18, 32

*N. J. Carpenters Health Fund v. Royal Bank of Scotland Grp., PLC*,
  709 F.3d 109 (2d Cir. 2013)........................................................................................13, 21

*Nayani v. LifeStance Health Grp., Inc.*,
  2023 WL 3260260 (S.D.N.Y. May 4, 2023) ..............................................................18, 19

*NECA-IBEW Health & Welfare Fund v. Goldman Sachs & Co.*,
  693 F.3d 145 (2d Cir. 2012)..............................................................................................13

*Novak v. Kasaks*,
  216 F.3d 300 (2d Cir. 2000)........................................................................................23, 24

*Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*,
  575 U.S. 175 (2015) ..........................................................................................................14

*In re OSG Sec. Litig.*,
  971 F. Supp. 2d 387 (S.D.N.Y. 2013).................................................................................14

*Panther Partners, Inc. v. Ikanos Commc'ns, Inc.*,
  538 F. Supp. 2d 662 (S.D.N.Y. 2008), *aff'd,* 347 F. App'x 617 (2d Cir. 2009)....................29

*Panther Partners Inc. v. Ikanos Commc'ns, Inc.*,
  681 F.3d 114 (2d Cir. 2012*)*.............................................................................................31

*Panther Partners Inc. v. Jianpu Tech. Inc.*,
  2020 WL 5757628 (S.D.N.Y. Sept. 27, 2020)..............................................................24, 30

*Rombach v. Chang*,
  355 F.3d 164 (2d Cir. 2004)........................................................................................13, 14

*In re Sanofi-Aventis Sec. Litig.*,
  774 F. Supp. 2d 549 (S.D.N.Y. 2011).................................................................................18

*Scott v. Gen. Motors Co.*,
  46 F. Supp. 3d 387 (S.D.N.Y. 2014), *aff'd,* 605 F. App'x 52 (2d Cir. 2015).......................13

*Set Cap. LLC v. Credit Suisse Grp. AG*,
  996 F.3d 64 (2d Cir. 2021)................................................................................................25

*Sheet Metal Workers Loc. 32 Pension Fund v. Terex Corp.*,
  2018 WL 1587457 (D. Conn. Mar. 31, 2018) ........................................................15

*Shenwick v. Twitter, Inc.*,
  282 F. Supp. 3d 1115 (N.D. Cal. 2017) ................................................................22

*Stratte-McClure v. Morgan Stanley*,
  776 F.3d 94 (2d Cir. 2015)....................................................................................30

*In re Tufin Software Techs. Ltd. Sec. Litig.*,
  2022 WL 596861 (S.D.N.Y. Feb. 25, 2022)..........................................................21

*In re Turquoise Hill Res. Ltd. Sec. Litig.*,
  625 F. Supp. 3d 164 (S.D.N.Y. 2022).....................................................................23

*In re Vivendi, S.A. Sec. Litig.*,
  838 F.3d 223 (2d Cir. 2016).......................................................................18, 20, 24

*Wilson v. Merrill Lynch & Co., Inc.*,
  671 F.3d 120 (2d Cir.2011)....................................................................................25

*Winter v. Stronghold Digital Mining, Inc.*,
  2023 WL 5152177 (S.D.N.Y. Aug. 10, 2023).......................................................35

**Statutes**

15 U.S.C. § 78j ........................................................................................................2, 14

15 U.S.C. § 77k...........................................................................................................*passim*

15 U.S.C. § 77l(a)(2) ..................................................................................................*passim*

15 U.S.C. § 77o............................................................................................................. 1

**Other Authorities**

17 C.F.R. § 229.105 ................................................................................................29, 30

17 C.F.R. § 230.159A ....................................................................................................32

17 C.F.R. § 229.303 ................................................................................................29, 30

17 C.F.R. § 240.10b-5................................................................................................2, 14

Fed. R. Civ. P. 8(a) .......................................................................................................13

Fed. R. Civ. P. 9(b) .......................................................................................................14

Fed. R. Civ. P. 12(b)(6)................................................................................................34

Fed. R. Civ. P. 15 .................................................................................................................. 35

Lead Plaintiffs, Delaware Public Employees' Retirement System and Denver Employees Retirement Plan ("Plaintiffs"), respectfully submit this memorandum in opposition to Defendants' Motion to Dismiss the Corrected Amended Class Action Complaint For Violations of the Federal Securities Laws (the "Motion" or "MTD") served by Defendants (i) Rent the Runway, Inc. ("Rent the Runway," "RTR," or the "Company"); (ii) Jennifer Y. Hyman, Scarlett O'Sullivan, Tim Bixby, Jennifer Fleiss, Scott Friend, Melanie Harris, Beth Kaplan, Dan Nova, Gwyneth Paltrow, Carley Roney, Dan Rosensweig, and Mike Roth (the "Individual Defendants" and, together with Rent the Runway, the "RTR Defendants"); and (iii) Goldman Sachs & Co. LLC, Morgan Stanley & Co. LLC, Barclays Capital Inc., Credit Suisse Securities (USA) LLC, Piper Sandler & Co., Wells Fargo Securities, LLC, JMP Securities LLC, KeyBanc Capital Markets Inc., and Telsey Advisory Group LLC (collectively, the "Underwriter Defendants" and, together with the RTR Defendants, the "Defendants"), on October 20, 2023.

## I.     INTRODUCTION

This strict liability securities class action, brought solely under Sections 11, 12(a)(2), and 15 of the Securities Act of 1933 (the "Securities Act"), 15 U.S.C. §§ 77k, 77l(a)(2), and 77o, arises from Rent the Runway's October 27, 2021 initial public offering (the "IPO"). As set forth more fully herein and in the Complaint,[1] the Offering Documents[2] used to conduct the IPO were materially false and misleading and omitted material facts in three critical ways which misled investors.  First, the Offering Documents created the impression that demand for the Company's

---

[1] Citations to paragraphs ("¶") are to paragraphs in the Corrected Amended Class Action Complaint filed on August 22, 2023 (the "Complaint"). ECF No. 61. Unless otherwise noted, emphasis is added and internal citations and quotation marks are omitted throughout.

[2] The IPO was conducted by the Defendants pursuant to, and the sale of Rent the Runway stock was solicited by, several documents filed by the Defendants with the SEC and disseminated by the Defendants to the investing public, including: (i) a registration statement on Form S-1, which following amendment, was declared effective by the SEC on October 26, 2021 (the "Registration Statement"); and (ii) a final prospectus dated October 26, 2021, which forms part of the Registration Statement, on Form 424(b)(4) (the "Prospectus" and, together with the Registration Statement, the "Offering Documents.").

rental services was increasing at the time of the IPO when in fact demand was declining and the Company was struggling to acquire and retain new customers. Second, the Offering Documents conveyed to investors that the Company was managing the cost of shipping its clothing rentals when in fact shipping costs were increasing because the Company was shipping fewer packages requiring it to switch shipping carriers multiple times leading up to and after the IPO. Third, the Offering Documents failed to disclose the material impact theft of the Company's rental clothing was having on the Company and misrepresented the availability of insurance coverage and the purported steps the Company was taking to prevent such thefts.

Defendants seek to evade liability for each of these misstatements and omissions of material fact through a variety of ineffective arguments. As an initial matter, Defendants egregiously mischaracterize the pleading standard for claims brought under Sections 11, 12(a)(2), and 15 of the Securities Act, arguing that the heightened pleading standard for fraud-based claims should apply because the Complaint purportedly sounds in fraud. However, Defendants rely exclusively on inapposite cases where courts faced the question of what pleading standard to apply when a complaint asserts both fraud claims under Section 10(b) of the Securities Exchange Act of 1934 and non-fraud claims under the Securities Act.

Defendants then apply this inapplicable legal standard to the three categories of alleged misstatements and omissions in an attempt to establish that they had no duty to inform investors of undisclosed material information. *First*, regarding customer demand, Defendants argue that they had no duty to inform investors that the Company's internal projections showed that demand for its service was not recovering from the COVID-19 pandemic and would likely never reach the levels it had before the pandemic. In an attempt to support their argument, Defendants seek to discredit multiple former Rent the Runway employees, claiming their allegations are

2

inaccurate, when each made exactly the same claim. Namely, that Defendants Hyman and O'Sullivan consistently reported internally that the Company was failing to meet internal projections and was losing thousands of customers a month.

**Second**, Defendants claim they had no responsibility to inform investors of issues with the Company's shipping carriers, which included both skyrocketing shipping costs, which rendered the Company's business unsustainable, and shipping reliability issues, which led to customer complaints and dissatisfaction, something the Company could not afford as demand waned. However, Defendants do little to negate the fact that—less than two months after the Company's IPO—Defendant O'Sullivan (RTR's CFO) admitted that the Company had always "anticipated . . . transportation headwinds" due to "price increases" heading into the IPO. This admission stands in stark contrast to what the Company told investors in the Offering Documents, when it merely warned of the risk of potential transportation issues.  As alleged in the Complaint, unbeknownst to investors, in the year before the IPO, the Company had to switch shipping carriers twice as a result of unsustainably high prices, driven in part by the fact that the Company was shipping significantly fewer packages as demand failed to return as the pandemic waned.

