**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| RAJAT SHARMA, Individually and on Behalf of All Others Similarly Situated, <br><br> Plaintiff, <br><br> -v.- <br><br> RENT THE RUNWAY, INC., JENNIFER Y. HYMAN, SCARLETT O'SULLIVAN, TIM BIXBY, JENNIFER FLEISS, SCOTT FRIEND, MELANIE HARRIS, BETH KAPLAN, DAN NOVA, GWYNETH PALTROW, CARLEY RONEY, DAN ROSENSWEIG, MIKE ROTH, GOLDMAN SACHS & CO. LLC, MORGAN STANLEY & CO. LLC, BARCLAYS CAPITAL INC., CREDIT SUISSE SECURITIES (USA) LLC, PIPER SANDLER & CO., WELLS FARGO SECURITIES, LLC, JMP SECURITIES LLC, KEYBANC CAPITAL MARKETS INC., and TELSEY ADVISORY GROUP LLC, <br><br> Defendants. | Case No. 1:22-cv-6935-OEM-VMS |

**REPLY MEMORANDUM OF LAW IN FURTHER SUPPORT OF DEFENDANTS'
MOTION TO DISMISS THE CORRECTED AMENDED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**

WILLKIE FARR & GALLAGHER LLP
Todd G. Cosenza
Charles D. Cording
787 Seventh Avenue
New York, NY 10019-6099
Telephone: (212) 728-8000

*Counsel for Defendants Goldman Sachs &
Co. LLC, Morgan Stanley & Co. LLC,
Barclays Capital Inc., Credit Suisse
Securities (USA) LLC, Piper Sandler & Co.,
Wells Fargo Securities, LLC, JMP
Securities LLC, KeyBanc Capital Markets
Inc., and Telsey Advisory Group LLC*

FRESHFIELDS BRUCKHAUS DERINGER US LLP
Mary Eaton
Meredith Kotler
Marques Tracy
3 World Trade Center
175 Greenwich Street, 51st Floor
New York, New York 10007
Telephone: (212) 277-4000

*Counsel for Defendants Rent the Runway, Inc.,
Jennifer Y. Hyman, Scarlett O'Sullivan, Tim Bixby,
Jennifer Fleiss, Scott Friend, Melanie Harris, Beth
Kaplan, Dan Nova, Gwyneth Paltrow, Carley
Roney, Dan Rosensweig, and Mike Roth*

**TABLE OF CONTENTS**

**Page**

TABLE OF AUTHORITIES ............................................................................................... *ii*

TABLE OF ABBREVIATIONS ........................................................................................ *vii*

PRELIMINARY STATEMENT ...........................................................................................1

REPLY BACKGROUND........................................................................................................2

ARGUMENT ............................................................................................................................3

I.      THE CAC FAILS TO PLEAD A SECTION 11 CLAIM.......................................4

        A.      The Customer Demand Statements Were Not False or Misleading ........................4

        B.      The Shipping Costs Statements Were Not False or Misleading ..............................8

        C.      The Theft and Fraud Prevention Statements Were Not False or Misleading ........11

        D.      The CAC Fails to Plead an Item 303 Violation ......................................................12

                1.      Customer Demand ..................................................................................12

                2.      Customer Theft ......................................................................................13

        E.      The CAC Fails to Plead an Item 105 Violation ......................................................14

II.     THE CAC FAILS TO PLEAD A SECTION 12(A)(2) CLAIM ......................................15

III.    NEGATIVE CAUSATION BARS PLAINTIFFS' CLAIMS ...........................................17

CONCLUSION........................................................................................................................17

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Altayyar v. Etsy*,
242 F.Supp.3d 161 (E.D.N.Y. 2017),
*aff'd*, 731 F.App'x 35 (2d Cir. 2018) ........................................................................17

*Ark. Pub. Emps. Ret. Sys. v. Bristol-Myers Squibb*,
28 F.4th 343 (2d Cir. 2022) ......................................................................................10

*ATSI Commc'ns v. Shaar Fund*,
493 F.3d 87 (2d Cir. 2007)........................................................................................17

*Banerjee v. Zhangmen Educ.*,
2023 WL 2711279 (S.D.N.Y. Mar. 30, 2023) ...........................................................13

*City of Omaha Police & Fire Ret. Sys. v. Evoqua Water Techs.*,
450 F.Supp.3d 379 (S.D.N.Y. 2020)......................................................................7, 16

*City of Roseville Emps.' Ret. Sys. v. EnergySolutions*,
814 F.Supp.2d 395 (S.D.N.Y. 2011)..........................................................................15

*Fresno Cnty. Emps.' Ret. Ass'n v. comScore*,
268 F.Supp.3d 526 (S.D.N.Y. 2017)............................................................................3

*Garnett v. RLX Tech.*,
632 F.Supp.3d 574 (S.D.N.Y. 2022),
*aff'd*, 2023 WL 8073087 (2d Cir. Nov. 21, 2023) ...............................................15, 16

*Gordon v. Tencent Music Entm't Grp.*,
2021 WL 9183821 (E.D.N.Y. Mar. 31, 2021) ...........................................................15

*Gortat v. Capala Bros.*,
2010 WL 1423018 (E.D.N.Y. Apr. 9, 2010),
*aff'd*, 568 F.App'x 78 (2d Cir. 2014)...........................................................................2

*Holbrook v. Trivago*,
2019 WL 948809 (S.D.N.Y. Feb. 26, 2019),
*aff'd*, 796 F.App'x 31 (2d Cir. 2019).........................................................................14

*In re Bear Stearns Mortg. Pass-Through Certificates Litig.*,
851 F.Supp.2d 746 (S.D.N.Y. 2012)............................................................................7

*In re Blue Apron Holdings Sec. Litig.*,
2020 WL 1950783 (E.D.N.Y. Apr. 22, 2020) ........................................................6, 13

*In re Chembio Diagnostics Sec. Litig.*,
  586 F.Supp.3d 199 (E.D.N.Y. 2022) ...................................................................................15

*In re Citigroup Bond Litig.*,
  723 F.Supp.2d 568 (S.D.N.Y. 2010)......................................................................................3

*In re Coty Sec. Litig.*,
  2016 WL 1271065 (S.D.N.Y. Mar. 29, 2016) .......................................................................5

*In re Countrywide Fin. Corp. Mortg.-Backed Sec. Litig.*,
  932 F.Supp.2d 1095 (C.D. Cal. 2013) .................................................................................16

*In re CPI Card Grp. Sec. Litig.*,
  2017 WL 4941597 (S.D.N.Y. Oct. 30, 2017) ......................................................................13

*In re Craftmatic Sec. Litig.*,
  890 F.2d 628 (3d Cir. 1989)................................................................................................15

*In re Danimer Sci. Sec. Litig.*,
  2023 WL 6385642 (E.D.N.Y. Sept. 30, 2023) ....................................................................17

*In re Dentsply Sirona Sec. Litig.*,
  665 F.Supp.3d 255 (E.D.N.Y. 2023) ...............................................................................6, 13

*In re DraftKings Sec. Litig.*,
  650 F.Supp.3d 120 (S.D.N.Y. 2023)....................................................................................15

*In re Express Scripts Holding Co. Sec. Litig.*,
  2017 WL 3278930 (S.D.N.Y. Aug. 1, 2017)........................................................................17

*In re Facebook IPO Sec. & Deriv. Litig.*,
  986 F.Supp.2d 487 (S.D.N.Y. 2013)......................................................................................6

*In re Giant Interactive Grp. Sec. Litig.*,
  643 F.Supp.2d 562 (S.D.N.Y. 2009)....................................................................................17

*In re HEXO Corp. Sec. Litig.*,
  524 F.Supp.3d 283 (S.D.N.Y. 2021)....................................................................................15

*In re Kosmos Energy Ltd. Sec. Litig.*,
  955 F.Supp.2d 658 (N.D. Tex. 2013) ..................................................................................16

*In re Lululemon Sec. Litig.*,
  14 F.Supp.3d 553 (S.D.N.Y. 2014),
  *aff'd*, 604 F.App'x 62 (2d Cir. 2015)...................................................................................5

