UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------------------x
RAJAT SHARMA, Individually and on Behalf of All Others
Similarly Situated,

                      Plaintiffs,

              -against-

RENT THE RUNWAY, INC., JENNIFER Y. HYMAN,
SCARLETT O'SULLIVAN, TIM BIXBY, JENNIFER
FLEISS, SCOTT FRIEND, MELANIE HARRIS, BETH
KAPLAN, DAN NOVA, GWYNETH PALTROW,
CARLEY RONEY, DAN ROSENSWEIG, MIKE ROTH,
GOLDMAN SACHS & CO. LLC, MORGAN STANLEY
& CO. LLC, BARCLAYS CAPITAL INC., CREDIT
SUISSE SECURITIES (USA) LLC, PIPER SANDLER &
CO., WELLS FARGO SECURITIES, LLC, JMP
SECURITIES LLC, KEYBANC CAPITAL MARKETS
INC., and TELSEY ADVISORY GROUP LLC,

                  Defendants.
-------------------------------------------------------------------------x

**MEMORANDUM & ORDER**
22-CV-06935 (OEM) (VMS)

**ORELIA E. MERCHANT, United States District Judge:**

      Plaintiff Rajat Sharma and lead plaintiffs Delaware Public Employees Retirement System

("DPERS") and Denver Employees Retirement Plan ("DERP") (together, "Lead Plaintiffs"), on

behalf of themselves and all other persons and entities, who purchased Defendant Rent the

Runway, Inc. (the "Company" or "RTR"), common stock in connection with its initial public

offering ("IPO"), bring this securities action against RTR and certain officers, directors and non-

employees (the "Individual Defendants"[1]), and underwriters (the "Underwriter Defendants"[2])

---

[1] The Individual Defendants are: Jennifer Y. Hyman ("Hyman"), Scarlett O'Sullivan ("O'Sullivan"), Tim Bixby
("Bixby"), Jennifer Fleiss ("Fleiss"), Scott Friend ("Friend"), Melanie Harris ("Harris"), Beth Kaplan ("Kaplan"),
Dan Nova ("Nova"), Gwyneth Paltrow ("Paltrow"), Carley Roney ("Roney"), Dan Rosensweig ("Rosenweig"), and
Mike Roth ("Roth").
[2] The Underwriter Defendants are: Goldman Sachs & Co. LLC ("Goldman Sachs"), Morgan Stanley & Co. LLC
("Morgan Stanley"), Barclays Capital Inc. ("Barclays"), Credit Suisse Securities (USA) LLC ("Credit Suisse"), Piper
Sandler & Co. ("Piper Sandler"), Wells Fargo Securities, LLC ("Wells Fargo"), JMP Securities LLC ("JMP"),
Keybanc Capital Markets Inc. ("KeyBanc"), and Telsey Advisory Group LLC ("Telsey").

(collectively "Defendants") for issuing an allegedly false and misleading registration statement (the "Registration Statement"), ECF 71-15, and a final IPO prospectus (the "Prospectus"), ECF 71-20 (together, the "Offering Documents"[3]), in violation of Sections 11, 12(a)(2), and 15 of the Securities Act of 1933 (the "Securities Act").  Before the Court is Defendants' fully briefed motion to dismiss the Corrected Amended Class Action Complaint for failure to state a claim pursuant to Federal Rule of Civil Procedure 12(b)(6).[4]  For the following reasons, Defendants' motion to dismiss is **GRANTED** in part and **DENIED** in part.

## BACKGROUND[5]

### A.  RTR's Business Model

As alleged, Rent the Runway pioneered the concept of internet-based clothing rentals, which the Company refers to as its "Closet in the Cloud."  Corrected Amended Class Action Complaint ("CAC"), ECF 61, ¶ 3.  Through their online platform, RTR's customers can rent clothing for everyday wear or a variety of events through a subscription or on a one-off basis.  *Id.*  To facilitate consumers' access to its digital closet, RTR uses an online portal, which it describes as a "proprietary operating system for the sharing economy of physical goods."  CAC ¶ 62.  Through this platform, consumers are able to choose from over 750 designer clothing brands to suit their particular fashion needs, including over 18,000 clothing styles ranging from formal attire

---

[3] The Registration Statement on Form S-1 was filed first on October 4, 2021.  ECF 71-15.  It was subsequently amended twice.  *See* ECF 71-16, 71-19.  The Registration was declared effective by the SEC on October 26, 2021.  The final prospectus is dated October 26, 2021 on Form 424(b)(4), ECF 71-20.

[4] Defendants' Motion to Dismiss ("Defs' Motion"), ECF 69; Defendants' Memorandum in Support of Motion to Dismiss ("Defs' Memo"), ECF 70; Defendants' declaration with accompanying exhibits, ECF 71, 71-1–71-66; Plaintiff's Opposition to Motion to Dismiss ("Opp."), ECF 72, and Defendants' Reply Memorandum ("Reply"), ECF 73.

[5] For purposes of deciding this motion to dismiss, the facts as alleged in the operative complaint are taken as true, as well as documents submitted by the parties that are incorporated by reference in the CAC, such as the Offering Documents, or otherwise integral to the Corrected Amended Class Action Complaint.  *See Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152 (2d Cir. 2002); s*ee, e.g.*, ECF 71.

to business casual.  *Id.*  Because RTR is able to rent the same piece of clothing to multiple customers, it is able to offer access to its service at a price affordable to most consumers.  *Id.*

A RTR customer is able to access the RTR digital closet in one of three ways: 1) a subscription plan whereby a customer can sign up for a recurring monthly subscription that allows them to order a certain number of items at a fixed price, CAC ¶ 63; 2) one-time rentals through what it describes as its "reserve" offering, CAC ¶ 64; or 3) through what the Company describes as its resale offering, CAC ¶ 65.  While reserve and resale contribute to the Company's bottom line, subscriptions account for the vast majority of the Company's revenue, bringing in approximately 80 percent of the Company's revenue.  Indeed, the Company primarily sees its reserve and resale offerings as a way of converting new customers into subscribers.  CAC ¶ 66.

As part of its business, the Company contracts with carriers to ship clothing to customers and back to the Company.  *Id.* ¶ 9.  Because the Company's business model relies on the timely shipping of clothing customers want to wear on a particular day, shipping costs are one of the Company's largest expenses, and efficient shipping is critical to the Company's success.  *Id.* ¶¶ 9, 88.

## B. Composition of RTR's Management and Board of Directors

Two Individual Defendants were employed by RTR.  Individual Defendant Hyman was the Company's Chief Executive Officer ("CEO") and Chair of the Board at the time of the IPO and had held those positions since March 2009.  *Id.* ¶¶ 6, 23.  Individual Defendant O'Sullivan was the Company's Chief Financial Officer ("CFO") at the time of the IPO and had held that position since September 2015.  *Id.* ¶ 24.

The other Individual Defendants Bixby, Fleiss, Friend, Harris, Kaplan, Nova, Paltrow, Roney, Rosenweig, and Roth were directors on the Board of the Company at the time of the IPO.

*Id.* ¶¶ 23-34.   Leading up to the IPO, Defendants Fleiss and Hyman, both co-founders of the Company, were controlling stockholders of the Company through their controlling ownership of Rent the Runway's Class B common stock.  *Id.* ¶ 26.

It is alleged that each of the Individual Defendants participated in preparing the Offering Documents and in making materially inaccurate, misleading, and incomplete statements.   In particular, the Individual Defendants each reviewed, edited, and approved the Offering Documents; participated in the IPO; and solicited the purchase of Rent the Runway's Class A common stock in the IPO to serve their financial interest and that of Rent the Runway. CAC ¶ 37; *see infra* Part E.

### C.  The COVID-19 Effect on RTR's Business

In response to the COVID-19 pandemic, which began in early 2020, nearly every state in the United States issued lockdown or shelter-in-place orders requiring most people to stay in their homes and non-essential businesses to close.  *Id.* ¶ 70.  As a result, demand for designer clothing rentals decreased significantly, causing an almost immediate contraction of the Company's customer base.  *Id.* ¶ 71.  During the COVID-19 pandemic, RTR lost almost two-thirds of its subscribers, "decimating" its revenue stream.  *Id.* ¶ 4.

The Offering Documents presented the following financial picture to potential investors from April 30, 2019, through July 31, 2021:

| | Three Months Ended | | | | | | | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | April 30, 2019 | July 31, 2019 | October 31, 2019 | January 31, 2020 | April 30, 2020 | July 31, 2020 | October 31, 2020 | January 31, 2021 | April 30, 2021 | July 31, 2021 |
| | | | | | ($ in millions) | | | | | |
| Active subscribers (at the end of period) | 101,607 | 106,192 | 118,827 | 133,572 | 52,886 | 54,228 | 65,545 | 54,797 | 74,018 | 97,614 |
| Gross profit | $  13.8 | $  17.6 | $  8.9 | $  13.3 | $  10.1 | $  (1.4) | $  2.4 | $  4.4 | $  8.1 | $  18.2 |
| Gross profit excluding product depreciation | 30.8 | 34.0 | 27.9 | 36.6 | 32.2 | 14.6 | 19.2 | 19.4 | 20.8 | 29.4 |
| Adjusted EBITDA | 0.8 | (1.1) | (10.6) | (7.1) | (3.1) | (7.5) | (5.4) | (4.3) | (6.2) | (1.9) |

Prospectus at 105; Registration Statement at 105 (PDF pg. 6).

As detailed in the Complaint, COVID wreaked havoc on RTR's business.  RTR "ended fiscal year 2019 (March 31, 2020 with 147,866 total subscribers and 133,572 active subscribers (which excludes paused subscriptions)."  CAC ¶ 117.  "On the other hand, [RTR] ended fiscal year 2020 (March 31, 2021) with 95,245 total subscribers and 54,797 active subscribers."  *Id.*  "This represented a loss of over 35% of total subscribers and over 59% of active subscribers."  *Id.*; *see also* CAC ¶ 72.

RTR readily admits that fiscal year 2020 was challenging for the Company both in the Offering Documents and its legal submissions.  *See* Defs' Memo at 6.  The Prospectus explicitly states that "[t]he COVID-19 pandemic materially adversely affected our fiscal year 2020 operating and financial results. Beginning in March 2020, positivity rates and shelter-in-place restrictions significantly reduced consumer demand for our Subscription and Reserve offerings due to a sharp decrease in interactions outside the home, social gatherings, special events and in-office work."  Prospectus at 94.  "Throughout 2020, we observed that consumer demand decreases were closely tied to COVID-19 positivity rates and social distancing/shelter-at-home restrictions."  *Id.*

However, as alleged by Plaintiffs, according to the Offering Documents, the Company grew active subscribers to 111,732 as of September 30, 2021, which represented 104% growth since the beginning of fiscal year 2021—only six months prior.  CAC ¶ 118.  Moreover, the Offering Documents reported that total subscribers as of September 30, 2021, had grown to 143,464, which represented 97% of the total subscribers at the end of fiscal year 2019.  *Id.*  Similarly, the Prospectus states that RTR's "revenue increased 39.4% from 33.5 million for the three months end[ing] April 30, 2021[,] to $46.7 million for the three months end[ing] July 31, 2021."  Prospectus at 25.  This upswing in the months leading up to the October 2021 IPO is at the core of one of Plaintiffs' securities claims, which the Court now turns to.

### D.  Subject Statements At Issue in the Offering Documents

Plaintiffs allege the Offering Documents were negligently prepared, and as a result, contained a total 25 statements that include untrue statements of material fact or omitted material facts necessary to make the statements contained therein not misleading, and failed to make adequate disclosures required under the rules and regulations governing their preparation.  CAC ¶¶ 111, 116.[6]

Plaintiffs seek to hold Defendants liable on three separate categories of misstatements or omissions.  First, that the Offering Documents "misrepresented that state of demand for Rent the Runway's subscription service" in various ways.  CAC ¶ 116.  Second, that undisclosed to prospective vendors, RTR's shipping costs were rising due to a hike in rates and switch in shipping vendors.  CAC ¶ 129.  Third, that RTR failed to disclose that customer thefts were materially increasing at the time of the IPO.  CAC ¶ 133.

Thus, the 25 challenged statements in the Offering Documents are best broken down into three categories: (1) statements regarding the state of affair of consumer demand for RTR's subscription services; (2) statements regarding rising shipping costs; and (3) statements regarding theft of RTR's clothing inventory and the insurance coverage for that inventory. A collection of the relevant statements in each category are as follows.

---

[6] The full list of statements may be found in the Annex A, provided by Defendants, which cites to the relevant portion of the CAC and Offering Documents.  The Court references and utilizes this and other Annexes as necessary as they do not contain nor are they used for legal argument, but rather they assist the Court by summarizing and organizing the facts in the record.  *See In re NYSE Specialists Sec. Litig.*, 260 F.R.D. 55, 65 (S.D.N.Y. 2009).

