UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------------------x
RAJAT SHARMA, Individually and on Behalf of All Others
Similarly Situated,

                    Plaintiffs,

           -against-

RENT THE RUNWAY, INC., JENNIFER Y. HYMAN,
SCARLETT O'SULLIVAN, TIM BIXBY, JENNIFER
FLEISS, SCOTT FRIEND, MELANIE HARRIS, BETH
KAPLAN, DAN NOVA, GWYNETH PALTROW,
CARLEY RONEY, DAN ROSENSWEIG, MIKE ROTH,
GOLDMAN SACHS & CO. LLC, MORGAN STANLEY
& CO. LLC, BARCLAYS CAPITAL INC., CREDIT
SUISSE SECURITIES (USA) LLC, PIPER SANDLER &
CO., WELLS FARGO SECURITIES, LLC, JMP
SECURITIES LLC, KEYBANC CAPITAL MARKETS
INC., and TELSEY ADVISORY GROUP LLC,

                    Defendants.
------------------------------------------------------------------------x

**MEMORANDUM AND ORDER**
22-CV-06935 (OEM) (TAM)

ORELIA E. MERCHANT, United States District Judge:

      This securities action arises out of a putative class of investors who purchased or acquired

common stock of Rent the Runway, Inc. ("RTR") traceable to RTR's registration statement and

prospectus in connection with RTR's October 27, 2021 initial public offering ("IPO"). Corrected

Amended Complaint ("CAC"), ECF 61. Plaintiff Rajat Sharma and lead plaintiffs Delaware

Public Employees Retirement System ("DPERS") and Denver Employees Retirement Plan

("DERP") ("Plaintiffs") bring this action against RTR, certain officers, directors and non-

employees (the "Individual Defendants"[1]), and underwriters (the "Underwriter Defendants"[2]) ("Defendants"), alleging that the registration statement and prospectus contained false and misleading statements and information in violation of Sections 11, 12(a)(2), and 15 of the Securities Act of 1933, 15 U.S.C. §§ 77k, 77l(a)(2), and 77o. *See generally* CAC.

The Court issued a Memorandum and Order dated September 25, 2024, granting in part and denying in part Defendants' motion to dismiss the CAC. Memorandum and Order ("Order"), ECF 77.

Before the Court is Defendants' fully-briefed motion for reconsideration of the Order or, alternatively, motion for certification of the Order for interlocutory appeal under 28 U.S.C. § 1292(b).[3] For the following reasons, Defendants' motion is granted in part and denied in part.

## BACKGROUND

The Court assumes the parties' familiarity with the facts as detailed in the CAC and the procedural history as set forth in the Order. *See generally* CAC; *see also Sharma v. Rent the Runway, Inc.*, 751 F. Supp. 3d 82 (E.D.N.Y. 2024).

## LEGAL STANDARDS

### A.    District Court's Review of a Motion for Reconsideration

To succeed on a motion for reconsideration, the movant must show "an intervening change of controlling law, the availability of new evidence, or the need to correct a clear error or prevent

---

[1] The CAC names the following Individual Defendants: Jennifer Y. Hyman ("Hyman"), Scarlett O'Sullivan ("O'Sullivan"), Tim Bixby ("Bixby"), Jennifer Fleiss ("Fleiss"), Scott Friend ("Friend"), Melanie Harris ("Harris"), Beth Kaplan ("Kaplan"), Dan Nova ("Nova"), Gwyneth Paltrow ("Paltrow"), Carley Roney ("Roney"), Dan Rosensweig ("Rosensweig"), and Mike Roth ("Roth"). *See generally* CAC.
[2] The CAC names the following Underwriter Defendants: Goldman Sachs & Co. LLC ("Goldman Sachs"), Morgan Stanley & Co. LLC ("Morgan Stanley"), Barclays Capital Inc. ("Barclays"), Credit Suisse Securities (USA) LLC ("Credit Suisse"), Piper Sandler & Co. ("Piper Sandler"), Wells Fargo Securities, LLC ("Wells Fargo"), JMP Securities LLC ("JMP"), Keybanc Capital Markets Inc. ("KeyBanc"), and Telsey Advisory Group LLC ("Telsey"). *See generally* CAC.
[3] Notice of Defendants' Motion, ECF 83; Defendants' Memorandum of Law ("Defs.' Recon. Mem."), ECF 83-1; Plaintiffs' Response in Opposition ("Pls.' Recon. Opp."), ECF 84; and Defendants' Reply ("Defs.' Recon. Reply"), ECF 85.

manifest injustice." *Metzler Investment Gmbh v. Chipotle Mexican Grill, Inc.*, 970 F.3d 133, 142 (2d Cir. 2020) (internal citation and quotation omitted). "A movant seeking reconsideration must specify the errors of law or fact in the previous order and support the motion with pertinent authority." *Xiu Juan Liu v. Lynch*, 670 F. App'x 28, 28 (2d Cir. 2016) (alteration in original) (citing 8 U.S.C. § 1229a(c)(6)(C)).

A motion for reconsideration "is not a vehicle for relitigating old issues, presenting the case under new theories, securing a rehearing on the merits, or otherwise taking [another] bite at the apple." *U.S. for Use & Benefit of Five Star Elec. Corp. v. Liberty Mut. Ins. Co.*, 758 F. App'x 97, 101 (2d Cir. 2018) (alteration in original) (quoting *Analytical Survs., Inc. v. Tonga Partners, L.P.*, 684 F.3d 36, 52 (2d Cir. 2012), as amended, (July 13, 2012)). Nor is it "an opportunity for a [party] to . . . present arguments that could have been made before the judgment was entered." *Ethridge v. Bell*, 49 F.4th 674, 688 (2d Cir. 2022) (quoting *Shrader v. CSX Transp., Inc.*, 70 F.3d 255, 257 (2d Cir. 1995)). Reconsideration of a court's previous order is "an extraordinary remedy to be employed sparingly in the interests of finality and conservation of scarce judicial resources." *In re Initial Pub. Offering Sec. Litig.*, 399 F. Supp. 2d 298, 300 (S.D.N.Y. 2005) (internal citation and quotation omitted), *aff'd sub nom. Tenney v. Credit Suisse First Bos. Corp., Inc.*, 05-CV-3430, 05- CV-4759, & 05-CV-4760, 2006 WL 1423785, at *1 (2d Cir. 2006). The decision to grant or deny a motion for reconsideration is "within 'the sound discretion of the district court.'" *Premium Sports Inc. v. Connell*, 10-CV-3753 (KBF), 2012 WL 2878085, at *1 (S.D.N.Y. July 11, 2012) (quoting *Aczel v. Labonia*, 584 F.3d 52, 61 (2d Cir. 2009))

**B.    District Court's Certification for Interlocutory Appeal**

A district court may certify an order for interlocutory appeal where it finds that "such order [1] involves a controlling question of law [2] as to which there is substantial ground for difference

of opinion and [3] that an immediate appeal from the order may materially advance the ultimate termination of the litigation." 28 U.S.C. § 1292(b). The party bringing the motion to certify an order for interlocutory appeal bears the burden of demonstrating that these three requirements are met. *See Casey v. Long Island R.R. Co.*, 406 F.3d 142, 146 (2d Cir. 2005).

