**FRESHFIELDS**

New York

3 World Trade Center
175 Greenwich Street
New York, NY  10007

**Mary Eaton**
**T** +1 (212) 277-4000
**E** mary.eaton@freshfields.com

**VIA ECF**

The Honorable Orelia E. Merchant
United States District Court
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

October 16, 2025

Re:   ***Sharma v. Rent the Runway, Inc.***, No. 1:22-cv-06935-OEM-SDE

Dear Judge Merchant:

We represent the RTR Defendants in the above-captioned matter.[1]   On behalf of all Defendants,[2] pursuant to Your Honor's Individual Practice and Rules, Section III.B, to respectfully request a pre-motion conference for the RTR Defendants' anticipated motion to be filed pursuant to Fed. R. Civ. P. 12(c).[3]

## 1.   Applicable Standard

A defense for failure to state a claim "may be made … by motion for judgment on the pleadings." *Santos v. Dist. Council*, 619 F.2d 963, 967 n.4 (2d Cir. 1980); *see also, e.g.*, *Keita v. Am. Sec. Ins. Co.*, 2021 WL 5865734, at *1 (E.D.N.Y. Dec. 10, 2021) ("Where, as here, a Rule 12(b)(6) motion to dismiss is timely made and denied" at least in part, "a defendant may, after close of the pleadings, again seek dismissal through Rule 12(c).").

In deciding a Rule 12(c) motion, a court "employ[s] the same standard applicable to dismissals pursuant to [Rule] 12(b)(6)," *Hayden v. Paterson*, 594 F.3d 150, 160 (2d Cir. 2010) (citation and quotation marks omitted), but "rel[ies] on the complaint, the answer, any written documents attached to them, and any matter of which the court can take judicial notice for the factual background of the case." *Roberts v. Babkiewicz*, 582 F.3d 418, 419 (2d Cir. 2009); *accord, e.g.*, *Keita*, 2021 WL 5865734, at *1.  Courts may consider documents "incorporated by reference in the pleadings" or which are "'integral' to the complaint." *120 Greenwich Dev. Assocs., L.L.C. v. Admiral Indem. Co.*, 2013 WL 12331487, at *4 (S.D.N.Y. Sept. 25, 2013) (quoting *L-7 Designs, Inc. v. Old Navy, LLC*, 647 F.3d 419, 422 (2d Cir. 2011)).

A court need not credit "allegations that are plainly contradicted by materials incorporated into the complaint or appropriately judicially noticed." *Zappin v. Cooper*, 2024 WL 3084015, at *2 n.1 (2d Cir. June 21, 2024).  A complaint can survive a 12(c) motion only if its non-contradicted and non-conclusory allegations state a plausible claim.  *L-7 Designs*, 647 F.3d at 430.

## 2.   The Shipping Vendor Contracts Show That Plaintiffs Have Not Pled A Plausible

---

[1] Capitalized terms not defined herein shall have the same meaning as in Defendants' Motion to Dismiss (ECF 70).

[2] This letter is being submitted with permission of counsel for the Underwriter Defendants.

[3] "A Rule 12(c) motion is a 'motion to dismiss' within the meaning of the PSLRA automatic stay provision," and the stay is therefore "triggered by" the RTR Defendants' motion. *Gardner v. Major Auto. Cos.*, 2012 WL 1230135, at *4 (E.D.N.Y. Apr. 12, 2012).  Under Your Honor's rules, service of this pre-motion letter seeking a conference for a Fed. R. Civ. P. 12 motion "shall constitute timely service of a motion made pursuant to those provisions."  Individual Practice and Rules, Rule III.B.7.