**Finally**, Defendants downplay their need to have informed investors of rampant theft of the Company's rental clothing by both customers and RTR employees. Compounding the over $100 million a year the Company was losing as a result of its unsustainable business model and waning demand, the Company was losing—at least—$6 million a year due to theft. Moreover, despite the Offering Documents' claims, RTR had no policies or procedures in place to prevent theft. This was only exacerbated by the fact that the Company's insurance only covered $100 per package (which was grossly inadequate when compared to the thousands of dollars a single piece of designer clothing can cost) coupled with the fact that the Company was only able to

3

successfully make an insurance claim on approximately 35 percent of stolen packages.

As explained in further detail below, each of Defendants' arguments do nothing to change the fact that the Offering Documents contained materially untrue statements and omissions, for which Defendants are liable.

## II.    BACKGROUND

### A.    Rent the Runway Flourished in an Environment Where People Attended Work and Social Events Regularly

In 2008, Rent the Runway introduced its then-novel "Closet in the Cloud," which the Company described as "the world's first and largest shared designer closet." ¶61. As the description implies, the Closet in the Cloud allowed Rent the Runway's customers to access a virtual inventory of thousands of pieces of designer clothing, which were shared amongst the Company's customers. ¶¶62–66. Because the Company is able to rent the same piece of clothing to multiple customers, it is able to offer access to its service at a price affordable to most consumers, who would otherwise be unable to afford the high cost of purchasing most designer clothing. *Id.* This concept flourished in an environment where millions of people throughout the United States attended work daily and socialized frequently. By the end of 2019 leading into 2020, Rent the Runway had almost 148,000 ending active subscribers.[3]

That momentum was halted when the COVID-19 pandemic entered the United States. As a company reliant on in-person events for which a person would need to dress up, COVID-19 represented the worst possible circumstances for Rent the Runway. In a one-week period, nearly every state in the United States issued lockdown or shelter-in-place orders requiring most people to stay in their homes and non-essential businesses to close. ¶70. Social gatherings were rapidly

---

[3] Rent the Runway defines ending active subscribers as ending total subscribers as of period end, excluding paused subscribers.

cancelled as people isolated in an effort to mitigate the spread of the virus. *Id*. As Defendant Hyman explained on a podcast on July 28, 2022, Rent the Runway lost 50 percent of its subscribers in a five-day period at the outset of the pandemic. ¶71.

By the end of 2020, Rent the Runway had barely over 95,000 ending active subscribers, representing an over 50,000 subscribers decrease from its pre-pandemic height. ¶72. As the pandemic subsided and vaccinations rapidly became available within the United States, Rent the Runway struggled to reacquire the customers it had lost. By July 31, 2021, less-than three months before the IPO, Rent the Runway had added just over 2,000 subscribers, rising to 97,614. *Id.*

In the time between the third quarter of 2021 and the Company's IPO, contrary to the image of the Company disclosed in the Offering Documents, Rent the Runway was unable to improve significantly. At the time of the IPO, Rent the Runway was still encountering material difficulties in retaining customers, acquiring new customers, and reacquiring customers that it lost at the outset of the pandemic. ¶76. According to at least four former RTR employees ("FEs"), in the period leading up to and during the IPO, the Company held meetings between once and twice a month where senior executives, including Defendants Hyman and O'Sullivan, presented on the problems the Company was experiencing in acquiring and retaining subscribers. ¶¶77–86.

As described in these internal meetings, leading up to and during the IPO, the Company was losing 100 subscribers a day (¶78), causing RTR to miss its internal projections (¶79). According to FE-1, Defendant O'Sullivan made presentations at these meetings which "reflected that the Company's subscriber enrollments were 'consistently down' and not meeting its projections" as RTR conducted the IPO and prepared the Offering Documents. ¶78. As a result, Defendants internally characterized the period leading up to the IPO as "rough times" for Rent the Runway (¶83)—which continued until the "tail end of COVID"—well past the IPO.  ¶85.

**B.      At the Time of the IPO, Rent the Runway Faced Increased Losses Due to Transportation Costs and Customer Theft**

At the same time that Rent the Runway was failing to attract new customers, the Company was experiencing myriad issues in connection with increased transportation costs, which necessitated switching shipping carriers multiple times immediately before and during the IPO (¶¶89–95), and increased losses due to theft, which were not adequately covered under the Company's insurance policy or prevented due to the Company's lack of policies or procedures (¶¶96–105).

As Rent the Runway's business is entirely dependent on being able to ship clothing to its customers in a timely manner, transportation is one of the most important services the Company provides as well as one of its highest costs. According to FE-1, customers were often frustrated with shipping delays, which led to customer cancellations. *See* ¶¶89–90. In an effort to mitigate the shipping problems hampering the Company's ability to attract and retain new customers—as well as lower costs—Rent the Runway switched from UPS to FedEx and utilized a local carrier in New York, which was temporarily cheaper though significantly less reliable. ¶91. After only a year of using FedEx, Rent the Runway was forced to switch back to UPS as a result of rising costs and reliability issues with FedEx. ¶92. According to FE-4, FedEx had doubled the Company's shipping rates because it was not shipping enough, which caused "panic" for 30 days until the Company switched back to UPS in August 2021—just two months before the IPO. *See* ¶¶93–94.

Rent the Runway also incurred millions of dollars of losses due to customer thefts. According to FE-2, the Company lost—at least—$500,000 every two months, or $6 million per year, solely as a result of clothing that was never returned by customers. ¶98. FE-2 explained, customers could simply scan their items at return boxes but never actually make the return. *Id.* Certain customers were so adept at taking advantage of Rent the Runway that they were able to

rack up tens (and sometimes hundreds) of thousands of dollars' worth of stolen merchandise before the Company took action to stop them from acquiring further rentals. *See* ¶97 (according to FE-1, one customer stole $100,000 in merchandise); ¶98 ("FE-2 recalled that one customer stole between $20,000 and $40,000 worth of merchandise from Rent the Runway."); ¶104 (according to FE-6, customers failed to return items worth $6,000).

FE-5, who was a senior employee in asset protection, explained that the revenue loss attributable to stolen items was "quite substantial." ¶¶99–100; *see also* ¶104 (FE-6 recalled the Company lost a significant amount of money on inventory and that customers were "robbing [the Company] blind"). FE-5 observed three primary ways theft occurred: (i) customers scanned items to return at Rent the Runway drop boxes located throughout the country but kept the items instead of returning them, (ii) employees or third-party vendors in charge of shipping returned items from customers at these drop boxes only shipped some of the scanned items back to Rent the Runway and kept the other items, and (iii) employees or staffing agency employees stole items from Rent the Runway's Secaucus, New Jersey and Arlington, Texas fulfillment centers. ¶100.

Though Rent the Runway had a fraud processing program, called *Signifyd*, the Company was never able to stop or even slow the substantial impact that theft was having on the Company's bottom line. ¶97. *Signifyd* required manual intervention to prevent customer thefts, but according to FE-1, that was never used. *Id.* In fact, according to FE-5, Rent the Runway did not have any policies or procedures in place to prevent thefts (¶101), and then when theft inevitably took place, the Company merely suspended their ability to rent new clothing (¶97).

Moreover, Rent the Runway's insurance was inadequate to compensate the Company for the significant losses incurred because of theft. FE-6 explained insurance claims were capped at $100 per shipment plus shipping costs because RTR did not pay for additional insurance when it

shipped items, resulting in "significant" losses because the value of almost every shipment far exceeded $100. ¶¶104–05. Additionally, Rent the Runway was only able to successfully make an insurance claim approximately 35 percent of the time. ¶104.

### C.    Rent the Runway's IPO

Despite the fact that the Company was experiencing these material issues it decided to conduct the IPO. ¶106. Defendants sold 19,550,000 shares of Class A common stock to the public, including an underwriter over-allotment option of 2,550,000 shares. *Id.* As a result of the shares of Class A common stock offered in the IPO, Rent the Runway received $377.3 million after deducting expenses and underwriting discounts and commissions. *Id.*

Given the Company's weak revenues, the funds raised through the IPO represented a windfall. However, rather than being able to invest that money into the business, Defendants were forced to use the IPO proceeds to pay off a loan the Company took out in 2020 in order to survive through the pandemic, which was secured on substantially all of the Company's assets. ¶5.

Despite the Company's struggles, the Offering Documents portrayed a company on the rise that had re-emerged from the pandemic on the same growth trajectory it had been on previously. Though the Company was consistently failing to meet its subscriber projections leading up to the IPO, it touted to investors a purportedly steep upward trend of new subscriptions which it assured investors was continuing. For example, the Offering Documents touted that the Company "*continue[d] to experience strong momentum* in the third quarter of fiscal year 2021" and that the "spread of COVID-19 Delta variant and the trend of continued work from home . . . *had minimal impact* on our business or financial performance as of the date of [the Offering Documents.]" ¶¶75, 119. Similarly, the Company assured investors that "*[a]s of the date of this prospectus, our operations and customer demand have not been significantly impacted.*" ¶120.