*In re Meta Materials Sec. Litig.*,
  2023 WL 6385563 (E.D.N.Y. Sept. 29, 2023) ......................................................................3

*In re Morgan Stanley Info. Fund Sec. Litig.*,
  592 F.3d 347 (2d Cir. 2010)..................................................................................15

*In re OSG Sec. Litig.*,
  971 F.Supp.2d 387 (S.D.N.Y. 2013)........................................................................3

*In re Qutoutiao Sec. Litig.*,
  2023 WL 4977499 (S.D.N.Y. Aug. 3, 2023)............................................................3

*In re Signet Jewelers Sec. Litig.*,
  2018 WL 6167889 (S.D.N.Y. Nov. 26, 2018)..........................................................6

*In re Turquoise Hill Res. Sec. Litig.*,
  625 F.Supp.3d 164 (S.D.N.Y. 2022).......................................................................6

*In re UBS Sec. Litig.*,
  2012 WL 4471265 (S.D.N.Y. Sept. 28, 2012),
  *aff'd*, 752 F.3d 173 (2d Cir. 2014).........................................................................2

*In re Vivendi, S.A. Sec. Litig.*,
  838 F.3d 223 (2d Cir. 2016)....................................................................................6

*In re Weight Watchers Int'l Sec. Litig.*,
  504 F.Supp.3d 224 (S.D.N.Y. 2020)......................................................................15

*Jensen v. iShares Tr.*,
  44 Cal. App. 5th 618 (2020) ..................................................................................16

*Jiajia Luo v. Sogou, Inc.*,
  465 F.Supp.3d 393 (S.D.N.Y. 2020).......................................................................5

*Johnson v. Ironshore Specialty Ins.*,
  2022 WL 912973 (S.D.N.Y. Mar. 28, 2022) ..........................................................4

*Lematta v. Casper Sleep*,
  2022 WL 4637795 (E.D.N.Y. Sept. 30, 2022) ..................................................5, 15

*Levy v. Maggiore*,
  48 F.Supp.3d 428 (E.D.N.Y. 2014) ........................................................................8

*Mass. Mut. Life Ins. Co. v. Res. Funding Co.*,
  843 F.Supp.2d 191 (D. Mass. 2012) .....................................................................16

*McKenna v. SMART Techs.*,
  2012 WL 3589655 (S.D.N.Y. Aug. 21, 2012).........................................................6

*Me. St. Ret. Sys. v. Countrywide Fin. Corp.*,
  2011 WL 4389689 (C.D. Cal. May 5, 2011) .........................................................16

*Midwest Operating Eng'rs Pension Tr. Fund v. Alkermes,*
  2021 WL 5782079 (2d Cir. Dec. 7, 2021) ...................................................................17

*N.J. Carpenters Health Fund v. Royal Bank of Scotland Grp., PLC,*
  709 F.3d 109 (2d Cir. 2013) ........................................................................................8

*Novak v. Kasaks,*
  216 F.3d 300 (2d Cir. 2000) ........................................................................................6

*Panther Partners v. Ikanos Commc'ns,*
  681 F.3d 114 (2d Cir. 2012) ......................................................................................13

*Panther Partners v. Jianpu Tech.,*
  2020 WL 5757628 (S.D.N.Y. Sept. 27, 2020) .......................................................6, 15

*Pinter v. Dahl,*
  486 U.S. 622 (1988) ..............................................................................................16, 17

*Plumber & Steamfitters Loc. 773 Pension Fund v. Danske Bank,*
  11 F.4th 90 (2d Cir. 2021) ...........................................................................................5

*Randall v. Dish Network, LLC,*
  2018 WL 3235543 (E.D.N.Y. July 2, 2018) ................................................................8

*Rombach v. Chang,*
  355 F.3d 164 (2d Cir. 2004) ........................................................................................3

*Rosenzweig v. Azurix,*
  332 F.3d 854 (5th Cir. 2003) .....................................................................................15

*Rubinstein v. Credit Suisse Grp. AG,*
  457 F.Supp.3d 289 (S.D.N.Y. 2020) ..........................................................................15

*Scott v. Gen. Motors,*
  46 F.Supp.3d 387 (S.D.N.Y. 2014),
  *aff'd*, 605 F.App'x 52 (2d Cir. 2015) ..........................................................................5

*Shaw v. Digit. Equip.,*
  82 F.3d 1194 (1st Cir. 1996) ......................................................................................15

*Sheet Metal Workers Loc. 32 Pension Fund v. Terex,*
  2018 WL 1587457 (D. Conn. Mar. 31, 2018) .............................................................7

*Shenwick v. Twitter,*
  282 F.Supp.3d 1115 (N.D. Cal. 2017) .........................................................................5

*SUN, A Series of E Squared Inv. Fund v. Sundial Growers,*
  2021 WL 4482276 (S.D.N.Y. Sept. 30, 2021) ...........................................................17

*Thomas v. Shiloh Indus.*,
  2018 WL 4500867 (S.D.N.Y. Sept. 19, 2018) .......................................................................12

*Vaccaro v. New Source Energy Partners L.P.*,
  2016 WL 7373799 (S.D.N.Y. Dec. 19, 2016) .......................................................................17

*Wandel v. Gao*,
  590 F.Supp.3d 630 (S.D.N.Y. 2022) .....................................................................................15

*Willard v. UP Fintech Holding*,
  527 F.Supp.3d 609 (S.D.N.Y. 2021) .....................................................................................14

*Wright v. Ernst & Young*,
  152 F.3d 169 (2d Cir. 1998) ....................................................................................................4

## TABLE OF ABBREVIATIONS[1]

| | |
|---|---|
| ¶ | Paragraphs of the CAC (as defined herein) |
| 1Q21 | First quarter ended April 30, 2021 |
| 1Q22 | First quarter ended April 30, 2022 |
| 2Q21 | Second quarter ended July 31, 2021 |
| 3Q21 | Third quarter ended October 31, 2021 |
| 3Q22 | Third quarter ended October 31, 2022 |
| 4Q21 | Fourth quarter ended January 31, 2022 |
| Annex A | Annex A to the MTD (as defined herein) |
| Annex B | Annex B to the MTD (as defined herein) |
| Annex C | Annex C to the MTD (as defined herein) |
| Annex D | Annex D to this Reply Memorandum of Law |
| Annex E | Annex E to this Reply Memorandum of Law |
| CAC | Corrected Amended Class Action Complaint for Violations of the Federal Securities Laws, dated September 5, 2023 (ECF 61) |
| CEO | Chief Executive Officer |
| CFO | Chief Financial Officer |
| Challenged Statement(s) | The statements challenged as false and misleading in the CAC. |
| Company | Rent the Runway, Inc. |
| Competitors | Defined solely for purposes of this Motion as StitchFix, Inc., Allbirds, Inc., and ThredUp Inc. |
| COVID-19 | Coronavirus disease 2019, an infectious disease cased by the SARS-CoV-2 virus |
| CW | Confidential Witness |

---

[1] This Table of Abbreviations includes those referenced in Defendants' Motion to Dismiss.