### 1.   Consumer Demand

The Offering Documents state in relevant part:

- **We continue to experience strong momentum in the third quarter of fiscal year 2021. The spread of the COVID-19 Delta variant and the trend of continued work from home has had minimal impact on our business or financial performance as of the date of this prospectus, but we continue to monitor the situation**. We grew to 111,732 active subscribers as of September 30, 2021, representing 104% growth since the beginning of fiscal year 2021. Active subscribers also grew 14% from the end of our second fiscal quarter on July 31, 2021 to September 30, 2021. Our total subscribers as of September 30, 2021 grew to 143,464 subscribers including paused and active subscribers representing 97% of the total subscribers at the end of fiscal year 2019.  CAC ¶ 119.

- The COVID-19 pandemic materially adversely affected our fiscal year 2020 operating and financial results. Beginning in March 2020, positivity rates and shelter-in-place restrictions significantly reduced consumer demand for our Subscription and Reserve offerings due to a sharp decrease in interactions outside the home, social gatherings, special events and in-office work. Unlike the retail model where a customer can invest in an article of clothing to wear in the future, we primarily operate a "rent now, wear now" subscription model where subscribers are picking items for immediate use. Throughout 2020, we observed that consumer demand decreases were closely tied to COVID-19 positivity rates and social distancing/shelter-at-home restrictions. ***As COVID-19 restrictions have been relaxed and virus positivity rates have declined, we have seen increased demand for our offerings.*** The first Delta variant case was identified in December 2020, and the variant soon became the predominant strain of the virus and by the end of July 2021, the Delta variant was the cause of more than 80% of new U.S. COVID-19 cases. As a result, new restrictions are being contemplated and implemented by workforces and federal, state and local government officials. ***As of the date of this prospectus, our operations and customer demand have not been significantly impacted***, but we continue to monitor the situation.  CAC ¶ 120.

### 2.   Shipping

The Offering Documents contain the following relevant statements as to RTR's shipping costs that Plaintiffs allege were materially misleading:

- We currently rely on several third-party national and regional shipping vendors for our outbound and inbound logistics. ***A substantial majority of our inbound shipments from customers are currently returned through a single vendor— we have from time to time transitioned, and are currently in the process of***

*transitioning, inbound shipments from this vendor to multiple other vendors, and we cannot predict how this transition may impact our costs and our customer sentiment and satisfaction.* CAC ¶ 128;

- *Shipping and logistics are a critical part of our business and our supply chain and any changes or interruptions in shipping or logistics operations could adversely affect our operating results*. CAC ¶ 130;

- *[O]ur business relies on the successful management of reverse logistics needed to ingest*, clean, and restock returned items quickly and efficiently in order to offer them for rental or resale to other customers. *If we are not able to negotiate acceptable pricing and other terms with these vendors or they experience performance problems or other difficulties, our operating results and customers' experience could be negatively impacted.* *Id.*

- *Increases in shipping costs* or other significant shipping difficulties or disruptions or any failure by our brand partners or third-party carriers to deliver high-quality products to us or to our customers, as applicable, in a timely manner or to otherwise adequately serve our customers *could damage our reputation and brand and may substantially harm our business.* *Id.*

### 3. Theft, Fraud, and Clothing Insurance

Plaintiffs challenge the following statements in the Offering Documents which relate to thefts

of clothing items from RTR. A sample of relevant statements include:

- *We have* **implemented fraud prevention measures, such as detection tools to identify irregular or high risk customer order patterns, to reduce the risk of fraud**. CAC ¶ 132.

- *We may incur significant losses from fraud. We have in the past incurred and may in the future incur losses from various types of fraud, including claims that a customer did not authorize a purchase, customers who have closed bank accounts or have insufficient funds to satisfy payments, customers who use stolen credit cards to make purchases, customers who fraudulently rented multiple products at once and customers who have failed to return rentals.* CAC ¶ 134.

- *If our insurance coverage is insufficient for the needs of our business or our insurance providers are unable to meet their obligations, we may not be able to mitigate the risks facing our business.* CAC ¶ 136.

- *We procure third-party insurance policies to cover various operations-related risks including* employment practices liability, workers' compensation, **property** and business interruptions, cybersecurity and data security incidents,

*crime*, directors' and officers' liability, and ***general business liabilities***. We cannot guarantee that we will continue to receive adequate insurance coverage on favorable terms. Insurance providers may discontinue their coverage or significantly increase the cost of coverage, and we cannot guarantee that we would be able to secure replacement coverage on reasonable terms or at all. In addition, if our insurance carriers change the terms of our policies in a manner not favorable to us, our insurance costs could increase. ***Further, if the insurance coverage we maintain is not adequate to cover losses that occur***, or if we are required to purchase additional insurance for other aspects of our business, ***we could be liable for significant additional costs***. Additionally, if any of our insurance providers becomes insolvent, it would be unable to pay any operations-related claims that we make. *Id.*

- Insurance providers have also raised premiums and deductibles for many businesses, including ours, and may do so in the future. As a result, our insurance and claims expense could increase, or we may decide to raise our deductibles or self-insured retentions when our policies are renewed or replaced. ***Our business, financial condition, and results of operations could be adversely affected if the cost per claim, premiums, the severity of claims, or the number of claims significantly exceeds our historical experience and coverage limits; we experience a claim in excess of our coverage limits; our insurance providers fail to pay on our insurance claims; we experience a claim for which coverage is not provided; or the number of claims under our deductibles or self-insured retentions differs from historical averages***. *Id.*

### E. Statement Made by Former Employees that are Alleged to have Made the Offering Documents Actionable under Securities Laws

Plaintiffs recite statements made by six anonymous former employees ("FE") of RTR in support of their three main claims. *See* CAC.

FE-1,[7] FE-2,[8] FE-3,[9] and FE-4,[10] recalled that multiple RTR leaders, including Hyman and O'Sullivan, stated that subscriber enrollments were not meeting projections at RTR's companywide meetings, which occurred monthly or every two weeks.  *Id.* ¶¶ 76-85.  FE-1 explained that RTR was not meeting its enrollment subscriber projections at the time of the IPO and that over 100 customers were cancelling their subscriptions per day.  *Id.* ¶ 78.

Additionally, the FEs related that RTR was also affected by increased transportation costs. *Id.* ¶¶ 88-95.  FE-1 stated that a lot of customers were frustrated with shipping delays and RTR was "constantly" searching for different carriers to lower costs.  *Id.* ¶¶ 89-91.  FE-1 explained that RTR switched carriers from UPS to FedEx to save money and used a local carrier in New York City, which was cheaper than FedEx but "less reliable."  *Id.* ¶ 91.  After one year of contracting with FedEx, RTR switched back to using UPS in or around August 2021 due to FedEx's significant cost increases and reliability issues.  *Id.* ¶¶ 92-94.  According to FE-4, FedEx doubled the Company's shipping rates because it was not shipping enough, which caused "panic" for a month until RTR switched back to UPS.  *Id.* ¶ 93.  The Offering Documents disclosed that the Company was in the process of transitioning shipping vendors at the time of the IPO.  *Id.* ¶ 94.  Prior to the IPO, RTR was also attempting to lower shipping costs by setting up physical drop boxes for customer returns.  *Id.* ¶ 95.

---

[7] FE-1 was employed by RTR as a Manager in the Customer Experience department from November 2020 to September 2022.  CAC ¶ 77.  In that role, FE-1 was responsible for, among other things, overseeing 15 Customer Experience team leaders, managing RTR's contact center, and meeting with the Finance department regarding Customer Experience costs.  *Id.*  FE-1 reported to Becky Hyman Leader, RTR's vice president of Customer Experience and sister of Defendant Hyman.  *Id.*

[8] FE-2 joined RTR in customer service in November 2017, was promoted to Training Specialist in May 2021, and departed RTR in November 2021.  CAC ¶ 80.  FE-2 reported to former RTR Director of Training and Quality Development Ashley Ostrowski and worked "closely" with Becky Hyman Leader.  CAC ¶¶ 80-81.

[9] FE-3 was an Operations Manager from before the IPO to May 2022 and was responsible for planning and budgeting and for completing and preparing one of RTR's fulfillment center's workload.  CAC ¶ 82.

[10] FE-4 joined RTR as Senior Operations Manager, Outbound and Inventory Control and Quality Assurance ("ICQA") in September 2019, transitioned to Senior Manager, Operations Integration and ICQA in August 2021, and left the Company in December 2022.  CAC ¶ 84.

Two other FEs provided statements regarding how, leading up to and at the time of the IPO, the Company also faced an increase in theft of rented merchandise. *Id.* ¶¶ 96-105. FE-1 stated that customer theft was an issue at the Company and Defendant Hyman and Becky Hyman Leader were aware of the issue but took no action to stop theft. *Id.* ¶ 97. Likewise, FE-2 reported that customer and employee thefts were a "huge issue" during her tenure at the Company and customer theft became a "larger issue" in 2021, estimating that the Company lost at least $500,000 every two months in revenue directly from thefts. *Id.* ¶ 98. According to FE-5,[11] the Company's revenue loss from items stolen by customers and employees was "quite substantial" and RTR did not have any policies or procedures in place to prevent theft. *Id.* ¶¶ 100-02. FE-6[12] recalled that "tons" of customer packages were lost and RTR was only able to obtain successful insurance claims on approximately 35 percent of those packages. *Id.* ¶ 104. FE-6 noted that insurance claims were capped at $100 per shipment plus shipping costs because RTR did not pay for insurance when it shipped items to customers, which led to a "pretty significant" revenue loss from lost packages. *Id.* ¶ 105. FE-2, FE-5, and FE-6 each recalled that some customers scanned their items to return at drop boxes but kept the items instead of returning them. *Id.* ¶¶ 98, 100, 104.

## F. The Lead Up to the IPO

Each of the Underwriter Defendants was an underwriter for the Company's IPO, serving as a financial advisor for and assisting in the preparation and dissemination of the Offering

---

[11] FE-5 was employed with RTR from March 2019 to July 2021 as a senior employee in Asset Protection. CAC ¶ 99. "FE-5 detailed the following ways in which Rent the Runway items were stolen: (1) some customers scanned items to return at Rent the Runway drop boxes located throughout the country but kept the items instead of returning them, (2) some Rent the Runway employees or third-party vendors in charge of shipping returned items from customers at these drop boxes only shipped some of the scanned items back to Rent the Runway and kept the other items, and (3) some Rent the Runway employees or staffing agency employees stole items from Rent the Runway's Secaucus, New Jersey and Arlington, Texas fulfillment centers." *Id.* ¶ 100.

[12] FE-6 joined RTR as a Customer Experience Operations Manager in June 2019 and departed as Manager, Transportation Execution in July 2021. CAC ¶ 103. As Manager of Transportation Execution, FE-6 was responsible for increasing shipping efficiency, acting as a liaison between customers and the RTR Transportation team, and dealing with shipping carrier claims. *Id.*

Documents.  *Id.* ¶¶ 44-52.  In preparation for the IPO, the Underwriter Defendants conducted a due diligence investigation into the business and operations of the Company, during which they had access to confidential corporate information concerning the Company's operations and financial prospects and had continual contact with the Company's lawyers, management, directors, and top executives.[13]  *Id.* ¶¶ 58-59.  The Underwriter Defendants solicited purchases of the Company's Class A common stock in the IPO and collectively received over $27 million in fees and commissions in connection with those sales.  *Id.* ¶ 55.

Additionally, prior to the IPO, the Individual Defendants and Underwriter Defendants conducted a roadshow for the IPO to solicit the purchase of the Company's Class A common stock in the IPO.  *Id.* ¶¶ 38, 56.  During the roadshow, the Individual Defendants and Underwriter Defendants met with investors and presented highly favorable information about the Company, its operations, and its financial prospects.  *Id*.

## G.  The IPO

On or about October 27, 2021, the Defendants conducted RTR's IPO, in which the Defendants sold 19,550,000 shares of Class A common stock to the public, including an underwriter over-allotment option of 2,550,000 shares.  *Id.* ¶ 106.  The Company received $377.3 million from the offered stock in the IPO, after deducting expenses and underwriting discounts and commissions.  *Id.*  The IPO was conducted pursuant to, and the sale of RTR stock was solicited by, the Offering Documents, which were filed with the SEC and disseminated to the investing public.  *Id.* ¶ 107.

---

[13] The Underwriter Defendants' due diligence investigation into the Company aimed to determine: "(i) the strategy to best accomplish the IPO; (ii) the terms of the IPO, including the price at which the Company's Class A common stock would be sold; (iii) the language to be used in the Offering Documents; (iv) what disclosures about the Company would be made in the Offering Documents; and (v) what responses would be made to the SEC in connection with its review of the Offering Documents."  CAC ¶ 59.

DPERS purchased 27,615 shares of RTR's Class A common stock, pursuant to and traceable to the Offering Documents, including in the IPO from an Underwriter Defendant. CAC ¶ 20. DPERS purchased RTR's Class A common stock at a time when only shares offered in the IPO were in the market. *Id.*

DERP also purchased 9,700 shares of RTR's Class A common stock pursuant to and traceable to the Offering Documents, and which was purchased in the IPO from an Underwriter Defendant. CAC ¶ 21. DERP purchased RTR's Class A common stock at a time when only shares offered in the IPO were in the market. *Id.*

### H. Events Subsequent to the IPO

In September 2022, just one year after the IPO, RTR announced a major restructuring plan, which included firing approximately 24 percent of the Company's corporate employees to save approximately $25 to $27 million in 2023.  CAC ¶ 13.  RTR's stock price fell from its offering price of $21.00 per share to $1.58 when the market closed on November 14, 2022, the day this action was filed.  CAC ¶ 15.