District courts must evaluate motions to certify an order for interlocutory appeal against the backdrop that "[i]t is a basic tenet of federal law to delay appellate review until a final judgment has been entered." *Koehler v. Bank of Berm. LTD*, 101 F.3d 863, 865 (2d Cir. 1996). Therefore, "federal practice strongly disfavors discretionary interlocutory appeals [as they] prolong judicial proceedings, add delay and expense to litigants, burden appellate courts, and present issues for decisions on uncertain and incomplete records, tending to weaken the precedential value of judicial opinions." *Dill v. JPMorgan Chase Bank, N.A.*, 19-CV-10947 (KPF), 2021 WL 3406192, at *4 (S.D.N.Y. Aug. 4, 2021). The Second Circuit has further emphasized that Section 1292(b) certification should be "strictly limited because 'only exceptional circumstances [will] justify a departure from the basic policy of postponing appellate review until after the entry of a final judgment.'" *In re Flor*, 79 F.3d 281, 284 (2d Cir. 1996).

However, where the Section 1292(b) criteria are met and the order at issue "involves a new legal question or is of special consequence, then the district court 'should not hesitate to certify an interlocutory appeal.'" *Balintulo* v. *Daimler AG*, 727 F.3d 174, 186 (2d Cir. 2013) (quoting *Mohawk Indus., Inc.* v. *Carpenter*, 558 U.S. 100, 111, (2009)). "Certification of an interlocutory appeal 'is not intended as a vehicle to provide early review of difficult rulings in hard cases.'" *Adar Bays, LLC v. Aim Expl., Inc.*, 310 F. Supp. 3d 454, 456 (S.D.N.Y. 2018). (citation omitted). As the Second Circuit has explained, "Congress passed 28 U.S.C. § 1292(b) primarily to ensure that the courts of appeals would be able to 'rule on . . . ephemeral question[s] of law that m[ight]

disappear in the light of a complete and final record.'" *Koehler v. Bank of Bermuda Ltd.*, 101 F.3d 863, 864 (2d Cir. 1996) (citation omitted).

Because interlocutory appeals are presumptively disfavored, "even where the three legislative criteria of [S]ection 1292(b) appear to be met, district courts have unfettered discretion to deny certification if other factors counsel against it." *Transp. Workers Union of Am., Loc. 100, AFL-CIO v. N.Y.C. Transit Auth.*, 358 F. Supp. 2d 347, 351 (S.D.N.Y. 2005) (internal quotation marks omitted). "Such unfettered discretion can be for 'any reason, including docket congestion' and 'the system-wide costs and benefits of allowing the appeal[.]'" *In re Facebook, Inc., IPO Sec. & Derivative Litig.*, 986 F. Supp. 2d 524, 530 (S.D.N.Y. 2014) ("*In re Facebook*") (quoting *Klinghoffer v. S.N.C. Achille Lauro*, 921 F.2d 21, 24 (2d Cir. 1990). Moreover, the fact that district courts have the power to certify questions for interlocutory appeal in no way suggests that interlocutory appeals should be the norm. *Republic of Colombia v. Diageo N. Am. Inc.*, 619 F. Supp. 2d 7, 10 (E.D.N.Y. 2007). Accordingly, the Second Circuit has repeatedly emphasized that district courts must "exercise great care in making a § 1292(b) certification." *Wausau Bus. Ins. Co. v. Turner Constr. Co.*, 151 F. Supp. 2d 488, 491-92 (S.D.N.Y. 2001) (citation omitted).

## DISCUSSION

### A.    Motion for Reconsideration

Defendants argue that the Court erred in concluding that Plaintiffs adequately alleged that Defendants made materially false or misleading statements with respect to RTR's risk disclosures about shipping costs, thefts of rented products, and insurance coverage for purposes of pleading claims under Sections 11 and 12(a)(2) of the Securities Act. *See* Defs.' Recon. Mem. at 1-2. Further, Defendants argue that the Court overlooked facts and controlling decisions warranting a different conclusion. *See id.* Finally, Defendants assert that the Court did not address their

independent dispositive argument on the negative causation affirmative defense for dismissal of the CAC and the Court should grant reconsideration to dismiss the remaining claims on that basis. *Id.*

For the reasons explained below, the Court grants reconsideration in part and denies in part. Specifically, Defendants' motion for reconsideration is denied with respect to the shipping costs, granted with respect to theft statements and insurance coverage claims, and granted to address the parties' arguments proffered in briefing in support of and opposition to dismissal of Plaintiff's Section 11 and 12(a)(2) claims to the extent that they were not fully addressed in the Order.

## 1.    Shipping Costs Statements

Defendants assert that the Court erred in holding that RTR's statements with respect to shipping costs were actionable.  Defs.' Recon. Mem. at 2, 4-8.  First, Defendants argue that the Court overlooked the fact that RTR had "undisputedly disclosed that shipping costs were on the rise," *id.* at 2, pointing to the fact that the news of the uptick in shipping prices prior the IPO "was broadly reported by the media," that a Wall Street Journal article reported that both FedEx and UPS were presenting new contracts to large shippers with "double-digit cost increases," and that RTR disclosed the fact that shipping rates were increasing in an August 20, 2021 presentation provided to analysts, *id.* at 4 (citing Defs.' MTD Exs. 5, 6, 14).  Second, Defendants argue that the Order "overlook[ed] the CAC's silence on how FE-4" learned that "FedEx had doubled RTR's shipping rates because [RTR] was not shipping enough," the Order should not have credited FE-4's statements because the CAC does not describe FE-4's job responsibilities, does not "relay conversations [FE-4] had with others at RTR about shipping, describe any documents they may have seen (including the FedEx notice, the FedEx contract, or the UPS contract), claim that FE-4 communicated directly with FedEx or UPS, negotiated the terms of their agreements with [RTR],

or was familiar with the rate structured provided." Defs.' Recon. Mem. at 5. In sum, according to Defendants, the CAC does not explain how FE-4 had "visibility into FedEx's alleged motives." *Id.* at 5-6. FE-4 was not in a position to know the factual allegations attributed to them, and under Second Circuit law, RTR was not required to separately disclose "the supposed *reasons* for the disclosed costs increases . . . ." Defs.' Recon. Mem. at 2, 4-8.

The Court finds that granting reconsideration of the Order's holding with respect to RTR's statements regarding shipping costs is not warranted. The CAC alleges that prior to the IPO, RTR had difficulty finding a reliable and affordable shipping carrier and that a year prior to the IPO, RTR switched from UPS to FedEx as its shipping vendor because UPS was cost prohibitive and was "less reliable" than its previous shipping carrier UPS. CAC ¶¶ 91, 129. It further alleges that in the months leading up to the IPO, FedEx doubled its shipping rates because RTR "was not shipping enough," which "caused a panic" at RTR and forced RTR to switch back to the already cost prohibitive UPS. CAC ¶ 93. The CAC alleges that this switch between shipping carriers and the related prohibitive costs occurred unbeknownst to investors. Further, the CAC alleges RTR's offering documents only warned investors that "[a] substantial majority of [its] inbound shipments from customers are currently returned through a single vendor" and the RTR was "currently in the process of transitioning" shipping vendors but it could not "predict how this transition may impact [RTR's] costs and [RTR's] customer sentiment and satisfaction." CAC ¶ 128. The CAC, however, alleges that Defendants had already returned back to UPS and therefore the impact of the prohibitive costs had already transpired. Drawing all inferences in Plaintiffs' favor as the non-moving party, Plaintiffs have sufficiently pleaded factual matter that give rise to the plausible inference that it stated claims on which relief can be granted. *See, e.g.*, *In re Facebook,* 986 F.