**FRESHFIELDS**

**Claim That The Shipping Cost Statements Were False Or Misleading**

*Plaintiffs' Sole Surviving Claims Are Limited*:  The sole surviving claims in this case are Plaintiffs' Section 11, 12(a)(2) and 15 claims regarding shipping cost statements.  ECF 77 at 32-36; ECF 100 at 6-10.   Plaintiffs allege that only two statements in the Registration Statement concerning shipping costs were false or misleading, particularly that (i) "we . . . are currently in the process of transitioning[] inbound shipments from this vendor to multiple other vendors, and we cannot predict how this transition may impact our costs" and (ii) "[i]ncreases in shipping costs or other significant shipping difficulties or disruptions or any failure by our … third-party carriers to deliver high-quality products to us or to our customers … in a timely manner or to otherwise adequately serve our customers could damage our reputation and brand and may substantially harm our business."  CAC ¶¶ 128, 130; *see* Ex. 1.  Although RTR never made any representation with regard to the rates FedEx charged, how they compared to UPS rates, or that the rates negotiated with FedEx in 2020 were not subject to change, Plaintiffs allege that these statements were rendered misleading by Defendants' omission that "just before the IPO," FedEx allegedly "doubled its shipping rates for the Company and the Company was forced to switch back to the already prohibitively expensive UPS."  CAC ¶¶ 129, 131.

*RTR's Underlying FedEx and UPS Contracts Are Integral To Plaintiffs' Shipping Cost Allegations*: The underlying contracts with FedEx and UPS, which are attached as exhibits to RTR's Answer (ECF 106), are integral to the purported factual allegations on which Plaintiffs base this claim.  CAC ¶¶ 10, 91-94 (referring to RTR "contracting" with FedEx, FedEx "doubl[ing]" its rates and RTR "switch[ing] to UPS").  The timing of RTR's contracts with FedEx and UPS and the rates they charged are facts which are necessarily based on the contracts.  RTR executed: (i) a contract with UPS in July 2019 (Ex.[4] A), (ii) a contract with FedEx in August 2020 (and an amendment to certain terms of the same in April 2021), as to which FedEx sent a termination notice on July 19, 2021 (Exs. B, C and F), (iii) a contract with UPS in May 2021 with amendments in June 2021, July 2021, and August 2021 (Exs. D, E, G, and J), and (iv) contracts with FedEx in August 2021 (Exs. H and I).  *See* Answer ¶¶ 10, 91-94.

*The Agreements, Termination Notice and Undisputed Facts Show That Plaintiffs Have Not Pleaded A Plausible Claim*:  The agreements show that FedEx did not "double" its rates for RTR "just before the IPO."  The FedEx agreements ███████████████████████████████ ████████████████████████████████████████████████████████████ ███████████████████████  *See* Ex. B at 4-7, 13, 14-15, 17; Ex. H at 3-6; Ex. I at 3-5[5]; *see also* Exs. 4 and 5 (published FedEx base rates for 2020 and 2021).[6]  Further, RTR ██████████████ ████████████████████████████████████  *See* Ex. B at 7-8 and 18-19; Ex. H at 6-7; Ex. I at 6-8. It is plain that the ████████████████ were ***not*** slashed in half (*i.e.*, such that rates doubled) in the

---

[4] "Ex." references to lettered exhibits A-F refer to the exhibits to the RTR Defendants' Answer, ECF Nos. 107-1 to 107-10, and numbered exhibits 1-5 refer to the exhibits to this Letter.

[5] As information made publicly available by FedEx, these documents are appropriate for judicial notice.  *See, e.g.*, *Doron Precision Sys., Inc. v. FAAC, Inc.*, 423 F. Supp. 2d 173, 179 n.8 (S.D.N.Y. 2006) ("a court may take judicial notice of information publicly announced on a party's website, as long as the website's authenticity is not in dispute and 'it is capable of accurate and ready determination.'").

[6] *Available at* https://www.fedex.com/content/dam/fedex/us-united-states/services/FedEx_Standard_List_Rates_2020.xlsx and https://www.fedex.com/content/dam/fedex/us-united-states/services/FedEx_Standard_List_Rates_2021.xlsx.