8

Further, though the Company included several purported risk factors identifying the *potential* risk that decreased demand posed to its business, it made no mention of the Company's sustained failure to meet its growth projections. For example, while the Company warned that "*[t]o the extent our growth rate slows, our business performance will become increasingly dependent on our ability to retain revenue from existing subscribers and increased sales to existing customers*" (¶123), "*[i]f we are unable to cost-effectively grow our customer base, our business, financial condition and results of operations would be harmed,*" (¶124), and "*[i]f we fail to retain customers, our business, financial condition, and results of operations would be harmed*" (¶125), it made no mention of the fact that it was failing to grow at the rate expected as the pandemic waned, could not attract new or retain existing customers, and was experiencing a decline in subscriptions and failing to meet internal benchmarks (¶126).

The Offering Documents also misled investors as to the risks associated with transportation costs. Indeed, in the Offering Documents, the Company told investors about its then-impending switch from FedEx to UPS stating that "*we cannot predict how this transition may impact our costs and our customer sentiment and satisfaction*" (¶128), and acknowledged that "*[i]ncreases in shipping costs . . . could damage our reputation and brand and may substantially harm our business*" (¶130). However—less than two months after the IPO—Defendant O'Sullivan admitted that the Company had always "anticipated . . . transportation headwinds" due to "price increases." ¶142. Moreover, contrary to the Offering Documents' disclosures, the Company already knew that UPS was more expensive than FedEx. ¶¶91–92

With regard to theft, the Offering Documents told investors that Rent the Runway had "*implemented fraud prevention measures, such as detection tools to identify irregular or high risk customer order patterns, to reduce the risk of fraud*" (¶132), but failed to mention that the

9

Company had no policies or procedures in place to prevent theft and no actions were taken against customers who stole rented merchandise aside from preventing those customers from placing new orders (¶133). Further, Rent the Runway warned that "*[w]e may incur significant losses from fraud*" and explained that "*our failure to adequately prevent fraudulent transactions could damage our reputation, result in litigation or regulatory action, and lead to expenses that could substantially impact our operating results*" (¶134), but failed to inform investors that the Company was already incurring significant losses as a result of theft, which were not covered by insurance (¶137). In fact, even though the Company was only able to successfully use its insurance to cover 35 percent of lost packages (which only reimbursed $100 per claim) (*id.*), it described such a risk as potential, stating: "*if the insurance coverage we maintain is not adequate to cover losses that occur*, . . . *we could be liable for significant additional costs*" (¶136).

### D.     Post-IPO Events

Immediately after the IPO, the Company reported a net loss of $87.8 million, which represented an additional loss of $43.5 million when compared to the same quarter a year prior—during the height of the COVID-19 pandemic. ¶139. A significant part of this loss was attributable to the Company's fulfillment expenses, i.e., the expenses the Company incurred to fulfill a customer's order, such as shipping costs, which ballooned to $19.2 million for the quarter immediately following the IPO, an increase of almost $6 million from the previous quarter.[4] ¶140. However, the Company continued to assure investors of sustained growth by releasing guidance that estimated an increase of approximately 4,000 subscribers to between 121,000 and 122,000 ending active subscribers for the next quarter. ¶139.

---

[4] The Offering Documents reported the following fulfillment expenses for the preceding four quarters: (i) $13.5 million for the second quarter 2021; (ii) $8.8 million for the first quarter of 2021; (iii) $9.2 million for the fourth quarter of 2020; and (iv) $11.0 million for the third quarter of 2020. ¶140.

On an earnings call discussing the Company's results, Defendant Hyman explained that rather than using the IPO proceeds to fund the Company's operations, the Company paid off approximately one third of its debt. ¶141. During this same call, as referenced above, Defendant O'Sullivan admitted that the Company had anticipated increased transportation costs before the IPO, explaining: "As we had anticipated, like many companies, we started to see transportation headwinds during Q3 with price increases from national carriers, and we expect to see the full impact of these headwinds in Q4 and fiscal '22." ¶142.

As a result of the above information, Rent the Runway's stock price fell $0.50 per share, or 4.35% to close at $11 on December 9, 2021. ¶143.

The next quarter, on April 13, 2022, Rent the Runway issued a press release reporting the Company's fourth quarter 2021 and full fiscal year 2021 financial results, announcing a net loss of $211.8 million, an approximately $40 million greater loss than the same quarter a year prior. ¶144.[5] Further, the Company reported 115,240 ending active subscribers, which not only represented an approximately 5,000 subscriber miss from the Company's previous quarter guidance, but also a loss of over 1,500 subscribers from the previous quarter. *Id.* The Company's fulfillment costs again increased to $20.4 million. ¶145.

The next quarter, on June 9, 2022, Rent the Runway issued a press release reporting the Company's first quarter 2022 financial results, announcing a net loss of $42.5 million. ¶148. Notably, The Company's fulfillment costs also increased to $22.9 million for the quarter. ¶149. Rent the Runway stopped providing guidance for its subscriber totals for future quarters. ¶148.

---

[5] Defendants semantically argue that this is "mistaken" because the "$211.8 million figure was for the fiscal year of 2021." MTD at 11 n. 14. However, Rent the Runway, like all other publicly traded companies, announce their year end results along with their fourth quarter results. In the fourth quarter of 2020, Rent the Runway's year end loss was $171.1, which is slightly more than $40 million less than the Company's $211.8 million loss in 2021. *See* Defs' Ex. 41 at 2.

11

On this news, the Company's stock price fell $.11 per share, or 3.14% to close at $3.39 on June 10, 2022. ¶151.

Finally on September 12, 2022—less than one year after the IPO—Rent the Runway issued its second quarter 2022 financial results, reporting a net loss of $33.9 million and a loss of over 10,000 active subscribers from the previous quarter. ¶152. The Company also announced a massive restructuring plan intended to "streamline its organizational structure and drive operational efficiencies," including a layoff of approximately 24 percent of the Company's corporate employees. *Id.* On this news, the Company's stock price fell $1.90 per share, or 38.77% to close at $3.00 on September 13, 2022. ¶155.

## III.   ARGUMENT

### A.   Legal Standard

To survive a motion to dismiss, a plaintiff must allege sufficient facts to "state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Courts must "accept[] all factual allegations in the complaint as true, and draw[] all reasonable inferences in the plaintiff's favor." *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152 (2d Cir. 2002).

"[T]he Securities Act impose[s] liability on certain participants in a registered securities offering when the publicly filed documents used during the offering contain material misstatements or omissions." *In re CPI Card Grp. Inc. Sec. Litig.*, 2017 WL 4941597, at *2 (S.D.N.Y. Oct. 30, 2017). The statute is "designed to assure compliance with the disclosure provisions of the [Securities] Act by imposing a stringent standard of liability on the parties who play a direct role in a registered offering." *Herman & MacLean v. Huddleston,* 459 U.S. 375, 381–82 (1983). Accordingly, under Sections 11 and 12(a)(2), issuers of securities are strictly liable for any misstatement or omission, and all others are held to a negligence standard. *CPI Card*, 2017 WL 4941597, at *2; *In re Morgan Stanley Info. Fund Sec. Litig.*, 592 F.3d 347, 359

12

(2d Cir. 2010) ("Issuers are subject to 'virtually absolute' liability under [S]ection 11, while the remaining potential defendants under sections 11 and 12(a)(2) may be held liable for mere negligence."). Liability can arise from "(1) a misrepresentation; (2) an omission in contravention of an affirmative legal disclosure obligation; and (3) an omission of information that is necessary to prevent existing disclosures from being misleading." *In re Facebook, Inc. IPO Sec. & Derivative Litig.*, 986 F. Supp. 2d 487, 506 (S.D.N.Y. 2013).

A plaintiff need only "plausibly allege that [the registrant] omitted material information that it was required to disclose or made material misstatements in its offering documents, [to] meet the relatively minimal burden of stating a claim . . . , under which, should plaintiffs' claims be substantiated, [a defendant's] liability as an issuer is absolute." *Scott v. Gen. Motors Co.*, 46 F. Supp. 3d 387, 397 (S.D.N.Y. 2014), *aff'd,* 605 F. App'x 52 (2d Cir. 2015) (quoting *Litwin v. Blackstone Grp., L.P.,* 634 F.3d 706, 718 (2d Cir.2011)); *N. J. Carpenters Health Fund v. Royal Bank of Scotland Grp., PLC*, 709 F.3d 109, 120 (2d Cir. 2013) ("Because claims under §§ 11 & 12(a)(2) of the [Securities] Act need not include allegations of fraud, this is an ordinary notice pleading case, subject only to the short and plain statement requirements of Federal Rule of Civil Procedure 8(a)."). "Fraud is not an element," the Complaint "need allege no more than negligence," *Rombach v. Chang*, 355 F.3d 164, 171 (2d Cir. 2004), and thus the Complaint need only plead "a short and plain statement of the claim." Fed. R. Civ. P. 8(a)(2); *see also Litwin*, 634 F.3d at 715. "Nor do the heightened pleading standards of the [PSLRA] apply to such non-fraud claims." *NECA-IBEW Health & Welfare Fund v. Goldman Sachs & Co.*, 693 F.3d 145, 157 (2d Cir. 2012).