| | |
|---|---|
| Defendants | Rent the Runway Defendants and Underwriter Defendants (as defined herein) |
| Delta | A variant of COVID-19, classified as a new variant by the World Health Organization on May 11, 2021 |
| Eaton Decl. | Declaration of Mary Eaton in Further Support of Defendants' Motion to Dismiss the CAC, dated February 23, 2024 |
| Ex. | Exhibits to the Tracy Decl. (Exs. 1-66) and the Eaton Decl. (Exs. 67-71) (as defined herein) |
| Exchange Act | Securities Exchange Act of 1934, 15 U.S.C. § 78a *et seq.* |
| FE | Former Employee |
| FedEx | FedEx Corporation |
| Individual Defendants | Jennifer Y. Hyman, Scarlett O'Sullivan, Tim Bixby, Jennifer Fleiss, Scott Friend, Melanie Harris, Beth Kaplan, Dan Nova, Gwyneth Paltrow, Carley Roney, Dan Rosensweig and Mike Roth |
| IPO | Initial Public Offering |
| Item 105 | Item 105 of Regulation S-K, 17 C.F.R. § 229.105 |
| Item 303 | Item 303 of Regulation S-K, 17 C.F.R. § 229.303 |
| MTD | Defendants' Memorandum of Law in Support of Defendants' Motion to Dismiss the Corrected Amended Class Action Complaint for Violations of the Federal Securities Laws, dated October 20, 2023 |
| Motion to Dismiss | Defendants' Motion to Dismiss the CAC, dated October 20, 2023 |
| Moving Brief | MTD (as defined herein) |
| Ms. Hyman | Jennifer Y. Hyman, CEO of Rent the Runway, Inc. |
| Ms. O'Sullivan | Scarlett O'Sullivan, former CFO of Rent the Runway, Inc. |
| Offering Documents | Prospectus and Registration Statement (as defined herein) |
| Omicron | A variant of COVID-19, classified as a new variant by the World Health Organization on December 1, 2021 |

| | |
|---|---|
| Opp. | Opposition (as defined herein) |
| Opposition | Lead Plaintiffs' Memorandum of Law in Opposition to Defendants' Motion to Dismiss, dated December 19, 2023 |
| Plaintiffs | Lead Plaintiffs Delaware Public Employees' Retirement System and Denver Employees Retirement Plan |
| Prospectus | Rent the Runway, Inc.'s Final Prospectus, filed with the SEC on Form 424B4 on October 27, 2021 |
| Registration Statement | Rent the Runway, Inc.'s Registration Statement, filed with the SEC on Form S-1 on October 4, 2021, and amended on Forms S-1/A on October 18, 2021 and October 22, 2021 |
| Rent the Runway | Rent the Runway, Inc. |
| Rent the Runway Defendants | Rent the Runway and the Individual Defendants (as defined herein) |
| RS | Registration Statement (as defined herein) |
| RTR | Rent the Runway, Inc. |
| Rule 9(b) | Federal Rule of Civil Procedure 9(b) |
| SEC | United States Securities and Exchange Commission |
| Section 10(b) | Section 10(b) of the Exchange Act |
| Section 11 | Section 11 of the Securities Act |
| Section 12(a)(2) | Section 12(a)(2) of the Securities Act |
| Section 15 | Section 15 of the Securities Act |
| Securities Act | Securities Act of 1933, 15 U.S.C. § 77e *et seq.* |
| Tracy Decl. | Declaration of Marques Tracy in Support of Defendants' Motion to Dismiss the CAC, dated October 20, 2023 |
| Underwriter Defendants | Defendants Goldman Sachs & Co. LLC, Morgan Stanley & Co. LLC, Barclays Capital Inc., Credit Suisse Securities (USA) LLC, Piper Sandler & Co., Wells Fargo Securities, LLC, JMP Securities LLC, KeyBanc Capital Markets Inc., and Telsey Advisory Group LLC |
| UPS | United Parcel Service |

**PRELIMINARY STATEMENT**

The Opposition ignores Defendants' arguments; concedes key facts; fails to mention (let alone distinguish) the MTD's authorities highlighting the CAC's deficiencies; rewrites the law on the requirements for crediting FE statements; concocts new, unpled reasons for why Plaintiffs were allegedly misled; and pretends that RTR's disclosures that belie Plaintiffs' claims were never made. The Opposition is thus both deficient and improper and cannot save the CAC from dismissal.

***Customer Demand.*** The Opposition persists with the fiction that customer demand was decreasing at the time of the IPO, which it plainly was not, as the documents quoted and/or incorporated in the CAC make clear. Plaintiffs' alleged "impression" that RTR's performance would return to pre-pandemic levels is not alleged in the CAC and is flatly inconsistent with RTR's risk factors, which warned investors otherwise. Plaintiffs' focus on RTR's slight performance decline in 4Q21 does not help them, as that was due to the Omicron variant, which did not emerge until post-IPO and could not have impacted any pre-IPO trends. And the allegations regarding RTR's internal forecasts do not state a claim because they lack sufficient detail to credit, do not conflict with any Challenged Statement, and cannot ground a federal securities claim regardless.

***Shipping Costs.*** The Opposition pretends investors first learned of RTR's shipping cost challenges after 3Q21 had closed. That ignores the undisputed facts that shipping cost increases during the pandemic were a market-wide, broadly-reported phenomenon and that, before the IPO, RTR expressly warned that shipping costs were on the rise, creating "headwinds" for the Company. As to RTR's carrier changes, Plaintiffs concede that RTR's pre-IPO carrier change was publicly reported, part of RTR's ongoing efforts to control costs, and did not negatively impact RTR's performance. No further disclosure was required.

*Fraud/Theft.* As Plaintiffs now concede, RTR had no duty to disclose the value of losses from fraud or theft because the amount was immaterial. They continue to assert that RTR was obligated to reveal granular details about the steps it took to prevent such losses or to seek recovery from those who stole from it, but those details are immaterial as well. Because sufficient information about RTR's efforts to combat theft and fraud was readily available to investors, Plaintiffs were not misled.

For these and other reasons, the CAC should be dismissed.

## REPLY BACKGROUND

The Opposition does not dispute, and therefore concedes,[2] the following dispositive facts:

- RTR's disclosure of its historical performance was accurate. (MTD 15-17.) RTR's total subscribers, active subscribers and revenues all increased in the months leading up to the IPO, including through the end of 3Q21. (MTD 15-17.) The Prospectus expressly warned investors that RTR's recent growth should not be considered indicative of future performance and made no promises in that regard. (MTD 7-8.)

- After the IPO, RTR experienced declines in active subscribers due to the emergence of the Omicron variant, which was unknown by RTR at the time of the IPO and did not become a variant of concern until December 1, 2021. (*See* MTD 6, 8-12, 28-30.) RTR expressly warned investors about the uncertainty surrounding COVID-19, including the risks associated with new variants. (*See* MTD 7-8.)

- Before the IPO, it was widely known that national carriers like FedEx and UPS were increasing shipping costs due to the increase in e-commerce arising out of COVID-19. (*See* MTD 4-5.) Recognizing this, RTR warned investors pre-IPO that it anticipated shipping cost headwinds. (*See* MTD 7-8.)

- Pre-IPO, RTR made various efforts to control shipping costs, including using drop boxes and switching carriers, which efforts were publicly disclosed. (*See* MTD 23, 31.) The Prospectus also disclosed that RTR was in the process of switching carriers and diversifying its shipping network to control costs and increase efficiencies. (*See* MTD 5, 8.)

- The Prospectus disclosed that RTR had in the past experienced losses from theft and

---

[2] *See, e.g.*, *In re UBS Sec. Litig.*, 2012 WL 4471265, \*11, \*18 n.18, \*21 n.19 (S.D.N.Y. Sept. 28, 2012) (where plaintiff "did not directly address" defendants' arguments, it "conceded the point by silence"), *aff'd*, 752 F.3d 173 (2d Cir. 2014); *Gortat v. Capala Bros.*, 2010 WL 1423018, \*11 (E.D.N.Y. Apr. 9, 2010) (argument not raised in opposition brief waived), *aff'd*, 568 F.App'x 78 (2d Cir. 2014).

fraud, that it may continue to do so in the future, and that it took various steps to mitigate these losses. (*See* MTD 8.) Those steps included charging replacement fees for non-returned items, deploying fraud/theft prevention measures, procuring insurance, and (where appropriate) pressing criminal charges. (*See* MTD 5, 8.) The CAC does not allege that such losses were material. (*See* MTD 25-26.)