### I. Procedural History

Plaintiffs filed their initial complaint on November 14, 2022.  *See* Complaint, ECF 1.  On June 8, 2023, the Court granted DPERS and DERP's motion for appointment as lead plaintiff.  *See* Order dated June 8, 2023, ECF 38; CAC ¶ 21.  Plaintiffs filed an Amended Complaint on August 21, 2023.  *See* Amended Complaint, ECF 59.  On September 5, 2023, the Court granted Plaintiffs' motion for leave to file a Corrected Amended Complaint, *see* Order dated Sept. 5, 2023, and Plaintiffs filed the operative Corrected Amended Complaint, *see* CAC.  The fully briefed motion to dismiss the CAC was filed on February 23, 2024.  The motion is ripe for adjudication.

## STANDARD OF REVIEW

### A. Motions to Dismiss Under 12(b)(6)

Under Rule 8(a)(2) of the Federal Rules of Civil Procedure, a complaint need only plead "a short and plain statement of the claim showing that the pleader is entitled to relief[.]"  FED. R. CIV. P 8(a)(2).  To survive a motion to dismiss for failure to state a claim, a complaint must include "sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  A complaint must offer more than "a formulaic recitation of the elements of a cause of action," or "naked assertion[s]" devoid of "further factual enhancement." *See Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 557 (2007).  If the plaintiff has

"not nudged their claims across the line from conceivable to plausible, their complaint must be dismissed." *Twombly*, 550 U.S. at 570.

### B. Rule 9(b)'s Heightened Pleading Requirement Does Not Apply

"In considering Section 11 and Section 12(a)(2) claims under the 1933 Securities Act, the Court must 'conduct a preliminary inquiry into whether plaintiffs' allegations are premised on fraud,' or merely on negligence, to determine the appropriate pleading standard." *In re Qutoutiao, Inc. Sec. Litig.*, 20-CV-6707 (SHS), 2023 WL 4977499, at *13 (S.D.N.Y. Aug. 3, 2023) (quoting *City of Pontiac Policemen's & Firemen's Ret. Sys. v. UBS AG*, 752 F.3d 173, 183 (2d Cir. 2014)); *see also Hutchison v. Deutsche Bank Sec. Inc.*, 647 F.3d 479, 484 (2d Cir. 2011).

"As a general rule, Securities Act claims do not require plaintiffs to plead scienter because '[f]raud is not an element or a requisite' of those claims." *In re Chembio Diagnostics, Inc. Sec. Litig.*, 616 F. Supp. 3d 192, 201 (E.D.N.Y. 2022) (quoting *Rombach v. Chang*, 355 F.3d 164, 171 & n.4 (2d Cir. 2004). "Where these claims are premised on allegations of fraud, however, Rule 9(b)'s heightened pleading standard applies." *Id.* (cleaned up); *see Rombach*, 355 F.3d at 171 ("[T]he heightened pleading standard of Rule 9(b) applies to Section 11 and Section 12(a)(2) claims insofar as the claims are premised on allegations of fraud"). Rule 9(b) requires that "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake." FED. R. CIV. P. 9(b).

Defendants argue Plaintiffs' claims brought under Sections 11 and 12(a)(2) of the Securities Act sound in fraud and so heightened pleading applies. *See* Opp. at 13-14. Defendants argue that the CAC is littered with classic fraud "buzzwords," and thus, Rule 9(b) must apply. Defs' Memo at 14; *id.* at n.22 (citing CAC ¶¶ 116, 121, 127, 129, 133, 138, 165, 171, 177); Defs' Reply at 3. Plaintiffs counter that their claims are sound in negligence given their explicit

disclaimers contained in the CAC and because the use of language such as "false and misleading statements" and "untrue statements of material fact" only "track[s] Section 11 without changing the nature of the Complaint."  Opp. at 13-14 (citing CAC ¶¶ 121, 127, 165).

It is the district court's duty to parse the complaint "to determine whether 'the gravamen of the complaint is plainly fraud.'"  *Refco*, 503 F. Supp. 2d at 632 (quoting *Rombach*, 355 F.3d at 172).  The Court concludes that the CAC sounds in negligence only. The CAC is replete with disclaimers that the CAC "does not sound in fraud. Lead Plaintiffs do not claim that any of the Defendants committed intentional or reckless misconduct or that any of the Defendants acted with scienter or fraudulent intent."  CAC ¶ 164.  "Lead Plaintiffs expressly disclaim any allegations of scienter or fraudulent intent in these non-fraud claims except that any challenged statements of opinion or belief made in connection with the IPO are alleged to have been materially misstated statements of opinion or belief when made."  *Id.*  And while "[p]laintiffs cannot evade the Rule 9(b) strictures by summarily disclaiming any reliance on a theory of fraud or recklessness," *see In re JP Morgan Chase Secs. Litig.*, 363 F. Supp. 2d 595, 635 (S.D.N.Y. 2005), here it is crucial that Plaintiffs do not bring claims under section 10(b)(5) of Securities Exchange Act, which would require satisfying the heightened pleading under Rule (9)(b).  *See Nayani v. LifeStance Health Grp., Inc.*, 22-CV-6833 (JSR), 2023 WL 3260260, at *2 (S.D.N.Y. May 4, 2023) (finding a complaint with similar disclaimers only brought pursuant to Section 11 did not sound in fraud based on the same arguments).

Further, the CAC alleges that "Offering Documents were negligently prepared, and as a result, contained untrue statements of material fact."  CAC ¶ 111.  The CAC alleges "[b]y virtue of each of the Individual Defendants' failure to exercise reasonable care, the Registration Statement contained misrepresentations of material facts and omissions of material facts necessary

to make the statements therein not misleading."  CAC ¶¶ 168-69; *see also* CAC ¶ 179 ("By virtue of each of these Defendants' failure to exercise reasonable care, the Prospectus contained misstatements of material facts and omissions of material facts necessary to make the statements therein not misleading.").  Such allegations are "consistent with negligence." *Nayani*, 2023 WL 3260260, at *2; *see also Altayyar v. Etsy, Inc.*, 242 F. Supp. 3d 161, 185 (E.D.N.Y. 2016) (finding Rule 8 pleading applies in a mixed Securities Act and Exchange Act complaint where "plaintiffs have attempted to separate their Securities Act claims and employ language that is at least evocative of negligence"), *aff'd*, 731 F. App'x 35 (2d Cir. 2018).

Finally, where, as here, when the allegations in the CAC simply track the elements of Section 11, a plaintiff cannot be held to allege fraud by simply tracking those elements.  *See Nayani*, 2023 WL 3260260, at *2 (finding that plaintiff's argument that Section 11 claims sounded in fraud "misconstrues both the plaintiff's complaint and the applicable law.  The FAC expressly states that 'it does not allege, and does not intend to allege, fraud or scienter'"); *see Fresno County Employees' Retirement Association v. comScore, Inc.*, 268 F. Supp. 3d 526, 559 (S.D.N.Y. 2017) ("To hold that bare recitations of the elements of the causes of action triggered Rule 9(b) would be contrary to the holding of the Court of Appeals in *Rombach* [*v. Chang*], 355 F.3d [164, 178 (2d Cir. 2004)], that claims under Section 11 need not sound in fraud[.]"); *In re Orion Sec. Litig.*, 08 CIV. 1328 (RJS), 2009 WL 2601952, at *1 (S.D.N.Y. Aug. 20, 2009) ("[T]hat a fact was known and not disclosed does not mean, as a matter of law, that the circumstances of the resulting omission sound in fraud.").  Thus, the CAC does not "sound in fraud," and its allegations will not be held to the heightened pleading requirements of Rule 9(b) but rather to the Rule 8 plausibility standard set out in *Iqbal* and *Twombly*.

**DISCUSSION**

**A. Applicable Law Securities Laws**

    **1. Section 11 of the Securities Act**

Under Section 11 of the Securities Act ("Section 11"), 15 U.S.C. § 77k(a), "[b]efore a company may sell securities in interstate commerce, it must file a registration statement with the Securities and Exchange Commission (SEC).  If that document either 'contain[s] an untrue statement of a material fact' or 'omit[s] to state a material fact ... necessary to make the statements therein not misleading,' a purchaser of the stock may sue for damages."  *Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*, 575 U.S. 175, 179 (2015) (quoting 15 U.S.C. § 77k(a)). Put simply, "issuers and signatories of a registration statement are liable for material misrepresentations of fact and material omissions of fact." *Altayyar*, 242 F. Supp. 3d at 184.

An issuer of stock is liable under Section 11 for any "(1) a material misrepresentation; (2) a material omission in contravention of an affirmative legal disclosure obligation; or (3) a material omission of information that is necessary to prevent existing disclosures from being misleading." *Litwin v. Blackstone Grp., L.P.*, 634 F.3d 706, 715-16 (2d Cir. 2011) (citation omitted); *accord Altayyar*, 242 F. Supp. 3d at 185; *see also Iowa Pub. Emps'. Ret. Sys. v. MF Global, Ltd.*, 620 F.3d 137, 141 (2d Cir. 2010) ("To prevail on a § 11 or § 12(a)(2) claim, a plaintiff must show that the relevant communication either misstated or omitted a material fact.").  The Securities Act thus "creates two ways to hold issuers liable for the contents of a registration statement—one focusing on what the statement says and the other on what it leaves out." *Omnicare, Inc.*, 575 U.S. at 179.

When it comes to affirmative legal disclosures "Section 17, Part 229 of the Code of Federal Regulations, also known as 'Regulation S[-]K,' provides standard instructions for filing forms under the Securities Act" and "gives rise to specific duties to disclose[.]" *Ong v. Chipotle Mexican*

*Grill, Inc.*, 294 F. Supp. 3d 199, 235 (S.D.N.Y. 2018) (citation omitted).  "Omissions of required disclosures under either Items 303 or 503 give rise to liability under the Securities Act." *Id.* (same).

To allege an actionable omission, a plaintiff must plead "that the defendant had a duty to disclose the omitted fact[.]" *Constr. Laborers Pension Tr. for S. Cal. v. CBS Corp.*, 433 F.Supp.3d 515, 531 (S.D.N.Y. 2020) (citation omitted).  A non-statutory duty to disclose arises where a statement in a prospectus or securities offering document "would otherwise be inaccurate, incomplete, or misleading" without the omitted statement." *Id.*  There is, however, no "generalized duty requiring defendants to disclose the entire corpus of their knowledge regarding" their business.  *In re Morgan Stanley Info. Fund Sec. Litig.*, 592 F.3d 347, 366 (2d Cir. 2010).

"The definition of materiality is the same for these Securities Act provisions as it is under section 10(b) of the Exchange Act: Whether the defendants' representations, taken together and in context, would have misled a reasonable investor." *In re Wachovia Equity Sec. Litig.*, 753 F. Supp. 2d at 376 (citation omitted).  "Whether a misstatement is material 'depends on whether there is a substantial likelihood that a reasonable shareholder would consider it important in deciding how to act.'" *Plumber & Steamfitters Loc. 773 Pension Fund v. Danske Bank A/S*, 11 F.4th 90, 100-01 (2d Cir. 2021) (quoting *ECA & Loc. 134 IBEW Joint Pension Tr. of Chi. v. JP Morgan Chase Co.*, 553 F.3d 187, 206 (2d Cir. 2009) (internal quotation marks omitted)).  To be material, "a statement must, in the view of a reasonable investor, have 'significantly altered the total mix of information made available.'" *Id.* (quoting *Singh v. Cigna Corp.*, 918 F.3d 57, 63 (2d Cir. 2019)) (quotation marks omitted).

The materiality of statements and omissions under §§ 11 and 12(a)(2) is a fact-specific and context-specific inquiry.  *See Litwin v. Blackstone Group, L.P.*, 634 F.3d 706, 716-17 (2d Cir. 2011); *Freidus v. Barclays Bank PLC,* 734 F.3d 132, 140 (2d Cir. 2013).  "A court must, of course,

consider the statement at issue in the context of the objective features surrounding *the sale* and *the seller*.  That context includes, for example, all facts related to the statement or omission, its surrounding text, the offering documents, the securities, the structure of the transaction, and the market in which the transaction occurs." *Fed. Hous. Fin. Agency for Fed. Nat'l Mortg. Ass'n v. Nomura Holding Am., Inc.*, 873 F.3d 85, 151 (2d Cir. 2017); *See Omnicare Inc.*, 575 U.S. at 1330 ("[A reasonable] investor takes into account the customs and practices of the relevant industry."); *Freidus v. Barclays Bank PLC*, 734 F.3d 132, 140 (2d Cir. 2013) (considering the materiality of misstatements and omissions in light of the "deteriorating credit market").

### 2.  SEC Regulation S-K Items 303 and 105

The CAC alleges that the Offering Documents omitted information required by Items 303 and 503 of SEC Regulation S-K, 17 C.F.R. §§ 229.303, 229.503.