Supp. 2d at 515 (a company's purported risk disclosures are misleading where the company warns only that a risk may impact its business when that risk has already materialized).

The Court did not overlook the facts that the news of the uptick in shipping prices prior the IPO "was broadly reported by the media," that a Wall Street Journal article reported that both FedEx and UPS were presenting new contracts to large shippers with "double-digit cost increases," and that RTR disclosed the fact that shipping rates were increasing in an August 20, 2021 presentation provided to analysts. *Id.* at 4 (citing Defs.' MTD Exs. 5, 6, 14). The fact that it was broadly reported *generally* that both FedEx and UPS "*approached* several large shippers with new contracts that imposed double-digit increases through a combination of higher rates and fewer discounts" and that they had "*dropped hints* to shippers that the annual rate increase would be higher than before" is insufficient to support the conclusion that it was widely reported that shipping rates had in fact increased. Defendants do not cite to any case law to support the proposition that third party news articles describing a trend in a particular industry insulates a company from accurately and truthfully disclosing its own risks with respect to that trend. These news articles do not address whether the particular risk disclosure statements made by RTR omitted material facts. Further, the August 20, 2021 presentation projected "shipping rate headwinds beginning in Q3'21"[4] does not alter the Court's conclusion. Rather, the projections made by that presentation only bolster the Court's conclusion: it used the same vague language that the Court found previously concluded was misleading.

Defendants' arguments challenging the Order's reliance on and the reasonable inferences drawn from FE-4's factual allegations fare no better. *See* Defs.' Recon. Mem. at 5-6. As an initial matter, Defendants previously made the same arguments with respect to FE-4 in their motion to

---

[4] As Plaintiffs correctly point out, the August 20, 2021 presentation is found at Exhibit 11 of Defendants' motion to dismiss.

dismiss, *see* Defs.' MTD Mem. at 23-24, and the arguments are addressed in the Order, *see* Order at 33, 35-36.  Defendants now seek a second bite at the apple, which is improper grounds for reconsideration.

"A complaint may rely on information from confidential witnesses if 'they are described in the complaint with sufficient particularity to support the probability that a person in the position occupied by the source would possess the information alleged." *Employees' Ret. Sys. of Gov't of the Virgin Islands v. Blanford*, 794 F.3d 297, 305 (2d Cir. 2015); *Novak v. Kasaks*, 216 F.3d 300, 314 (2d Cir. 2000).  In turn, a complaint sufficiently describes a confidential witness's position when it identifies that employee's title, when and where she worked, and her general responsibilities.  *Francisco v. Abengoa, S.A.*, 559 F. Supp. 3d 286, 319 n.11 (S.D.N.Y. 2021). Here, there is no dispute that the CAC did not provide FE-4's general job responsibilities, but only provided FE-4's positions: "Senior Operations Manager, Outbound and Inventory Control and Quality Assurance" from September 2019 until August 2021 when FE-4 became "Senior Manager, Operations Integrations and ICQA" a position they held until they left in December 2022.

Defendants cite to *In re MSC Indus. Direct Co.*, 283 F. Supp. 2d 838 (E.D.N.Y. 2003) to argue that the CAC does not allege how FE-4 came know the information that the CAC attributes to them.  However, *In re MSC Direct Co.* is distinguishable as the plaintiffs in that case described "their confidential sources as, 'a former director of an MSC corporate department'; 'a former MSC employee whose responsibilities were associated with the Company's acquisitions'; a 'former employee with high-level corporate duties' and 'an anonymous informant.'" *In re MSC Indus. Direct Co.*, 283 F. Supp. 2d 838, 847 (E.D.N.Y. 2003).  By contrast, here, FE-4's job title was not described with such vague language.  Further, Defendants' position that FE-4 had no insight into FedEx's alleged motives misses the mark.  As the Court explained in its Order, a reasonable

inference could be drawn that RTR's return to FedEx would present an opportunity for FedEx to increase its shipping prices – it is commonplace for businesses to leverage their position.

Further, Plaintiffs only need to plead the probability that FE-4 was in position to know what "[they are] talking about." *Francisco v. Abengoa, S.A.*, 559 F. Supp. 3d 286, 319 n.11 (S.D.N.Y. 2021) (citation omitted). Here, Plaintiffs have pleaded sufficient facts to support the probability that FE-4, as inventory manager, was in a position to know whether RTR was shipping enough during that relevant period of time. Even if the Court were to agree with Defendants that Plaintiffs have not pleaded facts to support the probability that FE-4 would be in a position to know about comparative shipping costs between two carriers, this does not alter the Court's conclusion as the Order did not rest solely on FE-4's statement. *See* Order at 33-34.

Defendants also take issue with the Court's conclusion about the extent of RTR's disclosure obligations under the securities law, arguing that any discrepancy between its disclosed reasons for rising shipping costs ("macro global transportation network inefficiencies") and the alleged actual basis (RTR "was not shipping enough") is immaterial because RTR is not required to disclose the reasons for the risks so long as it disclosed the risk. However, once RTR chose to speak by providing a reason for the increase in shipping cost, it assumed a duty to be both accurate and complete. *Caiola v. Citibank, N.A., N.Y.*, 295 F.3d 312, 331 (2d Cir. 2002); *see also In re Morgan Stanley Info. Fund Sec. Litig.*, 592 F.3d 347, 366 (2d Cir. 2010) (explaining that once a corporation makes "a disclosure about a particular topic, whether voluntary or required, the representation must be complete and accurate") (quotation omitted). Thus, contrary to Defendants' assertion, the Court's Order is consistent with *Ark. Pub. Emps. Ret. Sys. v. Bristol-Myers Squibb*, 28 F.4th 343 (2d Cir. 2022) decision and other authority in this Circuit in this regard.

Consequently, Defendants' motion for reconsideration with respect to shipping costs statements is denied.

### 2.    Consumer Theft of Rented Products

Defendants next argue that the Court erred in holding that RTR should have disclosed that it allegedly suffered $6 million in lost revenue as a result of consumer thefts because the holding is "inconsistent[] with well-settled Second Circuit law . . . ." Defs.' Recon. Mem. at 2. Specifically, Defendants assert that the Court erred in its application of the quantitative and qualitative factors set forth in the SEC's Staff Accounting Bulletin No. 99 ("SAB No. 99") to the materiality of the alleged misstatements about consumer theft. As to the quantitative factor, [5] Defendants argue that the Court did not explicitly apply a presumption of immateriality to the alleged $6 million in loss revenue as it represents less than 3% of RTR's annual revenue. On the qualitative factors, they argue that the Court did not appropriately consider whether "the misstatement concerns a segment or other portion of the registrant's business that has been identified as playing a significant role in the registrant's operations or profitability." Defs.' Recon. Mem. at 8-14. Finally, Defendants argue that the Court should not have credited FE-2's factual allegations. *Id.* Plaintiffs respond that Defendants simply disagree with the Court's analysis and advance new arguments not made in their motion to dismiss, which is impermissible on reconsideration.