**FRESHFIELDS**

FedEx 2021 Agreements.[7]  *See* Ex. 2.  Indeed, as a few examples show, the 2021 rates yielded ██ ████████████████ not 100% increases across the board.  *See* Ex. 3.

The agreements and notice also show that RTR entered into a new contract with UPS *prior* to FedEx's notice that it would terminate the 2020 Agreement and its pricing, and accordingly RTR was not "forced to switch back" to UPS after "FedEx doubled its shipping rates for the Company."  *See* Exs.  B, D, F; CAC ¶¶ 129, 131.  This chronology, and the fact that UPS's  rates ███████████████████████████████████████████, also undercut any inference that UPS used the FedEx increases to drive a harder bargain (ECF 77 at 36).  As for the UPS rates, Plaintiffs allege no facts, just the vague conclusory contention that they were "prohibitively expensive."  CAC ¶¶ 129, 131.  The UPS agreement provides ███████████ ████████████████ (*see* Exs. D, J), and the resulting rates demonstrably were not so expensive that they "prohibit[ed]" RTR from conducting business.  Further, the agreements, including their discounts, could be ██████████████████████████████████████ ████████████████████.  Ex. F; Ex. D at 2.  Finally, prior to the IPO, RTR undisputedly was diversifying its carrier network beyond FedEx and UPS and expanding its network of drop-off options for customer returns.  CAC ¶¶ 91, 95; Answer ¶¶ 91, 95.

Based on the pleadings and other documents which the Court must consider on a Rule 12(c) motion, Plaintiffs have failed to plead a plausible claim that the shipping cost statements were false or misleading.  It is clear that the allegation of a "failure to disclose the doubling in FedEx's shipping prices, which then precipitated a switch back to UPS"—on which the Court relied in holding that a plausible claim was pleaded (ECF 77 at 34-35)—has no factual basis.  Indeed, the FedEx and UPS documents and undisputed facts demonstrate that the sole remaining challenged statements were not misleading.  At the time of the IPO, it was true that if RTR was "not able to negotiate acceptable pricing and other terms with [several third-party national and regional shipping vendors] . . . [RTR's] operating results and customers' experience could be negatively impacted" and "[i]ncreases in shipping costs or other significant shipping difficulties . . . could damage [RTR's] reputation and brand and may substantially harm [RTR's] business."  CAC ¶ 130.  RTR had been able, however, to enter into vendor shipping agreements and was "in the process of transitioning" from one vendor "to multiple other vendors."  CAC ¶ 128.  Given (i) the diverse rates applicable to different categories in the new UPS and FedEx Agreements, which became effective ████████████████, (ii) the fact that those rates ██████████████████████████ and (iii) RTR's diversification to multiple additional vendors and more ways for customers to return clothing, RTR could not "predict how this transition may impact [RTR's] costs and [RTR's] customer sentiment and satisfaction" (*id.*).  RTR accurately warned it "anticipate[d] shipping cost headwinds."  ECF 70 at 8.  When the Q321 (Aug.-Oct.) results, including fulfillment expenses, were finalized, they were disclosed (CAC ¶ 140).

Accordingly, the CAC should be dismissed.  *See, e.g.*, *Pizza on 23rd Corp. v. Liberty Mut. Ins. Co.*, 723 F. Supp. 3d 307, 309 n.2 (S.D.N.Y. 2024) (granting defendant's 12(c) motion where the insurance policy incorporated by reference into the complaint contradicted allegations).  The RTR Defendants respectfully request that the Court schedule a pre-motion conference or allow the parties to submit a proposed briefing schedule for the RTR Defendants' 12(c) motion.

---

[7] Nor did the underlying FedEx standard rates double from 2020 to 2021, as is also easily ascertainable from the face of those public documents.  *See* Exs. 4 and 5.

**FRESHFIELDS**

4|4

Respectfully submitted,

/s/ *Mary Eaton*

Mary Eaton

*Counsel for RTR Defendants*

cc:  All Counsel of Record (via ECF and Email)