Despite Defendants' assertions, the Complaint does not sound in fraud. *See* MTD at 14. In fact, the Complaint explicitly disclaims such allegations, (¶¶164, 176, 184) and the Supreme

13

Court has recognized the effect of such disclaimers. *See Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*, 575 U.S. 175, 186 (2015) (recognizing effect of disclaimer where complaint specifically "exclude[d] and disclaim[ed] any allegation sounding in fraud or deception"). Defendants' argument that certain "buzzwords," which they claim trigger the heightened pleading standard under Rule 9(b) can be entirely disregarded. Rule 9(b) does not apply simply because the Complaint alleges the Offering Documents were "inaccurate and misleading" and contained "false and misleading statements" and "untrue statements of material fact." *E.g.*, ¶¶121, 127, 165. Those phrases track Section 11 without changing the nature of the Complaint. *Fresno Cnty. Emps. Ret. Ass'n v. comScore, Inc.*, 268 F. Supp. 3d 526, 559 (S.D.N.Y. 2017) ("To hold that bare recitations of the elements of the causes of action triggered Rule 9(b) would be contrary to the holding of the Court of Appeals in Rombach"); *In re OSG Sec. Litig.*, 971 F. Supp. 2d 387, 405–06 (S.D.N.Y. 2013) (same); *In re Citigroup Bond Litig.*, 723 F. Supp. 2d 568, 586 (S.D.N.Y. 2010) (same).

Further, each case Defendants cite to support their flawed argument dealt with a situation where plaintiffs brought claims under ***both*** Section 11 and Section 10(b).[6] Reliance upon *Rombach*—which states that Section 11 does not "require[] that plaintiffs allege the scienter," and applied the heightened pleading standards where plaintiffs' Section 11 claims incorporated the *same allegations* underlying their Exchange Act fraud claims—to claim the Complaint sounds in fraud is misguided. 355 F.3d 164, 169 n.4, 175 (2d Cir. 2004).

Accordingly, Defendants are incorrect that the Complaint sounds in fraud.

---

[6] *See* MTD at 14 (citing *In re Chembio Diagnostics, Inc. Sec. Litig.*, 586 F. Supp. 3d 199, 217 (E.D.N.Y.), *reconsideration denied*, 616 F. Supp. 3d 192 (E.D.N.Y. 2022) (applying Rule 9(b) standard where plaintiff asserted claims under both Section 11 and Section 10(b)); *In re AOL Time Warner Sec. & "ERISA" Litig.*, 381 F. Supp. 2d 192, 214 (S.D.N.Y. 2004) (same); *In re JP Morgan Chase Sec. Litig.*, 363 F. Supp. 2d 595, 635 (S.D.N.Y. 2005) (same).

14

**B.      Defendants' Attempts to Undermine Allegations Attributed to Former RTR Employees Fails**

Defendants argue that the allegations contained in the Complaint attributed to FEs do not support falsity. *See* MTD at 18–19. Defendants are wrong. "It is well-established that confidential sources may be relied upon in a complaint so long as plaintiffs also rely on other facts [that] provide an adequate basis for believing the allegations in the complaint." *In re Bear Stearns Mortg. Pass-Through Certificates Litig.*, 851 F. Supp. 2d 746, 768 n.23 (S.D.N.Y. 2012). "When the complaint provides a basis for inferring that a [confidential witness] had personal knowledge of the facts, the . . . allegations are credited for" a motion to dismiss. *Sheet Metal Workers Loc. 32 Pension Fund v. Terex Corp.*, 2018 WL 1587457, at *4 (D. Conn. Mar. 31, 2018). A complaint satisfies this requirement where it describes the confidential witness "by job title, office location, and duration of employment." *Bear Stearns*, 851 F. Supp. 2d at 768 n.23. Once this requirement is met, "courts consider and take as true the statements of such [confidential] witnesses at th[e] [pleading] stage." *City of Omaha Police & Fire Ret. Sys. v. Evoqua Water Techs. Corp.*, 450 F. Supp. 3d 379, 405 (S.D.N.Y. 2020). The Complaint satisfies this requirement for each FE.

For example, with respect to FE-1 the Complaint alleges that she "was employed by Rent the Runway as a Manager in the Customer Experience department from November 2020 to September 2022" and in that role "overs[a]w fifteen Customer Experience team leaders, manag[ed] Rent the Runway's contact center, and me[t] with the Finance department regarding Customer Experience costs." ¶77. The Complaint also alleges that FE-1 reported directly to Becky Hyman Leader, RTR's vice president of customer experience. *Id.* n.3. As a manager in customer experience, FE-1 had knowledge of the fact that over 100 RTR customers were cancelling every

15

day[7] as well as the fact that RTR had to put a special team of seven agents in place to work to quell the rate of subscribers the Company was losing. ¶78. Further, because FE-1 attended monthly all-hands meetings, she was able to see Defendant O'Sullivan's presentation, which reflected that subscriber enrollments were consistently down. ¶79.

Similarly, the Complaint alleges that FE-2 worked in RTR's customer experience department between November 2017 and November 2021, during which she was a training specialist from May 2021 to her departure in November 2021. ¶80. In this role, FE-2 worked closely with Becky Hyman Leader, Ashley Ostrowski,[8] subscriber teams, and other customer operations managers, all of whom met monthly or bi-weekly leading up to the IPO and discussed the Company's overall performance, including subscriber enrollment figures. ¶81.

FE-3 was an operations manager from before the IPO to May 2022 responsible for planning, budgeting, and completing and preparing one of Rent the Runway's fulfillment center's workload. ¶82. FE-3 attended Companywide Zoom meetings every two weeks or monthly, during which multiple RTR employees, including Defendants Hyman and O'Sullivan, described the Company's "rough times" as it failed to meet its subscriber enrollment projections. ¶83.

FE-4 worked as a senior operations manager, outbound and inventory control and quality assurance, and as a senior manager, operations integration and inventory control and quality assurance from September 2019 through December 2022. ¶84. FE-4 attended monthly Companywide Zoom meetings hosted by Defendant Hyman where she presented then-current subscriber statistics and projected future subscriber statistics. ¶85. During at least one of these

---

[7] Defendants argue that this allegation cannot be credited because "the CAC does not establish when this occurred, for how long, or that the rate of alleged cancellations/churns was inconsistent with rates the Company experienced." MTD at 19. This is simply incorrect as the Complaint alleges this occurred "leading up to the IPO" and that this continued as the Company "was not meeting its enrollment subscriber projections at the time of its October 2021 IPO." ¶78.

[8] Ashley Ostrowski was Rent the Runway's former director of training and quality development. ¶80.

meetings, either Defendant Hyman or Defendant O'Sullivan mentioned that Rent the Runway did not meet its subscriber enrollment projections at that time. *Id.*

FE-5 was employed with Rent the Runway from March 2019 to July 2021 as a senior employee in asset protection. ¶99. In this role, she was in a position to know the ways in which the Company was losing inventory due to fraud and theft as well as the magnitude of such losses, which were "quite substantial." ¶100. Further, she was aware of how the Company addressed these problems, including that there were no policies or procedures in place to stop theft. ¶101.

FE-6 joined Rent the Runway as a customer experience operations manager in June 2019 and departed as a manager in transportation execution in July 2021. ¶103. As manager of transportation execution, she was responsible for increasing shipping efficiency, acting as a liaison between customers and the RTR transportation team, and dealing with shipping carrier claims. *Id.* Accordingly, she was in a position to see how the Company handled lost inventory from customer theft, including the Company's lack of insurance coverage for the full value of lost items and that losses attributable to theft were "pretty significant." ¶104–05.

Because each FE was in a position to know the information attributed to them in the Complaint, the Court should credit the FE allegations contained in the Complaint, which, as explained below, support the falsity of Defendants' statements.