## ARGUMENT[3]

Plaintiffs do not contest that, where a complaint "sounds in fraud," they must meet the higher pleading standard of Rule 9(b)—including by pleading scienter—or that the CAC does not satisfy Rule 9(b)'s exacting requirements. (*See* MTD 14; Opp.13-14.) Instead, Plaintiffs insist that Rule 9(b) does not apply at all because (i) the CAC "specifically disclaims" any allegation of fraud, (ii) Defendants' authorities are inapposite because "each case" also involved a fraud claim under Section 10(b), and (iii) the CAC merely "track[s]" the words of the Securities Act, which does not require a showing of fraud. (Opp.13-14.) None of that is correct. Plaintiffs' own authorities (Opp.14) make clear that fraud disclaimers of the sort employed here are "insufficient" to displace Rule 9(b). *Fresno Cnty. Emps.' Ret. Ass'n v. comScore*, 268 F.Supp.3d 526, 558 (S.D.N.Y. 2017).[4] Likewise, it is untrue that Defendants' "sounds in fraud" cases all involved Section 10(b); several involved Section 11 claims alone. (MTD 14-15 n.23.)[5] Further, the CAC's words do not merely "track" the statute.[6] To the contrary, the CAC uses the same fraud-based language the Second Circuit and other courts have held sufficient to trigger Rule 9(b)[7] and asserts claims under Items 303 and 105 (*infra* at 12-15), which require proof that Defendants had actual

---

[3] Internal citations and quotations are omitted unless otherwise noted. All emphases are added unless otherwise noted.

[4] *Accord Rombach v. Chang*, 355 F.3d 164, 172 (2d Cir. 2004); *In re Meta Materials Sec. Litig.*, 2023 WL 6385563, *9 (E.D.N.Y. Sept. 29, 2023); *In re Qutoutiao Sec. Litig.*, 2023 WL 4977499, *13-14 (S.D.N.Y. Aug. 3, 2023); *In re OSG Sec. Litig.*, 971 F.Supp.2d 387, 406 n.136 (S.D.N.Y. 2013).

[5] As Plaintiffs' own authorities hold, Section 11 claims "may be—and often are—predicated on fraud." *In re Citigroup Bond Litig.*, 723 F.Supp.2d 568, 586 (S.D.N.Y. 2010).

[6] *See, e.g.,* ¶ 116 (alleging that RTR "misrepresented" the state of demand); ¶¶ 114, 127, 138 (omitted trends or facts that were "known" to the Company that would or did have unfavorable impact on results); ¶¶ 121, 127, 129, 133, 138, 165, 171, 177 (issued statements that were "false and misleading").

[7] MTD 14 (citing, *inter alia*, *Rombach*, 355 F.3d at 170-72).

knowledge of contrary facts that they concealed.  Indeed, the Opposition belies any contention that Plaintiffs' theory of liability is purely negligence-based, repeatedly arguing that Defendants hid facts they "knew" were "contrary to the Offering Documents," a classic fraud claim.  (*See, e.g.*, Opp.2-3, 9-11, 22, 26, 30-31.)

Regardless of whether Rule 9(b) governs here, the result is the same:  the CAC should be dismissed because it fails to adequately allege the essential elements of its Securities Act claims.

## I.  THE CAC FAILS TO PLEAD A SECTION 11 CLAIM

### A.  The Customer Demand Statements Were Not False or Misleading

*No False Statements.*  The Opposition argues that the four challenged affirmative statements (¶¶ 118-20) were false and misleading because the Company's "characterization" of how its subscriber metrics related to its "ability to emerge from the COVID-19 pandemic" led investors to believe that RTR "was growing as it had before the pandemic," the "financial impact of the COVID-19 pandemic was behind" it, and RTR's "subscriber metrics" and "growth trajectory" would return to "pre-pandemic levels."  (Opp.19, 23.)

These new allegations should be rejected outright because that is not what the CAC alleged,[8] and Plaintiffs may not amend the CAC through their Opposition.  *See Wright v. Ernst & Young*, 152 F.3d 169, 178 (2d Cir. 1998).[9]  Even if that were permissible—and it is not—these new arguments fail regardless.  For one thing, the risk factors in the Prospectus carefully warned investors that RTR's demand could wane and made no promises regarding the Company's future performance.  (*See* Annex B at 1-4.)  For another, RTR did in fact return to 2019 subscriber levels

---

[8] *See* ¶ 121 (alleging statements in ¶¶ 118-20 were false and misleading because RTR's "number of subscribers was materially trending down at the time of the IPO and the Company was materially not meeting internal subscriber enrollment projections").

[9] *Accord Johnson v. Ironshore Specialty Ins.*, 2022 WL 912973, *7 (S.D.N.Y. Mar. 28, 2022).

after the IPO. From 1Q22 (after Omicron subsided) until 3Q22 (more than a year after the IPO), RTR outperformed pre-pandemic subscriber metrics quarter-over-quarter. (*See* Annexes D & E.)[10]

Nothing in the Opposition saves their original falsity claims from dismissal either. Plaintiffs' challenge to RTR's reported historical performance figures (¶ 118) fails because Plaintiffs concede that these figures were accurate (Opp.21) and that a violation of federal securities laws "cannot be premised upon a company's disclosure of accurate historical data," *Plumber & Steamfitters Loc. 773 Pension Fund v. Danske Bank*, 11 F.4th 90, 99 (2d Cir. 2021). (*See also* MTD 15-16.)

Plaintiffs' challenge to RTR's statements regarding the "minimal impact" of the Delta variant (¶ 119) and the "increased demand" it saw as COVID-19 restrictions were lifted (¶ 120) are meritless because RTR's unchallenged historical performance figures bore this out: demand did increase as pandemic-related restrictions were lifted, including when the Delta variant was dominant (MTD 6, 16). Plaintiffs' impression about what this meant for the future was irrelevant because the Challenged Statements spoke only to a discrete moment in time—"as of the date of [the] prospectus" (¶ 119), not some later date—and RTR made no promises as to future performance (*see* MTD 7-8). This precludes any claim.[11] Plaintiffs have no answer except to cite irrelevant cases. (Opp.22.)[12]

---

[10] RTR's growth rates remained roughly equivalent too: as shown, the Company's growth rate had been inconsistent before the pandemic (MTD 21; Ex. 20 at 105-06), a dynamic that persisted post-IPO (*see* Annex C).

[11] *See Jiajia Luo v. Sogou, Inc.*, 465 F.Supp.3d 393, 406 (S.D.N.Y. 2020) ("Section 11—by its plain language—speaks to the truth or falsity of 'any part of the registration statement[] when such part became effective.'"); *In re Lululemon Sec. Litig.*, 14 F.Supp.3d 553, 571 (S.D.N.Y. 2014) (statement must be false "at the time it was made"), *aff'd*, 604 F.App'x 62 (2d Cir. 2015); *Scott v. Gen. Motors*, 46 F.Supp.3d 387, 394 (S.D.N.Y. 2014) (plaintiffs may not "rely[] solely on hindsight"), *aff'd*, 605 F.App'x 52 (2d Cir. 2015); *see also In re Coty Sec. Litig.*, 2016 WL 1271065, *8 (S.D.N.Y. Mar. 29, 2016) (no falsity where warned of potential impact on future performance; hindsight insufficient).

[12] *See Lematta v. Casper Sleep*, 2022 WL 4637795, *9 (E.D.N.Y. Sept. 30, 2022) (positive statements about profitability actionable where complaint adequately alleged profitability was unsustainable at time of IPO); *Shenwick v. Twitter*, 282 F.Supp.3d 1115, 1137-38 (N.D. Cal. 2017) (MTD denied where defendants subsequently admitted that, despite prospectus language, trends had been significantly declining since before IPO).

Plaintiffs' challenge to RTR's statements that it was experiencing "strong momentum in the third fiscal quarter of 2021" fares no better.  (*See* Opp.8, 22.)

- Words like "strong momentum" are classic puffery, as multiple cases hold (*see* MTD 17-18), and which Plaintiffs make no effort to distinguish (*see* Opp.22-23).  If anything, Plaintiffs' cases reinforce that the "strong momentum" statement is inactionable, as it did not "concretely assure[] investors of anything."  (Opp.23.)[13]

- RTR's performance was not "trending down" before the IPO (¶¶8, 126; Opp.27); it was trending up as the 3Q21 results—which ended two business days after the IPO—show (MTD 17).  Indeed, revenues, total subscribers, and active subscribers all *increased* from 1Q21 until after the IPO.  (*See* Annex C.)