Item 303 requires registrants to describe "any known material trends that have had or that the registrant reasonably expects will have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations." 17 C.F.R. § 229.303(a)(3)(ii).  This disclosure duty exists "where a trend, demand, commitment, event or uncertainty is both presently known to management and reasonably likely to have material effects on the registrant's financial condition or results of operation."  Certain Investment Company Disclosures, Exchange Act Release No. 6835, 1989 WL 1092885, at *4 (May 18, 1989); *accord Ong*, 294 F. Supp. 3d at 235.  Item 303 "requires the registrant's actual knowledge of the relevant trend or uncertainty." *Ind. Pub. Ret. Sys. v. SAIC, Inc.*, 818 F.3d 85, 95 (2d Cir. 2016).  Moreover, the "'reasonably expects will have' standard suggests that there must a fairly substantial probability that the known risk at issue will materialize and have a material impact—if not a more-likely-than-not standard, then something not too much below that." *Holbrook v. Trivago N.V.*, 17 CIV. 8348 (NRB), 2019 WL 948809, at

*12 (S.D.N.Y. Feb. 26, 2019), *aff'd sub nom. Shetty v. Trivago N.V.*, 796 F. App'x 31 (2d Cir. 2019).

Item 503, on the other hand, addresses the disclosure of risks. "Specifically, it requires an issuer to include in its disclosures 'a discussion of the most significant factors that make the offering speculative or risky.'" *Ong*, 294 F. Supp. 3d at 235 (quoting 17 C.F.R. § 229.503(c)).

## B. Statements Regarding State of Demand Leading Up to the IPO

Plaintiffs assert that several statements in the Offering Documents "misrepresented [the] state of demand for Rent the Runway's subscription service." CAC ¶ 116; *see* Annex A to Motion Dismiss at 1-2 (listing all 14). Plaintiffs argue that the Offering Document statements that RTR was seeing "increased demand" for its services and "experiencing strong momentum" were materially misleading when made because in fact subscribership "was materially trending down at the time of the IPO and the Company was materially not meeting internal subscriber enrollment projections." CAC ¶ 121. The Plaintiffs also allege that the Offering Documents failed to disclose the omitted material facts that RTR's "growth rate was slowing and declining, and the Company was failing to attract new customers and retain existing customers." CAC ¶ 126. At bottom, the CAC alleges that "[t]he Offering Documents inaccurately described as **potential**, certain future risks associated with acquiring new subscribers, reacquiring subscribers the Company had lost during the pandemic, and retaining subscribers, which 'may' or 'could' have an adverse effect on its business, financial condition, and results of operations, rather than disclosing the actual events and trends or uncertainties that had already manifested at the time of the IPO." CAC ¶ 122; *see also* CAC ¶¶ 76, 116. In short, the CAC alleges the Offering Documents were materially misleading because in the leadup to the IPO, consumer demand for RTR's subscription services was purportedly trending downward, so much so that it reflected a "material trend" that should

have been disclosed under Item 303[14] or otherwise should have been disclosed to make the statements as to demand in the Offering Documents not materially misleading. *See* Opp. at 19-20 ("Defendants' statements concerning customer demand would have led a reasonable investor to believe that the Company was growing as it had before the pandemic . . . unbeknownst to investor . . . . Rent the Runway was not emerging from the pandemic as expected, but rather was experiencing significant problems acquiring new customers, retaining its existing customers, and reacquiring the customers it had lost previously."). In arriving to this theory, the CAC relies, as many securities litigations do, on statements and information alleged to be known by confidential informants ("CIs") or confidential witnesses ("CWs") within RTR, identified here as former RTR employees ("FEs") *see* CAC ¶¶ 76-86. *See, e.g.*, *In re AppHarvest Sec. Litig.*, 684 F. Supp. 3d 201, 261 (S.D.N.Y. 2023) ("The Operative Complaint relies heavily on statements made by six CWs.").

Defendants respond with three lines of argument. First, as a threshold matter the Court should not rely on the FEs' statements and, second, even crediting them, these statements about consumer demand are not actionable given that the disclosures of RTR's historical performance figures were accurate—something that Plaintiffs do not deny—and therefore not actionable under the law. Defs' Memo at 15-16. Further, it was fully disclosed to investors that RTR's growth did

---

[14] However, in their briefing, Plaintiffs appear to change tack and couch liability in a new theory not found in the CAC; instead of arguing that RTR's Offering Documents were misleading because statements about demand were not in accordance with RTR's present knowledge about demand, *see, e.g.*, CAC ¶¶ 126-27, Plaintiffs now argue that "statements about increased demand were *false because they misled investors as to the sustainability of the Company's growth trajectory* as compared to the Company's pre-pandemic growth levels." Opp at 21 (emphasis added). Significantly, no such allegations nor even the words "sustainability" or "trajectory" appear in the CAC. *See generally id.* Plaintiffs "cannot amend [their] complaint through new allegations in an opposition brief" where an "allegation is absent from the" [CAC]. *Johnson v. Ironshore Specialty Ins. Co.*, 1:21-CV-03262 (GHW), 2022 WL 912973, at *7 (S.D.N.Y. Mar. 28, 2022); *Chen Coal Technologies, Inc. v. Leidos, Inc.*, 377 F. Supp. 3d 303, 321 (S.D.N.Y. 2019) (it is "axiomatic that a complaint cannot be amended by a brief in opposition to a motion to dismiss"). Accordingly, the Court reviews the CAC only under the theories presented and alleged in the CAC, and rejects Plaintiffs' new theory based on sustainable growth.

and could fluctuate for a variety of reasons.  Lastly, Defendants also contend that other statements about "momentum" are merely inactionable puffery.  *See* Reply at 6.  The Court takes each issue in turn.

### 1.  FEs' Statements

Plaintiffs rely heavily on the accounts of multiple FEs.  "As a general matter, courts consider and take as true the statements of such witnesses at this stage, even when applying the heightened standards of Rule 9(b) and the PSLRA," a higher standard than required here.  *City of Omaha Police & Fire Ret. Sys. v. Evoqua Water Techs. Corp.*, 450 F. Supp. 3d 379, 405 (S.D.N.Y. 2020); *see Novak v. Kasaks*, 216 F.3d 300, 313-14 (2d Cir. 2000).

"But a plaintiff may rest on information provided by anonymous sources only when they 'are described in the complaint with sufficient particularity to support the probability that a person in the position occupied by the source would possess the information alleged.'"  *Id.* (quoting *Novak*, 216 F.3d at 314); *accord New Jersey Carpenters Health Fund v. Royal Bank of Scotland Grp., PLC*, 709 F.3d 109, 123-24 (2d Cir. 2013) (Section 11 case analyzed under notice pleading standard).

As discussed below, the statements made by FEs and used in the CAC to support the claim involve FEs who merely related what they heard top brass at RTR discuss at internal RTR meetings they attended in person or virtually.  *See, e.g.*, CAC ¶¶ 79, 81, 83, 85.  As to the one FE who specifically discussed purported attrition rates, FE-1, it is plausibly alleged that FE-1 would know of these numbers because FE-1 worked as a manager in Customer Experience who managed RTR's contact center and attended meetings with the Finance department and RTR's vice president of Customer Experience, Becky Hyman Leader.  CAC ¶¶ 77-78.  In this role and position it is a plausible "probability" that FE-1 dealt with customer cancellations as part of their job because a

poor customer experience may often be the driving reason why a person would cancel a subscription. Thus, the Court credits the FE's allegations as true insofar as it regards customer demand in this section. However, whether if taken as true this changes the calculus is a different matter.

### 2. Materially Declining Trend of RTR Subscriptions

Plaintiffs contend that RTR's choice to use the language of "increased demand" in the Offering Documents was materially misleading because it is alleged that RTR knew that demand was not "increased" at the time. Plaintiffs point to statements made by FEs to support their contention that RTR management knew "[t]he number of subscribers was trending down and the Company was not meeting internal subscriber enrollment projections." CAC ¶ 126(c). The CAC alleges the loss in customer demand was of such a magnitude that it amounted to a material trend that RTR would be obligated to disclose under Item 303. *See* CAC ¶ 127 ("The failure of the Offering Documents to disclose the omitted material facts . . . IPO the number of subscribers was trending down at the time of the IPO . . . violated Item 303, because these undisclosed facts were known and would (and did) have an unfavorable impact on the Company's sales, revenues, and income from continuing operations.").

However, the CAC does not establish that RTR "failed to disclose a trend that is both [1] presently known to management and [2] reasonably likely to have material effects on the registrant's financial condition or results of operations," to wit, that RTR management knew of or failed to disclose of a material downward trend in subscribers. *In re Coty*, 2016 WL 1271065, at *5 (S.D.N.Y. Mar. 29, 2016). Taking even the most specific and on point allegation that RTR was potentially misstating consumer demand—FE-1's statement that at some point "leading up to the IPO" 100 subscribers a day were canceling or "churning," their subscriptions—this is insufficient

to plausibly plead that RTR made a material misrepresentation in the Offering Documents.  CAC ¶ 78.

    As to materiality, courts have recognized that without understanding "time period to which the statements refer, the magnitude of the alleged decline in sales, or the extent to which the decline impacted the [c]ompany's reported sales figures," a court is hard-pressed to find materiality.  *Ford v. Voxx Int'l Corp.*, 14-cv-4183 (JS) (AYS), 2016 WL 3982466, at *6 (E.D.N.Y. July 22, 2016).[15] Materiality is fact and context specific.  *Litwin*, 634 F.3d at 715-16.  In this case, while losing 100 subscribers a day is a specific allegation, there is no further factual matter to adduce the magnitude of this alleged trend such as: What price-tier level of subscribers were canceling?  How many new subscribers were nonetheless joining RTR?  How long did such a trend go on for—one week, a month, or an entire quarter? [16]  Was any alleged downward trend potentially caused by seasonality, a unique risk factor disclosed by RTR throughout the offering Documents?  *See* Prospectus at 42. Thus, this allegation, while specific in itself, is nonetheless too conclusory and vague when put into context.  Therefore, Plaintiffs have failed to establish materiality based on the FE-1 statement.

    An Item 103 claim fails for the independent reason that the timeframe alleged for the purported downward trend— "leading up to the IPO" —fails for duration as a matter of law.  CAC ¶ 78.  *See, e.g., Holbrook*, 2019 WL 948809, at *13 ("as a matter of law 15 days does not a trend make"); *Blackmoss Invs. Inc. v. ACA Capital Holdings, Inc.*, 2010 WL 148617, at *10 (S.D.N.Y. Jan. 14, 2010) ("As a matter of law, a two-month period of time does not establish a 'trend' for

---

[15] While *Ford* was decided pursuant to the heightened Rule 9(b) standard of review, the use of these indicia is no less helpful under a Rule 8 notice pleading standard.  The only material change is the level of specificity that must be alleged.

[16] And it is implausible to infer that such rate of attrition had gone on for as much time as an entire quarter given the actual and undisputed increase in subscribers and revenue RTR actually saw in the next quarter, 3Q21.  *See* Annex C to MtD, Performance Metrics Summary, ECF 70-3; *See also* Defs' Memo at 16 ("Rent the Runway's revenues steadily increased from $33.5 million for 1Q21, to $46.7 million for 2Q21, and to $59.0 million for 3Q21.").

purposes of the disclosures required by Item 303."); *see also In re Coty*, 2016 WL 1271065, at *7 ("[t]he decline in growth rate would have been almost contemporaneous with the IPO on June 13, 2013—clearly an insufficient time period to establish a trend, as opposed to an 'isolated occurrence[ ]' that would not require disclosure under Item 303.").

With no Item 303 trend to base its Section 11 claim on, Plaintiffs are left with claiming that the Offering Documents contained a material misrepresentation of current facts.  But this argument cannot stand here because "disclosure of accurate historical data does not become misleading even if less favorable results might be predictable by the company in the future."  *In re Coty*, 2016 WL 1271065, at *6 (quotation marks omitted) (collecting cases).

RTR's disclosures of historical performance data both in the Offering Documents and other investor materials shows that both revenues and subscriber numbers were (accurately) moving upward in the period leading up to the IPO.  From June (1Q21) to July 2021 (2Q21), RTR's revenues steadily increased from $33.5 million for 1Q21, to $46.7 million for 2Q21, and to $59.0 million for 3Q21.  *See* CAC ¶ 123 (the Company's "revenue increased 39.4% from 33.5 million for the three months ended April 30, 2021 to $46.7 million for the three months ended July 31, 2021"); *accord* Prospectus at 105.  So, too, was the case with subscribers.  "According to the Offering Documents, [RTR] grew active subscribers to 111,732 as of September 30, 2021, which represented a 104% growth since the beginning of fiscal year 2021 — only six months prior" and just weeks before the IPO.  CAC ¶ 118-19 ("Active subscribers also grew 14% from the end of our second fiscal quarter on July 31, 2021 to September 30, 2021"); s*ee also* Defs' Memo at 7 (citing to Defs' Motion, Ex. 18).



Ex. 18 to Defs' Memo, October 2021 RTR Roadshow Presentation, ECF 71-18.