As stated in the Order, regarding the governing law on materiality:

The Second Circuit has "consistently rejected a formulaic approach to assessing the materiality of an alleged misrepresentation," *Ganino v. Citizens Utils. Co.*, 228 F.3d 154, 162 (2d Cir. 2000), and has held that "bright-line numerical tests for

---

[5] Defendants state that "[RTR] has not and does not concede that Plaintiffs' estimated lost revenue from theft is accurate." Defs.' Recon. Mem. at 8. But that's of no moment, as the Court must accept as true the factual allegations in the CAC and draw all reasonable inferences in Plaintiffs' favor in deciding Defendants' Rule 12(b)(6) motion to dismiss. Defendants' apparent disagreement with that estimate is best addressed at summary judgment or trial, where both parties will marshal evidence obtained through discovery to litigate that issue before the Court (at summary judgment) or factfinder (at trial).

materiality are inappropriate." [*ECA, Loc. 134 IBEW Joint Pension Tr. of Chicago v. JP Morgan Chase Co., 553 F.3d 187, 205 (2d Cir. 2009) ("JP Morgan")*]. Rather, while a court may utilize numerical thresholds as a "basis for a preliminary assumption" about materiality, materiality is a fact intensive inquiry which involves proving other quantitative and qualitative factors. [*JP Morgan*], 553 F.3d at 204 (internal citation and quotation omitted). Such qualitative factors may include "whether the misstatement concealed an unlawful transaction[,]" "the misstatements' relation to a significant aspect of [the company's] operations," and "the market reaction to the public disclosures." *Id.* at 204-05. "These qualitative factors are intended to allow for a finding of materiality if the quantitative size of the misstatement is small, but the effect of the misstatement is large." *Id.* at 205. For example, in *Ganino*, "an alleged misrepresentation relating to less than two percent of defendant's assets, when taken in context, could be immaterial as a matter of law." *Id.* (emphasis added).

Order at 39. Applying the law, the Court found that:

> Plaintiffs allege RTR's entire business model was predicated on renting clothing, often designer clothing, to customers for a subscription fee and that this clothing was supposed to be returned to RTR to then re-rent again to other subscribers. CAC ¶¶ 3-4, 62, 71. Moreover, the main "value proposition" for subscribers, if they joined RTR, was that they could rent and wear clothing "they may not otherwise be able to afford." CAC ¶ 67. "According to the Offering Documents, the average subscriber gets to wear clothes worth more than twenty times what she pays for a monthly subscription on an annualized basis[.]" *Id.* As is plain, aside from its proprietary online portal, the clothing sourced and possessed by RTR is its most valuable physical asset; so much so that it was also used as collateral to secure loans. CAC ¶ 5.

> Thus, loss of clothing through employee and customer theft or fraud is certainly a "significant aspect" of RTR's operations which may be material to a reasonable investor. [*JP Morgan*], 553 F.3d at 204-05. As is plead here, thefts of RTR's primary physical assets are alleged to have caused $6 million dollars' worth of annual loss. While the Offering Documents disclosed to prospective investors in a cursory manner that RTR had "in the past incurred and may in the future incur losses from various types of fraud" including "customers who have failed to return rentals" – which is business-speak for theft – RTR's failure to disclose such facts about the level of theft it had experienced could plausibly "in the view of a reasonable investor, have 'significantly altered the total mix of information made available.'" *Singh*, 918 F.3d at 63; *see* Prospectus at 62. Consequently, Plaintiffs adequately alleged Section 12 claims on these grounds. *See also Rombach*, 355

F.3d at 173 ("Cautionary words about future risk cannot insulate from liability the failure to disclose that the risk has transpired.")

Order at 40.

The Court grants reconsideration of the Order's finding on materiality with respect to the alleged $6 million in loss revenue that did not make an explicit finding on whether, under the quantitative factor, a presumption of immateriality applies in this case and with respect to the Order's application of the qualitative factors. *See Hutchison v. Deutsche Bank Sec. Inc.*, 647 F.3d 479, 485 (2d Cir. 2011); *cf. Mallek v. Allstate Ins. Co.*, 22-86, 2023 WL 3513783, at *2 (2d Cir. May 18, 2023); *see also Tyco Healthcare Group LP v. Ethicon Endo-Surgery, Inc.*, 440 F. Supp. 2d 120, (D. Conn. 2006).

While a motion for reconsideration is not the appropriate mechanism to advance new facts, new theories or new arguments that were not previously called to the Court's attention, the Court grants reconsideration on the application of the qualitative factors in light of the parties complete arguments on this issue to correct the error of not applying these factors in the Order as required by controlling law.[6] *Suozzo v. Bergreen*, 00-CV-09649 (JGK), 2003 WL 256784, at *1 (S.D.N.Y. Feb. 5, 2003) ("The Court will grant reconsideration and reargument because it is apparent that with respect to one aspect of the opinion the Court was in error.").

---

[6] Neither party addressed the qualitative factors in their dismissal motion papers. Defendants only argued that the alleged loss was presumptively immateriality, but they did not argue that the qualitative factors fail to rebut that presumption. However, the SAB No. 99 factors and Second Circuit precedent require consideration of both the quantitative and qualitative factors in assessing materiality. *See, e.g., Hutchison*, 647 F.3d 479, 487. That is, even if there is an initial finding that the omission or misstatement was presumptively immaterial, the SAB No.99 factors nonetheless require consideration of the qualitative factors. Therefore, as the party arguing that the claims should be dismissed because they are immaterial under the SAB No. 99 factors, Defendants should have addressed the qualitative factors. Likewise, Plaintiffs did not argue in their opposition papers that the qualitative factors rebutted the presumption of immateriality. Thus, the parties' briefing in this regard was incomplete. Now, on this pending reconsideration motion, the parties have undertaken the effort to address the qualitative factors. *See* Defs.' Recon. Mem. at 9, Pls.' Recon. Opp. at 10-11.

As stated in the Order, the Second Circuit has on numerous occasions rejected a formulaic approach to assessing materiality and has instead directed courts to consider the SEC's guidance on the quantitative and qualitative factors set forth in SAB No. 99, 64 Fed. Reg. 45150 (1999). *JP Morgan*, 553 F.3d at 197-98; *Litwin v. Blackstone Grp.*, 634 F.3d 706, 717 (2d Cir. 2011) ("*Blackstone*") ("[The Circuit has] cited with approval" the SAB No. 99 factors "which provide[] relevant guidance regarding the proper assessment of materiality"); *Hutchison*, 647 F.3d at 485. First, under the quantitative factors, SAB No. 99 states that "the use of a percentage as a numerical threshold, such as 5%, may provide the basis for a preliminary assumption" of materiality but that a bright line percentage "cannot appropriately be used as a substitute for a full analysis of all relevant considerations." 64 Fed. Reg. at 45,151; *see JP Morgan*, 553 F.3d at 204 (noting that a "five percent numerical threshold is a good starting place for assessing . . . materiality"). Second, even if there is an initial finding that an omission or misstatement was presumptively immaterial, courts must proceed to consider materiality under the qualitative factors in SAB No. 99 that identify certain considerations that may "render material a quantitively small misstatement. . . ." SAB No. 99, 64 Fed. Reg. at 45,152 ("Qualitative factors may cause misstatements of quantitatively small amounts to be material . . . ."); *JP Morgan Chase*, 553 F.3d at 205 (qualitative factors are "intended to allow for a finding of materiality if the quantitative size of the misstatement is small but the effect of the misstatement is large."); *Hutchison*, 647 F.3d 479, 487 (2d Cir. 2011) (quantitative approach is "a good starting place for assessing the materiality of the alleged misstatement" but "further necessary consideration is the qualitative factors set forth in SAB No. 99"); *see Blackstone*, at 719-21 (alleged statement may be material based on SAB No. 99 factors even where there is a finding of presumption of immateriality under quantitative factor).