**C.      Defendants Fail to Establish That RTR's Statements Concerning Customer Demand Were Not False**

Defendants argue that the alleged misstatements concerning customer demand are not actionable by isolating each statement and attempting to show that it was either not false or that Defendants had no duty to disclose contrary information. MTD at 15–18. However, this approach to analyzing falsity is at odds with the weight of authority in the Second Circuit. The correct "'inquiry is not whether isolated statements within a document were true, but whether defendants'

17

representations or omissions, considered together and in context, would affect the total mix of information and thereby mislead a reasonable investor regarding the nature of the securities offered.'" *Bos. Ret. Sys. v. Alexion Pharms., Inc.*, 556 F. Supp. 3d 100, 123 (D. Conn. 2021) (quoting *Halperin v. eBanker USA.COM, Inc.*, 295 F.3d 352, 357 (2d Cir. 2002)). "[L]iteral tru[th]" is not the standard for falsity. *In re Vivendi, S.A. Sec. Litig.*, 838 F.3d 223, 240 (2d Cir. 2016). Indeed, "even an entirely truthful statement may provide a basis for liability" where, when taken in context, the statement acts to mislead investors. *In re Sanofi-Aventis Sec. Litig.*, 774 F. Supp. 2d 549, 561 (S.D.N.Y. 2011); *McMahan & Co. v. Wherehouse Ent., Inc.*, 900 F.2d 576, 579 (2d Cir.1990) ("Some statements, although literally accurate, can become, through their context and manner of presentation, devices which mislead investors. For that reason, the disclosure required by the securities laws is measured not by literal truth, but by the ability of the material to accurately inform rather than mislead prospective buyers."). In sum, when a corporation chooses to speak, it has a "duty to be both accurate and complete" and must disclose all material information. *Sanofi*, 774 F. Supp. 2d at 561; *Nayani v. LifeStance Health Grp., Inc.*, 2023 WL 3260260, at *3 (S.D.N.Y. May 4, 2023) ("Under [S]ection 11, [a]n issuer must as well desist from misleading investors by saying one thing and holding back another.").

"Materiality is an inherently fact-specific finding." *Litwin*, 634 F.3d at 716–17. An omission is material where there is "a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information available." *Id.* Because materiality "presents 'a mixed question of law and fact,' it will rarely be dispositive in a motion to dismiss." *In re Morgan Stanley Info. Fund Sec. Litig.*, 592 F.3d 347, 360 (2d Cir. 2010); *Ganino v. Citizens Utils. Co.*, 228 F.3d 154, 162 (2d Cir. 2000)

18

(dismissal inappropriate unless no reasonable minds could differ as to materiality); *Nayani*, 2023 WL 3260260, at *3 ("[M]ateriality is rarely a basis for dismissal on the pleadings.").

Defendants first challenge four of RTR's misstatements wherein the Company misled investors as to the state of demand for RTR's subscription service as the COVID-19 pandemic waned. MTD at 15. Plaintiffs' allegations concern the Company's characterization of how its subscriber metrics related to the Company's ability to emerge from the COVID-19 pandemic and maintain sustained growth in the face of a radically different operating environment. *See* ¶¶116–27. Indeed, in the Offering Documents, RTR unequivocally assured investors that "***[t]he spread of the COVID-19 Delta variant and the trend of continued work from home has had minimal impact on our business or financial performance as of the date of this prospectus***" (¶119), "***[a]s COVID-19 restrictions have been relaxed and virus positivity rates have declined, we have seen increased demand for our offerings***" (¶120), and "***[a]s of the date of this prospectus, our operations and customer demand have not been significantly impacted***" (*id.*).

These statements acted to assure investors that the financial impact of the COVID-19 pandemic was behind the Company and as a result, its growth would be sustained. When taken in context and coupled with the Company's subscription figures, Defendants' statements concerning customer demand would have led a reasonable investor to believe that the Company was growing as it had before the pandemic. Indeed, immediately before the IPO, the Company's subscriber figures had increased from the rock bottom lows it experienced during the height of the pandemic, and, in context, the Company's statements acted to lead investors to believe that the Company's growth was continuing on the same trajectory as before the pandemic.

However, unbeknownst to investors, far from having a "minimal" or "[in]significant[]" impact, the effects of the COVID-19 pandemic fundamentally changed Rent the Runway's

19

business. As multiple FEs explain below, Rent the Runway was not emerging from the pandemic as expected, but rather was experiencing significant problems acquiring new customers, retaining its existing customers, and reacquiring the customers it had lost previously. ¶¶76, 121. As a result, the Company was failing to meet the internal projections it needed in order to achieve the growth Defendants desired and investors expected. That the Company's internal analyses contradicted its public statements is sufficient to establish that the statements were misleading. *Vivendi*, 838 F.3d at 249 (finding "statement conflicted with internal forecasts . . . and thus was misleading"); *Facebook, Inc.*, 986 F. Supp. 2d at 516 (holding that statements "are misleading if the risks are professionally stamped in internal undisclosed analyses . . . as significantly greater or more certain than those portrayed in the prospectus.").

**1.    The Allegations Attributed to FEs 1-4 Establish Defendants' Statements Were False**

Indeed, according to at least four former RTR employees, the Company was failing to meet the internal projections necessary to emerge from the pandemic with the same growth trajectory it had been on prior to March 2020 and presented these missed projections at companywide meetings. *See* ¶79 (according to FE-1, Defendant O'Sullivan made presentations at companywide meetings which "reflected that the Company's subscriber enrollments were 'consistently down' and not meeting its projections."); ¶81 ("FE-2 recalled that Rent the Runway's overall performance, and specifically the Company's subscriber enrollment figures, were shared and discussed during [companywide] meetings."); ¶83 (FE-3 recalled that during companywide meetings "'multiple speakers,' including Defendant Hyman and Defendant O'Sullivan, said that the Company [wa]s 'going through rough times because we're not getting as many subscribers as we want.'"); ¶85 ("FE-4 recalled that during at least one of these meetings

20

held at the 'tail end of COVID,' either Defendant Hyman or Defendant O'Sullivan mentioned that Rent the Runway did not meet its subscriber enrollment projections at that time.").[9]

Though Defendants attempt to discredit the FE allegations on the basis that Plaintiffs have ostensibly failed to establish that each FE had access to companywide data (MTD at 18), that argument should be rejected as the FEs **collectively** had access to such data. *N. J. Carpenters Health Fund*, 709 F.3d at 123–24 (holding that the allegations of former regional employees— each having access only to regional data—are sufficient in supporting falsity where the complaint pleads, as it does here, "company-wide practices.").

### 2.    Defendants' Other Arguments Challenging the Actionability of Their Statements Fail

Defendants next argue that regardless of the FEs' allegations, the Company's statements concerning customer demand were not false for three primary reasons, each of which fails. ***First***, Defendants argue that because Plaintiffs do not allege that the Company's historical performance figures were inaccurate, there can be no liability. MTD at 15–16. However, "Plaintiff[s'] allegations do more" than simply take issue with the reporting of accurate performance figures. *In re Dentsply Sirona, Inc. Sec. Litig.*, 2023 WL 2682905, at *14 (E.D.N.Y. Mar. 29, 2023). Rather, the Complaint alleges that Defendants' statements about increased demand were false because they misled investors as to the sustainability of the Company's growth trajectory as compared to the Company's pre-pandemic growth levels. *See id.* at *14–*15 (finding statement

---

[9] Moreover, the corroborative nature of each of these FE accounts supports their sufficiency as well as the falsity of Defendants' statements. *N. J. Carpenters Health Fund*, 709 F.3d at 123–24 (finding CW allegations reliable where "they are described in the complaint with sufficient particularity to support the probability that a person in the position occupied by the source would possess the information alleged."); *City of Warren Police & Fire Ret. Sys. v. World Wrestling Ent. Inc.*, 477 F. Supp. 3d 123, 137–38 (S.D.N.Y. 2020) (corroborative CW testimony supported finding of falsity); *In re Tufin Software Techs. Ltd. Sec. Litig.*, 2022 WL 596861, at *7–8 (S.D.N.Y. Feb. 25, 2022) (finding CW allegations sufficient where CWs worked in appropriate position and testimony was corroborative).

21

attributing accurate historical revenue figures to "strong demand" to be actionable because whether revenue was driven by demand or sales requirements "fundamentally differ[ed] in sustainability."). Contrary to Defendants' assertion, the falsity of the demand statements is not premised on the fact that "less favorable results might [have] be[en] predictable" to the Company (MTD at 16), but rather on the fact that the Company knew that it was not meeting the projections that were required to match its pre-COVID growth trajectory or even to completely recover the subscribers the Company lost as a result of the pandemic.

**Second**, Defendants challenge the Company's statements about the "increased demand" it had seen and the "minimal impact" of COVID on the basis that the Company's financial figures showed an increase between the first and third quarters of 2021. MTD at 16. As explained above, this argument misses the point. Plaintiffs do not allege that the Company was having **no** success after the pandemic. Instead, the Complaint alleges these statements were false because they misled investors as to the sustainability of the Company's growth. *See Lematta v. Casper Sleep, Inc.*, 2022 WL 4637795, at *9 (E.D.N.Y. Sept. 30, 2022) (finding plaintiff adequately alleged a material omission where "a reasonable investor may have believed that [defendant] was on a path to achieve profitability and implement its growth initiatives" when in reality defendant "was actually suffering accelerating losses, its core operations were not profitable, its revenue growth rate was not sustainable, and it had not positioned itself to achieve profitability."); *Shenwick v. Twitter, Inc.*, 282 F. Supp. 3d 1115, 1135,1137, 1139–40 (N.D. Cal. 2017) (defendants "misled investors by failing to disclose [key internal] metrics" showing "flat or declining [] trends," which "cut[] against" their "reassurances [of] positive growth and [] trends").