- That RTR experienced a short-lived decrease in active subscribers during 4Q21 (Opp.24) is irrelevant.  Plaintiffs do not dispute that the decline in 4Q21 was due to Omicron and that Omicron did not emerge as a variant of concern until December 2021.  There is no allegation (nor could there be) that RTR knew Omicron was on the horizon pre-IPO or what its impact would be.  (MTD 9-11.)  Plaintiffs' cases are thus inapposite as they involve post-IPO statements that revealed the falsity of statements made pre-IPO.  (Opp.24-25.)[14]

- Even assuming RTR was not meeting its internal projections pre-IPO (*e.g.*, Opp.5, 22), the CAC's allegations are inadequate to show that the internal projections contradicted the Challenged Statements (*infra* at 8, 13), and, regardless, internal predictions are not "material facts" requiring disclosure, as multiple cases hold (MTD 17 & n.31).[15]

***No Misleading Omissions.***  As for the challenged risk factors, the Opposition does not dispute the Prospectus' extensive cautionary language (*see* Annex B), including warnings of

---

[13] Plaintiffs' other authorities (Opp.23) are distinguishable too because, unlike here, the statements in those cases were (i) known to be untrue, *see Novak v. Kasaks*, 216 F.3d 300, 315 (2d Cir. 2000); (ii) made in response to direct questions by analysts, *see In re Signet Jewelers Sec. Litig.*, 2018 WL 6167889, *12 (S.D.N.Y. Nov. 26, 2018); *In re Turquoise Hill Res. Sec. Litig.*, 625 F.Supp.3d 164, 223 (S.D.N.Y. 2022); and/or (iii) repeated multiple times, *see In re Dentsply Sirona Sec. Litig.*, 665 F.Supp.3d 255, 283-85 (E.D.N.Y. 2023).

[14] *See In re Blue Apron Holdings Sec. Litig.*, 2020 WL 1950783, *9 (E.D.N.Y. Apr. 22, 2020) (post-IPO call coupled with knowledge of shipping delays rendered prior statements false); *Panther Partners v. Jianpu Tech.*, 2020 WL 5757628, *9 (S.D.N.Y. Sept. 27, 2020) (post-IPO call revealed falsity of statements from prior month); *McKenna v. SMART Techs.*, 2012 WL 3589655, *4 (S.D.N.Y. Aug. 21, 2012) (post-IPO financials coupled with particular knowledge of spending declines revealed falsity of prior statements).

[15] Plaintiffs make no effort to grapple with this long line of authority, instead citing other irrelevant cases.  *See* Opp.20, 24 (citing *In re Vivendi, S.A. Sec. Litig.*, 838 F.3d 223, 249 (2d Cir. 2016) (statement about anticipated cash flow contradicted by contemporaneous internal communications); *In re Facebook IPO Sec. & Deriv. Litig.*, 986 F.Supp.2d 487, 507-08 (S.D.N.Y. 2013) (risk disclosures misleading where warned of risks had already materialized); *Novak*, 216 F.3d at 315 (statement that inventory was "under control" actionable where defendants knew contrary was true).

RTR's limited track record (Ex. 20 at 25-27), the historical impact of COVID-19 on RTR's business (*see id.* at 27-28, 94-96), the continuing uncertainty surrounding COVID-19 and the risks of "new variants" (*id.* at 28), and how easily subscribers could cancel or pause subscriptions (*id.* at 25). Nor does the Opposition dispute RTR's warnings that "it is difficult to evaluate [its] current business and future prospects," that it "may not grow as much or as fast as we expect," that "there can be no assurance that [it] will be able to retain a significant portion of subscribers beyond the existing monthly subscription periods," and that "the forecasts of market growth included in this prospectus should not be taken as indicative of our future growth." (*Id*. at 25-26, 49.) Plaintiffs claim the risk factors were misleading because the described risks had already materialized (Opp.24, 27), but as shown, that is simply not true (MTD 20-22; *supra* at 4-6).

The alleged FE statements do not and cannot alter the result. (Opp.20-21.) Tellingly, the Opposition does not reference—let alone confront—*any* of the 25 cases cited in the MTD establishing the standard Plaintiffs must meet for such statements to be credited and the many reasons why they fail to do so here. (*See* MTD 18-20; Opp.20-21, 27-28.) Plaintiffs instead attempt to elide the issue, suggesting that they need only identify the FEs' "job title, office location, and duration of employment" for their statements to be credited. (Opp.15.)[16] Plaintiffs' own authority (Opp.15) holds otherwise. *See City of Omaha Police & Fire Ret. Sys. v. Evoqua Water Techs.*, 450 F.Supp.3d 379, 405-06 (S.D.N.Y. 2020) ("[A] plaintiff may rest on information provided by anonymous sources only when they 'are described in the complaint with sufficient particularity to support the probability that a person in the position occupied by the source would

---

[16] Even if this were the standard (and it is not) the CAC does not meet it because it fails to identify (i) the office location for any of the six FEs (*see* ¶¶ 77-85, 89-91, 93, 97-105); (ii) the specific job titles for FE-2 (¶ 80) or FE-5 (¶ 99), or (iii) the duration of FE-3's employment (*see* ¶ 82).

-7-

possess the information alleged.'")[17]  Because Plaintiffs make no effort to meet the applicable standard for FE statements, or their incorrect one,[18] the FE statements should be disregarded.

In any case, the Opposition does not demonstrate with specificity how and why the FE statements contradict the challenged disclosures, as required.  (*See* MTD 18-20.)  Among other reasons, (i) the allegations regarding the internal projections lack sufficient details as to what they were, the extent to which they were purportedly missed, or for what time period; (ii) the claim that "over 100 [RTR] customers" were cancelling per day did not explain when it occurred, for how long, or that the rate was inconsistent with prior periods;[19] and (iii) the statements attributed to Ms. Hyman and/or Ms. O'Sullivan were too conclusory, generalized, and vague to support a claim. (*See* MTD 18-20.)  In short, general allegations from unknown employees that RTR was missing unknown, aspirational, internal enrollment projections at unknown times by unknown amounts are insufficient to state a claim.  (*See* MTD 19.)

**B.    The Shipping Costs Statements Were Not False or Misleading**

There is no dispute that RTR expressly warned investors in advance of the IPO that it "anticipate[d] shipping cost headwinds due to macro global transportation network inefficiencies over the next several quarters."  (MTD 22; Opp.9, 25-26.)[20]  There is likewise no dispute that the

---

[17] *Accord Sheet Metal Workers Loc. 32 Pension Fund v. Terex*, 2018 WL 1587457, \*4 (D. Conn. Mar. 31, 2018); *In re Bear Stearns Mortg. Pass-Through Certificates Litig.*, 851 F.Supp.2d 746, 767 n.23 (S.D.N.Y. 2012).

[18] The Opposition does not dispute that, given their roles, the FEs did not have access to granular subscription and revenue information.  (*See* Opp.21.)  Nevertheless, it nonsensically insists that, "collectively" they had such information on a Company-wide level.  (*Id.*)  That obviously does not follow, and the single case they cite is not on point.  *N.J. Carpenters Health Fund v. Royal Bank of Scotland Grp., PLC*, involved improper underwriting practices (more likely to be uniform across locations), and the FEs there were specifically alleged to have been "spread across the country."  709 F.3d 109, 123-24 (2d Cir. 2013) (holding that allegations from FEs familiar with disregard of firm underwriting practices at multiple regional offices sufficient to allege company-wide practice).

[19] Even accepting as true FE-1's claim that over 100 RTR subscribers were cancelling per day, it is undisputed that subscriber numbers were increasing at the time of the IPO (*see supra* at 2, 4-6), which can only mean new or returning subscribers outstripped the number of cancellations.

[20] Of the four Challenged Statements concerning shipping costs, the Opposition addresses only two.  (*Compare* ¶¶

-8-

Prospectus contained extensive risk factor disclosures, stressing the impact of such cost increases on the Company's performance and disclosing RTR's specific efforts to minimize shipping costs. (*See* MTD 8, 22-23; Annex B at 5.) Investors were also told that "[a] substantial majority of [its] inbound shipments from customers are currently returned through a single vendor," that it had "from time to time transitioned and [was] currently in the process of transitioning" from this vendor, and that it could not "predict how this transition may impact [its] costs and [its] customer sentiment and satisfaction." (MTD 6-8, 22; ¶ 128; Annex A at 3; Annex B at 5.)