On these facts, there can be no actionable material misstatement as to "increased demand" in the Offering Documents. *In re Nokia Oyj (Nokia Corp.) Sec. Litig.*, 423 F. Supp. 2d 364, 395 (S.D.N.Y. 2006) ("Defendants may not be held liable under the securities laws for accurate reports of past successes, even if present circumstances are less rosy." (internal quotation marks omitted)); *In re Bayer AG Sec. Litig.*, 03-cv-1546 (WHP), 2004 WL 2190357, at *11 (S.D.N.Y. Sept. 30, 2004) (finding that accurate statements of "strong sales" records are not actionable "since they are merely recitations of historical fact and are not alleged to be inaccurate"). This finding also disposes of Plaintiffs' allegation that RTR's statement in the Offering Documents that the Delta variant of COVID-19 had "minimal impact" on demand was materially misleading. As pointed out by Defendants, the Delta variant surged in June 2021, yet both revenue and subscribers continued to increase during this period. CDC, "CDC Museum COVID-19 Timeline," https://perma.cc/3F8W-TFSV.[17]

---

[17] The CDC is the nation's healthcare protection agency, and the court takes judicial notice of CDC's various COVID-19-related postings and guidance. *See Murphy v. Lamont*, No. 3:20-cv-0694 (JCH), 2020 WL 4435167, at *10 (D. Conn. Aug. 3, 2020) (subsequent history omitted); *Daum v. Eckert*, No. 17-cv-239 (RPK) (LB), 2020 WL 5040596, at *3 (E.D.N.Y. Aug. 26, 2020) (taking judicial notice of information concerning COVID-19 risk factors that has been published on the CDC's website under Federal Rule of Evidence 201) (subsequent history omitted).

### 3.   Failure to Meet Internal Projections

Plaintiffs also allege that the "failure of the Offering Documents to disclose the omitted material facts . . . [such as the fact that] the Company was not meeting projected subscriber enrollments  . . . violated Item 303, because these undisclosed facts were known and would (and did) have an unfavorable impact" on RTR's sales, revenues, and income from continuing operations.  CAC ¶ 127.  As support for this claim, Plaintiffs advance FE statements that relay RTR management's concerns as to the fact that RTR was not meeting "its internal subscriber enrollment projections," CAC ¶ 121; *see also* CAC ¶¶ 82-85.  However, the relevant statements disclosed to the FEs from RTR management only describe that subscriptions were "down every day," CAC ¶ 78, or "consistently down and not meeting projections," *id.* ¶ 79.  While lamentable for RTR, lower subscription numbers do not prove that *no* subscribers were being added, just simply that RTR was not meeting its internal, commercial aspirations of "getting as many subscribers as [it] wante[d]."  CAC ¶¶ 82-83.

While such information—a soon-to-be public company's failure to meet internal performance metric targets—would be of interest to a reasonable investor, "[d]isclosure of an item of information is not required ... simply because it may be relevant or of interest to a reasonable investor."  *Maso Cap. Invs. Ltd. v. E-House (China) Holdings Ltd.*, No. 22-355, 2024 WL 2890968, at *3 (2d Cir. June 10, 2024) (summary order) (quoting *Resnik v. Swartz*, 303 F.3d 147, 154 (2d Cir. 2002)) (quotation marks omitted) (discussing disclosure of internal projections). Moreover, the Second Circuit has held that such statements are inactionable under the Securities Act "where, as here, the statements are explicitly aspirational, with qualifiers such as 'aims to,' 'wants to,' and 'should.'"  *See City of Pontiac Policemen's & Firemen's Ret. Sys. v. UBS AG*, 752 F.3d 173, 183 (2d Cir. 2014).  Accordingly, the Court concludes that Defendants were "under no

obligation to disclose" their internal projections or forecasts, even if RTR was not hitting the subscriber numbers it was looking to achieve. *See In re New York Cmty. Bancorp, Inc., Sec. Litig.*, 448 F. Supp. 2d 466, 480 (E.D.N.Y. 2006) (collecting cases); *In re Facebook, Inc. IPO Sec. & Derivative Litig.*, 986 F. Supp. 2d 487, 507 (S.D.N.Y. 2013) ("Item 303 similarly does not obligate companies to disclose their internal forecasts") (collecting further cases).

### 4. RTR's "Growth Rate"

Plaintiffs also allege that the "failure of the Offering Documents to disclose the omitted material facts . . . [that RTR's] growth rate was slowing and declining, . . . violated Item 303, because these undisclosed facts were known and would (and did) have an unfavorable impact" on RTR's sales, revenues, and income from continuing operations. CAC ¶ 127. Any Section 11 claim predicated on this argument fails as well for the same reasons already explained above.

The Prospectus clearly warned prospective investors that "quarterly revenue fluctuated in the remaining periods presented primarily due to the impacts of the COVID-19 pandemic" and that "that the number of active subscribers was closely tied to COVID-19 positivity rates and social distancing/shelter-at-home restrictions, resulting in an overall reduction in revenue and revenue growth rates compared to pre-COVID-19 levels during this period." Prospectus at 107. Thus, when COVID-19 restrictions were "relaxed and virus positivity rates declined in fiscal year 2021, [RTR] have seen increased demand for [its] offerings." *Id.* These statements are also directly borne out by the quarterly data that shows revenue generated by subscriptions fluctuating from January 2020 to July 2021.

| | Three Months Ended | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| Consolidated Statement of Operations Data: | April 30, 2019 | July 31, 2019 | October 31, 2019 | January 31, 2020 | April 30, 2020 | July 31, 2020 | October 31, 2020 | January 31, 2021 | April 30, 2021 | July 31, 2021 |
| | (in millions, except share and per share amounts) | | | | | | | | | |
| Revenue: | | | | | | | | | | |
| Subscription and Reserve rental revenue | $ 50.6 | $ 58.6 | $ 59.2 | $ 67.0 | $ 52.3 | $ 24.0 | $ 30.5 | $ 29.1 | $ 29.8 | $ 42.9 |
| Other revenue | 4.8 | 4.8 | 5.1 | 6.8 | 7.3 | 4.9 | 5.0 | 4.4 | 3.7 | 3.8 |
| Total revenue, net | 55.4 | 63.4 | 64.3 | 73.8 | 59.6 | 28.9 | 35.5 | 33.5 | 33.5 | 46.7 |

*See* Prospectus at 105-06.

Moreover, the Offering Documents list 11 other factors potentially affecting "revenue growth rate." *See id.* at 39. On these facts, the Court concludes that the Offering Documents disclosed sufficient information about the source of RTR's growth, and the risks associated with its business model, to avoid incurring any duty to disclose the specific items Plaintiffs claim they concealed. Thus, Plaintiffs' omissions claim fails for failure to establish a duty to disclose. *See Musab Abuhamdan v. Blyth, Inc.*, 9 F. Supp. 3d 175, 195 (D. Conn. 2014); *Villare v. Abiomed, Inc.*, No. 19 CIV. 7319 (ER), 2021 WL 4311749, at *12 (S.D.N.Y. Sept. 21, 2021) (finding no actionable omission where "Defendants offered robust and specific disclosures that included detailed figures regarding market penetration and reorder rates, and informed investors in advance of risks and of a potential decline in growth rate.")

Accordingly, the Court dismisses Plaintiffs' Section 11 and Item 303 claims on these grounds.

### 5. Strong Momentum

Lastly, the Court finds that the Offering Documents' representations that RTR "continue[d] to experience strong momentum in the third quarter of fiscal year 2021" is inactionable puffery. CAC ¶¶ 75, 119, 121; See also CAC ¶¶ 6, 69 ("entered 2020 with momentum behind [it], poised for continued growth."). "Statements that 'are too general to cause a reasonable investor to rely upon them' constitute 'puffery,' which do not give rise to securities violations." *In re Dentsply Sirona, Inc. Sec. Litig.*, 665 F. Supp. 3d 255, 284 (E.D.N.Y. 2023) (quoting *ECA*, 553 F.3d at 206). "While certain statements, viewed in isolation, may be mere puffery, when the statements are made repeatedly in an effort to reassure the investing public about matters particularly important to the company and investors, those statements may become material to investors." *Id.* (citation and

quotation marks omitted).  "This is especially so where the statements are made in response to direct questions on the subject."  *Id.*  However, "[s]tatements containing simple economic projections, expressions of optimism, and other puffery are insufficient."  *Novak v. Kasaks*, 216 F.3d 300, 315 (2d Cir. 2000).  *In re Turquoise Hill Res. Ltd. Sec. Litig.*, 625 F. Supp. 3d 164, 223 (S.D.N.Y. 2022) (finding statement not puffery when "[t]aken in the context in which they were offered, was *addressed to the particular concern of investors* about the announced delay") (cited in Opp. at 23).  RTR's statements that it was "experiencing strong momentum" and was "poised for continued growth" in the Offering Documents is at best viewed as corporate optimism given what happened in the preceding fiscal quarter, supported by actual numbers indicating upward growth and not a "guarantee" or "concrete assurance" that such growth would necessarily continue.  *In re Turquoise Hill*, 625 F. Supp. 3d at 228.  Indeed, as just discussed, *supra*, the Offering Documents are littered with cautionary language about RTR's prior downswings due to COVID-19 and potential adverse uncertainty about COVID-19 and future strains' potential effect on its business.  *See generally* Annex B to MtD, Select Notes of Caution in the Prospectus.[18]  And it is not alleged that the investing public believed that RTR was in poor shape at the time and that

---

[18] For example, the Offering Documents cautioned that:
- "We have a history of losses, and we may be unable to achieve or sustain profitability . . ."
- "Liquidity and Impact of COVID-19 Pandemic. The Company has incurred a net loss from operations since inception and has historically relied upon debt and equity financing to fund its operations. In addition, the COVID-19 pandemic has had a significant adverse impact on the Company's business. As a result, the Company experienced a significant decline in active subscribers, subscription revenue and a-la-carte rental revenue and a significant increase in net loss in fiscal year 2020."
- "[D]ue to the COVID-19 pandemic and related responses [we] have seen negative impacts on customer demand at varying levels as a result. . . ."
- "We expect the effects of the COVID-19 pandemic, including the spread of any new strains, such as the Delta variant, to have a continued impact on our business, results of operations, and financial condition through at least the end of fiscal year 2021, and we continue to take actions to adjust to the changing COVID-19 business environment.";
- "[P]ossible resurgences of the COVID-19 pandemic, including as a result of new variants of the virus, such as the Delta variant, or otherwise, that lead to new or additional shelter-in-place orders and/or travel advisories, which may dampen future demand for our products and offering."

RTR sought to reassure investors otherwise or were being challenged on subscribership on an earnings call. *See In re Dentsply Sirona*, 665 F. Supp. 3d at 284; *See also In re Turquoise Hill,* 625 F. Supp. 3d 164. Ultimately, the Court concludes that these statements, taken in context of the Offering Documents as a whole, would not have misled any reasonable investor. That is, no reasonable investor would have thought such aspirational statement were more than corporate puffery, or "a determinate, verifiable statement about [their] company." *Omnicare*, 575 U.S. 184.

### C.  Statements Regarding RTR's Shipping Costs

The thrust of Plaintiffs' argument as to shipping costs is that RTR "merely warned of the risk of potential transportation issues," Opp. at 3, when RTR in fact knew of "significant, then-existing material events and adverse trends or uncertainties that Rent the Runway had already been facing at the time of the IPO." CAC ¶ 131 (emphases omitted).

Specifically, Plaintiffs allege that the statements above were "false and misleading statements of material fact when made because they failed to disclose material adverse facts, material adverse trends, material uncertainties, or significant risks that existed at the time of the IPO [because,] [i]n particular, the Offering Documents failed to disclose that prior to the IPO, Rent the Runway had switched from UPS to FedEx as its primary shipping vendor because UPS was too expensive to be sustainable, however, just before the IPO, FedEx doubled its shipping rates for the Company and the Company was forced to switch back to the already prohibitively expensive UPS." *Id.* ¶ 129; *see also id.* ¶ 131 (same allegation).

Again, Plaintiffs primarily rely on FEs to argue that the Offering Documents were materially false and/or misleading given what was known internally at RTR in the time leading up to the IPO. *See* Opp. at 6, 26. In relevant part, FE-1, a Manager in the Customer Experience department, stated that RTR "switched carriers from UPS to FedEx to save money and utilized a

local carrier in New York, New York referred to as last mile couriers, which was cheaper than FedEx but 'less reliable.'" CAC ¶ 91. "Due to significant cost increases after the first year of contracting with FedEx, as well as reliability issues, Rent the Runway was forced to switch back to using the prohibitively expensive UPS for shipping." CAC ¶ 92. However, the CAC does not contain further factual allegations that "support the probability that a person in the position occupied by the [FE-1] would possess the information" about comparative shipping costs between two vendors such that a reasonable investor could credit the opinion that FedEx's cost increases or alleged lack of reliability were material or that RTR's contractual rates UPS after the switch were materially "prohibitive." *See In re Bear Stearns*, 851 F. Supp. 2d 746, 767 n.23. The Court finds that FE-1 opinions in this regard are only "vague assertions" that do not make the Offering Documents false or misleading for lack of any additional disclosure. *In re Coty Inc.*, 2016 WL 1271065, at *6 (rejecting confidential informant information based in opinion where the informant's allegations did "not contain information of reasonable specificity or impart a definite indicia" to the relevant statement).