As noted in the Order, "an alleged misrepresentation relating to less than two percent of defendant's assets, taken in context, *could* be immaterial as a matter of law." Order at 39 (emphasis added). However, the Court did not explicitly make such a finding—and now makes it: the alleged $6 million in loss revenue is presumptively immaterial because it implicates less than 5% of RTR's annual revenue. *IBEW Local Union No. 58 Pension Tr. Fund & Annuity Fund v. Royal Bank of Scotland Grp., PLC*, 783 F.3d 383, 391 (2d Cir. 2015) ("RBS") (undisclosed $6.8 billion represented less than 1% of total assets).

Turning to the qualitative factors, Defendants argue that they do not "tip the scales," and the Order misapplied one of the factors that asks whether "the misstatement concerns *a segment or other portion* of the registrant's business that has been identified as playing a significant role in the registrant's operations or profitability." Defs.' Recon. Mem. at 10 (quoting 64 Fed. Reg. at 45151). Citing to the Second Circuit's decisions in *Hutchinson* and *Blackstone*, Defendants explain that this factor was meant to capture circumstances where a misstatement or omission was quantitatively small relative to a company's entire business, but was nonetheless material because of its significance to an important segment or division of a company. *Id.* According to Defendants, the Order erred because this qualitative factor does not apply to circumstances where the alleged omission or misstatement relates to a company's operations as a whole or to a company with only one segment or division, such as RTR. *Id.*

The Court agrees. In *Hutchison*, the Second Circuit explained this factor applies where "a particular product or productline, or division or segment of a company's business, has independent significance for investors," such as when that "product or segment" of the company is its "original niche, its iconic or eponymous business, critical to its reputation, or most promising for growth or as an engine of revenue." 647 F.3d at 488 (citations omitted). Here, the clothes are not a segment

or product line of RTR, but rather represents an inventory.  A reasonable investor would not have an independent investment interest in the rented clothes because the investor's investment interests relates to RTR's subscription rates.  *See* CAC ¶ 3 ("At the time of the IPO, customers suing a subscription plan accounted for over 80% of the Company's revenues."); *see also id.* ¶¶ 63-68.

Plaintiffs' arguments in opposition are unavailing.  Plaintiffs do not directly address Defendants' argument but instead assert that "SAB No. 99 itself makes clear that the factors listed therein are not 'an exhaustive list of the circumstances that may affect the materiality of a quantitatively small misstatement.'"  Pls.' Recon. Opp. at 11 (quoting SAB No. 99).  That may be true, but Plaintiffs do not point to any other qualitative factors or case law applicable to this case that might tip the scale in their favor.  Further, Plaintiffs argue that courts must consider the alleged misstatements and omissions "in context" and that the CAC sufficiently alleges that Defendants were required to disclose the impact of theft because they chose to include statements concerning theft in the offering documents.  Pls.' Opp. at 12.  However, Plaintiffs have not cited to any caselaw holding that certain misstatements or omissions were material despite a finding that they were immaterial under the SAB No. 99 factors, *see* Pls.' Opp. at 12, and the Court is not aware of any.

On reconsideration, because neither quantitative nor qualitative factors support the finding that the alleged misstatements related to customer thefts were material, the Court dismisses these claims.

### 3.    Item 303 Violation

Defendants seek reconsideration of the Orders' finding that there was an Item 303 violation.  In support, Defendants argue that the Court overlooked facts in the prospectus establishing a downward trend with respect to "rental product depreciation" and that the Court did not make a finding as to whether the alleged downward trend was material and was presently

known to management as required to plead an Item 303 violation. *Panther Partners Inc. v. Ikanos Comm'ns, Inc.*, 681 F.3d 114, 120 (2d Cir. 2012) (holding that Item 303 imposes "a disclosure duty where a trend, demand, commitment, event or uncertainty is both (1) presently known to management and (2) reasonably likely to have material effects on the registrant's financial condition or results of operations.") (internal quotation and citation omitted); 17 C.F.R. § 229.303(a).

Because the Court finds on reconsideration that the CAC fails to sufficiently plead material misstatements or omissions related to the alleged customer thefts, Plaintiffs' claim based on purported Item 303 violation also fails. *In re Adient plc Sec. Litig.*, 18-CV-9116 (RA), 2020 WL 1644018, at *24 (S.D.N.Y. Apr. 2, 2020) (dismissing Item 303 claim where complaint failed to plead any material misstatements or omissions) (citing *Ong v. Chipotle Mexican Grill, Inc.*, 294 F. Supp. 3d 199, 235-36 (S.D.N.Y. 2018).

### 4.    Insurance Coverage Claims

Defendants assert that the Court erred in holding that RTR had to disclose that it carried insufficient insurance to cover losses from the thefts of its rented clothes, in particular that RTR's insurance coverage was capped at $100 per shipment and that RTR was successful on recovery claims on only 35% of lost packages. Defendants argue that the Court overlooked "multiple contrary undisputed facts" that would alter the Court's conclusion with respect to RTR's insurance coverage statements. In particular, Defendants argue that because the $6 million revenue loss incurred from thefts is not material, the insurance losses for such items could not have been material either.

Because the Court on reconsideration has found that the alleged misstatements with respect to theft was immaterial, RTR's statements regarding insurance coverage statements are also

immaterial.  That is, any potential losses stemming from those thefts due to insufficient coverage are necessarily quantitively and qualitatively immaterial.  Accordingly, the Court dismisses Plaintiffs' claims based on purported misstatements or omissions related to RTR's insurance coverage.

### 5.    Negative Causation

Defendants argue that Plaintiffs' claims must be dismissed because Defendants have met their burden of proving negative causation as a matter of law on the ground that (1) RTR's stock price declined before the first "corrective disclosure," (2) RTR's stock price decline coincided with similar price declines faced by its competitors, and (3) the three price declines alleged by Plaintiffs are unrelated to the alleged misstatements.  *See* Defs.' MTD Mem. at 34-35; *see also* Defs.' Recon. Mem at 16-18.  Thus, Defendants argue that "any inference that the market was reacting to [RTR]-specific news" is negated.[7]  *Id.*  In opposition, Plaintiffs respond that negative causation arguments at the motion to dismiss stage are premature and that the CAC sufficiently alleges that RTR's stock price dropped after RTR announced poor financial metrics and declining subscriber totals.  *See* Pls.' MTD Opp. at 35; Pls.' Recon. Opp. at 15-19.

Unlike in securities fraud cases brought under Section 10(b), plaintiffs bringing claims under Sections 11 and 12(a)(2) need not plead loss causation because loss causation—the causal

---

[7] Defendants cite in a footnote to the Second Circuit decision in *Lentell v. Merril Lynch*, 396 F.3d 161 (2d Cir. 2005) for the holding that negative causation requires that the "misstatement or omission concealed something from the market that, when disclosed, negatively affected the value of the security." Defs.' MTD Mem. at 34 n.62.  Defendants correctly conceded that *Lentell* address loss causation in the context of Section 10(b) fraud claims but argue that "courts have applied its reasoning to Section 11 claims." *Id.* (first citing *Amorosa v. AOL Time Warner*, 409 F. App'x 412 (2d Cir. 2011); then citing *In re State Street Bank & Tr. Co. Fixed Income Funds. Inv. Litig. (In re State Street)*, 774 F. Supp. 2d 584 (S.D.N.Y. 2011).