**Third**, and finally, Defendants argue that the Company's statement that it was "continu[ing] to experience strong momentum" is inactionable. MTD at 17–18. As an initial

22

matter, the statement is not puffery. Whether a statement constitutes puffery is not a binary inquiry, rather, puffery is context dependent, and where, as here, a statement is made to reassure the investing public, it is actionable. *See Dentsply Sirona*, 2023 WL 2682905, at \*15 ("[W]hen the statements are made repeatedly in an effort to reassure the investing public about matters particularly important to the company and investors, those statements may become material to investors."); *In re Turquoise Hill Res. Ltd. Sec. Litig.*, 625 F. Supp. 3d 164, 228 (S.D.N.Y. 2022) ("The key inquiry in deciding whether a statement constitutes puffery is the nature of the specific statement and whether it concretely assured investors of anything."). Given the context in which this statement was made, coupled with slightly raised subscriber numbers and assurance that demand was strong, investors were led to believe that the Company's recovery from the pandemic was proceeding as expected and that the Company's "momentum" would bring its subscriber metrics back to pre-pandemic levels. This was key information as investors had no way to discern what long-term effects the pandemic would have on Rent the Runway's business, particularly as the work from home trend continued after the pandemic waned.

Accordingly, in context, courts within the Second Circuit have found similar statements to be actionable. *Novak v. Kasaks*, 216 F.3d 300, 315 (2d Cir. 2000) (statements that "the inventory situation was 'in good shape' or 'under control'" were "more than just [] rosy predictions" or "expressions of optimism, and other puffery"); *Turquoise Hill*, 625 F. Supp. 3d at 223 ("[S]tatement that 'lateral development has progressed well—viewed in context—was" not puffery as it "reassured investors that [such] construction . . . was not substantially impaired by any delay"); *Signet*, 2018 WL 6167889, at \*11–12 (describing credit portfolio as "strong," "very strong," and "very healthy" to reassure the investing public about the portfolio's health is "not puffery at all").

23

Further, though Defendants suggest that the statement cannot be false because subscriber projections are "irrelevant" (MTD at 17), there is no bright line rule allowing a Company to assure investors of one fact while it is internally known that the opposite is true. Rather, the statements here assured investors that demand was strong and continuing to grow while Defendants "knew that the contrary was true," rendering their statements "misrepresentations of existing facts." *Novak*, 216 F.3d at 315; *see Vivendi*, 838 F.3d at 249 (finding "statement conflicted with internal forecasts . . . and thus was misleading").

Finally, Defendants incorrectly assert that the Complaint attempts to plead the falsity of the statement by hindsight. MTD at 17. As the FEs explain above, at the time of the IPO, Rent the Runway was hemorrhaging 100 subscribers per day. This was not disclosed in the Offering Documents nor communicated to investors in any other way. Rather, investors only became aware of what was happening at the time of the IPO when the Company released its fourth quarter financial results wherein it reported an approximately 5,000 subscribers miss from the Company's previous quarter guidance as well as a loss of over 1,500 subscribers from the previous quarter. ¶144. The post-IPO declines pled in the Complaint simply corroborate the FEs' allegations. *In re Blue Apron Holdings, Inc. Sec. Litig.*, 2020 WL 1950783, at *9 (E.D.N.Y. Apr. 22, 2020) ("The post-IPO earnings call demonstrated the delays at the Linden Facility *in fact* adversely affected Blue Apron's financial condition [at the time of the IPO].") (emphasis in original); *Panther Partners Inc. v. Jianpu Tech. Inc.*, 2020 WL 5757628, at *9 (S.D.N.Y. Sept. 27, 2020) ("Moreover, during a December 2017 conference call, [defendant's] top executives disclosed that 'non-licensed financial institutions' were responsible for 'around 12% of [defendant's] total revenue in November.' . . . It is unlikely that all such non-licensed financial services providers joined [defendant's] platform in the second half of November, after the IPO."); *McKenna v.*

24

*SMART Techs. Inc.*, 2012 WL 3589655, at \*4 (S.D.N.Y. Aug. 21, 2012) (financials released five-months post-IPO support the plaintiff's claim that there was demand uncertainty for the defendant's core product at the time of the IPO).

**D.      Defendants Fail to Establish That the Company's Risk Disclosures Were Not Misleading**

Defendants attempt to explain away the Offering Documents' misleading risk disclosures by arguing that investors had sufficient information to understand the risks facing the Company at the time. MTD at 20–28. However, because each risk factor was described as "potential" (*see* ¶¶116–38), this argument must fail as it is well settled that "cautionary words about future risk cannot insulate from liability an issuer's failure to disclose that the risk has, in fact, materialized." *Set Cap. LLC v. Credit Suisse Grp. AG*, 996 F.3d 64, 85 (2d Cir. 2021); *Wilson v. Merrill Lynch & Co., Inc.*, 671 F.3d 120, 130 (2d Cir.2011); ("[C]autionary words about future risk cannot insulate from liability the failure to disclose that the risk has transpired."); *Facebook*, 986 F. Supp. 2d at 516 (same). As one court artfully explained, "[b]y superficially warning of possible risks while failing to disclose critical facts, [defendant] was akin to someone who warns his hiking companion to walk slowly because there might be a ditch ahead when he knows with near certainty that the Grand Canyon lies one foot away." *See In re MF Glob. Holdings Ltd. Sec. Litig.,* 982 F. Supp. 2d 277, 318 (S.D.N.Y. 2013).

**1.      Defendants Fail to Show That Risks Associated With Shipping and Transportation Were Adequately Conveyed to Investors**

Defendants argue that the Company adequately informed investors of rising shipping costs and its multiple carrier switches. MTD at 22–24. Defendants' arguments ring hollow as the Company's risk disclosures again characterized risks associated with shipping as potential. For example, the Offering Documents warned investors that "***[a] substantial majority of [its] inbound shipments from customers are currently returned through a single vendor***" and the Company

25

was "***currently in the process of transitioning***" shipping vendors but claimed that it could not "***predict how this transition may impact [the Company's] costs and [the Company's] customer sentiment and satisfaction***." ¶128.

Unbeknownst to investors, in reality, prior to the IPO, Rent the Runway had encountered substantial difficulties in finding a reliable and affordable shipping carrier. Approximately a year before the IPO, Rent the Runway switched from UPS to FedEx as its primary shipping vendor because UPS was too expensive to be sustainable, however, just months before the IPO, FedEx doubled its shipping rates because the Company was not making enough shipments. ¶129. As a result, the Company was forced to switch back to the already prohibitively expensive UPS. *Id.* Rent the Runway was constantly searching for cheaper carriers, and when the Company switched from UPS to FedEx, it supplemented FedEx in New York with local "last mile" couriers that were cheaper than FedEx but much-less reliable. ¶91. The Company also attempted to lower shipping costs by using physical drop boxes for customer returns. ¶95.

After just one year of contracting with FedEx, the Company experienced significant, undisclosed cost increases and reliability issues, forcing it to switch back to the already cost prohibitive UPS. ¶92. FE-4 explained that FedEx doubled the Company's shipping rates because it was not shipping enough, causing a "panic" within the Company until it was able to switch back to UPS in August 2021. ¶¶93–94. Notably, immediately after the IPO, Defendant O'Sullivan admitted that the Company had "anticipated . . . transportation headwinds" due to "price increases" heading into the IPO (¶142). Further, according to FE-1, during her tenure, RTR customers were frustrated with shipping delays, causing increased subscriber cancellations. ¶¶89– 90.

Even if the Company's carrier switches were publicly reported (*see* MTD at 23), investors

26

could not have fully understood the nature of or reasons for those changes. This is particularly true in the context of the undisclosed demand decreases facing the Company as fewer shipments ultimately caused FedEx to double its rate.

Accordingly, the Company's risk factors related to shipping were false and misleading.

### 2. Defendants Wrongly Suggest That the Offering Documents Adequately Informed Investors About Customer Demand

Defendants attempt to downplay their ardent statements concerning customer, suggesting that investors could not have been misled because the Company warned of its "limited track record of success." MTD at 20. However, that characterization of the Company stands in stark contrast to what the Offering Documents led investors to believe. *See supra,* § II.C. Though Rent the Runway included risk factors in the Offering Documents related to customer demand, the risk factors warned only of potential risks and failed to include material information concerning declining trends in subscriber enrollment. *See* ¶¶122–27. For example, the Offering Documents stated that "***[i]f we are unable to manage our growth effectively, our brand, company culture, and financial performance may suffer***" and attributed that growth to "***in demand for our subscription offerings.***" ¶123. Similarly, the Offering Documents explained that "***[i]f we are not able to continue to expand our customer base through cost-effective methods, our revenue may grow slower than expected or decline***" (¶124) and "***[i]f we fail to retain customers, our business, financial condition, and results of operations would be harmed***" (¶125).