The Opposition insists that RTR's risk disclosures were nevertheless inadequate because RTR "had encountered substantial difficulties in finding a reliable and affordable shipping carrier" in the past and switched carriers prior to the IPO to address those issues. (Opp.3, 25-26 (citing ¶¶ 91-95, 129).) But as the MTD showed and Plaintiffs concede, (i) the challenged risk factors informed investors that RTR had previously switched carriers and was in the process of doing so again (*see* MTD 8, 22-23; Annex A at 3; Annex B at 5; Opp.25-26); (ii) RTR had no duty to reveal the names of those carriers, which were publicly reported anyway (*see* MTD 23; Opp.26-27); (iii) RTR had no duty to disclose the terms of its contractual arrangements with its vendors or the quality of their performance (*see* MTD 23-24; Opp.26-27)[21]; and (iv) it was publicly reported at the time that FedEx and UPS increased their pricing market-wide in response to the increase in e-commerce business during the pandemic (*see* MTD 5 & n.2).[22] Nothing material was withheld.[23]

---

128, 130 *with* MTD 22-23 and Opp.9, 25-26.) Plaintiffs' challenge to Statement Nos. 16-17 (Annex A at 3-4) has therefore been abandoned. *See Levy v. Maggiore*, 48 F.Supp.3d 428, 452 (E.D.N.Y. 2014); *Randall v. Dish Network, LLC*, 2018 WL 3235543, *5 (E.D.N.Y. July 2, 2018).

[21] On-time performance issues regarding FedEx and UPS were widely reported during the pandemic. *See, e.g.*, Exs. 69, 70.

[22] *See also* Exs. 67, 68, 71.

[23] Plaintiffs also point to RTR's addition of "last mile" couriers and the use of "physical drop boxes" (Opp.26), but their use was also publicly disclosed well before the IPO (*see, e.g.*, Ex. 10 at 105; Ex. 20 at 38; MTD 31 n.56).

Plaintiffs seem to think something more was required, arguing that "investors could not have fully understood the nature of or reasons for those changes." (Opp.26-27.) But that argument does not align with the CAC's allegations, which is reason enough to disregard it.[24] (*Supra* at 4.) What is more, the "nature" of the changes was disclosed. And the "reasons" for the changes were not material. RTR had no duty to "speak up" simply because investors were curious about why the carrier switch was made. *Ark. Pub. Emps. Ret. Sys. v. Bristol-Myers Squibb*, 28 F.4th 343, 353 (2d Cir. 2022). In any event, investors could well understand the reasons for the shipping vendor changes based on the public record and RTR's disclosures (MTD 7, 8, 22, 35), which Plaintiffs inexplicably ignore (*see* Opp.25-27).

Plaintiffs' reliance on FE-1 and FE-4's statements (Opp.26) changes nothing. Plaintiffs nowhere confront the many cases holding that statements like those at issue here (*e.g.*, that UPS's prices were "too expensive" or "prohibitively expensive") are too conclusory, subjective, and vague to be credited. (MTD 24.) Nor do Plaintiffs explain how either FE was in a position to know RTR's pricing arrangements with shipping vendors or their effects on RTR's financial performance. (*See* Opp.15-17; MTD 24.)[25] Plaintiffs' argument also makes no sense. Whether UPS had historically been more expensive than FedEx does not mean that was true at the time of the IPO, and the CAC pleads no facts to suggest it was. (MTD 24.) Assuming RTR's decision to switch back to UPS was prompted by FedEx "doubl[ing]" its rates (¶ 93), the only logical inference is that UPS was more cost-effective than FedEx, not vice versa (MTD 24). Likewise, if FedEx's

---

[24]*See* ¶¶ 129, 131 (alleging that shipping costs statements were misleading because Prospectus "failed to disclose that prior to the IPO, [RTR] had switched from UPS to FedEx as its primary shipping vendor because UPS was too expensive to be sustainable, however, just before the IPO, FedEx doubled its shipping rates for [RTR] and [RTR] was forced to switch back to the already prohibitively expensive UPS").

[25] Plaintiffs' allegation that FedEx doubled its rates "because [RTR] was not making enough shipments" (Opp.26; ¶ 93) should be rejected because (i) the CAC does not allege how the purported source of this information (FE-4) would have known this information and (ii) the allegation is too vague to credit regardless. (MTD 24.)

services were less reliable than UPS's, as claimed (¶¶ 10, 92), switching carriers was a good business decision,[26] not a negative material fact requiring disclosure (MTD 24). Plaintiffs have no answer to these common-sense points. (*See* Opp.25-27.)

### C.      The Theft and Fraud Prevention Statements Were Not False or Misleading

Plaintiffs' allegations regarding the theft/fraud statements are belied by the Prospectus and documents of which this Court may take judicial notice and should be rejected out of hand. (MTD 24-27.) For starters, the claim that RTR disclosed only the "potential" for theft and fraud is untrue. (¶ 134.) As the Prospectus stated, "*[w]e have in the past incurred . . . losses from various types of fraud*, including . . . customers who fraudulently rented multiple products at once and customers who have failed to return rentals." (Ex. 20 at 62.) The allegation that RTR had no "policies or procedures" in place to prevent theft or fraud is also untrue. (¶ 101.) As disclosed, RTR had "implemented fraud prevention measures, such as detection tools to identify irregular or high-risk customer order patterns, to reduce the risk of fraud." (Ex. 20 at 62; ¶ 132.) Nor is there any foundation for the contention that the Company took "no actions" against malfeasant customers. (Opp.9-10.) It is a matter of public record that the Company had a policy to charge customers the purchase price for non-returned items (Ex. 64) and that it took action against customers who stole from it (Exs. 2-3). As for insurance, RTR disclosed that it did "procure third-party insurance policies to cover various operations-related risks including . . . crime" (Ex. 20 at 63; ¶ 136), but expressly warned that it could not "guarantee" that it would "continue to receive adequate insurance coverage on favorable terms," or that it "would be able to secure replacement coverage on reasonable terms or at all" (Ex. 20 at 63; ¶ 136).

The Opposition whistles past these points, parroting the allegations of the CAC instead

---

[26] As noted in the MTD, the switch to UPS has continued to prove favorable to RTR. (*See* MTD 24 n.47.)

(Opp.28-29)—thereby conceding Defendants' points (*see supra* at 2 n.2).  That aside, the law is clear that further disclosure was not required.  For instance, even if RTR had lost $6 million in revenue annually due to theft (¶¶ 98, 133, 137-38)—which it did not—those losses comprise less than 3% of RTR's 2021 annual revenue of $203.3 million (Ex. 41).  Such amounts are immaterial as a matter of law (MTD 25-26), and Plaintiffs make no argument otherwise.  Similarly, Plaintiffs cite no authority for the proposition that RTR was required to disclose details regarding its insurance coverage or other specifics and make no effort to distinguish the cases holding that such disclosure was not required.  (MTD 26.)   As to the FEs, even assuming they were positioned to know about these matters—and they were not—their statements are contradictory [27] and too vague, subjective, and anecdotal to credit.  (MTD 26-27.)

### D.    The CAC Fails to Plead an Item 303 Violation

As a threshold matter, the Opposition does not respond to, and thus concedes, Defendants' argument that Item 303 does not apply to private rights of action under the federal securities laws. (*See* MTD 27 n.53.)  Indeed, the U.S. Supreme Court is poised to resolve this issue this term.  (*Id.*)

In any event, as the Opposition confirms, the CAC does not satisfy the three essential elements of any Item 303 claim:  (1) an existing trend, event, or uncertainty of sufficient duration; (2) "actual knowledge" by management of the trend; and (3) a "substantial probability" that the alleged trends would "have a material impact" on the company's financial results.  (Opp.29-30; MTD 27-30.)