The story is different, however, when considering statements made by FE-4. FE-4 was employed at RTR as a Senior Operations Manager, in Outbound and Inventory Control and Quality Assurance in the time leading up to the IPO. CAC ¶ 84. FE-4 states FedEx had "doubled [] RTR's shipping rates because it was not shipping enough, which caused 'panic' for 30 days until the Company switched to UPS." *Id.* ¶ 93. This "change back to UPS occurred in August 2021." *Id.* ¶ 94. Ultimately, "[f]ulfillment expenses, which include shipping costs, increased to $19.2 million for the third quarter 2021," the quarter after the IPO. CAC ¶ 140. On an earnings call on December 8, 2021, Defendant O'Sullivan spoke about the impact of the rising transportation costs on the Company's profitability, explaining that it was something that the Company had "anticipated"

during the IPO: "As we had anticipated, like many companies, we started to see transportation headwinds during Q3 with price increases from national carriers, and we expect to see the full impact of these headwinds in Q4 and fiscal '22." *Id.* ¶ 142.

The Court finds that, as alleged, the failure to disclose the doubling in FedEx's shipping prices, which then precipitated a switch back to UPS, is plausibly material to any potential investor such that it was required to be disclosed.  Plaintiffs allege that RTR was using FedEx as its vendor for a "substantial majority" of its inbound shipping at the time prior to the IPO but that FedEx unilaterally imposed on RTR a two-fold rate hike on its shipping services sometime between approximately early July 2021 and the beginning of August 2021 due to an alleged lack of throughput of packages.  CAC ¶¶ 92-94; Prospectus at 38.  A 100 percent increase of a key cost driver for RTR would be plausibly material to a reasonable investor given the statements in the Offering Documents.  Specifically, RTR already warned investors in the Offering Documents that shipping costs were one of the "primary costs" associated with "fulfillment expenses" that would impact RTR's bottom line in terms of net profit.  *See* Prospectus at 98 (PDF pg. 61) ("Fulfillment expenses consist of all variable costs to receive, process and fulfill customer orders.  This *primarily includes shipping costs* to/from customers . . . the extent we are successful in becoming more efficient in fulfilling orders, and at a magnitude that is able to offset increasing shipping costs, wage rates and cleaning/packing supply price increases, we would expect these expenses to decrease as a percentage of total revenue over the longer term" (emphasis added)).  Indeed, the Prospectus explicitly states that, among other things "shipping costs" "could have a material adverse effect on our business, financial condition, and results of operations."  Prospectus at 33; *id.* at 38 ("Increases in shipping costs or other significant shipping difficulties or disruptions or any failure by our brand partners or third-party carriers to deliver high-quality products to us or to

our customers, as applicable, in a timely manner or to otherwise adequately serve our customers could damage our reputation and brand and may substantially harm our business.").  That this doubling of shipping rates occurred prior to the IPO Roadshow and the issuance of the Offering Documents, but was not disclosed, is the nail in the coffin.

Defendants attempt to avoid liability by contending that RTR had gotten ahead of any impending downside to increased shipping costs by repeatedly disclosing "advanced warnings" to investors that RTR "anticipate[d] shipping cost headwinds due to macro global transportation network inefficiencies over the next several quarters."  Defs' Memo at 22 (citing various SEC Form S-1s).  However, as alleged, the shipping increase that materialized was not based on "macro global network inefficiencies" but rather on RTR's own *known* reduction in shipping items with FedEx, which led FedEx to double its rates.

Defendants' other arguments do not squarely address the gravamen of the alleged omission that made the Offering Documents materially misleading.  Contrary to Defendants' arguments, the gist of Plaintiffs' claim is not that RTR is liable for a securities violation for failing to disclose the names of its shipping vendors, the fact that its shipping vendors changed, or the terms of its contract with UPS (which are not alleged).  *See* Pl's Memo at 23-24.  Indeed, Plaintiffs allege, and the Offering Documents explicitly disclosed, that RTR was "transitioning [] inbound shipments from" one vendor to another.  CAC ¶ 128.  Specifically, Plaintiffs allege that "[a] substantial majority of [RTR's] inbound shipments from customers are currently returned through a single vendor" and that shipping costs could "negatively affect [RTR's] brand, financial condition and results of operations," the fact that shipping costs by that single vendor (presumed to be FedEx) had doubled for at least 30 days should have been disclosed to make the statement not materially misleading under Section 11.  Prospectus at 38; CAC ¶ 128, 131.  Lastly, Defendants argue that

switching back from UPS could not have been "the more expensive of the two carriers at the time

of the IPO" because "the only logical inference flowing from that allegation [that RTR switched

from FedEx back to UPS] is that UPS was more cost-effective than FedEx at the pertinent time,

not less so." Pl's Memo at 24. But that is not the only logical inference that may be made by a

reasonable investor. Furthermore, at this stage, all Plaintiffs must do is plead a *plausible* material

omission, not refute Defendants' proffered argument. Drawing all reasonable inferences in favor

of the Plaintiffs, given that RTR had cycled sequentially from two primary vendors back to back

and needed UPS to perform vital and expensive RTR fulfillment functions, it would be a logical

and equally plausible inference that UPS would use the opportunity to renegotiate higher shipping

costs upon RTR's return than the terms it originally offered. *Cf. In re Tempur Sealy Int'l, Inc. Sec.

Litig.*, No. 17-cv-2169 (LAK), 2019 WL 1368787, at *7 (S.D.N.Y. Mar. 26, 2019) ("Sealy sought

to capitalize on Mattress Firm's efforts to grow as a company and threatened to cancel its contracts

with Mattress Firm if it did not agree to terms that were increasingly favorable to Tempur Sealy."

(internal quotation marks omitted)); *see also In re LATAM Airlines Grp. S.A.*, No. 20-11254 (JLG),

2022 WL 2657345, at *8 (Bankr. S.D.N.Y. July 8, 2022) ("Moreover, the Debtors have shown

that even if the Backstop Parties were willing to renegotiate the agreements, market conditions

have deteriorated significantly since the Backstop Agreements were executed in January, meaning

that the Debtors would be highly unlikely to obtain backstop commitments on equally favorable

term"). This, too, would be material to a reasonable investor for the same reasons just explained.

Accordingly, the Court denies Defendants' motion to dismiss Section 11 claims predicated

on RTR's increased shipping costs.

**D.  Statement Regarding Theft/Fraud Prevention and Insurance Coverage**

Plaintiffs' allegation relies on the theory that these statements were materially false or misleading because the "Offering Documents inaccurately described as *potential*, certain future risks . . .  operations, rather than disclosing the actual events and trends or uncertainties that had already manifested."  CAC ¶¶ 133-35 (emphasis in original), 137.  Specifically, the CAC alleges that the "then-existing material events and adverse trends or uncertainties that Rent the Runway had already been facing at the time of the IPO" included the following: (1) thefts were materially increasing and leading to a loss of at least $6 million in revenue annually; (2) in an attempt to lower the RTR's shipping expenses, RTR expanded the use of return drop boxes throughout the country, however, the drop boxes facilitated the theft of rented merchandise; (3) RTR's fraud processing program was insufficient as RTR did not have policies or procedures in place to prevent fraud and no actions were taken against customers who stole rented merchandize aside from preventing those customers from placing new orders; and (4) RTR was only able to obtain successful insurance claims on approximately 35 percent of "lost" packages and insurance claims were capped at $100 plus shipping costs.  CAC ¶ 137.  Plaintiffs also assert that these facts are also the bases of an additional Item 303 claim as well as a violation of Item 105.  CAC ¶ 138.

### 1.  Impact of Thefts of RTR's Clothing Assets

Plaintiffs allege that "customer thefts were materially increasing at the time of the IPO, leading to at least a loss of $6 million in revenue annually."  CAC ¶¶ 133, 137(a), 138.  As detailed in the CAC, many FEs understood theft of clothing to be a prevalent issue for RTR.  In FE-2's "estimat[ion]," RTR "lost at least $500,000 every two months in revenue directly from thefts" by both employees and customers.  CAC ¶ 98.  FE-2 "detailed that some customers scanned their items to return at drop boxes located throughout the country but kept the items instead of returning

them." *Id.*  FE-2 "recalled that one customer stole between $20,000 and $40,000 worth of merchandise from Rent the Runway." *Id.*  Similarly, FE-1 asserts that "during her tenure at Rent the Runway … a 'notorious' customer stole $100,000 worth of merchandise."  CAC ¶ 97.

FE-5, who "was employed with Rent the Runway from March 2019 to July 2021 as a senior employee in Asset Protection," stated that revenue loss from stolen items during her tenure was "quite substantial."  CAC ¶¶ 99-100.  FE-5 laid out in detail the several ways clothing was stolen. *See id.*  FE-5 further "noted that lost revenue from thefts 'never got better' during her tenure." CAC ¶ 102.  FE-6, a Manager of Transportation Execution, "noted that customers during her tenure were 'robbing us blind' and explained that when some customers went to return items worth $6,000 and more at drop boxes at *Nordstrom* and *West Elm*, they scanned their items for return but kept the items and subsequently sold them on *Poshmark* and other platforms."  CAC ¶¶ 103-04.  FE-6 noted that most customer thefts occurred at drop boxes at *WeWork* locations.  *Id.*

As a preliminary matter, Defendants argue that the CAC "fails to explain how FE-2 … would have had access to granular revenue information, given his role as a customer service Training Specialist."  Defs' Memo at 26 (citing *See Woolgar v. Kingstone Companies, Inc.*, 477 F. Supp. 3d 193, 219 (S.D.N.Y. 2020)).  This misapprehends the relevant factual allegation, which the Court takes to be true on a motion to dismiss, that the aggregate thefts amounted to a loss of "$6 million in revenue annually."  CAC ¶¶ 133, 137(a), 138.  The factual existence of thefts is well corroborated by other FEs in the CAC.  This includes FEs who were in positions to know about loss through unreturned merchandise, such FE-5, who was a "senior employee" directly stationed in RTR's Asset Protection department, as well as FE-6, who dealt with shipping and carrier claims and therefore was in the plausible position to know of lost packages.  Indeed, FE-6 specifically alleged customers defrauded RTR by "scann[ing] their items for return but kept the items and

subsequently sold them on *Poshmark* and other platforms."   CAC ¶¶ 99-104.   Moreover, it is alleged that RTR's own employees and contractors were stealing clothes from its fulfillment centers.  *See* CAC ¶ 100.  As all the FEs were former RTR employees, including FE-3, who worked directly "preparing one of Rent the Runway's fulfillment center's workload" prior to the IPO, it is plausible that FE-3 would have known about thefts from fulfillment centers.  CAC ¶ 82.

Turning to the merits of claim, Defendants argue that the Offering Documents warned investors that RTR experienced theft, CAC ¶ 134, and, in any event, that the failure to disclose that RTR suffered a $6 million loss in annual revenue is not actionable because such a loss would not be material as a matter of law as it comprised "less than 3% of [RTR's] 2021 annual revenue $203.3 million."  *See* Def's Memo at 25 (citing *see, e.g.*, *ECA*, 553 F.3d at 204); Reply at 12.

The Second Circuit has "consistently rejected a formulaic approach to assessing the materiality of an alleged misrepresentation," *Ganino v. Citizens Utils. Co.*, 228 F.3d 154, 162 (2d Cir. 2000), and has held that "bright-line numerical tests for materiality are inappropriate.  *ECA*, 553 F.3d at 205.  Rather, while a court may utilize numerical thresholds as a "basis for a preliminary assumption" about materiality, materiality is a fact intensive inquiry which involves proving other quantitative and qualitative factors.  *ECA*, 553 F.3d at 204 (internal citation and quotation omitted).  Such qualitative factors may include "whether the misstatement concealed an unlawful transaction[,]" "the misstatements' relation to a significant aspect of [the company's] operations," and "the market reaction to the public disclosures."  *Id.* at 204-05.  "These qualitative factors are intended to allow for a finding of materiality if the quantitative size of the misstatement is small, but the effect of the misstatement is large."  *Id.* at 205.  For example, in *Ganino*, "an alleged misrepresentation relating to less than two percent of defendant's assets, *when taken in context*, could be immaterial as a matter of law."  *Id.* (emphasis added).

Plaintiffs allege RTR's entire business model was predicated on renting clothing, often designer clothing, to customers for a subscription fee and that this clothing was supposed to be returned to RTR to then re-rent again to other subscribers.  CAC ¶¶ 3-4, 62, 71.  Moreover, the main "value proposition" for subscribers, if they joined RTR, was that they could rent and wear clothing "they may not otherwise be able to afford."  CAC ¶ 67.  "According to the Offering Documents, the average subscriber gets to wear clothes worth more than twenty times what she pays for a monthly subscription on an annualized basis[.]"  *Id.*  As is plain, aside from its proprietary online portal, the clothing sourced and possessed by RTR is its most valuable physical asset; so much so that it was also used as collateral to secure loans.  CAC ¶ 5.