However, the Court is not persuaded by Defendants' proffer here.  In *Amorosa*, the court applied *Lentell* to Section 11 claim specifically regarding the issue of determining a corrective disclosure date for the purposes of assessing whether a claim is time-barred—nothing about the merits of negative causation.  The remaining cites to *Lentell* in *Amorosa* were in the context of that court's analysis of the Section 10(b) claims.  *In re State Street,* although persuasive, is not binding authority on this Court, and courts have since declined to adopt its conclusion and outcome.  *See, e.g., Emerson v. Mutual Fund Series Trust*, 393 F. Supp. 3d 220, 254-58 (E.D.N.Y. 2019).

connection between alleged misrepresentations or omissions and plaintiffs' loss—is not an element of a claim under either section. *See In re Morgan Stanley Info. Fund Sec. Litig.*, 592 F.3d 347, 359 (2d Cir. 2010) ("[P]laintiffs bringing claims under sections 11 and 12(a)(2) need not allege . . . loss causation."); *Briarwood Invs. Inc. v. Care Inv. Trust Inc.*, 07-CV-8159 (LLS), 2009 WL 536517, at *3 (S.D.N.Y. Mar. 4, 2009) ("A plaintiff is not required to plead 'loss causation' (*i.e.*, that the misleading statements in [a] suit caused the depreciation in the stock price) to establish a prima facie claim under [sections] 11 or 12(a)(2) of the Securities Act."); *Degulis v. LXR Biotech.*, 95-CV-4204 (RWS), 1997 WL 20832, at *3 (S.D.N.Y. Jan. 21, 1997) ("[T]o make out a prima facie case at the pleadings stage, Plaintiffs need only allege a material misstatement or omission.") Rather, the absence of loss causation—also known as "negative causation"—is an affirmative defense that defendants bear the burden of proving, reflecting Congress's "desire to allocate the risk of uncertainty to the defendants." *Akerman v. Oryx Commc'ns Inc.*, 810 F.2d 336, 341 (2d Cir. 1987) ("[S]ection 11(e) expressly creates an affirmative defense of disproving causation."); *see also* 15 U.S.C. § 77k(e); 15 U.S.C. § 77*l*. The burden is a "heavy" one, *In re WorldCom, Inc. Sec. Litig.*, 294 F. Supp. 2d 392, 408 (S.D.N.Y. 2003), as Section 11 and Section 12(a)(2) "create a factual presumption that 'any decline in value is . . . caused by the misrepresentation'" in the registration statement and prospectus document. *Levine v. AtriCure, Inc.*, 508 F. Supp. 2d 268, 272 (S.D.N.Y. 2007)

Negative causation "is generally not properly raised on a Rule 12(b)(6) motion" as the analysis is often fact-intensive, which is more properly suited for summary judgment. *In re Giant Interactive Grp., Inc. Sec. Litig.*, 643 F. Supp. 2d 562, 572 (S.D.N.Y. 2009); *Levine*, 508 F. Supp. 2d at 272; *In re Facebook,* 986 F. Supp. 2d at 523. Courts have nonetheless granted dismissal on the negative causation defense when defendants have established that the lack of loss causation is

apparent on the face of the complaint, such that plaintiffs must "plead [themselves] out of court by unintentionally alleging facts (taken as true) that establish an affirmative defense." *Levine*, 594 F. Supp. 2d at 474 (quoting *Pani v. Empire Blue Cross Blue Shield*, 152 F.3d 67, 74 (2d Cir. 1998); *see United States v. Space Hunters, Inc.*, 429 F.3d 416, 426 (2d Cir. 2005).

Here, Defendants have not established an absence of price impact caused by the alleged misstatements. *See Chen v. Missfresh Limited*, 701 F. Supp. 3d 236, 250 (S.D.N.Y. 2023). The CAC alleges that following various post-IPO statements made by RTR and its employees, RTR's stock price declined. For example, the day after RTR's December 8, 2021, press release and earnings call where it reported a net loss of $87.8 million and where O'Sullivan discussed the impact of rising transportation costs on RTR's profitability, the price of RTR's stock declined by 4.35%. CAC ¶¶ 139-43. The CAC alleges that following other press releases and earnings calls where RTR announced net losses, a "miss" on its projected total subscriber numbers, and increases in fulfillment expenses that included shipping costs – RTR's stock price declined each time. CAC ¶¶ 144-53. Plaintiffs have therefore raised the plausible inference that stock price declines were related to alleged misrepresentations in the offering documents. *See In re Fuwei Films Sec. Litig.*, 634 F. Supp. 2d at 444-45.

Defendants argue that RTR's stock price decline coincided with similar price declines faced by its competitors and therefore cannot be attributed to the alleged misstatements. Defendants also argue that none of the three stock price declines caused Plaintiffs any losses because "none of them revealed the information Plaintiffs claim was wrongfully hidden," suggesting that Plaintiffs cannot plead a loss causation on a corrective disclosure theory. Defs.' Recon. Mem. at 16. In opposition, Plaintiffs argue that the CAC does not allege corrective disclosures but rather "plead some of the myriad stock drops which occurred when RTR

announced poor financial metrics after the IPO—in particular, increased shipping costs, 'raising transportation costs,' changes in shipping carriers, and the need for a 'massive restructuring plan' to reduce costs." Pls.' Recon. Opp. at 17.

To successfully make a negative causation defense, "a party must prove not the mere possibility that some other factor caused the plaintiff's loss but rather that all or an identified portion of plaintiff's loss was caused by that other factor." *See, e.g., Fed. Hous. Fin. Agency v. Nomura Holding Am., Inc.*, 11-CV-6201 (DLC), 2015 WL 685159, at \*4 (S.D.N.Y. Feb. 18, 2015). At this stage, however, the Court cannot determine from the CAC what portion of the decline in RTR's stock was due to factors unrelated to the alleged misstatements, as this typically requires expert testimony disaggregating the various causes of stock price movements. *See id.*; *Adair v. Kaye Kotts Assocs., Inc.*, 1998 WL 142353, at \*7 (S.D.N.Y. Mar. 27, 1998) (Sotomayor, J.) ("It should be noted that in the cases where defendants have successfully established [a Section] 11(e) defense on summary judgment, they have not only submitted expert testimony, but have provided and discussed evidence attributing the decline to factors other than their own disclosure of financial results."); *City of Westland Police & Fire Ret. Sys. v. MetLife, Inc.*, 928 F. Supp. 2d 705, 719 (S.D.N.Y. 2013) ("While defendants may prove that the drops in stock value were due to other market forces, that possibility is insufficient to defeat claims under Sections 11 and 12(a)(2) on a motion to dismiss."). At the pleading stage, the proper inquiry for the Court is not a final determination "as to what losses occurred and what actually caused them" but only need to find that Plaintiffs' allegations are plausible. *Winter v. Stronghold Digital Mining, Inc.*, 686 F. Supp. 3d 295, 311 (S.D.N.Y. 2023) (first citing *In re Fannie Mae 2008 Sec. Litig.*, 742 F. Supp. 2d 382, 414) (S.D.N.Y. 2010); then citing *In re Fuwei Films Sec. Litig.*, 634 F. Supp. 2d at 444); *Fed. Hous. Fin. Agency for Fed. Nat'l Mortg. Ass'n v. Nomura Holding Am., Inc.*, 873 F.3d 85, 155 (2d