Each of these risk factors described potential consequences associated with the loss of subscribers and decreased customer demand, but failed to inform investors that the Company was already experiencing those exact issues. As explained above, at the time of the IPO: (i) the number of subscribers was trending down, (ii) the Company was failing to attract and retain customers,

27

and (iii) the Company's growth rate was already slowing and declining.[10] ¶126. Moreover, the fact that the Company was not meeting its internal projections further undermines the efficacy of the risk disclosures. *Facebook*, 986 F. Supp. 2d at 516 ("[E]ven apparently specific risk disclosures like those in [a defendant company's] prospectus are misleading if the risks are professionally stamped in internal undisclosed analyses . . . as significantly greater or more certain than those portrayed in the prospectus.").

Accordingly, the Company's risk factors concerning customer demand failed to accurately inform invest of the then-current demand declines plaguing Rent the Runway.

> **3.     Defendants' Arguments Concerning the Company's Risk Factors Related to Theft and Fraud Fail to Establish That They Adequately Informed Investors**

Finally, Defendants argue that the Company sufficiently disclosed the risks of theft and fraud and the associated costs. MTD at 24–27. However, none of Defendants' arguments change the fact that while the Company may have warned investor that theft ***could*** have an impact, at the time of the IPO, it had no mechanism in place to stop theft and was actively ignoring it, resulting in continued, substantial losses. Rather, the Offering Documents told investors that the Company had "***implemented fraud prevention measures, such as detection tools to identify irregular or high risk customer order patterns, to reduce the risk of fraud***." ¶132. However, the Company did not have policies or procedures in place to prevent theft, and the Company failed to take any actions against customers who stole rented merchandize other than prohibiting those customers from placing new orders. ¶133. As a result, RTR was losing at least $6,000,000 annually due to fraud and theft. *Id.*

According to FE-5, a senior employee in asset protection (¶99), there were three primary

---

[10] In an attempt to argue that these risk factors were not misleading, Defendants simply reassert the same arguments addressed above. MTD at 21.

ways the Company's items were stolen: (i) customers scanned items to return at Rent the Runway drop boxes located throughout the country but kept the items instead of returning them, (ii) Rent the Runway employees or third-party vendors in charge of shipping returned items from customers at these drop boxes only shipped some of the scanned items back to Rent the Runway and kept the other items, and (iii) Rent the Runway employees or staffing agency employees stole items from Rent the Runway's Secaucus, New Jersey and Arlington, Texas fulfillment centers. ¶100. Similarly, FE-6 explained that the Company was only able to obtain successful insurance claims on approximately 35 percent of those packages and, even then, was only able to cover $100, which was a small fraction of the price of one RTR package, given the significant cost of designer clothing. ¶¶104–05.

Because theft had a material impact on the Company revenues Defendants were required to disclose the above information.

### E.    Defendants Failed to Comply With the Disclosure Requirements of Items 303 and 105

In another attempt to shirk their disclosure obligations Defendants repeat each of their above arguments to rebut Plaintiffs' claims that they violated Item 303 and Item 105 of Regulation S-K. MTD at 27–32.  Items 303 and 105 "give[] rise to specific duties to disclose" and a "[f]ailure to make the requisite disclosures under Regulation S–K will generally produce liability under the Securities Act." *Panther Partners, Inc. v. Ikanos Commc'ns, Inc.*, 538 F. Supp. 2d 662, 668–69 (S.D.N.Y. 2008), *aff'd,* 347 F. App'x 617 (2d Cir. 2009).

Pursuant to Item 303, a company must disclose information "where a trend, demand, commitment, event or uncertainty is both presently known to management and reasonably likely to have material effects on the registrant's financial conditions or results of operations." *Dentsply Sirona*, 2023 WL 2682905, at *19. Merely mentioning a known trend or uncertainty is

insufficient, "Item 303 requires not only a discussion but also an analysis of known material trends, and that disclosure is necessary to an understanding of a company's performance, and the extent to which reported financial information is indicative of future results." *Stratte-McClure v. Morgan Stanley*, 776 F.3d 94, 105 (2d Cir. 2015).

Item 105 requires "a discussion of the most significant factors that make the offering speculative or risky," "courts typically analyze the sufficiency of Item [105] disclosures with the familiar materiality standard." *City of Roseville Employees' Ret. Sys. v. EnergySolutions, Inc.*, 814 F. Supp. 2d 395, 426 (S.D.N.Y. 2011) (discussing Item 105, formerly known as Item 503). Plaintiffs "need not allege Defendants' knowledge … to plead an Item [105] violation." *Panther Partners*, 2020 WL 5757628, at *10.

**1.      Defendants' Arguments Do Not Negate That Loss of Customer Demand was a Known Trend and Material Risk That RTR was Required to Disclose**

Defendants argue that pursuant to Items 303 and 105, Rent the Runway had no obligation to disclose that demand for its service was faltering and failed to recover as the COVID-19 pandemic waned (MTD at 28). However, the Company failed to comply with the requirements of Items 303 and 105 when it failed to inform investors of the faltering demand for its subscriptions, which was both a trend known to management and a material risk to the Company's continued viability. Indeed, such a loss of customer demand, which persisted for over a year before the IPO, has been found to constitute a trend or uncertainty that is required to be disclosed pursuant to Item 303. *See Dentsply Sirona*, 2023 WL 2682905, at *20 (finding an Item 303 violation where defendants "were aware, through the market reports that they received monthly, that the market was trending downward, i.e., that there was insufficient end-user demand.").

Further, the Complaint's allegations, including FE accounts that these trends existed and were known throughout the Company and worsening—and regularly discussed at companywide

30

meetings—are sufficient to plead that the "other shoe" would drop after the IPO. *CPI* Card, 2017 WL 4941597, at *3 (plausible inference of known trend that "other shoe" would drop after IPO); *see also Blue Apron*, 2020 WL 1950783, at *8 ("Drawing the allegations in the light most favorable to Plaintiffs, . . . [d]efendants were aware of the existence of significant delays . . . . "); *Panther Partners Inc. v. Ikanos Commc'ns, Inc.*, 681 F.3d 114, 121–22 (2d Cir. 2012*)* (plausible inference of known uncertainty concerning sales issues). Similarly, as discussed above, declining demand and the loss of subscribing customers constitute a significant factor (*i.e.*, they were material) that made investing in the IPO risky to investors and consequently, should have been disclosed to investors pursuant to Item 105.

Accordingly, Defendants violated their disclosure obligations under Items 303 and 105 by failing to disclose the Company's demand issues.

### 2. Losses Due to Theft Were a Known Trend and Material Risk That RTR Was Required to Disclose

As discussed above, leading up to the IPO, the Company was experiencing increased losses due to theft from both customers and RTR employees, which amounted to at least $6,000,000 annually. Because the COVID-19 pandemic had already caused a severe contraction of the Company's revenue stream, the substantial loss in revenue attributable to theft created a significant uncertainty about the Company's revenue stream and thus its continued viability. Moreover, as the Company needed to maximize the revenue it was receiving (as evidenced by the fact that less than a year after the Company's IPO, it had to fire 25 percent of its corporate work force to save approximately $25 million for the year), $6,000,000 was a material amount to the Company, the loss of which had the potential to bring into question the Company's ability to continue operating. Thus, it should have disclosed the above information to its investors as it was a known uncertainty that that the Company would struggle if goods continued to be stolen.

31

Similarly, because the Company's losses were of such a magnitude that they had a material impact on the Company's profits, the Company was required to disclose this information under Item 105.

Accordingly, the Complaint sufficiently pleads a violation of Items 303 and 105 in connection with losses attributable to theft.

> **F.    Defendants' Arguments Fail to Negate Plaintiffs' Claim Under Section 12(a)(2)**

"Claims under [S]ections 11 and 12(a)(2) are . . . Securities Act siblings with roughly parallel elements[.]"*Morgan Stanley*, 592 F.3d at 359. Section 12(a)(2), however, imposes an additional requirement that a defendant must be a "statutory seller." *Id.* "An individual is a statutory seller—and therefore a potential section 12(a)(2) defendant—if he: (i) "passed title, or other interest in the security, to the buyer for value, or" (ii) "successfully solicit[ed] the purchase [of a security], motivated at least in part by a desire to serve his own financial interests or those of the securities['] owner." *Id.* (alteration in original).

In addition to reasserting their arguments against Section 11 liability, the Rent the Runway Defendants also argue that the Complaint fails to adequately plead that they are statutory sellers.[11] MTD at 32–33. As an initial matter, Rent the Runway, as the issuer of the security, is a statutory seller and its argument to the contrary "is foreclosed by SEC Rule 159A, which provides that an issuer is a statutory seller for the purposes of Section 12(a)(2) regardless of the form of underwriting." *See Citiline Holdings, Inc. v. iStar Fin. Inc.*, 701 F. Supp. 2d 506, 512 (S.D.N.Y. 2010); *see Fed. Housing Fin. Agency v. UBS Ams., Inc.*, 858 F. Supp. 2d 306, 333 (S.D.N.Y. 2012) (same), *aff'd*, 712 F.3d 136 (2d Cir. 2013); *Mallen v. Alphatec Holdings, Inc.*, 861 F. Supp. 2d 1111, 1132 (S.D. Cal. 2012) (same), *aff'd*, 607 F. App'x 694 (9th Cir. 2015); 17 C.F.R. § 230.159A(a) ("[R]egardless of the underwriting method used to sell the issuer's securities, seller

---

[11] Defendants do not contest that the Underwriter Defendants are statutory sellers.

shall include the issuer of the securities sold to a person as part of the initial distribution of such securities[.]"). Further, "the issuer shall be considered to offer or sell the securities to such person, if the securities are offered or sold to such person by means of any . . . prospectus." 17 C.F.R. § 230.159A(a)(1). Accordingly, Rent the Runway, by law, is liable under Section 12(a)(2).