#### 1.    Customer Demand

Plaintiffs have no Item 303 claim regarding customer demand because there was "never a

---

[27] For example, FE-5 claims RTR had no policies in place (¶ 101), while FE-1 acknowledges RTR used *Signifyd*, "a fraud processing program" (¶ 97).  No credit should be given where the FEs give "conflicting accounts." *Thomas v. Shiloh Indus.*, 2018 WL 4500867, *6 (S.D.N.Y. Sept. 19, 2018).

trend" of declining subscriber growth to disclose. (MTD 28.)  To the contrary, in the nine-month period leading up to the IPO, RTR's uncontested disclosures reported quarter-over-quarter increases in both total and active subscribers and revenues. (MTD 6.)  Nor was there any discernible trend regarding growth rates, which, as RTR's unchallenged disclosures also showed, fluctuated both pre-and post-IPO. (MTD 28.)  And because there was no reportable trend, RTR management plainly lacked "actual knowledge" of something that did not exist and could not have had a "material impact" on the Company's performance. (MTD 28-29.)

Plaintiffs do not mention, let alone distinguish, the many cited authorities showing that no Item 303 claim can lie under such circumstances. (*See* MTD 28-30.)  Instead, they insist that RTR was allegedly failing to meet internal, unpublished growth targets, which they argue should have been disclosed. (*See* Opp.30-31.)  But the law, which Plaintiffs do not address, holds otherwise: Item 303 does not require the disclosure of internal targets. (MTD 28 n.55.)  Even if it did, (i) the CAC's allegations nowhere show the alleged failure to meet those internal targets constituted a trend of sufficient duration to justify disclosure (*id.*); (ii) Plaintiffs do not adequately allege actual knowledge because the CAC "is premised on disavowing any allegation of knowledge," *Banerjee v. Zhangmen Educ.*, 2023 WL 2711279, *13 (S.D.N.Y. Mar. 30, 2023) (MTD 28-29); and (iii) Plaintiffs nowhere plead that the failure to meet purely internal targets would "have a material impact" on the Company's reported results (*see* MTD 30).[28]

---

[28] Plaintiffs' cited authority (Opp.30-31) is distinguishable, as they involved far more detailed allegations, including specific contemporaneous reports and statements made at the time, which demonstrated actual knowledge. *See In re Dentsply*, 665 F.Supp.3d at 289-91 (specific, monthly market reports showing insufficient demand); *Blue Apron*, 2020 WL 1950783, *7 (documents describing delays at specific facility); *In re CPI Card Grp. Sec. Litig.*, 2017 WL 4941597, *4 (S.D.N.Y. Oct. 30, 2017) (statements establishing visibility into inventory issues, touting integration with "key customers"); *Panther Partners v. Ikanos Commc'ns*, 681 F.3d 114, 121 (2d Cir. 2012) (discussions of increase in customer calls discussing chip failure rate).

## 2.    Customer Theft

The Opposition's responses regarding the supposed theft-related trends are equally infirm and should be rejected.  Any losses resulting from the use of drop boxes and the procurement of allegedly insufficient insurance are only alleged to be "unfavorable" (¶ 138), did not represent a "change in circumstances" sufficient to support a reporting obligation, and are not supported by adequate allegations of "actual knowledge" (MTD 30-31).

Cognizant of these deficiencies, Plaintiffs now argue that the purported $6 million in theft losses were supposedly "material" (not just "unfavorable") given the "severe contraction of the Company's revenue stream" resulting from the pandemic and the subsequent restructuring announced in September 2022.  (Opp.31.)  These new arguments should be rejected because they are nowhere to be found in the CAC and because they are meritless:  (i) the Company's revenue stream had already rebounded in 2021 (MTD 6); (ii) the restructuring, which was announced nearly a year after the IPO (*see* MTD 12 n.19), was too remote to be relevant and is not alleged to have had any connection with alleged losses from theft (*see* Ex. 50; Ex. 51); and (iii) even if the Court were to credit the $6 million figure, it was immaterial as a matter of law (*see* MTD 25-26, 30). Regardless, because the Opposition concedes the CAC's failure to allege that such losses were a reportable "trend" or that management knew as much, no claim lies as a matter of law.[29]

## E.    The CAC Fails to Plead an Item 105 Violation

The Item 105 claim fails for at least three reasons.  *First,* the CAC must plead facts "unique to Item [105]," *Willard v. UP Fintech Holding*, 527 F.Supp.3d 609, 618 n.4 (S.D.N.Y. 2021), which it nowhere does (Opp.29-32).  *Second*, Item 105 requires a discussion of the "most

---

[29] Plaintiffs' claim that the purported $6 million loss "had the *potential to bring into question* the Company's ability to continue operating" (Opp.31) also fails to satisfy Item 303's third element, which requires alleging a "*substantial probability*" that such a trend would "have a material impact" on RTR's financial results, *see, e.g.*, *Holbrook v. Trivago*, 2019 WL 948809, *12 (S.D.N.Y. Feb. 26, 2019), *aff'd*, 796 F.App'x 31 (2d Cir. 2019).

significant factors" that make the offering speculative or risky (MTD 31-32), a standard Plaintiffs nowhere claim RTR failed to meet (*see* Opp.29-32).   Instead, Plaintiffs conflate the "most significant factors" test with materiality (Opp.30), which is not the same, *see, e.g., Gordon v. Tencent Music Entm't Grp.*, 2021 WL 9183821, *7 (E.D.N.Y. Mar. 31, 2021) ("most significant factors" standard "goes beyond materiality" and is "considerably high").[30]   *Third*, Plaintiffs nowhere "demonstrate 'actual knowledge' of a risk to sufficiently allege an Item 105 violation," *In re Chembio Diagnostics Sec. Litig.*, 586 F.Supp.3d 199, 229 (E.D.N.Y. 2022).[31]

## II.    THE CAC FAILS TO PLEAD A SECTION 12(A)(2) CLAIM

Because Plaintiffs' Section 11 claim fails, so too does their Section 12(a)(2) claim, as the standard for falsity is the same for both.  *See In re Morgan Stanley Info. Fund Sec. Litig.*, 592 F.3d 347, 359 (2d Cir. 2010).  The Section 12(a)(2) claim fails for the independent reason that the CAC does not allege that the Individual Defendants or RTR were "statutory sellers."  (MTD 32-34.)

***Individual Defendants.***  As Plaintiffs concede, every Court of Appeals to address the issue has held that merely signing a Registration Statement does not constitute "solicitation,"[32] and many authorities—including Plaintiffs' own[33]—have held the same.  (MTD 33.)[34]  That makes eminent sense because a contrary holding would render meaningless the distinction between

---

[30] Plaintiffs' reliance on *City of Roseville Emps.' Ret. Sys. v. EnergySolutions*, 814 F.Supp.2d 395, 426 (S.D.N.Y. 2011), is misplaced because it is an outdated decision construing Item 503 (Item 105's predecessor).  Recent authority in this District confirms the "considerably high" standard.  *E.g.*, *Gordon*, 2021 WL 9183821, *7.

[31] While Plaintiffs cite *Panther Partners*, 2020 WL 5757628, *10, for the proposition that actual knowledge is not an Item 105 requirement, the balance of authority in the Second Circuit holds otherwise.  *See, e.g., In re DraftKings Sec. Litig.*, 650 F.Supp.3d 120, 181 n.35 (S.D.N.Y. 2023); *Lematta*, 2022 WL 4637795, *13; *Wandel v. Gao*, 590 F.Supp.3d 630, 646 (S.D.N.Y. 2022); *In re HEXO Corp. Sec. Litig.*, 524 F.Supp.3d 283, 302 (S.D.N.Y. 2021); *Rubinstein v. Credit Suisse Grp. AG*, 457 F.Supp.3d 289, 300 (S.D.N.Y. 2020).

[32] *See Rosenzweig v. Azurix*, 332 F.3d 854, 871 (5th Cir. 2003); *Shaw v. Digit. Equip.*, 82 F.3d 1194, 1216 (1st Cir. 1996); *In re Craftmatic Sec. Litig.*, 890 F.2d 628, 636 (3d Cir. 1989).  The Second Circuit has yet to address the issue.