Thus, loss of clothing through employee and customer theft or fraud is certainly a "significant aspect" of RTR's operations which may be material to a reasonable investor.  *ECA*, 553 F.3d at 204-05.  As is plead here, thefts of RTR's primary physical assets are alleged to have caused $6 million dollars' worth of annual loss.  While the Offering Documents disclosed to prospective investors in a cursory manner that RTR had "in the past incurred and may in the future incur losses from various types of fraud" including "customers who have failed to return rentals" —which is business-speak for theft—RTR's failure to disclose such facts about the level of theft it had experienced could plausibly "in the view of a reasonable investor, have 'significantly altered the total mix of information made available.'" *Singh*, 918 F.3d at 63; *see* Prospectus at 62. Consequently, Plaintiffs adequately alleged Section 12 claims on these grounds.  *See also Rombach*, 355 F.3d at 173 ("Cautionary words about future risk cannot insulate from liability the failure to disclose that the risk has transpired.")

Plaintiffs have also adequately plead an Item 303 violation.  That is, Plaintiffs sufficiently allege that RTR failed to disclose a trend that "is both [1] presently known to management and [2]

reasonably likely to have material effects on the registrant's financial condition or results of operations." *In re Coty*, 2016 WL 1271065, at *5 (S.D.N.Y. Mar. 29, 2016) (citation omitted). As just discussed, the alleged pervasiveness of the theft was certainly material and was plausibly already affecting RTR's revenue and operations. It is also plausibly alleged as a trend that was known to management. The Prospectus touts in a section entitled "Agility and Resilience During COVID-19" that it "[l]aunched new features such as cross-ship and *expanded our drop-off box network* … to increase retention of subscribers." Prospectus at 95 (emphasis added). Similarly, the Prospectus informed potential investors that RTR had "invested" in as well as "designed and managed return methods including physical drop-off points, mobile trucks and RTR drop-off boxes strategically positioned in retail stores or corporate offices." Prospectus at 141. Plaintiffs allege that this "expanded use of drop boxes throughout the country, however, . . . facilitated the theft of rented merchandise" and that the risks of using drop boxes had already materialized by the time of the IPO. CAC ¶ 133, 136, 137. This plausibly alleges an upward trend of thefts due to RTR's choice to expand clothing returns by adding more drop boxes. Lastly, FE-5, the senior Asset Protection employee, states that "in 2019 she approached former Rent the Runway Director of Operations Chris Brougham about creating policies and procedures to prevent these thefts from occurring, but that Rent the Runway never addressed this issue during FE-5's tenure." CAC ¶ 101. Similarly, FE-1, stated that "Defendant Hyman and Becky Hyman Leader were aware of the theft issue but did not take any actions to stop them and ignored recommendations from employees, including former Rent the Runway Customer Experience Fraud Analyst Lindsay Gulla, to help prevent thefts." CAC ¶ 97. Notably, FE-1's statement is plausible as she was a manager who is alleged to have "reported to Becky Hyman Leader, RTR's vice president of Customer Experience." CAC ¶ 77. The Court finds this sufficient at this stage to plausibly plead actual knowledge of this

trend by RTR management. *Ind. Pub. Ret. Sys.*, 818 F.3d at 95. Thus, Plaintiffs have adequately alleged an Item 303 violation as it pertains to material thefts of RTR's physical assets.

To be clear, however, the Court does not rule here that any Section 12 or Item 303 claim lies for any failure to disclose that any material thefts were due primarily to RTR's use of drop boxes themselves or the alleged failure to prosecute individual bad apple customers. The law does not make disclosure of the *source* of such thefts and frauds material to the reasonable investor here; rather, it is the partial disclosure of thefts and fraud without supplying the additional facts as to the extent of harm these frauds and thefts were having on the company's finances that makes the allegations plausibly material to the reasonable investor. C*f. In re AppHarvest Sec. Litig.*, 684 F. Supp. 3d 201, 270 (S.D.N.Y. 2023) ("Revealing one fact about a subject does not trigger a duty to reveal all facts on the subject, so long as what was revealed would not be so incomplete as to mislead." (cleaned up)).

### 2. Insurance Coverage for RTR's Clothes Inventory

Plaintiffs also argue that the Offering Documents "misrepresented the availability of insurance coverage." Opp. at 2; *See* CAC ¶ 136. Specifically, Plaintiffs allege that the representations in the Offering Documents were materially misleading and violated Item 103 because RTR "was [1] only able to obtain successful insurance claims on approximately 35% of 'lost' packages and [2] insurance claims were capped at $100 plus shipping costs." CAC ¶ 137(d). This latter allegation is corroborated by FE-6, the Asset Protection employee, who stated "insurance claims were capped at $100 per shipment plus shipping costs because RTR did not pay for insurance when it shipped items to customers. FE-6 explained that since most shipments contained items worth more than $100, the revenue loss from these lost packages was 'pretty significant.'" CAC ¶ 105.

The Court finds that Plaintiffs plausibly allege a Section 11 claim. The Offering Documents do disclose that RTR does "procure third-party insurance policies to cover various operations-related risks including . . . property," *i.e.*, clothing inventory. Prospectus at 63. The Prospectus continues that RTR's "business, financial condition, and results of operations could be adversely affected if the cost per claim, premiums, the severity of claims, or the number of claims significantly exceeds our historical experience and coverage limits" or RTR "experience a claim *in excess of our coverage limits . . .* " Prospectus at 63; *see also id.* ("Further, if the insurance coverage we maintain is not adequate to cover losses that occur . . . we could be liable for significant additional costs."). While the Prospectus details a variety of potential risks that RTR might incur due to action on part of their insurers and generally discloses that RTR did have insurance coverage for, among many things, "property," it entirely fails to disclose the additional critical fact that RTR's chosen insurers "capped" claims on property "at $100 per shipment" and that when RTR did file claims for lost items it was only successful 35 percent of the time. CAC ¶ 137(b). It is plausible that this failure to additionally disclose these facts would be material to a reasonable investor at an IPO for the same reasons just explained when discussing theft of clothes. RTR's designer clothing inventory was its physical lifeblood. As lauded in the Prospectus, most of the clothes rented to subscribers were not basic garments but "authentic designer items" that "would typically retail for above $350, making Rent the Runway comparable to or cheaper than many mass-market and fast fashion players while offering access to authentic designer items." Prospectus at 140. Given these facts, Plaintiffs have plausibly alleged that the Prospectus contained omissions of material facts when it disclosed that generally RTR had insurance for its "property," but that when its "property" – expensive designer clothing – was lost or stolen, RTR's chosen insurance policies on the clothes and on shipping would likely make such losses a

subsequent net loss for RTR's bottom line given RTR's low success rate on recoupment and insurance cap.  Thus, Plaintiffs have adequately alleged a Section 11 claim on these facts as well.

However, Plaintiffs have failed to allege an Item 303 violation because, though this omission may have been material, it is not alleged as a trend.  There is no indication that this was anything but par for the course for RTR; there is no allegation that RTR's success rate in obtaining a pay out on insurance claims was previously higher and trended downward (or vice versa).  So too for RTR's insurance caps.  Without allegations that the *status quo* changed over a period of time there can be no trend.  *See In re Francesca's Holdings Corp. Sec. Litig.*, 13-cv-6882 RJS, 2015 WL 1600464, at *18 (S.D.N.Y. Mar. 31, 2015) ("Here, the CAC fails to plead in a non-conclusory manner that the prices or terms it received from KJK or Stony *even changed* during the Class Period.  Lacking any facts as to *how* the relationships were getting worse . . . the CAC therefore fails to plausibly allege a change of circumstance that the Company should have reasonably expected would have a material impact on its financials." (emphasis in original)).

### E.  Item 105 Claims[19]

While Item 303 focuses on trends, Item 105 addresses risk factors, directing, in relevant part:

(a) Where appropriate, provide under the caption "Risk Factors" a discussion of the material factors that make an investment in the registrant or offering speculative or risky. The discussion must be organized logically with relevant headings and each risk factor should be set forth under a subcaption that adequately describes the risk. The presentation of risks that could apply generally to any registrant or any offering is discouraged, but to the extent generic risk factors are presented, disclose them at the end of the risk factor section under the caption "General Risk Factors."

(b) Concisely explain how each risk affects the registrant or the securities being offered . . .

---

[19] On May 2, 2019, the SEC relocated the former Item 503(c), then-codified at 17 C.F.R. § 229.503(c), to Item 105, now codified at 17 C.F.R. § 229.105.  *See also Gordon v. Tencent Music Ent. Grp.*, No. 19-CV-5465LDHPK, 2021 WL 9183821, at *7 n.8 (E.D.N.Y. Mar. 31, 2021).

17 C.F.R. § 229.105.

"Thus, Item 105 requires, '[w]here appropriate,' an issuer to discuss 'the material factors that make an investment in the registrant or offering speculative or risky,' setting forth each risk factor 'under a subcaption' and '[c]oncisely explain[ing] how each risk affects the registrant or the securities being offered.'" *Lian v. Tuya Inc.*, 22 Civ. 6792 (JPC), 2024 WL 966263, at *8 (S.D.N.Y. Mar. 5, 2024) (quoting 17 C.F.R. § 229.105).  The "most significant factors" standard is a "considerably high" standard and goes beyond materiality.  *Gordon v. Tencent Music Entm't Grp.*, 19-cv-5465 (LDH) (PK), 2021 WL 9183821, *7 (E.D.N.Y. Mar. 31, 2021) (quotation marks omitted); *see In re BHP Billiton Ltd. Sec. Litig.*, 276 F. Supp. 3d 65, 89 (S.D.N.Y. 2017) (finding that while the alleged omissions at issue were material, they did not rise to the level of the considerably higher "most significant factors" standard of Item 503).  "'Although there is scant caselaw on Item 503,' the inquiry can be boiled down to 'whether the Offering Documents were accurate and sufficiently candid.'"  *Christine Asia Co. v. Alibaba Grp. Holding Ltd.*, 192 F. Supp. 3d 456, 477 (S.D.N.Y. 2016) (internal citation omitted), *vacated and remanded on other grounds sub nom,* 718 F. App'x 20 (2d Cir. 2017).

Additionally, "most courts that have confronted this question have concluded that Item 105 does impose a knowledge requirement and, thus, the regulation requires disclosure of only risks known to the issuer."  *Lian*, 2024 WL 966263, at *9 (collecting cases).

Plaintiffs allege that RTR violated Item 105 when it failed to disclose that (1) "the number of subscribers was trending down at the time of the IPO," CAC ¶ 127, and (2) that it has substantial loss in revenue attributable to theft created a significant uncertainty about the Company's revenue stream and thus its continued viability.  CAC ¶ 138; *see* Opp. at 29-32.

As to demand, the Court has already determined there was no material misstatement of fact and thus the Item 105 claim is not actionable on this ground.  *See Gordon*, 2021 WL 9183821, at *7 ("Given that Plaintiff has not sufficiently pleaded a material omission, she has not pleaded the Defendants failed to satisfy the higher standard of Item [105].").

As to the latter allegations, the Court also finds that Item 105 claims do not lie.  The Offering Documents do include a "Risk Factors" section, *see e.g.*, Prospectus 25-62, candidly and accurately stated the risk that it "may incur significant losses from fraud" and "in the past incurred" losses from failure to return rentals.  *See* Prospectus at 62.  Moreover, while the Court has found that Plaintiffs have alleged plausible materiality in failure to disclose revenue losses from fraud, it is not convinced that Plaintiff has alleged enough facts showing that RTR was required to disclose more.   As the Second Circuit has explained, "[d]isclosure is not a rite of confession," and companies do not have a duty "to disclose uncharged, unadjudicated wrongdoing."  *City of Pontiac Policemen's & Firemen's Ret. Sys. v. UBS AG*, 752 F.3d 173, 184 (2d Cir. 2014).   Therefore, Plaintiffs' Item 105 claims are dismissed in their entirety.

### F.  Section 12(a)(2) Claims

Plaintiffs allege "the Defendants named in this cause of action violated and/or controlled a person who violated Section 12(a)(2) of the Securities Act."  CAC ¶ 181.

Section 12(a)(2) of the Act, as amended, 15 U.S.C. § 77l ("Section 12"), accords relief to any person: (1) who was offered or purchased a security "by means of a prospectus or oral communication"; (2) from a statutory seller; (3) when the prospectus or oral communication "includes an untrue statement of a material fact or omits to state a material fact necessary in order to make the statements, in the light of the circumstances under which they were made, not misleading"; and (4) the plaintiff did not "know . . . of such untruth or omission" at the time of

sale (the "absence-of-knowledge element"). 15 U.S.C. § 77l(a)(2); *see Fed. Hous. Fin. Agency for Fed. Nat'l Mortg. Ass'n v. Nomura Holding Am., Inc.*, 873 F.3d 85, 98 (2d Cir. 2017); *In re Morgan Stanley Info. Fund Sec. Litig. (Morgan Stanley)*, 592 F.3d 347, 359 (2d Cir. 2010).