Cir. 2017) (holding that even at summary judgment, the burden is on defendant to disprove loss causation, and "any difficulty separating loss attributable to a specific misstatement from loss attributable to macroeconomic forces benefits the plaintiff"); *accord Emergent Cap. Inv. Mgmt., LLC. v. Stonepath Grp., Inc*, 343 F.3d 189, 197 (2d Cir. 2003) ("[I]f the loss was caused by an intervening event, like a general fall in the price of Internet stocks, the chain of causation will not have been established.  But such is a matter of proof at trial and not to be decided on a 12(b)(6) motion to dismiss.").  Therefore, Defendants' motion to dismiss Plaintiffs' claims on the negative causation affirmative defense is denied.

**B.    Request for Certification for Interlocutory Appeal**

Defendants seek to certify three issues from the Court's Order for interlocutory appeal: (1) "whether a registrant is required to disclose an increase in one of its component costs where that increase is not, and cannot be, alleged to have had a material effect on the registrant's results of operations," Defs.' Recon. Mem. at 19; (2) "whether an event which has a presumptively immaterial impact on the issuer's business can nevertheless qualify as a material omission merely because the event involved a 'significant aspect' of the issuer's overall business, especially where the alleged 'significant aspect' does not refer to a 'particular product or productline, or division or segment of a company' but rather to alleged losses to inventory,"  *id.* at 20; and (3) "whether stockholders' claims under Section 11 and 12 can survive dismissal where the complaint undisputedly does not allege that any of the alleged omissions was ever revealed to the market, thereby establishing negative causation on the face of the complaint," *id.* at 21.

The Court sees no reason to certify Defendants' second question related to materiality under the SAB No. 99 factors in light of the Court's finding on reconsideration that the alleged omission regarding revenue loss was not material under these factors.  In other words, those claims

are no longer at issue as this order dismisses them, thus Defendants' request to certify the second question is moot.  As to the issue of negative causation, any arguments Defendants made for interlocutory appeal was premature as they are not based on an order of the Court and therefore did not—and could not—address the Court's reasoning.  While that alone is sufficient basis to deny certification of this issue, the Court, nonetheless, addresses Defendants' arguments.

A comparison of Defendants' arguments on reconsideration and motion to dismiss and the remaining two questions reveals that the latter relates to the sufficiency of Plaintiff's allegations in the CAC.  Such challenges "are not generally the appropriate subjects of interlocutory review, as 'a reversal [on interlocutory appeal] at most could lead only to a remand for repleading, with possibilities of further interlocutory appeals thereafter.'"  *In re Facebook*, 986 F. Supp. 2d at 530 (collecting cases); (denying motion for certification); *In re Manhattan Inv. Fund Ltd.*, 288 B.R. 52, 56–57 (S.D.N.Y.2002) (noting that the Second Circuit has held that challenges to the sufficiency of a pleading are not generally the appropriate subjects of interlocutory review unless they present difficult questions of substantive law).

Ultimately, Defendants have failed to demonstrate that exceptional circumstances warrant interlocutory appeal in this case.  *In re Ambac Fin. Grp., Inc. Sec. Litig.*, 693 F. Supp. 2d 241, 282 (S.D.N.Y. 2010) ("Only 'exceptional circumstances' will justify a departure from the basic policy of avoiding appellate review until a final decision on the merits.") (quoting *Williston v. Eggleston*, 410 F.Supp.2d 274, 276 (S.D.N.Y.2006); *In re Tops Holding II Corp.*, 22-CV-9450 (NSR), 22-CV-9464 (NSR), 22-CV-9471 (UA), 2023 WL 119445, at *2-3 (interlocutory appeals are "strongly disfavored" in federal practice and it is a "basic tenet of federal law is to delay the appellate review until a final judgment").  That is a sufficient basis to deny the motion, as district courts have discretion to deny motion for certification even where all three criteria are met as this

case does not present exceptional circumstances. *Laydon v. Mizuho Bank, Ltd.*, 12-CV-3419 GBD, 2015 WL 6955193, at \*2 (S.D.N.Y. July 24, 2015) ("Although Section 1292(b) sets out three criteria, district courts 'retain unfettered discretion to deny certification of an order for interlocutory appeal even where the three legislative criteria of section 1292(b) appear to be met.'").  The Court addresses each criterion in turn.

### 1.    Controlling Questions of Law

To be ripe for interlocutory appeal, "the controlling question of law must 'refer to a pure question of law that the reviewing court could decide quickly and cleanly without having to study the record.'"  *B & R Supermarket, Inc. v. Visa Inc.*, 17-CV-2738, 2025 WL 845109, at \*3 (E.D.N.Y. Mar. 18, 2025).  By contrast, "[q]uestions regarding application of the appropriate law to the relevant facts are generally not suitable for certification." *In re Facebook*, 986 F. Supp. 2d at 536 (alteration in original) (internal quotation marks omitted).  A question of law is "controlling" where "'[i] reversal of the district court's opinion could result in dismissal of the action, [ii] reversal of the district court's opinion, even though not resulting in dismissal, could significantly affect the conduct of the action, or [iii] the certified issue has precedential value for a large number of cases.'"  *New York v. Citibank N.A.*, 24-CV-659 (JPO), 2025 WL 1194377, \*2 (S.D.N.Y. Apr. 22, 2025).

Defendants advance in conclusory fashion that these issues present controlling questions of law because "if the answer to [these] question[s] is "no," then Plaintiffs' claims based . . . must be dismissed." *See* Defs. Recon. Mem.  at 19, 20, 21.  The two questions are not "pure" questions of law because, in the context of Sections 11 and 12(a)(2) securities claim, "materiality of statements and omissions . . . is a fact-specific and context-specific inquiry," Order at 19 (citing *Levine*) and dismissal of Section 11 and 12(a)(2) on the negative causation affirmative defense at

the pleading stage is often disfavored as the inquiry is fact-specific better suited for summary judgment. Thus, case-specific inquiries do not present questions of law but rather mixed questions of fact and law. *See In re Facebook*, 986 F. Supp. 3d at 536.

Defendants next assert that the Order's holding will have "precedential value for a large number of cases." Defs.' Recon. Mem. at 19. However, precedential value is not "per se sufficient to meet the 'controlling issue of law' standard." *In re Facebook*, 986 F. Supp. 2d at 537. Moreover, the assertion this Order ruling will have "broad-reaching ramifications" for public companies and their directors and officers is highly speculative: Defendants have not pointed to any evidence of currently pending similarly situated securities actions for which this Order could have an impact. *See, e.g., Primavera Familienstiftung v. Askin,* 139 F. Supp. 2d 567, 573 (S.D.N.Y.2001); *SEC v. Guss*, 2012 WL 3306166 (S.D.N.Y. Aug. 13, 2012) ("Without any quantification of how many pending cases could be impacted by the [challenged opinion], [defendant's] statement is merely speculative.")