Defendants also argue that the Individual Defendants are not statutory sellers. This argument too fails. While Defendants argue that "signing a registration statement does not amount to solicitation" (MTD at 33), the Second Circuit has not addressed the issue, and "numerous courts in this circuit hold that on a motion to dismiss, officers or directors of the stock issuer who signed its registration statement are deemed to have solicited the purchase of the offered stock." *Briarwood Invs. Inc. v. Care Inv. Tr. Inc.*, 2009 WL 536517, at *4 (S.D.N.Y. Mar. 4, 2009).

Moreover, the Complaint does not merely rest on the allegation that the Individual Defendants signed the Registration Statement. Rather, the Complaint alleges that each Individual Defendant: (i) "signed the Registration Statement," which incorporates the Prospectus (¶36); (ii) "participated in the preparation of the Offering Documents and in the making of the materially inaccurate, misleading, and incomplete statements" including by review[ing], edit[ing], and approv[ing] the Offering Documents" (¶37); and (iii) "conducted a roadshow for the IPO along with the Underwriter Defendants," during which they "reviewed, approved, and delivered to investors the IPO's roadshow presentation, talking points, and script" (¶38). *See, e.g.*, *Garnett v. RLX Tech. Inc.*, 632 F. Supp. 3d 574, 615 (S.D.N.Y. 2022), *aff'd sub nom. Tseng v. De Vries*, 2023 WL 8073087 (2d Cir. Nov. 21, 2023) (finding plaintiff sufficiently pled individual was a statutory seller where the complaint alleged that they "reviewed, contributed to, and signed the Registration Statement, . . . solicited the investing public to purchase . . . securities . . . , hired and assisted the underwriters, [and] planned and contributed to the IPO and the [r]egistration

33

[s]tatement"); *Evoqua*, 450 F. Supp. 3d at 404 (finding defendants were "statutory sellers" where they "participated in the promotion and sale of . . . stock," "collected lucrative underwriting fees for their roles in the IPO," and "drafted and disseminated the Offering Materials").

Each of the Individual Defendants had substantial financial motive for seeing the IPO to completion. Each non-employee director received significant cash awards upon completion of the IPO through a non-employee compensation program, expressly adopted in connection with the IPO. ¶40 ("Defendant Bixby received $60,000, Defendant Fleiss received $44,000, Defendant Friend received $61,500, Defendant Harris received $50,000, Defendant Kaplan received $63,000, Defendant Nova received $56,500, Defendant Paltrow received $44,000, Defendant Roney received $44,000, Defendant Rosensweig received $54,500, and Defendant Roth received $46,500"). Also, in connection with the IPO, the Company granted Defendants Hyman and O'Sullivan each an "IPO RSU Award" equal to 67,842 RSUs on the date of the IPO. ¶42.

Because the Rent the Runway Defendants are statutory sellers and the Prospectus contained a material misstatement, they are liable under Section 12(a)(2).

## G.    Defendants' Negative Causation Defense Fails

Defendants finally attempt to "avoid liability" by arguing that Plaintiffs claims are barred by their negative causation defense. MTD at 34–5. "As an initial matter, loss causation is not an element of a claim under either Section 11 or 12;" rather, it is an affirmative defense. *In re Giant Interactive Grp., Inc. Sec. Litig.*, 643 F. Supp. 2d 562, 571 (S.D.N.Y. 2009); *Levine v. AtriCure, Inc.*, 508 F. Supp. 2d 268, 272 (S.D.N.Y. 2007) ("§ 11 can be said to create a factual presumption that any decline in value is . . . caused by the misrepresentation in the registration statement.")

Accordingly, Defendants' negative causation argument is premature "[b]ecause [as] it is unnecessary to plead loss causation to maintain claims under Sections 11 and 12, the affirmative defense of negative causation is generally not properly raised on a Rule 12(b)(6) motion." *Giant*

34

*Interactive*, 643 F. Supp. 2d at 572; *In re Fuwei Films Sec. Litig.*, 634 F. Supp. 2d 419, 444 (S.D.N.Y.2009) ("Given the burden on Defendants to establish an affirmative defense such as negative causation, the Court finds that dismissal on this ground is more properly considered on a motion for summary judgment."); *Levine*, 594 F. Supp. 2d at 474 (noting the negative causation affirmative defense exists only when a plaintiff "plead[s] itself out of court by unintentionally alleging facts (taken as true) that establish an affirmative defense"). Defendants' "burden [to establish negative causation] is a heavy one, and is generally established by a defendant on a motion for summary judgment or at trial." *Winter v. Stronghold Digital Mining, Inc.*, 2023 WL 5152177, at *10 (S.D.N.Y. Aug. 10, 2023).

Here, the Complaint does nothing more than plead the myriad stock drops which happened after Rent the Runway announced poor financial metrics and declining subscriber totals, which ultimately led to the Company's decision to fire almost 25 percent of its corporate work force. *Id.* ("Even if it is likely that a significant portion of Plaintiffs' losses were the result [something other than the] alleged misstatements, [t]he Court need not make a final determination as to what losses occurred and what actually caused them, and need only find that Plaintiffs' allegations are plausible." (alteration in original)). Moreover, the fact that Defendants rely on extraneous exhibits to support their argument (*see* MTD at 34–5), clearly shows the facts contained in the Complaint do not establish their defense. *Giant Interactive*, 643 F. Supp. 2d at 573 (finding defendants failed to establish negative causation "[b]ecause the facts . . . fall outside of the [c]omplaint").

## IV.   CONCLUSION

For the foregoing reasons, Defendants' Motion to Dismiss should be denied in full.[12]

---

[12]   If the Court dismisses any or all of the Complaint, Plaintiffs respectfully request leave to amend pursuant to Rule 15 of the Federal Rules of Civil Procedure as this is the first complaint considered. *See Cortec Indus., Inc. v. Sum Holding L.P.*, 949 F.2d 42, 48 (2d Cir. 1991) ("usual practice upon granting a motion to dismiss to allow leave to replead").

DATED: December 19, 2023                Respectfully submitted,

                                        */s/ Alfred L. Fatale III*
                                        **LABATON SUCHAROW LLP**
                                        Jonathan Gardner
                                        Alfred L. Fatale III
                                        Guillaume Buell
                                        Robert S. Rowley
                                        140 Broadway
                                        New York, New York 10005
                                        Telephone: (212) 907-0700
                                        Facsimile: (212) 818-0477
                                        jgardner@labaton.com
                                        afatale@labaton.com
                                        gbuell@labaton.com
                                        rrowley@labaton.com

                                        *Lead Counsel for Lead Plaintiffs and the Class*

36

## CERTIFICATE OF SERVICE

I, Robert S. Rowley, certify that on December 19, 2023, the foregoing document entitled

**LEAD PLAINTIFFS' OPPOSITON TO DEFENDANTS' MOTION TO DISMISS** was

served on the following Counsel via email:

Mary Eaton
Meredith Kotler
Marques Tracy
**FRESHFIELDS BRUCKHAUS
DERINGER US LLP**
601 Lexington Avenue, 31st Floor
New York, New York 10022
Telephone: (212) 277-4000
mary.eaton@freshfields.com
meredith.kotler@freshfields.com
marques.tracy@freshfields.com

*Counsel for Defendants Rent the Runway, Inc.,
Jennifer Y. Hyman, Scarlett O'Sullivan, Tim Bixby,
Jennifer Fleiss, Scott Friend, Melanie Harris, Beth
Kaplan, Dan Nova, Gwyneth Paltrow, Carley Roney,
Dan Rosensweig, and Mike Roth*

Todd G. Cosenza
Charles D. Cording
**WILLKIE FARR & GALLAGHER LLP**
787 Seventh Avenue
New York, NY 10019-6099
Telephone: (212) 728-8000
Facsimile: (212) 728-8111
tcosenza@willkie.com
ccording@willkie.com

*Counsel for Defendants Goldman Sachs & Co. LLC,
Morgan Stanley & Co. LLC, Barclays Capital Inc.,
Credit Suisse Securities (USA) LLC, Piper Sandler
& Co., Wells Fargo Securities, LLC, JMP Securities
LLC, KeyBanc Capital Markets Inc., and Telsey
Advisory Group LLC*

                                        */s/ Robert S. Rowley*
                        _____