[33] *See Garnett v. RLX Tech.*, 632 F.Supp.3d 574, 615 (S.D.N.Y. 2022), *aff'd*, 2023 WL 8073087, *1 n.1 (2d Cir. Nov. 21, 2023).  (Opp.33.)

[34] *See In re Weight Watchers Int'l Sec. Litig.*, 504 F.Supp.3d 224, 260-61 (S.D.N.Y. 2020) (collecting cases).

Section 11 (which expressly imposes liability upon every signer of the registration statement) and Section 12 (which does not).[35]  Plaintiffs likewise concede that, standing alone, the conduct in which the Individual Defendants allegedly engaged (*see* Opp.33) is "plainly insufficient" to plead solicitation (MTD 33).  To survive dismissal, Plaintiffs must allege that Plaintiffs were personally and actively solicited (not an unnamed class member) by specific individuals (not Defendants *en masse*),[36] which Plaintiffs concededly have not done.  (*See* MTD 33.)[37]

**RTR**.  The CAC nowhere alleges that RTR either sold securities directly to investors in the IPO or actively solicited them to purchase.  Instead, Plaintiffs' claim rests entirely on SEC Rule 159A (not cited in the CAC), which purports to deem all issuers as statutory sellers as a matter of law.  (Opp.32-33.)    As numerous courts have recognized, however, Rule 159A is inconsistent with the Supreme Court's decision in *Pinter*, which held that a defendant who did not directly sell to the purchaser can be liable under Section 12 only if the defendant was directly involved in the actual solicitation of a securities purchase.[38]  *See Jensen v. iShares Tr.*, 44 Cal. App. 5th 618, 650 n.21 (2020) (collecting cases).[39]  Multiple courts have dismissed Section 12(a)(2) claims applying

---

[35] It would also conflict with the Supreme Court's directive in *Pinter v. Dahl* that "Congress did not intend that [Section 12] impose liability" "for mere participation in unlawful sales transactions."  486 U.S. 622, 650 (1988).

[36] The two cases Plaintiffs cite (Opp.33-34) are inapposite.  *See Evoqua*, 450 F.Supp.3d at 404 (discussing solicitation allegations against underwriter defendants only); *Garnett*, 632 F.Supp.3d at 614-615 (holding, in obiter, that complaint sufficiently alleged that one defendant's activities were more than "preliminary to the offering").  Notably, the Section 12 claims in *Garnett* were abandoned on appeal.  *See* 2023 WL 8073087, *1 n.1.

[37] It makes no difference whether the Individual Defendants were "motivated" by a desire to serve their own "financial interests," as Plaintiffs now claim (Opp.34), because motive to solicit must be alleged *in addition to solicitation*, which Plaintiffs have not done.

[38] Requiring a plaintiff to plead direct solicitation against an issuer also makes sense "[a]s a policy matter" since "Section 12(a)(2) claims do not require allegations of scienter, reliance or loss causation."  *Me. St. Ret. Sys. v. Countrywide Fin. Corp.*, 2011 WL 4389689, *10 (C.D. Cal. May 5, 2011).

[39] *Accord In re Kosmos Energy Ltd. Sec. Litig.*, 955 F.Supp.2d 658, 671 (N.D. Tex. 2013) (*Pinter* "forecloses the SEC's interpretation" of Section 12(a)(2) found in Rule 159A); *Mass. Mut. Life Ins. Co. v. Res. Funding Co.*, 843 F.Supp.2d 191, 207 (D. Mass. 2012) (SEC regulation "cannot countermand a contrary Supreme Court holding."); *In re Countrywide Fin. Corp. Mortg.-Backed Sec. Litig.*, 932 F.Supp.2d 1095, 1118 (C.D. Cal. 2013) ("[t]he SEC's rule exceeded the statutory language of Section 12(a)(2)").

*Pinter* and without wading into Rule 159A.[40]  This Court should do the same.

## III.   NEGATIVE CAUSATION BARS PLAINTIFFS' CLAIMS

As the MTD showed, RTR's stock price decline began well before the first alleged "corrective disclosure" and moved in tandem with its Competitors.  (MTD 34; Exs. 39, 65.)  Its subsequent stock price declines were also unconnected to any previously undisclosed "truth" because customer demand was not decreasing at the time of the IPO, shipping cost increases were revealed before the IPO, and the alleged "truth" regarding the extent of customer fraud/theft or RTR's insurance coverage for the same was never publicly disclosed.  (MTD 35; Exs. 25, 66.)

Plaintiffs' only response is that negative causation is an affirmative defense and "premature" to raise now and that, were the Court to consider the issue, it may not look beyond the four corners of the CAC.  (Opp.34-35.)  Not so.  Courts can and do grant motions to dismiss on negative causation grounds.  (MTD 34.)  And in making that assessment, nothing prevents the Court from considering public stock prices and documents referenced in or integral to the CAC, which is the case here.  (MTD 3 n.1.)[41]

### CONCLUSION

The CAC should be dismissed with prejudice, and Plaintiffs' perfunctory request for leave to amend (Opp.35 n.12) should be denied.[42]

---

[40] *See, e.g.*, *SUN, A Series of E Squared Inv. Fund v. Sundial Growers*, 2021 WL 4482276, *9 (S.D.N.Y. Sept. 30, 2021); *Altayyar v. Etsy*, 242 F.Supp.3d 161, 184-86 (E.D.N.Y. 2017), *aff'd*, 731 F.App'x 35 (2d Cir. 2018); *Vaccaro v. New Source Energy Partners L.P.*, 2016 WL 7373799, *8 (S.D.N.Y. Dec. 19, 2016).

[41] *See, e.g.*, *ATSI Commc'ns v. Shaar Fund*, 493 F.3d 87, 98 (2d Cir. 2007); *In re Danimer Sci. Sec. Litig.*, 2023 WL 6385642, *3 (E.D.N.Y. Sept. 30, 2023); *In re Express Scripts Holding Co. Sec. Litig.*, 2017 WL 3278930, *8-10 (S.D.N.Y. Aug. 1, 2017).  Moreover, the one case Plaintiffs cite, *In re Giant Interactive Grp. Sec. Litig.* (Opp.35), makes clear that the Court can consider judicially noticeable documents as part of the negative causation analysis. 643 F.Supp.2d 562, 573 (S.D.N.Y. 2009).

[42] The complaint has already been amended once, and Plaintiffs fail to specify how they would further amend, let alone cure the myriad deficiencies identified herein.  *See Midwest Operating Eng'rs Pension Tr. Fund v. Alkermes*, 2021 WL 5782079, *5 (2d Cir. Dec. 7, 2021).

Dated:   New York, New York
         February 23, 2024

Respectfully submitted,

**FRESHFIELDS BRUCKHAUS DERINGER US LLP**

/s/ *Mary Eaton*

Mary Eaton
Meredith Kotler
Marques Tracy
3 World Trade Center
175 Greenwich Street, 51st Floor
New York, New York 10007
Telephone: (212) 277-4000
mary.eaton@freshfields.com
meredith.kotler@freshfields.com
marques.tracy@freshfields.com

*Counsel for Defendants Rent the Runway, Inc., Jennifer Y. Hyman, Scarlett O'Sullivan, Tim Bixby, Jennifer Fleiss, Scott Friend, Melanie Harris, Beth Kaplan, Dan Nova, Gwyneth Paltrow, Carley Roney, Dan Rosensweig, and Mike Roth*

**WILLKIE FARR & GALLAGHER LLP**

/s/ *Todd G. Cosenza*

Todd G. Cosenza
Charles D. Cording
787 Seventh Avenue
New York, NY 10019-6099
Telephone: (212) 728-8000
Facsimile: (212) 728-8111
tcosenza@willkie.com
ccording@willkie.com

*Counsel for Defendants Goldman Sachs & Co. LLC, Morgan Stanley & Co. LLC, Barclays Capital Inc., Credit Suisse Securities (USA) LLC, Piper Sandler & Co., Wells Fargo Securities, LLC, JMP Securities LLC, KeyBanc Capital Markets Inc., and Telsey Advisory Group LLC*

-18-