"Notably, whereas the reach of Section 11 is expressly limited to specific offering participants, the list of potential defendants in a section 12(a)(2) case is governed by a judicial interpretation of section 12 known as the 'statutory seller' requirement." *Garnett v. RLX Tech. Inc.*, 632 F. Supp. 3d 574, 595 (S.D.N.Y. 2022) (cleaned up) (quoting *In re Morgan Stanley*, 592 F.3d at 359)., a*ff'd sub nom. Tseng v. De Vries*, 22-2787-cv, 2023 WL 8073087 (2d Cir. Nov. 21, 2023).

"Claims under sections 11 and 12(a)(2) are ... Securities Act siblings with roughly parallel elements[.]" *In re Morgan Stanley Info. Fund Sec. Litig.*, 592 F.3d 347, 359 (2d Cir. 2010).  Thus, satisfying one of the bases for liability in a Section 11 claim will also allow for liability for Section 12(a)(2) so long as it is based on a prospectus and the statutory seller requirement is satisfied.  *Id.* Here, the Court has already found that Plaintiffs have adequately plead primary violations of Section 11 as to the shipping cost claim and the theft and insurance claim.  Thus, Plaintiffs may succeed on Section 12(a)(2) claims if they can establish the additional element that Defendants were statutory sellers.

### 1.  Statutory Sellers

 "An individual is a 'statutory seller'—and therefore a potential section 12(a)(2) defendant— if he: (1) 'passed title, or other interest in the security, to the buyer for value,' or (2) 'successfully solicit[ed] the purchase [of a security], motivated at least in part by a desire to serve his own financial interests or those of the securities['] owner.'" *In re Morgan Stanley Info. Fund Sec. Litig.*, 592 F.3d at 359*.* (quoting *Pinter v. Dahl*, 486 U.S. 622, 642, 647 (1988)) (alteration in original); *accord In re Weight Watchers Int'l Inc. Sec. Litig.*, 504 F. Supp. 3d 224, 245 (S.D.N.Y. 2020).

"The Second Circuit has yet to define the activities that constitute successful solicitation, but it has advised that an individual must have done more than engage in activities that were preliminary to the offering." *In re Weight Watchers Int'l Inc. Sec. Litig.*, 504 F. Supp. 3d at 259. Additionally, while the Second Circuit has yet to rule directly on the issue, courts in this Circuit overwhelmingly agree that "[a] pleading must allege that a defendant did more than merely sign a registration statement or prospectus to allege liability under Section 12(a)(2)." *Id.* at 245; s*ee also Citiline Holdings, Inc. v. iStar Fin. Inc.*, 701 F. Supp. 2d 506, 512 (S.D.N.Y. 2010) (noting that every Court of Appeals to consider the issue has concluded that "an individual's signing a registration statement does not itself suffice as solicitation under Section 12(a)(2)").

### 2. Individual Defendants

As to the Individual Defendants, the CAC alleges that "[e]ach of the Individual Defendants signed the Registration Statement" CAC ¶ 36, the "Individual Defendants each reviewed, edited, and approved the Offering Documents, participated in the IPO and solicited the purchase of Rent the Runway's Class A common stock in the IPO to serve their financial interest and those of Rent the Runway[,]" CAC ¶ 37, and "[t]he Individual Defendants each also reviewed, approved, and delivered to investors the IPO's roadshow presentation, talking points, and script." CAC ¶ 38.

These allegations are sufficient at this stage to plausibly allege Section 12(a)(2) solicitation liability for the Individual Defendants because the Individual Defendants' conduct involved more than just signing a registration statement—it also included affirmative conduct including the allegations that the Individual Defendant chose to participate in delivering IPO roadshow presentations. *Id.* In summary, these allegations suggest that the Individual Defendants did "more than engage in activities that were preliminary to the offering." *Garnett,* 632 F. Supp. 3d at 615. Thus, at the pleading stage, the Court cannot conclude that the Individual Defendants "are

incapable of being held liable under Section 12(a)(2) on the ground that they were not statutory sellers." *Id.*

Defendants argue that the CAC is not viable in establishing solicitation by the Individual Defendants because the "CAC relies on impermissible group pleading, alleging that the Individual Defendants *en masse* solicited purchases of Rent the Runway stock." Pl's Memo at 33.  But Defendants fail to proffer any authority that Plaintiffs are required to plead the involvement of each defendant with any more specificity beyond alleging they were involved.  In any event, the Court has already found that Rule 8's "lenient standard" for pleading applies.  *Wynder v. McMahon*, 360 F.3d 73, 80 (2d Cir. 2004).  Significantly, "the Second Circuit has also held that 'Rule 8 does not necessarily require ... that the complaint separate out claims against individual defendants.'" *Feldman v. Comp Trading, LLC*, 19-CV-4452 (RPK) (RLM), 2021 WL 930222, at *3 (E.D.N.Y. Mar. 11, 2021) (quoting *Wynder*, 360 F.3d at 80).  That is, "[n]othing in Rule 8 prohibits collectively referring to multiple defendants where the complaint alerts defendants that identical claims are asserted against each defendant." *Id.* (quotation marks omitted) (collecting cases).  "The question is ultimately whether the complaint gives each party notice of the substance of the claims against him." *Id.* (citations and quotation marks omitted).  That is plain here when the CAC identifies the Individual Defendants and the claims asserted against them and the reason why—they are alleged to have solicited shares of RTR leading up to the IPO in a desire to serve their own financial interests.

With the issue of group pleading resolved, the remainder of the elements for the Section 12 claim are easily sufficed.  Lead Plaintiffs purchased RTR Class A common stock "pursuant and traceable" to the IPO.  *See* CAC ¶¶ 20-21, 106.[20]

There is a plausible inference that each Individual Defendant was "motivated at least in part by a desire to serve his own financial interests or those of the securities['] owner.'"  *Garnett*, 632 F. Supp. 3d at 615 (alteration in original).  As alleged, "[i]n connection with the IPO, the Board adopted a non-employee director compensation program which gave each non-employee director[21] (each Individual Defendant except Defendants Hyman and O'Sullivan)" and annual cash retainer dependent on their position on the board.  *See* CAC ¶ 39.  Notably, "the non-employee directors were entitled to elect to receive restricted stock units (RSUs) in lieu of all or a portion of their annual cash retainers."  *Id.*  Similarly, in connection with the IPO, RTR granted Defendant Hyman and Defendant O'Sullivan each an "IPO RSU Award" equal to 67,842 RSUs on the date of the IPO.  CAC ¶ 42.  "RSUs are contractual promises to deliver Class A common stock in the future."  *Id.*  It is plausible at this juncture to infer that the Individual Defendants participated in the Roadshow and provided other input into scripts and other materials in the belief of increasing RTR's stock value, which they could elect to be paid in as part of their retainer agreements and could be more valuable than cash.

### 3.  Underwriter Defendants

As to the Underwriter Defendants, Plaintiffs allege that the "Underwriter Defendants' participation in and their solicitation of purchases of Rent the Runway's Class A common stock in

---

[20] While "[c]ourts within this [Circuit] have been appropriately wary of allegations that a plaintiff purchased a security 'pursuant or traceable to' an offering, as compared to simply 'pursuant to an offering,'" nowhere do Defendants challenge the sufficiency of this allegation.  *Garnett*, 632 F. Supp. 3d at 614 (quotation marks omitted).
[21] This would be defendants Tim Bixby, Jennifer Fleiss, Scott Friend, Melanie Harris, Beth Kaplan, Dan Nova, Gwyneth Paltrow, Carley Roney, Dan Rosensweig and Mike Roth.

the IPO was motivated by their financial interests."  CAC ¶ 55.  "Collectively, the Underwriter

Defendants received over $27 million in fees and commissions in connection with their sale of

Rent the Runway's Class A common stock in the IPO."  *Id.*

Further, Plaintiffs allege "[t]he Underwriter Defendants determined that in return for their

share of the IPO's proceeds, they were willing to merchandise Rent the Runway's Class A common

stock in the IPO."  CAC ¶ 56.  "The Underwriter Defendants arranged for a roadshow prior to the

IPO during which they and the Individual Defendants met with investors and presented highly

favorable information about the Company, its operations, and its financial prospects."  *Id.*

At the pleading stage this is enough to plausibly plead the Underwriter Defendant's liability

as statutory sellers.  *See Evoqua Water Techs. Corp.*, 450 F. Supp. 3d at 404 (finding a similar

allegation sufficient where "Underwriter Defendants participated in the promotion and sale of

Evoqua stock to investors.  The Underwriter Defendants also promoted their own financial

interests by doing so—they collected 'lucrative underwriting fees' for their roles in the IPO and

SPO. And the Underwriter Defendants drafted and disseminated the Offering Materials." (record

citations omitted)) (collecting cases).

### 4.  RTR

As to RTR's involvement as a statutory seller, Plaintiffs rely on SEC Rule 159A which

provides that "in a primary offering of securities," an issuer is a statutory seller for the purposes

of Section 12(a)(2) "regardless of the underwriting method used to sell the issuer's securities."

*Fed. Hous. Fin. Agency v. UBS Americas, Inc.*, 858 F. Supp. 2d 306, 333 (S.D.N.Y. 2012) (quoting

17 C.F.R. 230.159A)*, aff'd*, 712 F.3d 136 (2d Cir. 2013); *accord Citiline Holdings, Inc.*, 701

F.Supp.2d at 512.  Here, there is no doubt that RTR was an "issuer" of securities and thus a

statutory seller.  *See* Class A Common Stock, Prospectus ("This prospectus complies with the

requirements that apply to an issuer [of Class A Common Stock] that is an emerging growth company.").

### G.  Section 15 Claim

Plaintiffs claim that the Individual Defendants violated Section 15 of the Securities Act ("Section 15"), 15 U.S.C. § 77o, "which establishes so-called 'control person' liability under the Securities Act." *Altayyar*, 242 F. Supp. 3d at 185 (citation omitted).  "Claims under Section 15 hinge on the success of claims under Sections 11 and 12(b)(2), as Section 15 provides for liability of any person who, by or through stock ownership, agency, or otherwise, 'controls any person' found liable under Sections 11 or 12(a)(2)." *Garnett*, 632 F. Supp. 3d at 596 (quoting 15 U.S.C. § 77o).

"To make out a claim for control-person liability under section 15 of the Securities Act, plaintiffs must allege (a) a primary violation by a controlled person, and (b) control by the defendant of the primary violator." *In re Refco, Inc. Sec. Litig.*, 503 F. Supp. 2d 611, 637 (S.D.N.Y. 2007) (citation and quotation marks omitted).  As the Court has already determined, Plaintiffs have plausibly alleged claims under Section 11 and 12(a)(2) of the Securities act for material misstatements and omission in connection with RTR's shipping costs, theft, and insurance coverage.  This suffices the primary violation.

The Individual Defendants are liable under Section 15 because "the act of signing a registration statement, as the individual defendants in this case are alleged to have done, is a manifestation of the signer's responsibility for the information contained in the document and, therefore, sufficient to establish 'control person' status." *UBS Americas, Inc.*, 858 F. Supp. 2d at 333 (S.D.N.Y. 2012); *see* CAC ¶¶ 36, 168.  Further, the CAC alleges that "[t]he Individual Defendants each had a series of direct and/or indirect business and/or personal relationships with

other directors and/or officers and/or major stockholders of Rent the Runway," CAC ¶ 185, and "[e]ach of the Individual Defendants participated in the preparation and dissemination of the Offering Documents, and otherwise participated in the process necessary to conduct the IPO. *Id.* ¶ 186. At the pleading stage, the Court considers this sufficient.

Moreover, Defendant's only argument against a finding of Section 15 liability is that "[b]ecause the CAC fails to plead a primary violation, the Section 15 claim for control person liability fails." Pl's Memo at 35 n.69. As just explained above, the Court has now rejected that argument. Accordingly, Defendants' motion to dismiss Plaintiffs' Section 15 claims will be denied. *Panther Partners Inc. v. Jianpu Tech. Inc.*, 18 CIV. 9848 (PGG), 2020 WL 5757628, at *17 (S.D.N.Y. Sept. 27, 2020) (rejecting defendants attempts to dismiss Section 15 claim for control person liability where the only grounds for dismissal was based on the purported failure of plaintiff's Section 11 and 12 claims).

## CONCLUSION

For the foregoing reasons, Defendants motion to dismiss is **GRANTED in part and DENIED in part**. Specifically, the Court rules as follows:

1) Defendants' motion to dismiss is **DENIED** as to: Plaintiff's claims under Section 11 and 12(a)(2) of the Securities Act regarding RTR's shipping costs, theft, and insurance coverage; Item 303 of the SEC Regulation S-K claim regarding theft only; and Section 15 of the Securities Act claim against the Individual Defendants; Plaintiffs have plausibly plead these claims which may proceed to discovery; and

2) Defendants' motion to dismiss is **GRANTED** as to Plaintiffs' Securities Act claims regarding consumer demand and Plaintiffs' SEC Item 105 claims, and these claims are hereby **DISMISSED.**

       **SO ORDERED**.

Dated:      September 25, 2024
               Brooklyn, New York

                                          */s/*
                              ORELIA E. MERCHANT
                             United States District Judge