Finally, the substance of all three questions sought for interlocutory appeal were previously raised in Defendants' motion to dismiss and the instant motion. Granting this request for certification would effectively give Defendants a third bite at the apple – a practice that counsels against certification. *Cf. Guss*, 2023 WL 3306166, at *4 (noting that questions presented repeated arguments made in motion to dismiss briefing and essentially highlight disagreement with court's order).

### 2.     Substantial Ground for Difference of Opinion

Defendants argue that there is substantial ground for difference of opinion on the first and third issues presented. Defs.' Recon. Mem. at 19, 22. A substantial ground for difference of opinion exists when (1) "there is conflicting authority on the issue," or (2) "the issue is particularly

difficult and of first impression for the Second Circuit." *Kusnier v. Virgin Galactic Holdings, Inc.*, 21-CV-3070 (ARR) (TAM), 2023 WL 8750398, at *8 (E.D.N.Y. Dec. 19, 2023).  However, "the mere presence of a disputed issue that is a question of first impression, standing alone, is insufficient to demonstrate a substantial ground for difference of opinion." *In re Flor*, 79 F.3d 281, 284 (2d Cir. 1996).  Rather, a district judge must "analyze the strength of the arguments in opposition to the challenged ruling when deciding whether the issue for appeal is truly one on which there is a substantial ground for dispute." *Id.* (quotation omitted).  The standard is met when a party seeking certification shows there is "genuine doubt as to whether the district court applied the correct legal standard in its order." *Consub Del. LLC v. Schahin Engenharia Limitada*, 476 F. Supp. 2d 305, 309 (S.D.N.Y. 2007).  Substantial ground for difference of opinion may exists where the challenged decision conflicts with other decisions issued within the same district.  *See, e.g., Glatt v. Fox Searchlight Pictures, Inc.*, 11-CV-6784 (WHP), 2013 WL 5405696, at *2 (S.D.N.Y. Sept. 17, 2013) ("[I]ntra-district split and decisions from other circuits show a substantial basis exists for difference of opinion").

On the issue of negative causation, Defendants' argument boils down to the CAC "undisputedly does not allege" loss causation on the face of the complaint.  This is the same argument that Defendants made for reconsideration, and the Court's rejection of that argument applies with equal force here.  Moreover, Defendants rely on *McMahan & Co. v. Wherehouse Ent., Inc.*, 65 F.3d 1044 (2d Cir. 1995) for the proposition that Second Circuit has previously held that district courts should consider negative causation as grounds for pleading stage dismissal.  Defs.' Recon. Mem. at 21.  However, that case was in a different procedural posture—at summary judgment with a fully developed factual record—and the Second Circuit remanded to the district court to allow defendants the opportunity "to *prove* that the decline in value was not caused by the

alleged misstatements. *McMahan*, 65 F.3d at 1048 (emphasis added). The court in *McMahan* said nothing about ruling on the negative causation at the pleading stage, and its remand directive is consistent with the prevailing authority in this Circuit addressed above. *See* supra at 18-20.

Further, Defendants' conclusory statement that the Court's holding will have "broad-reaching ramifications" for public companies having to defend securities actions where plaintiffs could not show loss causation, is not convincing. Defs.' Recon. Mem. at 22 (quoting *Cath. Health*, 521 F. Supp. 3d at 278, where court found the issue was "novel" in the Second Circuit, there was absence of controlling authority, and therefore may have important ramification for the industry). On the issue of liability for risk disclosures, Defendants assert that substantial grounds of difference exists because "the Court's Order conflicts with how other district courts within this Circuit have interpreted Second Circuit precedent." Defs.' Recon. Mem. at 19. However, "[t]here must be more than 'simple disagreement' on the issue," *Danaher Corp. v. Travelers Indem. Co.*, 10-CV-121, 2020 WL 6712193, at *1 (S.D.N.Y. Nov. 16, 2020), and Defendants have not shown that this issue is unusually challenging.

### 3.    Materially Advance the Litigation

Defendants argue that interlocutory appeal would materially advance this litigation because "it would substantially narrow the scope of discovery from eliminating [two] out of the remaining [five] alleged misstatements found actionable by the Order," and would "streamline discovery and narrow the issues for trial." Defs.' Recon. Mem. at 21. Plaintiffs respond that obtaining reversal on appeal "always contain the possibility of a dismissal" which is insufficient to warrant certification as that would otherwise make interlocutory appeal "commonplace and virtually automatic" and not the "exceptional circumstances" as the rules require. Pls.' Recon. Opp. at 24-

25.  Finally, Plaintiffs argue that interlocutory appeal are disfavored in big securities litigation cases.  *Id.*

A party seeking certification for interlocutory appeal may show that an interlocutory appeal would "materially advance" the litigation by demonstrating that the appeal "promises to advance the time for trial or to shorten the time required for trial."  *B & R Supermarket, Inc. v. Visa Inc.*, 17-CV-2738 (MKB), 2025 WL 845109, at *9 (E.D.N.Y. Mar. 18, 2025).  This factor is "'closely connected' to the first factor."  *Capitol Recs., LLC v. Vimeo*, 972 F. Supp. 2d 537, 551 (S.D.N.Y. 2013) (quoting *In re 650 Fifth Ave.*, 08-CV-10934, 2012 WL 363118, at *2 (S.D.N.Y. Feb. 2, 2012)).  "In evaluating this factor, courts must consider the 'institutional efficiency of both the district court and the appellate court.'" *See SEC v. Coinbase, Inc.*, 23-CV-4738 (KPF), 2025 WL 40782, at *12 (S.D.N.Y. Jan. 7, 2025) (quoting *SEC v. Rio Tinto PLC*, 17-CV-7994, 2021 WL 1893165, at *2 (S.D.N.Y. May 11, 2021)).

On the two remaining issues, certification could result in prompt termination of this action as reversal on either negative causation or on the risk disclosure issue would end this case, rendering any discovery or trial on the merits a nullity.  But because the "Court certifies orders, not legal questions, under Section 1292(b)," *Coinbase*, 761 F. Supp. 3d at 721, and because the Court of Appeals reviews de novo a motion to dismiss failure to state claims, it is also possible that the Second Circuit would be well within its right to reinstate previously dismissed claims.

Ultimately, "even when the elements of [S]ection 1292(b) are satisfied, the district court retains 'unfettered discretion' to deny certification."  *Garber v. Office of the Commissioner of Baseball*, 120 F. Supp. 3d 334, 337 (S.D.N.Y. 2014) (quoting *National Asbestos Workers Medical Fund v. Philip Morris, Inc.*, 71 F. Supp. 2d 139, 162–63 (E.D.N.Y. 1999)); *In re Facebook, Inc.*, 986 F. Supp. 2d at 530 (stating that a district court's decision may be for "any reason") (citation

omitted).  For the reasons discussed above, the Court concludes that certification of the Order is not warranted.

## CONCLUSION

For the foregoing reasons, Defendants' motion for reconsideration is granted in part and denied in part.  Plaintiffs' Section 11 and 12(a)(2) claims regarding consumer theft and insurance coverage and Item 303 claim regarding theft are dismissed. Further, Defendants' request for certification for interlocutory appeal is denied.

**SO ORDERED**.


September 12, 2025
Brooklyn, New York

/s/ _____
ORELIA E. MERCHANT
United States District Judge